# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

Case No.: 21-cv-20862-BLOOM/Otazo-Reyes _____

MILLENNIUM FUNDING, INC., a Nevada corporation,
HUNTER KILLER PRODUCTIONS, INC., a Nevada corporation,
VOLTAGE HOLDINGS, LLC, a Nevada limited liability company,
EVE NEVADA, LLC, a Nevada limited liability company,
BODYGUARD PRODUCTIONS, INC., a Nevada corporation,
KILLING LINK DISTRIBUTION, LLC, a California limited liability company,
LHF PRODUCTIONS, INC., a Nevada corporation,
RAMBO V PRODUCTIONS, INC., a Nevada corporation,
WONDER ONE, LLC, a Wyoming limited liability company
DEFINITION DELAWARE, LLC, a Delaware limited liability company,
MILLENNIUM IP, INC., a Nevada corporation,
NIKOLA PRODUCTIONS, INC., a Nevada corporation,
OUTPOST PRODUCTIONS, INC., a Nevada corporation,
211 PRODUCTIONS, INC., a Nevada corporation,
DAY OF THE DEAD PRODUCTIONS, INC., a Nevada corporation,
VENICE PI, LLC, a California limited liability company,
I AM WRATH PRODUCTIONS, INC., a California corporation,
BADHOUSE STUDIOS, LLC, a Wyoming limited liability company,
YAR PRODUCTIONS, INC., a New York corporation,
AMBI DISTRIBUTION CORP., a Delaware corporation,
AFTER PRODUCTIONS, LLC, a Delaware limited liability company,
AFTER II MOVIE, LLC, a Nevada limited liability company,
MORGAN CREEK PRODUCTIONS, INC., a Maryland corporation,
BEDEVILED LLC, a California limited liability company,
MILLENNIUM MEDIA, INC., a Nevada corporation,
COLOSSAL MOVIE PRODUCTIONS, LLC, a California limited liability company,
FSMQ FILM, LLC, a California limited liability company,
FW PRODUCTIONS, LLC, a California limited liability company,
LF2 PRODUCTIONS, INC., a Nevada corporation,
RUPTURE CAL, INC., a California limited liability company,
MON, LLC, a California limited liability company,
SF FILM, LLC, a New York limited liability company,
SPEED KILLS PRODUCTIONS, INC., a Wyoming corporation,
MILLENNIUM SPVH, INC., a Nevada corporation,
HANNIBAL CLASSICS INC., a California corporation,
JUSTICE EVERYWHERE PRODUCTIONS LLC, a Georgia limited liability company,
STATE OF THE UNION DISTRIBUTION AND COLLECTIONS, LLC, a California limited
liability company,
PARADOX STUDIOS, LLC, a Delaware limited liability company,
DALLAS BUYERS CLUB, LLC, a Texas limited liability company,
SCREEN MEDIA VENTURES, LLC, a Delaware limited liability company, and
42 VENTURES, LLC, a Hawaii limited liability company,

20-023DBa

Plaintiffs,

vs.

1701 MANAGEMENT LLC d/b/a LIQUIDVPN, a Puerto Rico limited liability company,
AUH2O LLC, a Nevis limited liability company,
WASTE PROFESSIONALS LLC d/b/a TALISMARK, a Florida limited liability company,
QUADRANET INC., a California Corporation,
QUADRANET ENTERPRISES LLC, a Delaware limited liability company,
CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS, individually and as co-trustee of
120@53 Trust,
MARCI BABIONE, co-trustee of 120@53 Trust,
MICHAEL GAMACHE a/k/a JAMIE CASTRO, individually, and
DOES 1-100,

Defendants.

_____

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs MILLENNIUM FUNDING, INC., HUNTER KILLER PRODUCTIONS, INC.,

VOLTAGE HOLDINGS, LLC, 211 PRODUCTIONS, INC., AMBI DISTRIBUTION CORP.,

AFTER PRODUCTIONS, LLC, AFTER II MOVIE, LLC, MORGAN CREEK PRODUCTIONS,

INC., MILLENNIUM FUNDING, INC., EVE NEVADA, LLC, BEDEVILED LLC,

MILLENNIUM MEDIA, INC., COLOSSAL MOVIE PRODUCTIONS, LLC, DAY OF DEAD

PRODUCTIONS, INC., YAR PRODUCTIONS, INC., FSMQ FILM, LLC, FW PRODUCTIONS,

LLC, MILLENNIUM IP, INC., I AM WRATH PRODUCTION, INC., KILLING LINK

DISTRIBUTION, LLC, BADHOUSE STUDIOS, LLC, LF2 PRODUCTIONS, INC., LHF

PRODUCTIONS, INC., VENICE PI, LLC, RAMBO V PRODUCTIONS, INC., RUPTURE CAL,

INC., MON, LLC, SF FILM, LLC, SPEED KILLS PRODUCTIONS, INC., MILLENNIUM IP,

INC., NIKOLA PRODUCTIONS, INC., WONDER ONE, LLC, BODYGUARD

PRODUCTIONS, INC., MILLENNIUM SPVH, INC., OUTPOST PRODUCTIONS, INC.,

DEFINITION DELAWARE LLC, HANNIBAL CLASSICS INC., JUSTICE EVERYWHERE

PRODUCTIONS LLC, STATE OF THE UNION DISTRIBUTION AND COLLECTIONS, LLC,

2

20-023DBa

PARADOX STUDIOS, LLC, DALLAS BUYERS CLUB, LLC and SCREEN MEDIA VENTURES, LLC ("Copyright Plaintiffs"), and 42 VENTURES, LLC ("42"), by and through their counsel, bring this First Amended Complaint against 1701 MANAGEMENT LLC d/b/a LIQUIDVPN, AUH2O LLC, WASTE PROFESSIONALS LLC d/b/a TALISMARK, QUADRANET INC., QUADRANET ENTERPRISE LLC, CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS, MARCI BABIONE, MICHAEL GAMACHE a/k/a JAMIE CASTRO and DOES 1-100 ("Defendants") and allege as follows:

## I.     INTRODUCTORY STATEMENT

1.      Plaintiffs bring this action to stop the massive piracy of their motion pictures and registered trademark brought on by the data center QuadraNet and its subscribers such as LiquidVPN.  LiquidVPN provides a Virtual Private Network ("VPN") service under the brand name "Popcorn Time VPN", and blatantly promotes it for the purpose of committing and concealing movie piracy.  LiquidVPN's customers use the so-called Popcorn Time VPN exactly as encouraged – to pirate copyright protected content.  QuadraNet continues to supply the essential Internet services to LiquidVPN and other subscribers while willfully ignoring the *hundreds of thousands of notices of infringement* sent to it by copyright owners including the Copyright Plaintiffs.  The quantity of these notices provides overwhelming evidence to QuadraNet that its subscribers such as LiquidVPN are using the services for massive piracy yet QuadraNet steadfastly refuses to take any meaningful action against LiquidVPN or any of its other subscribers.

2.      An individual that pirates copyright protected content in the United States from her home Internet service via peer-to-peer (P2P) networks such as the BitTorrent Protocol puts herself in great legal peril because her Internet Protocol ("IP") address is publicly exposed.  A copyright owner can obtain her subscriber identification from the service provider that provided her with the

3

IP address and seek statutory damages for copyright infringement that can be as high as $150,000. This risk is known among prolific pirates and feared.

3. After decades of a successful career in the waste disposal industry, Charles Muszynski ("Muszynski") recognized an opportunity to profit from this widespread fear – and hide money from his ex-wife – and purchased LiquidVPN, not coincidentally shortly before a Florida appellate court affirmed a trial court's million dollar plus alimony and equitable distribution order against him. *See Muszynski v. Muszynski*, 277 So. 3d 110 (Fla. 5th DCA 2019).

4. Muszynski, his various alter egos and his high school buddy Michael Gamache ("Gamache") promote LiquidVPN as "Popcorn Time VPN", an essential tool to use the notorious piracy application Popcorn Time to pirate movies "without the risk of getting caught". Not surprisingly, Muszynski and Gamache use fake aliases such as "Jamie Castro", "Frederick Douglas" and the name and likeliness of the prior owner without his permission to eliminate their own "risk of getting caught".

## II.     NATURE OF THE ACTION

5. Copyright Plaintiffs brings this action under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act") and allege that Defendants 1701 MANAGEMENT LLC, AUH2O LLC, WASTE PROFESSIONALS LLC d/b/a TALISMARK, CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS, MICHAEL GAMACHE a/k/a JAMIE CASTRO and DOES 1-100 are liable for direct copyright infringements in violation of 17 U.S.C. §§ 106 and 501 and violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202.

6. Copyright Plaintiffs allege that Defendants 1701 MANAGEMENT LLC, AUH2O LLC, WASTE PROFESSIONALS LLC d/b/a TALISMARK, QUADRANET INC., QUADRANET ENTERPRISES LLC, CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS, MICHAEL

4

JOSEPH GAMACHE a/k/a JAMIE CASTRO and DOES 1-100 are secondarily liable (under material contribution, intentional inducement, and vicarious infringement) for direct copyright infringements.

7.     Copyright Plaintiffs allege that Defendants 1701 MANAGEMENT LLC, AUH2O LLC, WASTE PROFESSIONALS LLC d/b/a TALISMARK, CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS, MICHAEL GAMACHE a/k/a JAMIE CASTRO and DOES 1-100 are secondarily liable (under material contribution, intentional inducement, and vicarious infringement) for DMCA violations.

8.     Copyright Plaintiffs allege that Defendants 1701 MANAGEMENT LLC, AUH2O LLC, QUADRANET INC., QUADRANET ENTERPRISES, LLC, CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS, and MICHAEL GAMACHE a/k/a JAMIE CASTRO are liable for injunctive relief pursuant to 17 U.S.C. §§ 512(j).

9.     Plaintiff 42 brings this action for infringement of a federally registered trademark in violation of Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)) and for unfair competition in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), and alleges that 1701 MANAGEMENT LLC, AUH2O LLC, CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS, and MICHAEL GAMACHE a/k/a JAMIE CASTRO are liable for trademark infringement and false descriptions.

10.    Plaintiffs MILLENNIUM FUNDING, INC., HUNTER KILLER PRODUCTIONS, INC., and VOLTAGE HOLDINGS, LLC allege that 1701 MANAGEMENT LLC, AUH2O LLC, WASTE PROFESSIONALS LLC d/b/a TALISMARK, CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS, and MICHAEL GAMACHE a/k/a JAMIE CASTRO are liable for breach of right of David Cox's right of publicity under Fla. Stat. §540.08 (commercial misappropriation) and

Florida common law, breach of contract with David Cox and unjust enrichment under Florida common law.

### III.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition) and 28 U.S.C. § 1367 (supplemental jurisdiction).

12.    Defendants solicit, transact, or are doing business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; (b) the Defendants reside or resided, and therefore can or could be found, in this District; and/or (c) Defendants are subject to the court's personal jurisdiction with respect to the present action. Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents resides and/or can be found in this District.

### IV.    PARTIES

**A.   The Plaintiffs**

14.    Copyright Plaintiffs are owners of the copyrights for the motion pictures ("Works"), respectively, as shown in Exhibit "1".

15.    Plaintiff MILLENNIUM FUNDING, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

16.    Plaintiff HUNTER KILLER PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

20-023DBa

17.     Plaintiff VOLTAGE HOLDINGS, LLC is a Nevada limited liability company with its principal place of business at 116 N. Robertson Blvd, Suite 200, Los Angeles, CA 90048.

18.     Plaintiff EVE NEVADA, LLC is a Nevada limited liability company with its principal place of business at 116 N. Robertson Blvd, Suite 200, Los Angeles, CA 90048.

19.     Plaintiff BODYGUARD PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

20.     Plaintiff KILLING LINK DISTRIBUTION, LLC is a California limited liability company with its principal place of business at 9190 Olympic Blvd. Suite 400, Beverly Hills, CA 90212.

21.     Plaintiff LHF PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

22.     Plaintiff RAMBO V PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

23.     Plaintiff WONDER ONE, LLC is a Wyoming limited liability company with its principal place of business at 4164 Weslin Ave. Sherman Oaks, CA 91423.

24.     Plaintiff DEFINITION DELAWARE, LLC is a Delaware limited liability company with its principal place of business at 251 Little Falls Drive Wilmington, DE 19808.

25.     Plaintiff MILLENNIUM IP, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

26.     Plaintiff NIKOLA PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

27.     Plaintiff OUTPOST PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

20-023DBa

28.     Plaintiff 211 PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

29.     Plaintiff DAY OF THE DEAD PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

30.     Plaintiff VENICE PI, LLC is a California limited liability company with its principal place of business at 116 N Robertson Blvd Ste #200, Los Angeles, CA 90048.

31.     Plaintiff I AM WRATH PRODUCTIONS, INC. is a California corporation with its principal place of business at 1901 Ave of the Stars Suite 1050, Los Angeles, CA 90067.

32.     Plaintiff BADHOUSE STUDIOS, LLC is a Wyoming limited liability company with its principal place of business at 8265 Sunset Blvd., Suite 107, West Hollywood, CA 90046.

33.     Plaintiff YAR PRODUCTIONS, INC. is a New York corporation with its principal place of business at 9 Acer Ct. Monsey, New York, 10952.

34.     Plaintiff AMBI DISTRIBUTION CORP. is a Delaware corporation with its principal place of business at 3415 S. Sepulveda Blvd., 11th Fl. Los Angeles, California 90034.

35.     Plaintiff AFTER PRODUCTIONS, LLC is a Delaware limited liability company with its principal place of business at 1209 Orange Street Wilmington, DE 19801.

36.     Plaintiff AFTER II MOVIE, LLC, is a Nevada limited liability company with its principal place of business at 500 N. Rainbow Road, Suite 300 A, Las Vegas, NV, 89107.

37.     Plaintiff MORGAN CREEK PRODUCTIONS, INC. is a Maryland corporation with its principal place of business at 32 Loockerman Square, #L-100 Dover, DE 19901.

38.     Plaintiff BEDEVILED LLC is a California limited liability company with its principal place of business at 18823 Belshire Ave Cerritos, CA 90703.

39.     Plaintiff MILLENNIUM MEDIA, INC. is a Nevada corporation with its principal

20-023DBa

place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

40.     Plaintiff COLOSSAL MOVIE PRODUCTIONS, LLC is a California limited liability company with its principal place of business at 127 Broadway, Suite 220, Santa Monica, CA 90401.

41.     Plaintiff FSMQ FILM, LLC is a California limited liability company with its principal place of business at 9107 Wilshire Blvd. Ste 600 Beverly Hills, CA 90210.

42.     Plaintiff FW PRODUCTIONS, LLC is a California limited liability company with its principal place of business at 9454 Wilshire Blvd., Suite M-16 Beverly Hills, CA 90212.

43.     Plaintiff LF2 PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

44.     Plaintiff RUPTURE CAL, INC. is a California limited liability company with its principal place of business at 9454 Wilshire Blvd., Suite M-16 Beverly Hills, CA 90212.

45.     Plaintiff MON, LLC is a California limited liability company with its principal place of business at 215 1/2 Arnaz Drive Beverly Hills, CA 90211.

46.     Plaintiff SF FILM, LLC is a New York limited liability company with its principal place of business at 90 State Street Ste 700, Office 40 Albany, New York 12207.

47.     Plaintiff SPEED KILLS PRODUCTIONS, INC. is a Wyoming corporation with its principal place of business at 8265 Sunset Blvd., Suite 107 West Hollywood, CA 90046.

48.     Plaintiff MILLENNIUM SPVH, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

49.     Plaintiff HANNIBAL CLASSICS INC. is a California corporation with its principal place of business at 8033 Sunset Blvd Suite 1066 West Hollywood, CA 90046.

50.     Plaintiff JUSTICE EVERYWHERE PRODUCTIONS LLC is a Georgia limited

20-023DBa

liability company with its principal place of business at 1901 Ave of the Stars, Suite 1050, Los Angeles, CA, 90067.

51.     Plaintiff STATE OF THE UNION DISTRIBUTION AND COLLECTIONS, LLC is a California limited liability company with its principal place of business at 800 W. 6th Street, Suite 380, Los Angeles, CA 90017.

52.     Plaintiff PARADOX STUDIOS, LLC is a Delaware limited liability company with its principal place of business at 919 North Market Street, Suite 950 Wilmington, DE 19801.

53.     Plaintiff DALLAS BUYERS CLUB, LLC is a Texas limited liability company with its principal place of business at 7 Switchbud Pl, Ste 192, The Woodlands, TX 77380.

54.     Plaintiff SCREEN MEDIA VENTURES, LLC is a Delaware limited liability company with its principal place of business at 800 Third Ave., 3rd Floor, New York, NY 10022.

55.     Copyright Plaintiffs are producers of popular motion pictures currently available for sale in online and brick and mortar retail stores. Many of these critically acclaimed motion pictures were released in theaters throughout the world and feature A-list actors such as Matthew McConaughey, Samuel Jackson, Ryan Reynolds, Sylvester Stallone, Nicholas Cage, Angela Basset, Gerard Butler, Gary Oldman, Common, Linda Cardellini, Milla Jovovich, Pierce Brosnan, Dylan McDermott, Woody Harrelson, James Marsden and Rob Reiner, among others.

56.     Copyright Plaintiffs invested significant financial resources, time and effort in making and marketing these motion pictures based upon the expectation that they would have an opportunity to get a return on their investment from rentals and sales. Massive piracy of these motion pictures on the Internet via P2P networks by service provider subscribers of data centers such as QuadraNet that operate LiquidVPN and the willful failure of the service providers and data centers to deal with this issue despite clear notice of it have hindered this opportunity.

20-023DBa

57.     Plaintiff 42 is a limited liability company organized under the laws of Hawaii and having its principal place of business at 75-5915 Walua Rd, Kailua Kona, Hawaii 96740.

58.     Plaintiff 42 distributes and streams licensed content to the public from a plurality of means including, but not limited to, websites.  For example, 42 streams in depth humorous movie reviews called "Reel Reviews" and debates concerning motion pictures and pop culture called "Nerd Wars" from the website http://popcorntime4u.com/ under the mark "Popcorn Time" through an agreement with Andy Signore, the creator of the popular YouTube channel Popcorned Planet (since 2009) and former executive producer of the Emmy nominated series Honest Trailers (nominated in 2016 and 2017).

**B.  The Defendants**

59.     1701 Management, LLC ("1701") is a limited liability company organized under the laws of Puerto Rico and having a principal place of operations in San Juan, Puerto Rico.

60.     AUH2O LLC ("AUH2O") is a limited liability company organized under the laws of Nevis and having an unknown principal place of operations.  As discussed more fully below, AUH2O is a mere shelf company used by Defendant Muszynski as one of his alter egos.

61.     Waste Professionals LLC d/b/a TALISMARK ("TALISMARK") is a limited liability company organized under the laws of Florida and having a principal place of operations in, upon information and belief, Lake Mary, Florida.  As discussed more fully below, TALISMARK, is a mere shelf company used by Defendant Muszynski as one of his alter egos.

62.     QuadraNet, Inc. is a corporation organized under the laws of California and having a principal place of operations in, upon information and belief, Tarzana, California.

63.     QuadraNet Enterprises, LLC is a limited liability company organized under the laws of Delaware and having a principal place of operations in, upon information and belief,

Tarzana, California.

64.     QuadraNet, Inc. and QuadraNet Enterprises, LLC are mere alter egos.

65.     QuadraNet, Inc. and QuadraNet Enterprises, LLC have the same address of principal place of operations.  *See* Affidavit of Joshua J. Lee at ¶22.

66.     QuadraNet, Inc. and QuadraNet Enterprises, LLC have the same CEO.  *See* Id. at ¶23.

67.     QuadraNet, Inc. and QuadraNet Enterprises, LLC have some of if not all of the same directors.  *See* Id. at ¶24.

68.     QuadraNet, Inc. and QuadraNet Enterprises, LLC share IP addresses received from ARIN. QuadraNet, Inc. and QuadraNet Enterprises will be referred to below collectively as "QuadraNet".

69.     QuadraNet operates a facility in Miami, Florida for providing a data center, dedicated servers and colocation services.

70.     MICHAEL GAMACHE a/k/a JAMIE CASTRO ("Gamache") is an adult individual residing in, upon information and belief, Winter Park, Florida (Orange County).   Upon information and belief, Gamache's alias JAMIE CASTRO is the name of his pet dog.

71.     CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS ("Muszynski") is an adult individual residing in, upon information and belief, Livingston, Texas.  Muszynski has indicated in his Texas driver license that his residential address is in Livingston, Texas since 2019.

72.     Upon information and belief, Muszynski, a Caucasian male of Polish origin, uses the alias of the famous African American abolitionist FREDERICK DOUGLAS because he considers himself a "slave" for being ordered by a Florida state Court to pay alimony to his ex-wife and having to pay taxes to the United States government despite grossing hundreds of millions of dollars in the United States.

73.     Muszynski resided in Winter Park, Florida (Orange County) until 2019.   Upon information and belief, Muszynski changed his residence to Texas to take advantage of what he considered more favorable laws against excessive alimony.   For example, Muszynski wrote in the forum of his website Legal Shame under his alias Frederick Douglas, "That "giant sucking sound" you hear is people pulling up stakes and moving to the Republic of Texas - where alimony is capped at 5 years and $5K/month. EVEN AFTER the "agreement" is done in another bolshevik state…" on Nov. 16, 2019.

74.     Upon information and belief, Muszynski spends significant time in Daytona Beach, Florida (Volusia County).  Muszynski uses his Credit Card to pay for services for his website domains from IP addresses such as 142.196.19.132 that geolocate to Daytona Beach, Florida.

75.     Upon information and belief, Muszynski is the owner and sole member of 1701 and AUH2O.

76.     In the certificate of 1701, the email address of the resident agent is CMUSZYNSKI @TALISMARK.COM.

77.     At least through January 2020, Muszynski was the chief executive officer of TALISMARK.

78.     Muszynski and non-party Marshall Staiman closely hold TALISMARK.

79.     Upon information and belief, Muszynski controls TALISMARK by owning and/or controlling fifty percent or more of the voting rights.

80.     Muszynski and Marshall Staiman have completely disregarded corporate formalities of TALISMARK.

81.     Muszynski and Marshall Staiman created different classes of shares in TALISMARK to dilute voting rights, and then sold ninety percent of their non-voting shares to trusts controlled by them at substantial discounted values to fraudulently avoid their creditors, including Muszynski's ex-wife.

82.     Muszynski and Defendant Marci Babione are co-trustees of the 120@53 Trust, a beneficiary defective irrevocable trust created by Muszynski in October of 2009 in Florida to protect his assets from the government, creditors and other third properties.

83.     Defendant Marci Babione is a long-time family friend of Muszynski and, at least as of 2017, an accountant for TALISMARK.

84.     Upon information and belief, Muszynski is the sole beneficiary of the 120@53 Trust.

85.     A Florida circuit court held Muszynski in contempt and threatened him with incarceration after he fraudulently transferring his company shares to the 120@53 trust in violation of the court's order in an attempt to avoid an alimony judgment. *See Muszynski v. Muszynski*, 2020 Fla. App. LEXIS 1857, 45 Fla. L. Weekly D 365, 2020 WL 739023 (Fla. App. 2020) ("he has transferred his company shares to avoid foreclosure…. illustrates   yet   another—potentially purposeful— violation of the final judgment").

86.     Defendants Muszynski and 1701 have entered into contractual service agreements with SMR Hosting LLC ("SMR") and David Cox ("Cox") in which they agreed to be subject to jurisdiction in Florida.

87.     Defendants QuadraNet, Muszynski, Gamache and 1701 purposefully directed their activities at, and consummated transactions in this District with, for example, each other and non-party ReliableSite.Net LLC, and performed acts by which Defendants QuadraNet, Muszynski, Gamache and 1701 purposefully availed themselves of the privilege of conducting activities in this District, thereby invoking the benefits and protections of its laws.

88.     Defendants Muszynski, Gamache, and 1701 entered into agreements with ReliableSite.Net LLC and QuadraNet for server and/or network services at data centers located in Miami, Florida and thus in this District.  Upon information and belief, the agreement requires

14

Defendants Muszynski, Gamache, and 1701 to indemnify ReliableSite.Net LLC and QuadraNet for claims based upon copyright infringement similar to the claims in this complaint.

89.    QuadraNet has purposefully targeted Miami as a place to conduct business and marketed to the public the benefit of its Miami facility.  QuadraNet states on its website that its "…Miami facility is at the center of the leading hub to most Latin American & Caribbean markets." https://www.quadranet.com/miami-datacenter [last accessed on April 11, 2021].

90.    QuadraNet employs numerous professionals such as electrical engineers to maintain the Miami facility.  QuadraNet states on its website that, "In-house electrical engineers and electricians are on staff to deliver circuits overnight as soon as needed. Controlled access and monitoring with 24/7 manned building security keep your servers safe, so that you never have to worry about unauthorized access to your data."  Id.

91.    Upon information and belief, Defendants Muszynski, Gamache, and 1701 sell or have sold VPN service to individuals residing in Florida and this District under the name LiquidVPN (the "LiquidVPN Service").

92.    AUH2O sells VPN bandwidth of LiquidVPN for digital cryptocurrency on the Orchid distributed VPN network.

93.    Defendants DOES 1-100 entered into subscription agreements with Defendants Muszysnki, Gamache and 1701 for LiquidVPN Service and thus entered into an agreement with a company in this District.  By the nature of the LiquidVPN Service which anonymizes the IP address of the user, Plaintiffs are unable to ascertain the residency of Defendants DOES 1-100.

94.    In the certificate of 1701, the authorized person is indicated as Carmen Marcano.

95.    Upon information and belief, Carmen Marcano is or was a paralegal at the law firm Ferraiuoli LLC.

20-023DBa

96.     Upon information and belief, Muszysnki purposely chose to place Carmen Marcano as the authorized person as an attempt to conceal his involvement with the LiquidVPN Service.

97.     Muszysnki and Gamache effectively make all policy decisions for 1701, specifically including any policy regarding copyright infringement. Upon information and belief, Muszysnki and Gamache directed 1701's response to allegations of copyright infringement occurring on the LiquidVPN Service, including the decisions not to terminate repeat copyright infringers, to ignore notices of copyright infringement and to promote the LiquidVPN Service for the purposes of copyright infringement.

98.     Upon information and belief, Muszynski so dominates 1701, AUH2O and TALISMARK that 1701, AUH2O and TALISMARK have become merely the alter ego to Muszynski.

99.     There is such a unity of interest between Muszynski, AUH2O, TALISMARK and 1701 that the individuality, or separateness, of Muszynski, AUH2O, TALISMARK and 1701 have ceased and the facts are such that an adherence to the fiction of the separate existence of the Muszynski, AUH2O, TALISMARK and 1701 would, under the particular circumstances, sanction a fraud or promote injustice.

100.    Muszynski and Gamache control, participate in, exercise control over, or benefit from the infringement of Defendants 1701 and AUH2O as discussed below.

101.    Muszysnki and his alter egos 1701, TALISMARK and AUH2O together with Gamache have operated the LiquidVPN service under the name LiquidVPN from, upon information and belief, March of 2019.

102.    The 120@53 Trust is an alter ego of Muszysnki.

103.    A Court of competent jurisdiction found that Muszynski's transfer of

TALISMARK shares to the 120@53 Trust "…was unconscionable", set aside its separate existence and considered it marital property.  Case No. 2013-DR-18828-O, Final Judgment of Dissolution of Marriage, Circuit Court of the Ninth Circuit, Orange County, Fla. (Oct. 4, 2017), Bob Leblanc (Circuit Judge), aff'd per curiam *Muszynski v. Muszynski*, 2019 Fla. App. LEXIS 9913 (June 25, 2019).

104.    The same Court held Muszynski in contempt and threatened him with incarceration for failing to comply with Court orders.  In a concurrence of the appellate court decision dismissing Muszynski's appeal of the contempt order, appellate court Judge Traver stated, "There is no dispute that in the three-plus years since the trial court pronounced judgment, Former Husband [Muszynski] has failed to make a single equitable distribution payment. He has also failed to secure his payment obligations. This required Former Wife to file more motions for contempt." *See Muszynski v. Muszynski*, 2020 Fla. App. LEXIS 1857, 45 Fla. L. Weekly D 365, 2020 WL 739023 (Fla. App. 2020).

105.    From July of 2018 through February of 2019 ("negotiation period"), Muszynski and his alter ego TALISMARK negotiated with Cox and SMR on the terms of purchasing the assets of LiquidVPN.

106.    During this negotiation period, Muszynski held himself out as an authorized agent of TALISMARK.

107.    At least through February 14, 2019, Muszynski was the manager and authorized agent of TALISMARK per DOCUMENT# L09000110917 filed with the Secretary of State of Florida.

108.    During this negotiation period, Muszynski used TALISMARK resources to evaluate a proper purchase price of the assets of LiquidVPN.

109.    Muszynski emailed non-party David Cox from an email address using the official

17

domains of TALISMARK such as "wasteprofessional.com" and signed his emails as "Charles Muszynksi Chief Executive Officer", "Talismark, North America's leading waste utility outsourcing company, is recognized by Inc. Magazine as one of the nation's fastest-growing companies", and with the address "1000 Primera Boulevard Lake Mary, FL 32746", which is the address of TALISMARK.

110.    Muszynski directed at least one other corporate officer of TALISMARK besides himself to evaluate a proper price for purchasing the assets of LiquidVPN.

111.    In one email from Muszynski dated August 16, 2018 sent from the email address cmuszynski@wasteprofessionals.com, Muszynski told Cox that "Mike [GAMACHE] and I have a meeting set today with our CFO to determine a valuation prior to an offer".

112.    On October 9, 2018, Muszynski, 1701, Cox and LiquidVPN, Inc. entered into a Letter of Intent ("LOI") for the Acquisition of assets of LiquidVPN.

113.    Although Muszysnki used the name of his alter ego 1701 to enter into the LOI, he entering into the agreement as an agent of TALISMARK and on behalf of TALISMARK.

114.    In   an   email   dated   Nov.   30,   2018   from   the   email   address cmuszynski@wasteprofessionals.com, Muszynski instructed Cox to come to Orlando, Florida on Dec. 15, 2018 to meet in person and discuss the terms of the asset purchase agreement.

115.    In   an   email   dated   Dec.   23,   2018   from   the   email   address cmuszynski@wasteprofessionals.com, Muszynski describes each of 1701 and AUH2O as his mere "different shelf company into which the assets are placed". This email included the signature Chief Executive Officer, Talismark.

116.    On February 12, 2019, Muszynski sent an email to Cox that included the final draft of the asset purchase agreement from email address cmuszynski@wasteprofessionals.com and including the signature Chief Executive Officer, Talismark.

117.     In February of 2019, Muszynski and his alter ego 1701 entered into an asset purchase agreement with Cox and SMR to purchase the assets of LiquidVPN.   Muszynski, Gamache, TALISMARK, AUH2O and 1701 will be collectively referred to as "LiquidVPN Defendants".

118.     Although Muszysnki used the name of his alter ego 1701 to enter into the asset purchase agreement, he was entering into the agreement as an agent of TALISMARK and on behalf of TALISMARK.

119.     Muszysnki mislead Cox and SMR into believing that they were effectively entering into the asset purchase agreement with TALISMARK and that Muszynski was just using one of his shelf companies to enter into the purchase as one of Muszynski's tactics to limit tax liability and avoid paying alimony he was owed his ex-wife.

120.     In the certificate of 1701, the email address of the resident agent is CMUSZYNSKI @TALISMARK.COM.

121.     Gamache, Muszysnki and his alter egos 1701, TALISMARK and AUH2O (the "LiquidVPN Defendants") primarily operate the LiquidVPN Service from October 9, 2018 to the present.

122.     The LiquidVPN Defendants' LiquidVPN Service is for transmitting, routing and/or or providing connections for said transmitting and routing, through a network controlled by the LiquidVPN Defendants ("providing network connections").

123.     A VPN is a type of Internet Service that provides access to the Internet.  A conventional ISP will assign its subscriber an IP address and log the subscriber's activities on the Internet while using the assigned IP address.  In comparison, many VPN providers provide their subscribers "anonymous" usage by, for example, not logging subscriber access, assigning the subscriber IP addresses that are simultaneously shared among many users, and/or encrypting traffic.

124.     The LiquidVPN Defendants advertise their LiquidVPN Service as providing

20-023DBa

"Anonymous IP Addresses to Protect … Online Privacy", being used to "Hide Your IP address"

and further state that LiquidVPN has "…over two thousand public IP addresses. Imagine getting

access to a new IP anytime you use the VPN for Kodi and BitTorrent."   Affidavit of Joshua J. Lee

at ¶8.

     125.



126.    The LiquidVPN Defendants advertise the LiquidVPN Service as providing three

different types of VPN connections:  1) dynamically assigned public IP address in which a public

IP address is randomly assigned; 2) a shared VPN tunnel in which encrypted VPN traffic is

protected behind a firewall; and 3) Modulating VPN tunnel in which the subscriber's public IP

address from which traffic exits is changed on new events that create new connections.  *See*

https://www.liquidvpn.com/supported-vpn-tunnel/ [last accessed on Feb. 23, 2021].

127.    The LiquidVPN Defendants recommend the dynamically assigned public IP

address for peer-2-peer (P2P) downloading.

128.    DOES 1-100 are subscribers of the LiquidVPN Service.  Each of DOES 1-100 were

assigned an IP address from the LiquidVPN Service and used said IP address to download and reproduce Plaintiffs' Works without a license and further share (distribute) copies of Plaintiffs' Works from said IP address to individuals across the world as encouraged and instructed to by the LiquidVPN Defendants.

129.    Gamache and each of Defendants DOES 1-100 used a piracy website such as Pirate Bay either directly or via a BitTorrent Client such as Popcorn Time to obtain torrent files for downloading and distributing Plaintiffs' Works using an IP address provide by the LiquidVPN Defendants

130.    Gamache and Defendants DOES 1-100 are members of a group of BitTorrent users or peers whose computers are collectively interconnected for the sharing of a particular unique file, otherwise known as a "swarm".  The particular file a BitTorrent swarm is associated with has a unique "hash" number and a file name.

131.    Plaintiffs are informed and belief that the LiquidVPN Defendants are in possession of identification information or information that will lead to the identities of DOES 1-100 such as payment information.  However, further discovery may be necessary in some circumstances in order to be certain of the identity of the proper Defendant.  Plaintiff believes that information obtained in discovery will lead to the identification of each Defendants DOES 1-100's true name and permit the Plaintiffs to amend this Complaint to state the same.  Plaintiffs further believe that the information obtained in discovery may lead to the identification of additional infringing parties to be added to this Complaint as defendants.  Plaintiffs will amend this Complaint to include the proper names and capacities when they have been determined.  Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named Defendants participated in and are responsible for the acts described in this Complaint and damages resulting therefrom.

### C.  Non-parties

132.    Cox is an adult individual residing in, upon information and belief, Livonia, Michigan (Wayne County).

133.    SMR is a limited liability company organized under the laws of Michigan with its principal place of operations in, upon information and belief, Canton, Michigan (Wayne County).

134.    Upon information and belief, SMR has been in existence since 2013.

135.    LiquidVPN, Inc. is a corporation organized under the laws of Wyoming that was dissolved in 2018.

136.    Cox was the sole shareholder in LiquidVPN, Inc.

137.    The American Registry of Internet Numbers ("ARIN") is a nonprofit, member-based organization that manages and distributes Internet number resources such as IP addresses and Autonomous System Numbers (ASNs).

138.    ARIN manages these resources within its service region, which is comprised of Canada, the United States, and many Caribbean and North Atlantic islands.

139.    Choopa LLC ("Choopa") is a provider of data centers, dedicated servers and colocation service at a facility in Miami, Florida, among other places.  Choopa receives IP addresses from ARIN.

140.    ReliableSite.Net LLC ("Reliable") is a provider of data centers and dedicated servers. Reliable obtains at least some services including IP addresses from Choopa at the facility in Miami, Florida.  Reliable reassigned IP addresses in this facility to the LiquidVPN Defendants.

141.    Orchid Labs, Inc. is a provider of Orchid Network which is an open source software application suite that facilitates communication between users and providers of bandwidth in a distributed VPN.

## V.    JOINDER

142.    Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs are properly joined

because, as set forth in detail above and below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely (i) the use of the LiquidVPN Service by Gamache and the LiquidVPN Defendants' subscribers (Defendants DOES 1-100) for infringing the copyrights in Plaintiffs' Works, (ii) the contribution to said copyright infringements by QuadraNet and the LiquidVPN Defendants, (iii) the promotion of the VPN service by the LiquidVPN Defendants as "Popcorn Time VPN" for the purpose of infringing copyright protected Works including Plaintiffs' in violation of 42's registered trademark, and (iv) the failure of the LiquidVPN Defendants to comply with the obligations of the agreements they made with Cox and SMR concerning LiquidVPN; and (b) that there are common questions of law and fact.

143.    Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants was properly joined because, as set forth in more detail below, the Plaintiffs assert that the infringements complained of herein by each of the Defendants (a) arises out of the same transaction, occurrence, or series of transactions or occurrences, and (b) there are common questions of law and fact.  That is, (i) each of Gamache and Defendants DOES 1-100 used the LiquidVPN Service provided and promoted by the LiquidVPN Defendants to infringe Plaintiffs' copyrights in their Works, and (ii) QuadraNet provided the IP addresses, servers and/or colocation services used by the LiquidVPN Defendants to promote and facilitate widespread infringement.

144.    Plaintiffs assert a right of relief against the LiquidVPN Defendants jointly and severally.

## VI.    FACTUAL BACKGROUND

### A. The Plaintiffs Own the Copyrights to the Works and a Registered Trademark

145.    The Copyright Plaintiffs are the owners of the copyright in the Works, respectively. The Works are the subjects of copyright registrations, and this action is brought pursuant to 17

U.S.C. § 411.  *See* Exhibit "1".

146.    Each of the Works are motion pictures currently offered for sale in commerce.

147.    Defendants had notice of the Copyright Plaintiffs' rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

148.    Defendants also had notice of the Copyright Plaintiffs' rights through general publication and advertising associated with the motion pictures, and packaging and copies, each of which bore a proper copyright notice.

149.    Plaintiff 42 is the owner of a federal trademark registration, Reg. No. 5,963,253, which issued on Jan. 14, 2020 on the principal register of the United States Patent and Trademark Office. This registration for the standard character mark Popcorn Time covers CLASS 9: Downloadable computer software for downloading and streaming multimedia content images, videos and audio. A true copy of this registration is attached as Exhibit "2". The registration is valid and subsisting and has never been cancelled.

150.    Plaintiff 42 is also owner of the trademark registrations for Popcorn Time in Iceland and Russia.

151.    Plaintiff 42 distributes and streams content under the Popcorn Time mark throughout the US on one or more websites.

152.    Plaintiff 42 has invested substantial time, effort and financial resources promoting its Popcorn Time trademark in connection with the marketing and sale of its software in interstate commerce.

153.    Plaintiff 42's Popcorn Time trademark is inherently distinctive as applied to 42's software and website that bear the mark.

**B. Gamache and Defendants DOES 1-100 Used BitTorrent to Infringe the Plaintiffs'**

*Copyrights*

154.     BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

155.     The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

*1. Each of Defendants Gamache and DOES 1-100 installed a BitTorrent Client onto his or her Computer.*

156.     A BitTorrent Client is a software program that implements the BitTorrent Protocol. There are numerous such software programs which can be directly downloaded from the Internet.

157.     Once installed on a computer, the BitTorrent Client serves as the user's interface during the process of uploading and downloading data using the BitTorrent protocol.

158.     Defendants Gamache and DOES 1-100 installed a BitTorrent Client such as "Popcorn Time" as promoted by the LiquidVPN Defendants onto their respective computers.

159.     The Popcorn Time promoted by the LiquidVPN Defendants has been referred to in the news media as "Netflix for pirates". http://fortune.com/2016/02/26/popcorn-time-netflix-pirates/ [accessed on March 1, 2021].

160.     The United States Trade Representative ("USTR") placed the Popcorn Time promoted by the LiquidVPN Defendants on a list of examples of Notorious Markets engaged in and facilitating substantial piracy. *See* USTR, 2020 Review of Notorious Markets, Jan. 14, 2021,

pg.                  26,                  Available                  at
https://ustr.gov/sites/default/files/files/Press/Releases/2020%20Review%20of%20Notorious%20
Markets%20for%20Counterfeiting%20and%20Piracy%20(final).pdf [last accessed on March 5, 2021].

161.    Popcorn Time provides an interface so that users can easily copy and share copies of copyright protected content, including Plaintiffs'.

162.    The home interface of Popcorn Time includes a collection of title art of popular motion pictures and a search bar where a user can enter words associated with a copyright protected motion picture they wish to copy.

163.    Simply entering words associated with a motion picture automatically generates a pull down tab below the search bar with a narrowed selection of motion pictures associated with the words.

### 2. The Initial Seed, Torrent, Hash and Tracker

164.    A BitTorrent user that wants to upload a new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using the Client he or she installed onto his or her computer.

165.    The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

166.    The initial seeder often modifies the file title of the Work to include a wording such as "RARBG", "FGT" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her files and attract users to his or her piracy website.

167.    The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

168.    The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Work, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

169.    When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

170.    Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

171.    The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

172.    The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

173.    Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 3. Torrent Sites

174.    "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol.   There are numerous torrent websites such as The Pirate Bay, Kickass Torrents and Extratorrents that are promoted by the LiquidVPN Defendants.

20-023DBa

175. The Pirate Bay torrent site is so notorious that the USTR placed it on a list of examples of Notorious Markets engaged in and facilitating substantial piracy. *See* USTR, 2018 Out-of-Cycle Review of Notorious Markets, April 2019, pgs. 27-28, Available at:https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [last accessed on February 23, 2021].

176. Upon information and belief, Defendants Gamache and DOES 1-100 went to a torrent site directly or indirectly to upload and download Plaintiffs' copyrighted Works.

177. Upon information and belief, Defendants Gamache and DOES 1-100 went to the torrent site Pirate Bay directly or indirectly to download Plaintiffs' copyrighted Works.

178. By using a BitTorrent Client such as Popcorn Time, Defendants Gamache and DOES 1-100 can simply enter words associated with a motion picture to automatically generate a pull down tab below the search bar with a narrowed selection of motion pictures associated with the words and chose one particular motion picture and automatically connect to torrent sites.

### 4. Uploading and Downloading a Work Through a BitTorrent Swarm

179. Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Works) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

180. The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.

181. Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.

28

182.     In this way, all of the peers and seeders are working together in what is called a "swarm."

183.     Here, Defendants Gamache and DOES 1-100 participated in the same swarm and directly interacted and communicated with other members of that swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions.

184.     In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

185.     Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

### *5. The Plaintiffs' Computer Investigator Identified the Defendants' IP Addresses as Participants in a Swarm That Was Distributing the Plaintiffs' Copyrighted Works*

186.     Choopa reassigned IP address 108.61.128.241 to Reliable.

187.     Reliable reassigned IP address 108.61.128.241 to the LiquidVPN Defendants.

188.     The Plaintiffs retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiffs' copyrighted Works.

189.     MEU used forensic software to enable the scanning of peer-to-peer networks for

20-023DBa

the presence of infringing transactions.

190.     MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

191.     For example, the IP addresses, Unique Hash Number, and hit dates contained on Exhibit "3" accurately reflect what is contained in the evidence logs, and show that Defendants DOES 1-100 have copied a piece of the Plaintiffs' copyrighted Works *Automata*, *Hunter Killer*, *I Feel Pretty* and *Shock and Awe* as identified by the Unique Hash Number from IP address 108.61.128.241.

192.     The Defendants DOES 1-100's computers used the identified IP address to connect to the investigative server from a computer in this District in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

193.     MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses listed on Exhibit "3" and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Work.

194.     MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

***C. Defendants Gamache and DOES 1-100 knew the Copyright Management Information included in the files they distributed to other peers had been removed or altered without the authority of Plaintiffs.***

195.     A legitimate file copy of the Work includes copyright management information ("CMI") indicating the title.

196.   The initial seeders of the infringing file copies of Plaintiffs' Works added wording to the file titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

197.   The initial seeder of the infringing file copies of the Works *Hunter Killer* and *Shock and Awe* added the wording "FGT" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the RARBG website.

198.   The word FGT is not included in the file title of legitimate copies or streams of the Works *Hunter Killer* and *Shock and Awe*.  The initial seeder of the Work altered the title to falsely include the words "FGT" in the CMI.

199.   The initial seeder of the infringing file copies of the Work *I Feel Pretty* added the wording "YTS" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the YTS website.

200.   The word YTS is not included in the file title of legitimate copies or streams of the Voltage's Work *I Feel Pretty*.  The initial seeder of the Work altered the title to falsely include the words "YTS" in the CMI.

201.   The file copies Defendants DOES 1-100 distributed to other peers in the Swarm included the altered CMI in the file title.

202.   Defendants DOES 1-100 knew that the website or BitTorrent Client from which they obtained their torrent files was distributing illegal copies of the Work.

203.   Defendants DOES 1-100 knew that YTS or FGT was not the author of Plaintiffs' Works.

204.   Defendants DOES 1-100 knew that YTS or FGT was not a licensed distributor of Plaintiffs' Works.  Indeed, the YTS website includes a warning to this effect.

20-023DBa

205.    Defendants DOES 1-100 knew that the CMI that included YTS and FGT in the file names was false.

206.    Defendants DOES 1-100 knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Works when they distributed the false CMI, altered CMI or the Work including the false or altered CMI.

207.    Namely, Defendants DOES 1-100 knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Work.

208.    By providing the altered CMI to others, Defendants Gamache and DOES 1-100 induced, enabled and facilitated further infringements of the Work.

***D.   The LiquidVPN Defendants had knowledge that their subscribers were infringing Plaintiffs' Works and distributing file copies of the Works with altered CMI but continued to provide LiquidVPN service to their subscribers***

209.    Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512(c)(3) of the DMCA to be sent to service providers of IP addresses where MEU confirmed infringement of copyright protected content.

210.    Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered CMI, the IP address and port number at where infringement was confirmed and the time of infringement down to the second.  *See* Exhibit "4" (excerpt below).

Protocol: BITTORRENT
Infringed Work: I Feel Pretty
Infringing FileName: I Feel Pretty (2018) [BluRay] [1080p] [YTS.AM] Infringing FileSize: 1895499662
Infringer's IP Address: 108.61.128.241 Infringer's Port: 61561 Initial Infringement Timestamp: 2019-05-17 13:43:08

211.    MEU determines the proper abuse contact email address for the service provider assigned the IP addresses at issue from publicly available information from ARIN.

212.    Plaintiffs' agent sends the Notice to the abuse contact email address.

213.    Plaintiffs identified the IP addresses used by the LiquidVPN Defendants.

214.    Plaintiffs' agent has sent over 5530 Notices to service providers concerning infringements of Plaintiffs' Works at IP addresses controlled by the LiquidVPN Defendants.

215.    Plaintiffs' agent has sent 5451 Notices to QuadraNet concerning infringements of Plaintiffs' Works at IP addresses assigned to QuadraNet from ARIN and reassigned to the LiquidVPN Defendants by QuadraNet.

216.    QuadraNet failed to update the ARIN records to show that these IP addresses were reassigned to LiquidVPN.

217.    For example, Plaintiffs' agent sent over 980 Notices to QuadraNet concerning infringement of the motion picture *Hitman's Bodyguard* at IP addresses assigned to QuadraNet from ARIN and reassigned by QuadraNet to the LiquidVPN Defendants.

218.    Plaintiffs' agent sent Notices to Choopa concerning IP addresses associated with confirmed infringing activity.

219.    Plaintiffs' agent sent over 50 Notices to Choopa concerning IP address 108.61.128.241 between October of 2018 and April of 2019 ("time period").

220.    During this time period, Choopa had allocated IP address 108.61.128.241 to Reliable.

221.    During this time period, Reliable had allocated IP address 108.61.128.241 to the LiquidVPN Defendants.

222.    During this time period, Choopa forwarded Notices sent by Plaintiffs to its customers, including Reliable.

33

223.    During this time period, Reliable forwarded Notices it received from Choopa concerning IP address 108.61.128.241 to the LiquidVPN Defendants.

224.    Upon information and belief, other rightsholders had similar Notices sent to Choopa concerning infringing activity at IP addresses controlled by the LiquidVPN Defendants that the LiquidVPN Defendants indeed received.

225.    The LiquidVPN Defendants continued to provide the LiquidVPN Service to their subscribers despite knowledge that their subscribers were using the service to pirate copyright protected Works including Plaintiffs' exactly as promoted, encouraged and instructed by the LiquidVPN Defendants.

### E. The LiquidVPN Defendants intentionally induce infringements of copyright protected Works, including Plaintiffs' Works.

226.    The LiquidVPN Defendants actively promote their LiquidVPN Service for the purpose of movie piracy, including of infringing Plaintiffs' Works.

227.    The LiquidVPN Defendants' website includes a statement that their VPN service is the "Best VPN for Torrenting and P2P Filesharing today" over the image of the notorious movie piracy website Pirate Bay. *See* https://www.liquidvpn.com/best-vpn-for-torrenting/ [last accessed on Feb. 23, 2021] (excerpt below).



Affidavit of Joshua J. Lee at ¶9.

228.    The LiquidVPN Defendants state their LiquidVPN Service can be used to "Watch Popcorn Time without being detected by your ISP and P2P tracking software".    *See* https://www.liquidvpn.com/popcorn-time-vpn/ [last accessed on Feb. 23, 2021]. (excerpt below).



Affidavit of Joshua J. Lee at ¶10.

229.     The LiquidVPN Defendants further state, "Experience everything Popcorn Time has to offer in the United States and the UK. Except the risks", "Stream Content Anonymously. Why bother risking complaints from your ISP, settlement demands, threats and jail time for streaming your favorite TV show." *See* https://www.liquidvpn.com/popcorn-time-vpn/ [last accessed on Feb. 23, 2021]. (excerpt below).



Affidavit of Joshua J. Lee at ¶11.

230.    The LiquidVPN Defendants include a screenshot of Popcorn Time operating on a mobile device that includes the movie art of Millennium's Work *Survivor* among other copyright protected titles. *See id.*





*Magnified Version showing "Survivor*

Affidavit of Joshua J. Lee at ¶12.

231.    The LiquidVPN Defendants further promote their VPN service as "Popcorn Time VPN".  https://www.liquidvpn.com/popcorn-time-vpn/ [last accessed on April 21, 2021].

Affidavit of Joshua J. Lee at ¶20.

232.    Plaintiffs' investigator confirmed that Popcorn Time can be used to download, reproduce, and distribute copies of the Works "Automata", "Ava", "The Hitman's Bodyguard", "Criminal", "Disturbing the Peace", "Extremely Wicked, Shockingly Vile and Evil", "Hellboy", "I Feel Pretty", "Kill Chain", "London Has Fallen", "Mechanic: Resurrection", "Rambo V: Last Blood", "The 2nd", "Hunter Killer", "Homefront", "Survivor" "Stoic fka Acts of Vengeance", "Tesla", and "The Outpost" exactly as promoted and encouraged by the LiquidVPN Defendants.

233.    The LiquidVPN Defendant's subscribers such as DOES 1-100 use Popcorn Time exactly as explained and encouraged to them by the LiquidVPN Defendants – to infringe copyright protected content while logged into LiquidVPN so they can conceal their illicit activities.

234.    The LiquidVPN Defendants' subscribers use LiquidVPN to "…watch Popcorn Time without being detected by [their] ISP and P2P tracking software [such as Plaintiffs]", to "Experience everything Popcorn Time has to offer in the United States … Except the risks", and "Stream Content Anonymously" while not risking…complaints from your ISP, settlement demands, threats and jail time for streaming your favorite TV show" exactly as encouraged to by the LiquidVPN Defendants.

235.    The LiquidVPN Defendants even blatantly promote their service to be used to stream copyright law in violation of criminal laws and encourage their users to do so.



Affidavit of Joshua J. Lee at ¶13.

236.    The LiquidVPN defendants promote LiquidVPN as a tool to engage in massive copyright infringement to entice subscribers to purchase their LiquidVPN Service.

237.    Based upon the Liquid VPN Defendants' encouragement that the LiquidVPN can be used to "safely" operate piracy apps such as Popcorn Time and visit torrent sites such as Pirate Bay, Kickass Torrents and Extratorrents, subscribes such as Defendants DOES 1-100 purchase LiquidVPN, install piracy apps such as Popcorn Time on their devices and/or visit torrent sites to infringe copyright protected content including Plaintiffs' while using the LiquidVPN Service.

20-023DBa



Affidavit of Joshua J. Lee at ¶14.

238.    In a Frequently Asked Questions section of the LiquidVPN Defendants' website, in response to the question "Can I use BitTorrent and P2P", the LiquidVPN Defendants say affirmatively "Yes" and point out they "…will never censor P2P or BitTorrent…".

> Yes, LiquidVPN fully supports bittorrent and P2P on all of our servers. We will never censor P2P or BitTorrent on any of our servers. In fact, we have pulled out of locations because they did not like our policies on P2P and bit torrent. If you would like to verify LiquidVPN is working by checking your bit torrent IP head over to https://cryptoip.info/check-torrent-ip-address and run a test

Affidavit of Joshua J. Lee at ¶15.

239.    Defendants Gamache and DOES 1-100 installed Popcorn Time on their device so they could watch content in violation of copyright laws (i.e., "free movies").

240.    Defendants Gamache and DOES 1-100 obtained an IP address from the LiquidVPN Defendants via the LiquidVPN Service, and used the IP address to download and share copies of copyright protected content including Plaintiffs by using Popcorn Time as instructed by the

20-023DBa

LiquidVPN Defendants while concealing their identity.

241.    The LiquidVPN Defendants knew or had reason to know that their subscribers used Popcorn Time exactly as promoted by them would result in direct infringement of the Copyrights of specific material including Plaintiffs'.

### F. The LiquidVPN Defendants control the conduct of their subscribers.

242.    The LiquidVPN Defendants can terminate their subscriber accounts at any time.

243.    Upon information and belief, the LiquidVPN Defendants promptly terminated subscriber accounts when said subscribers failed to pay for the LiquidVPN Service.

244.    The LiquidVPN Defendants have the capability to log their subscribers' access to the LiquidVPN Service but purposefully choose not to.

245.    Indeed, the LiquidVPN Defendants make clear that they will log a subscriber's activities if they believe these activities are negatively impacting the performance of their network. In such cases, the LiquidVPN Defendants store: Login/logout Timestamps; Remote IP; Username; and Local IP.

### G. The LiquidVPN Defendants profit from the massive piracy conducted by their subscribers.

246.    The LiquidVPN Defendants encourage their subscribers to use their LiquidVPN Service for piracy.

247.    The LiquidVPN Defendants even market particular products to assist their subscribers in engaging in piracy anonymously.

248.    The LiquidVPN Defendants state that, "If you follow our directions this VPN kill switch will never give your real IP away." *See* https://www.liquidvpn.com/vpn-kill-switches/ [last accessed on Feb. 26, 2021].

249.    The LiquidVPN Defendants pay affiliates operating websites evaluating VPN

services to give them a positive evaluation and recommend their service for piracy.

250.    For example, on the BESTVPN website https://bestvpn.org/liquidvpn-review/, the author gave the LiquidVPN Service a review of 3.5/5 stars.

251.    In the review, the author stated that "With the Liquid Lock enabled, torrenting is protected from an occasional connection drop".

252.    In the review, the author noted that "P2P is allowed, in case you were wondering" and "provider openly supports P2P".

253.    The author of the article never states that BESTVPN is one among dozens of paid affiliates of Defendants.

254.    The LiquidVPN Defendants recommend their Public IP VPN Topology for "P2P downloading".  *See* https://www.liquidvpn.com/supported-vpn-tunnel/ [last accessed on Feb. 26, 2021].

255.    The LiquidVPN Defendants state, "Once you buy VPN service from LiquidVPN our network becomes your network. Use it as much as you like. Here are some highlights – We do not limit Bittorrent or P2P."  *See* https://www.liquidvpn.com/buy-vpn-service/ [last accessed on Feb. 26, 2021].

### *H. QuadraNet had knowledge that its subscriber LiquidVPN was directly infringing and contributing to infringement of Plaintiffs' Works*

256.    QuadraNet is a member of ARIN and receives IP addresses from ARIN.

257.    QuadraNet is required to update the WHOIS records for the IP addresses it reassigns or reallocates per its registration agreement with ARIN.

258.    QuadraNet advertises providing, "high-quality dedicated servers, colocation, and cloud services in…Miami…".   https://www.quadranet.com/ [last accessed on April 28, 2021].

259.    QuadraNet advertises specific VPN solutions to its subscribers. *See* https://blog.quadranet.com/quadranet-new-vpn-solution-private-network/ [last accessed on April 28, 2021].

260.    QuadraNet advertises its service for providing high-speed access to the Internet.

261.    QuadraNet advertises that, "All Outlet dedicated servers include 100Mbps port speed. Need more speed? Get 10x more network performance - upgrade to a 1Gbps port for + $10/m". https://www.quadranet.com/outlet. [last accessed on April 28, 2021].

262.    QuadraNet's subscribers such as the LiquidVPN Defendants are motivated to become customers from QuadraNet's advertisements.

263.    QuadraNet's subscribers such as the LiquidVPN Defendants are motivated to become customers from the knowledge of QuadraNet's practice of ignoring notices of infringements or failing to take any meaningful action.

264.    Plaintiffs' agent sent over 5400 Notices to QuadraNet concerning infringement at IP addresses QuadraNet reassigned to LiquidVPN but continues to hold itself out as the proper abuse contact in ARIN in violation of its registration agreement with ARIN.

265.    Plaintiffs' agent sent over 100 Notices to QuadraNet concerning observed infringements at each of IP addresses 104.223.91.154, 104.223.91.202 and 104.223.91.234 that QuadraNet reassigned to LiquidVPN.

266.    Upon information and belief, other rightsholders had similar Notices sent to QuadraNet concerning infringing activity at IP addresses controlled by the LiquidVPN Defendants.

267.    The LiquidVPN Defendants use IP addresses 23.226.133.19 and 23.226.133.20 provided by QuadraNet as the main server IP addresses for hosting their VPN network.

268.    QuadraNet failed to terminate the LiquidVPN account or the accounts associated

with these IP addresses or take any meaningful action in response to these Notices.

269.     QuadraNet continued to provide service to the LiquidVPN Defendants despite knowledge that the LiquidVPN Defendants were using the service to facility massive piracy of copyright protected Works including the Copyright Plaintiffs' exactly as promoted, encouraged and instructed by the LiquidVPN Defendants.

### I.  QuadraNet controls the conduct of its subscribers.

270.     QuadraNet can terminate the account of the LiquidVPN Defendants or other subscriber accounts at any time.

271.     QuadraNet promptly terminates subscriber accounts when said subscribers failed to pay for the Service.     *See* QuadraNet Terms of Service at ¶8(b), https://www.quadranet.com/terms-of-service [last accessed on April 26, 2021].

272.     QuadraNet has the capability to log its subscribers' access to its service but purposefully chooses not to.  Indeed, QuadraNet offers its subscribers "backup services" and "server management" at an additional price.  Id. at ¶¶3-4.

### J.  QuadraNet and the LiquidVPN Defendants do not have a safe harbor from liability.

273.     As part of the DMCA, Congress created a safe harbor that limits the liability of a service provider for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

274.     QuadraNet has failed to terminate the accounts and/or take any meaningful actions against

its subscribers such as the LiquidVPN Defendants in response to these Notices consistent with a reasonably implemented policy for termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability ("policy").

275. The LiquidVPN Defendants have failed to terminate any repeat infringers and/or take any meaningful actions against their subscribers in response to these Notices consistent with a policy.

276. Plaintiffs' agent has sent over 180,000 Notices to QuadraNet concerning infringements at IP addresses QuadraNet publishes as assigned to it.

277. QuadraNet's refusal to terminate the accounts of subscribers using IP address 173.44.37.82 or take any action is illustrative of QuadraNet's lack of any meaningful action consistent with the policy.

278. Plaintiffs' Agent has sent over 5857 Notices to QuadraNet concerning infringements at this IP address as of March 18, 2020.  Notice numbers sent to other IP addresses controlled by QuadraNet as of March 18, 2020 are show below.

| IP | Notices Sent |
| --- | --- |
| 173.44.37.82 | 5857 |
| 96.44.144.122 | 5835 |
| 96.44.189.114 | 5736 |
| 173.44.37.98 | 5727 |
| 173.44.37.106 | 5723 |
| 96.44.147.106 | 5722 |
| 173.254.222.162 | 5720 |
| 96.44.147.42 | 5719 |
| 96.44.144.114 | 5716 |
| 173.44.37.114 | 5705 |

Affidavit of Daniel Arheidt at ¶12.

279. QuadraNet received IP addresses 96.47.224.0-96.47.231.255 ("96 Block") from

ARIN, which QuadraNet uses at its facility in Miami.   *See Id.* at ¶15.

280.   Plaintiffs' agents have sent over 2619 Notices to QuadraNet concerning just this 96 Block.  Plaintiffs' agent sent over 308 Notices to QuadraNet between June of 2017 to April of 2021 concerning just IP address 96.47.226.34. *See* Id. at ¶16-17.

281.   Plaintiffs' counsel sent first and second letters to QuadraNet on March 18, 2020 and September 1, 2020 concerning massive piracy at IP addresses controlled by QuadraNet that were completely ignored.  *See* Exhibits "5" and "6".

282.   Congress created a safe harbor that limits the liability of a service provider for copyright infringement "…by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider" does not have the requisite knowledge, "…responds expeditiously to remove or disable access to, the material…" and has the appropriate designated agent for receiving notices. 17 U.S.C. § 512(c)(1), (2).

283.   The LiquidVPN Defendants have setup their network so that its main servers are those of QuadraNet at IP addresses 23.226.133.19 and 23.226.133.20.

284.   QuadraNet has failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2).

285.   QuadraNet's conduct renders it ineligible for safe harbor immunity from copyright liability under the DMCA.

286.   The LiquidVPN Defendants do not have a policy of terminating repeat infringers.

287.   The LiquidVPN Defendants even promote the fact that their LiquidVPN is a "DMCA Free Zone" as a positive aspect that makes them stand out from competing VPN providers.  *See* https://www.liquidvpn.com/best-vpn-for-torrenting/ [last accessed on Feb. 23, 2021] (screenshot

47

below).



288.    In a Frequently Asked Questions section of the LiquidVPN Defendants' website, in response to the question "Can I use BitTorrent and P2P?", the LiquidVPN Defendants say affirmatively "Yes" and point out they "…will never censor P2P or BitTorrent…".

289.    Plaintiffs' counsel sent a letter to 1701 on Oct. 27, 2020 concerning massive piracy at an IP address controlled by LiquidVPN that were completely ignored.  *See* Exhibit "7".

290.    The LiquidVPN Defendants have failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2).

291.    The LiquidVPN Defendants' conduct renders them ineligible for safe harbor immunity from copyright liability under the DMCA.

**K. Defendants 1701, Muszynski and Gamache infringe Plaintiff 42's registered Trademark**

292.    Notwithstanding Plaintiff 42's established rights in the trademark Popcorn Time, Defendants 1701, Muszynski and Gamache adopt and use the confusingly similar and/or identical

mark Popcorn Time in interstate commerce in connection with the distribution and/or streaming of unlicensed copyright protected content.

293. Defendants 1701, Muszynski and Gamache promote their VPN service under the brand name "Popcorn Time VPN" that includes the Popcorn Time mark as a spurious designation that is identical with, or substantially indistinguishable from Plaintiff 42's registered Popcorn Time trademark.

294. 42's registered trademark is depicted below (see Exhibit "2" for a true copy of the registration):

# Popcorn Time

295. Defendants 1701, Muszynski and Gamache use the Popcorn Time mark as it appears on their website:



Affidavit of Joshua J. Lee at ¶20.

296.    Any prior use of the mark Popcorn Time by Defendants 1701, Muszynski and Gamache is ineligible for senior rights because such use was for criminal activities and thus unlawful commerce.

### L.  *Muszynski and Gamache are each individually liable for 1701's conduct.*

297.    Upon information and belief, Muszynski's and Gamache's infringing conduct included, among other things, formulating and implementing the business policies, procedures, and practices that breach contractual obligations, infringe a registered trademark and the publicity rights of the prior owners, provide repeat infringers with continued internet service through LiquidVPN, without consequence. Because Muszynski and Gamache directed 1701's policies, Muszynski and Gamache are both personally liable for 1701's failure to comply with its legal responsibilities and for the copyright and trademark infringements that resulted from those failures.

298.    Muszynski and Gamache have gone through great lengths to conceal their involvement in LiquidVPN because they are aware of their legal liability for copyright infringement.

299.    Gamache fraudulently uses the alias JAMIE CASTRO on the website to conceal his involvement.

300.    Gamache uses the same alias when registering with NAMECHEAP for website domains.

301.    Gamache even attempted to setup a fake Facebook website with his alias JAMIE CASTRO to further conceal his involvement.

302.    Muszynski and Gamache knowingly and willingly continue to fraudulently hold the dissolved corporation LiquidVPN, Inc. out as the owner and operator of the LiquidVPN Service despite LiquidVPN, Inc. being dissolved in 2018.



Affidavit of Joshua J. Lee at ¶18.

303.    Muszynski and Gamache knowingly and willingly continue to fraudulently promote Cox as one of the persons who "run the day to day operations of LiquidVPN" on the website knowing that Cox ceased all involvement with LiquidVPN in 2019. https://www.liquidvpn.com/about-liquidvpn/ [last accessed on April 19, 2021].



**M. The LiquidVPN Defendants breached a contract with David Cox and SMR.**

304.    The LiquidVPN Defendants entered into a contract with Cox and SMR to purchase LiquidVPN.

305.    The contract called for Cox and SMR to provide "…during the term of the six (6) months Earn-Out [after the purchase date]…seventy-seven (77) hours of personal assistance as required by the [LiquidVPN Defendants] to complete and finalize details of the technical aspects related to transferring, operating, and marketing the VPN service."

306.    Cox and SMR provided substantially more than the 77 hours required in the contract and were paid an Earn-Out amount of $65,000 in installments.

307.    After Cox and SMR performed their obligations in the contract, the Liquid Defendants requested Cox and SMR to perform further infrastructure support services for which they were paid $18,000.

308.    After Cox and SMR fully performed their obligations to the contracts and performed additional infrastructure support work, the LiquidVPN Defendants proposed that Cox and SMR develop an infrastructure sufficient to permit LiquidVPN to provide services to Orchid

VPN, implement new VPN protocols, automate networking task and perform technical support ("post earn-out work") at his hourly rate.  Cox and SMR agreed to this proposal.

309.    The LiquidVPN Defendants made payments of $5000 and $6365 to SMR via Muszynski's American Express ("Amex") card as a deposit towards costs and services for the post earn-out work.

310.    SMR timely completed the post earn-out work and invoiced the LiquidVPN Defendants $55,790.

311.    Muszynski immediately executed chargebacks on his Amex card to reverse the deposits and any other payments he made to Cox and SMR and ignored their demands for payment.

312.    Cox and the Contract did not give the LiquidVPN Defendants the right to use Cox's name, likeliness, and or publicity rights to promote LiquidVPN after the purchase date.

313.    Cox and the Contract did not give the LiquidVPN Defendants the right to use the name of the dissolved corporation LiquidVPN, Inc., likeliness, and or publicity rights to promote LiquidVPN after the purchase date.

314.    Cox and SMR assigned all claims they have against the LiquidVPN Defendants to Plaintiffs MILLENNIUM FUNDING, INC., HUNTER KILLER PRODUCTIONS, INC., and VOLTAGE HOLDINGS, LLC to resolve claims in an action in the Eastern District of Michigan.

### N. TALISMARK is liable for Muszynski's acts under respondeat superior

315.    TALISMARK had prior notice that Muzynski was using TALISMARK resources to evaluate and purchase LiquidVPN from Cox and SMR.

316.    Particularly, TALISMARK had such knowledge from Muszynski, who was CEO of TALISMARK and from the officers Muszynski requested to evaluate LiquidVPN.

317.    Muszynski's conduct of evaluating new business opportunities and purchasing new

businesses was consistent with and/or the type of conduct he was employed to perform and, therefore, was within the scope of his employment with TALISMARK.

318.     Muszynski's conduct of purchasing and operating LiquidVPN occurred substantially within his authorized work time and was done by TALISMARK resources such as his email address and, therefore, was within the scope of his employment with TALISMARK.

319.     TALISMARK benefited financially from Muszynski's conduct.

320.     Muszynski's conduct of promoting LiquidVPN for the purposes of piracy was actuated, at least in part, for the purpose of serving TALISMARK.

## VII. FIRST CLAIM FOR RELIEF
### (Direct Copyright Infringement against Defendants 1701, TALISMARK, AUH2O, Muszynski, Gamache and DOES 1-100)

321.     Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

322.     Copyright Plaintiffs are the copyright owners of the Works which each contains an original work of authorship.

323.     Defendant Gamache logged into the LiquidVPN service using email addresses: mikeygamache@gmail.com;     mgamache@live.com;     chichi_tavares@hotmail.com;     and mgamache@bitbanc.com, and distributed a constituent piece of each of the copyright protected Works *Angel Has Fallen* and *Rambo V: Last Blood* to others from IP address 185.169.198.224 on 11/23/2019 and 12/7/2019 to others.

324.     As a result of the foregoing, Defendant Gamache violated the Plaintiff Millennium Funding, Inc.'s and Rambo V Productions, Inc.'s exclusive right to distribute copies of their Works in copies, in violation of 17 U.S.C. §§ 106(3) and 501.

325.     Defendants DOES 1-100 copied the constituent elements of Plaintiffs' copyright

protected Works.

326.     As a result of the foregoing, Defendants DOES 1-100 violated the Copyright Plaintiffs' exclusive right to reproduce the Works in copies, in violation of 17 U.S.C. §§ 106(1) and 501.

327.     By participating in the BitTorrent swarms with others, Defendants DOES 1-100 distributed at least a piece of each of the Copyright Plaintiffs' copyright protected Works to others.

328.     Defendants 1701, Muszynski and Gamache distributed at least a piece of each of the Copyright Plaintiffs' Works over their LiquidVPN network with knowledge that their subscribers such as DOES 1-100 were engaging in infringing activity.

329.     Copyright Plaintiffs did not authorize, permit, or provide consent to Defendants to copy, reproduce, distribute or perform their Works.

330.     As a result of the foregoing, Defendants 1701, Muszynski, Gamache and DOES 1-100 violated the Copyright Plaintiffs' exclusive rights to distribute copies of the Work in copies, in violation of 17 U.S.C. §§ 106(3) and 501.

331.     Defendants 1701, Muszynski, Gamache and DOES 1-100's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

332.     Copyright Plaintiffs have suffered damages that were proximately caused by the Defendants 1701, Muszynski, Gamache and DOES 1-100's copyright infringement including, but not limited to lost sales, price erosion, and a diminution of the value of its copyright.

333.     1701, TALISMARK, AUH2O and the 120@50 Trust are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

334.     TALISMARK is liable for the acts of Muszynski under *respondeat superior*.

335.     1701 is liable for the acts of Gamache under *respondeat superior*.

## VIII. SECOND CLAIM FOR RELIEF
### (Contributory Copyright Infringement by Intentional Inducement against Defendants 1701, TALISMARK, AUH2O, 120@50 Trust, Muszynski and Gamache)

336.    Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

337.    Defendants 1701, AUH2O, Muszynski and Gamache (the "LiquidVPN Defendants") intentionally induced the infringement of Copyright Plaintiffs' exclusive rights under the Copyright Act, including infringement of Plaintiffs' exclusive right to reproduce, publicly perform and distribute copies of the Copyrighted Works.

338.    As instructed and encouraged by the LiquidVPN Defendants, their subscribers such as Defendants DOES 1-100 install and use the piracy application Popcorn Time on their devices while assigned IP addresses by the LiquidVPN Defendants' so-called "Popcorn Time VPN" to conceal their identities.

339.    The LiquidVPN Defendants' subscribers use Popcorn Time to connect to sources that publicly perform and/or distribute copies of Copyright Plaintiffs' Copyrighted Works while they use their so-called "Popcorn Time VPN".

340.    The LiquidVPN Defendants induce direct infringement of Copyright Plaintiffs' Works by encouraging their subscribers to use movie piracy applications such as Popcorn Time that facilitate, enable, and create direct links between their customers and infringing sources, and by actively inducing, encouraging and promoting their LiquidVPN Service as "Popcorn Time VPN" and a means to "safely" use movie piracy applications for blatant copyright infringement by assuring customers that their identification information will be concealed by the LiquidVPN Service.

20-023DBa

341.    The LiquidVPN Defendant' intentional inducement of the infringement of Copyright Plaintiffs' rights in their Copyrighted Works constitutes a separate and distinct act of infringement.

342.    1701, TALISMARK, AUH2O and the 120@50 Trust are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

343.    TALISMARK is liable for the acts of Muszynski under *respondeat superior.*

344.    1701 is liable for the acts of Gamache under *respondeat superior.*

### IX. THIRD CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon Material Contribution against all Defendants)

345.    Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

346.    By participating in the BitTorrent swarms with others, Defendants Gamache and DOES 1-100 induced, caused or materially contributed to the infringing conduct of the Plaintiffs' copyright protected Work by others.

347.    Copyright Plaintiffs did not authorize, permit, or provide consent to the Defendants inducing, causing, or materially contributing to the infringing conduct of others.

348.    Defendants Gamache and DOES 1-100 knew or should have known that the other BitTorrent users in a swarm with them were directly infringing the Copyright Plaintiffs' copyrighted Works by copying constituent elements of the registered Works that are original. Indeed, Defendants DOES 1-100 directly participated in and therefore materially contributed to others' infringing activities.

349.    Through its conduct, Defendants 1701, Muszynski and Gamache (the "LiquidVPN Defendants") knowingly and intentionally induced, enticed, persuaded, and caused its subscribers

to infringe Copyright Plaintiffs' Copyrighted Works and continue to do so in violation of Plaintiffs' copyrights.

350.     Through their activities, the LiquidVPN Defendants knowingly and intentionally take steps that are substantially certain to result in direct infringement of Plaintiffs' Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiffs' copyrights.

351.     Despite the LiquidVPN Defendants' knowledge that their subscribers are using their LiquidVPN Service to engage in widescale copyright infringements, the LiquidVPN Defendants have failed to take reasonable steps to minimize the infringing capabilities of its service.

352.     Not only have the LiquidVPN Defendants failed to take reasonable steps to minimize the infringing capabilities of its service, the LiquidVPN Defendants actively promote their LiquidVPN Service as "Popcorn Time VPN" and a means to safely infringe Copyright protected Works, including Copyright Plaintiffs' and explicitly the Work *Survivor* of Millennium.

353.     The LiquidVPN Defendants are liable as contributory copyright infringers for the infringing acts of their subscribers.  The LiquidVPN Defendants have actual and constructive knowledge of the infringing activity of their subscribers.  The LiquidVPN Defendants knowingly caused and otherwise materially contributed to these unauthorized reproductions and distributions of Copyright Plaintiffs' Works.

354.     Through its activities, QuadraNet knowingly and intentionally take steps that are substantially certain to result in direct infringement of Copyright Plaintiffs' Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiffs' copyrights.

355.     Despite QuadraNet's knowledge that its subscribers such as the LiquidVPN Defendants were using its service to engage in widescale copyright infringements, QuadraNet has

20-023DBa

failed to take reasonable steps to minimize the infringing capabilities of its service.

356.   QuadraNet is liable as contributory copyright infringers for the infringing acts of its subscribers such as the LiquidVPN Defendants.  QuadraNet has actual and constructive knowledge of the infringing activity of its subscribers.  QuadraNet knowingly caused and otherwise materially contributed to these unauthorized reproductions and distributions of Copyright Plaintiffs' Works.

357.   The Defendants' infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

358.   By engaging in the contributory infringement alleged in this Complaint, the Defendants deprived not only the producers of the Work from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.  The Defendants' misconduct therefore offends public policy.

359.   1701, TALISMARK, AUH2O and the 120@50 Trust are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

360.   TALISMARK is liable for the acts of Muszynski under *respondeat superior.*

361.   1701 is liable for the acts of Gamache under *respondeat superior.*

## X. FOURTH CLAIM FOR RELIEF
### (Vicarious Infringement against the LiquidVPN Defendants and QuadraNet)

362.   Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

363.   Defendants 1701, Muszynski and Gamache (the "LiquidVPN Defendants") are vicariously liable for the infringing acts of their subscribers.

20-023DBa

364.     The LiquidVPN Defendants have the right and ability to supervise and control the infringing activities that occur through the use of their service, and at all relevant times have derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

365.     The LiquidVPN Defendants have refused to take any meaningful action to prevent the widespread infringement by their subscribers. Indeed, the ability of subscribers to use Defendants' so-called "Popcorn Time VPN" to access Popcorn Time to infringe Copyright Plaintiffs' Works while concealing their activities acts as a powerful draw for users of the LiquidVPN Service, who use that service exactly as encouraged by the LiquidVPN Defendants to download, distribute, and stream copies of Plaintiffs' Works.

366.     The LiquidVPN Defendants are therefore vicariously liable for the unauthorized reproduction, distribution, and public performance of Plaintiffs' Works.

367.     1701, TALISMARK, AUH2O and the 120@50 Trust are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

368.     TALISMARK is liable for the acts of Muszynski under *respondeat superior*.

369.     1701 is liable for the acts of Gamache under *respondeat superior*.

370.     QuadraNet is vicariously liable for the infringing acts of its subscribers' infringements including but not limited to the LiquidVPN Defendants' direct infringements of the Copyright Plaintiffs' exclusive right to distribute copies of their Works.

371.     QuadraNet has the right and ability to supervise and control the infringing activities that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

372.     QuadraNet has refused to take any meaningful action to prevent the widespread infringement by its subscribers including but not limited to the LiquidVPN Defendants despite

having actual knowledge.  Indeed, the ability of subscribers such as the LiquidVPN Defendants to use QuadraNet's service to host and operate their so-called "Popcorn Time VPN" to distribute copies of Plaintiffs' Works while concealing their end users' identities acts as a powerful draw for users of QuadraNet's service.

373.    QuadraNet is therefore vicariously liable for the unauthorized reproduction, distribution, and public performance of Plaintiffs' Works.

## XI. FIFTH CLAIM FOR RELIEF
**(Digital Millennium Copyright Act Violations against the LiquidVPN Defendants and DOES 1-100)**

374.    Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

375.    The Defendants DOES 1-100 knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the Plaintiffs' copyright protected Works, distributed copyright management information ("CMI") that falsely included the wording "FGT" in violation of 17 U.S.C. § 1202(a)(2).

376.    The Defendants DOES 1-100 knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Work *I Feel Pretty* distributed CMI that falsely included the wording "YTS" or in violation of 17 U.S.C. § 1202(a)(2).

377.    The Defendants DOES 1-100 knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Works *Hunter Killer* and *Shock and Awe* distributed CMI that falsely included the wording "FGT" in violation of 17 U.S.C. § 1202(a)(2).

378.    Defendants DOES 1-100, without the authority of Plaintiffs or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include wording

such as "RARBG", "YTS" or "FGT" without the authority of the Plaintiffs and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiffs' Copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

379.    Defendants DOES 1-100, without the authority of Plaintiffs or the law, distributed Plaintiffs' Copyright protected Works knowing that the CMI had been removed or altered to include wording such as "RARBG", "YTS" or "FGT", and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

380.    Particularly, the Defendants DOES 1-100 knew that the CMI in the file names of the pieces of the Work had been altered to include wording such as "RARBG", "YTS" or "FGT".

381.    Particularly, the Defendants DOES 1-100 distributed the file names that included CMI that had been altered to include the wording "YTS" or "FGT".

382.    Defendants DOES 1-100 knew that the wording "YTS" or "FGT" originated from notorious movie piracy website.

383.    Defendants DOES 1-100's acts constitute violations under the Digital Millennium Copyright Act ("DMCA violation"), 17 U.S.C. § 1202.

384.    Through their conduct, Defendants 1701, Muszynski and Gamache (the "LiquidVPN Defendants") knowingly and intentionally induced, enticed, persuaded, and caused its subscribers to constitute DMCA violations.

385.    Through its activities, the LiquidVPN Defendants knowingly and intentionally take or took steps that are substantially certain to result in their subscribers committing DMCA violations, and that have resulted in DMCA violations.

386.    The LiquidVPN Defendants encourage their subscribers to access torrent files for

copying copyright protected Works from notorious movie piracy websites such as The Pirate Bay.

387.    Despite the LiquidVPN Defendants' knowledge that their subscribers use the LiquidVPN Service to commit DMCA violations, the LiquidVPN Defendants have failed to take reasonable steps to minimize the capabilities of its service to facilitate DMCA violation.

388.    The LiquidVPN Defendants are secondarily liable for the DMCA violations of their subscribers.   The LiquidVPN Defendants have actual and constructive knowledge of their subscribers' DMCA violations.   The LiquidVPN Defendants knowingly caused and otherwise materially contributed to these DMCA violations.

389.    The LiquidVPN Defendants are vicariously liable for the DMCA violations of its subscribers. The LiquidVPN Defendants have the right and ability to supervise and control the DMCA violations that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the DMCA violations complained of herein. The LiquidVPN Defendants have refused to take any meaningful action to prevent the widespread DMCA violations by their subscribers. Indeed, the ability of subscribers to access torrent website such as the Pirate Bay that the LiquidVPN Defendants themselves promote and obtain file copies of the Works with altered CMI and distribute said copies while concealing their activities acts as a powerful draw for users of the LiquidVPN Service, who use that service exactly as encouraged by the LiquidVPN Defendants to commit DMCA violations. The LiquidVPN Defendants are therefore vicariously liable for the DMCA violations.

390.    Copyright Plaintiffs are entitled to an injunction to prevent Defendants from engaging in and/or contributing to further violations of 17 U.S.C. § 1202.

391.    Copyright Plaintiffs are entitled to recover from Defendants the actual damages suffered by Plaintiffs and any profits Defendants have obtained as a result of their wrongful acts

20-023DBa

that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Defendants have realized by their violations of 17 U.S.C. § 1202.

392.    Copyright Plaintiffs are entitled to elect to recover from Defendants statutory damages for their violations of 17 U.S.C. § 1202.

393.    Copyright Plaintiffs are further entitled to costs and reasonable attorneys' fees.

394.    1701, TALISMARK, AUH2O and the 120@50 Trust are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

395.    TALISMARK is liable for the acts of Muszynski under *respondeat superior.*

396.    1701 is liable for the acts of Gamache under *respondeat superior.*

## XII.  SIXTH CLAIM FOR RELIEF
### (Application for Injunctive Relief based upon Contributory Infringement against QuadraNet and the LiquidVPN Defendants)

397.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

398.    1701, Muszynski and Gamache (the "LiquidVPN Defendants") and QuadraNet have actual knowledge of their users' infringements of Plaintiffs' exclusive rights under the Copyright Act by accessing notorious piracy websites that are of foreign origin. Indeed, the LiquidVPN Defendants promote some of these notorious piracy websites.

399.    Despite having said actual knowledge, QuadraNet and the LiquidVPN Defendants continued to provide service to their subscribers.

400.    QuadraNet and the LiquidVPN Defendants' actions of providing transmission, routing, or connections for said copies of the Works to their users are a direct and proximate cause of the infringements of Plaintiffs' Works.

401.     QuadreNet and the LiquidVPN Defendants had actual or constructive knowledge of infringement of Plaintiffs' exclusive rights under the Copyright Act by its users.  QuadraNet and the LiquidVPN Defendants knowingly and materially contributed to such infringing activity.

402.     As a direct and proximate result of the infringement to which QuadraNet and the Liquid VPN Defendants knowingly and materially contribute, Plaintiffs are entitled to injunctive or other equitable relief as provided by 17 U.S.C. §§ 512(j)(1)(A) and (B) including but not limited to an order restraining QuadraNet and the Liquid VPN Defendants from providing access to infringing material or activity residing at movie piracy websites including but not limited to: (a) YTS; (b) Piratebay; (c) Rarbg; (d) 1337x; and (e) Popcorntime and/or taking reasonable steps to block access to said movie piracy websites.

### XIII. SEVENTH CLAIM FOR RELIEF
### (Trademark Infringement against Defendants 1701, AUH2O, Muszynski and Gamache)

403.     Plaintiff 42 re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

404.     Defendants 1701, Muszynski and Gamache have infringed 42's trademark in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

405.     Plaintiff 42 has distributed and streamed licensed content in United States commerce under the Popcorn Time trademark since at least November 29, 2019.  Plaintiff 42 has used the Popcorn Time trademark continuously in United States commerce since that time.

406.     Without Plaintiff 42's consent, Defendants 1701, Muszynski and Gamache have used and continue to use the infringing Popcorn Time mark in connection with the sale, offering for sale, distribution and advertising of goods and/or services at least in the United States.

407.     Defendants 1701, Muszynski and Gamache's actions are likely to mislead the public into concluding that their goods and or services originate with or are authorized by Plaintiff 42,

which will damage both Plaintiff 42 and the public. Plaintiff 42 has no control over the quality of goods and services sold by these Defendants and because of the source confusion caused by these Defendants, Plaintiff 42 has lost control over its valuable goodwill.

408.    Upon information and belief, Defendants 1701, Muszynski and Gamache have advertised and offered their services for sale using the Popcorn Time mark with the intention of misleading, deceiving or confusing consumers as to the origin and of trading on Plaintiff 42's reputation and goodwill.  Defendants' use of the Popcorn Time mark constitutes willful, deliberate and intentional trademark infringement.

409.    As a direct and proximate result of the Defendants 1701, Muszynski and Gamache's trademark infringement, Plaintiff 42 has suffered and will continue to suffer irreparable loss of income, profits and goodwill and the Defendants have and will continue to unfairly acquire income, profits and goodwill.

410.    Defendants 1701, Muszynski and Gamache's acts of infringement will cause further irreparable injury to Plaintiff 42 if Defendants are not restrained by this Court from further violation of Plaintiff 42's rights. Plaintiff 42 has no adequate remedy at law.

411.    Defendants 1701, Muszynski and Gamache's acts of infringement associate 42's trademark Popcorn Time with rampant illegal movie piracy and thus hinder 42's ability to establish legitimate business relationships with other content creators.

412.    1701, AUH2O and the 120@50 Trust are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

413.    1701 is liable for the acts of Gamache under *respondeat superior.*

## XIV. EIGHTH CLAIM FOR RELIEF
### (Federal Unfair Competition against Defendants 1701, AUH2O, Muszynski and Gamache)

414.    Plaintiff 42 re-alleges and incorporate by reference the allegations contained in each

66

of the foregoing paragraphs.

415.     Defendants 1701, Muszynski and Gamache engage in unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

416.     Defendants 1701, Muszynski and Gamache's unauthorized marketing and sale of their products in interstate commerce using 42's Popcorn Time trademark constitutes a use of a false designation of origin or false representation that wrongfully and falsely designates Defendants' products and/or services as originating from or connected with Plaintiff 42, and constitutes the use of false descriptions or representations in interstate commerce. The actions of the Defendants as alleged herein constitute intentional, willful, knowing and deliberate unfair competition.

417.     Defendants 1701, Muszynski and Gamache's actions constitute federal unfair competition and violate 15 U.S.C. § 1125(a).

418.     As a direct and proximate result of the Defendants 1701, Muszynski and Gamache's unfair competition, Plaintiff 42 has suffered and will continue to suffer irreparable loss of income, profits and goodwill and the Defendants have and will continue to unfairly acquire income, profits and goodwill.

419.     Defendants 1701, Muszynski and Gamache's acts of unfair competition will cause further irreparable injury to Plaintiff 42 if they are not restrained by this Court from further violation of Plaintiff 42's rights. Plaintiff 42 has no adequate remedy at law.

420.     1701, AUH2O and the 120@50 Trust are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

421.     1701 is liable for the acts of Gamache under *respondeat superior.*

## XV. TENTH CLAIM FOR RELIEF
**(Breach of Contract against 1701, AUH2O, TALISMARK, Muszynski and Gamache)**

422.     Plaintiffs MILLENNIUM FUNDING, INC. ("Millennium"), HUNTER KILLER PRODUCTIONS, INC. ("Hunter Killer"), and VOLTAGE HOLDINGS, LLC ("Voltage") re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

423.     Defendants 1701, AUH2O, TALISMARK, Muszynski and Gamache, Cox and SMR Hosting entered into an agreement for SMR Hosting to perform post earn-out Work for 1701, AUH2O, Muszynski and Gamache in exchange for a payment at Cox's hourly rate.

424.     The Agreement is a valid, binding and enforceable contract.

425.     Cox and SM relied upon this contract to their detriment.

426.     Defendants 1701, AUH2O, TALISMARK, Muszynski and Gamache breached the Agreement by failing to pay SMR the total of $46,540.00 excluding interest.

427.     Defendants 1701, AUH2O, TALISMARK, Muszynski and Gamache's obligation to make the agreed upon payment was not excused or relieved.

428.     Defendants 1701, AUH2O, TALISMARK, Muszynski and Gamache's breaches of the agreement were substantial failures to perform that are material.

429.     SMR and Cox have been damaged as result of Defendants 1701, AUH2O, TALISMARK, Muszynski and Gamache's breach of contract in an amount to be proven at trial and is entitled to injunctive relief to prevent any further breaches and damages.

430.     SMR and Cox are also entitled to attorneys' fees arising from Defendants 1701, AUH2O, TALISMARK, Muszynski and Gamache's breach of contract.

431.     SMR and Cox's claims against Defendants 1701, AUH2O, TALISMARK, Muszynski and Gamache's were assigned to Plaintiffs Millennium, Voltage and Hunter Killer per the stipulation in the action 4:21-cv-10490 in the Eastern District of Michigan.

432.     1701, TALISMARK, AUH2O and the 120@50 Trust are merely the alter egos for

Muszynski, and thus liable for the acts of Muszynski and each other.

433.    At all relevant times, Muszynski was acting as an agent of TALISMARK with authority to bind TALISMARK.

434.    TALISMARK is liable for the acts of Muszynski under *respondeat superior.*

435.    1701 is liable for the acts of Gamache under *respondeat superior.*

## XVI. ELEVENTH CLAIM FOR RELIEF
### (Unjust enrichment against 1701, AUH2O, Muszynski and Gamache)

436.    Plaintiffs Millennium, Voltage and Hunter Killer re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

437.    Cox and SMR Hosting conferred a benefit on Defendants 1701, AUH2O, Muszynski and Gamache.

438.    Defendants 1701, AUH2O, Muszynski and Gamache requested the benefit.

439.    Defendants 1701, AUH2O, Muszynski and Gamache did not pay or otherwise offer compensation to Cox and SMR Hosting for the benefits Defendant received.

440.    SMR and Cox have been damaged as result of Defendants' unjust enrichment in an amount to be proven at trial and is entitled to injunctive relief to prevent any further breaches and damages.

441.    SMR and Cox's claims against Defendants 1701, AUH2O, TALISMARK, Muszynski and Gamache's were assigned to Plaintiffs Millennium, Voltage and Hunter Killer re-allege per the stipulation in the action 4:21-cv-10490 in the Eastern District of Michigan.

442.    1701, TALISMARK, AUH2O and the 120@50 Trust are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

443.    At all relevant times, Muszynski was acting as an agent of TALISMARK with authority to bind TALISMARK.

20-023DBa

444.    TALISMARK is liable for the acts of Muszynski under *respondeat superior.*

445.    1701 is liable for the acts of Gamache under *respondeat superior.*

## XVII. TWELTH CLAIM FOR RELIEF
### (Breach of David Cox's Statutory and Common Law Right of Publicity against 1701, AUH2O, Muszynski and Gamache)

446.    Plaintiffs Millennium, Voltage and Hunter Killer re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

447.    Defendants 1701, AUH2O, Muszynski and Gamache publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name and/or other likeness of David Cox on the website liquidvpn.com

448.    Cox did not give 1701, AUH2O, Muszynski and Gamache express written or oral consent to use his name on the website liquidvpn.com.

449.    Cox has suffered damages as a result of said use of his name and/or other likeness without his permission by Defendants 1701, AUH2O, Muszynski and Gamache in an amount to be proven at trial and is entitled to injunctive relief to prevent any further use of his name and/or other likeness without his permission.

450.    Cox is also entitled to attorneys' fees arising from Defendants 1701, AUH2O, Muszynski and Gamache's breach of his right of publicity.

451.    Cox's claims against 1701, AUH2O, Muszynski and Gamache were assigned to Plaintiffs Millennium, Voltage and Hunter Killer per the stipulation in the action 4:21-cv-10490 in the Eastern District of Michigan.

452.    1701, TALISMARK, AUH2O and the 120@50 Trust are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

453.    At all relevant times, Muszynski was acting as an agent of TALISMARK with

authority to bind TALISMARK.

454.    TALISMARK is liable for the acts of Muszynski under *respondeat superior*.

455.    1701 is liable for the acts of Gamache under *respondeat superior*.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully requests that this Court:

(A) permanently enjoin Defendants and each of their agents, representatives, employees, officers, attorneys, successors, assigns, affiliates, and any persons in privity or active concert or participation with any of them from infringing to and/or contributing to infringements of the Copyright Plaintiffs' copyrighted Works and 42's registered trademark.

(B) permanently enjoin Defendants 1701, Muszynski and Gamache from promoting and encouraging their subscribers to use the LiquidVPN Service as a means to conceal use of Popcorn Time and movie piracy websites such as the Pirate Bay for pirating Plaintiffs' Works and promoting its service as "Popcorn Time VPN" in violation of Plaintiff 42's trademark.

(C) Order the Defendants 1701, Muszynski and Gamache to immediately remove the title art of Plaintiff Millennium Funding, Inc.'s Work *Survivor* and any reference to Cox or LiquidVPN, Inc. that falsely portrays him and his dissolved corporation as playing a role in the operations of LiquidVPN from their website.

(D) Order QuadraNet, 1701, AUH2O, TALISMARK, Muszynski and Gamache to block subscribers from accessing notorious piracy websites of foreign origin that are listed in the annual trade report of Notorious Foreign Markets published by the United States Government such as (a) YTS; (b) Piratebay; (c) Rarbg; (d) 1337x; and (e) Popcorntime on networks under their control.

(E) order QuadraNet, 1701, AUH2O, TALISMARK, Muszynski and Gamache to adopt a policy that provides for the prompt termination of subscribers that engage in more than three

20-023DBa

infringements of copyright protected Works.

(F) order QuadraNet, 1701, AUH2O, TALISMARK, Muszynski and Gamache to block ports 6881-6889 on all of the servers under their control to prevent further pirating of Plaintiffs' Works via the BitTorrent protocol.

(G) award the Copyright Plaintiffs actual damages and Defendants' profits in such amount as may be found; alternatively, at Copyright Plaintiffs' election, for maximum statutory damages of $150,000/Work pursuant to 17 U.S.C. § 504-(a) and (c) against (i) each of Defendant DOES 1-100; (ii) against Defendants 1701, AUH2O, TALISMARK, 120@53 Trust, Muszynski and Gamache jointly and severally; and (iii) QuadraNet.

(H) award the Copyright Plaintiffs their actual damages from the DMCA violations and Defendants' profits in such amount as may be found; or, in the alternative, at Copyright Plaintiff's election, for maximum statutory damages of $25,000 for DMCA violations pursuant to 17 U.S.C. § 1203(c) for violations of 17 U.S.C. § 1202 against (i) each of Defendant DOES 1-100;and (ii) Defendants 1701, AUH2O, TALISMARK, 120@53 Trust, Muszynski and Gamache jointly and severally.

(I) award the Copyright Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 against Defendants;

(J) Order Defendants 1701, AUH2O, 120@53 Trust, Muszynski and Gamache jointly and severally, to pay statutory damages of $2,000,000 pursuant to 15 U.S. Code § 1117(c)(2) for willful infringement of Plaintiff 42's Popcorn Time trademark;

(K) award the Plaintiffs Millennium, Voltage and Hunter Killer damages of $46,540.00 plus interest against Defendants 1701, AUH2O, 120@53 Trust, TALISMARK, Muszynski and Gamache jointly and severally for their breach of contract and/or unjust enrichment;

(L) award the Plaintiffs Millennium, Voltage and Hunter Killer damages against Defendants 1701, AUH2O, TALISMARK, 120@53 Trust, Muszynski and Gamache jointly and severally for their breach of David Cox's publicity rights.

(M) Order pursuant to 28 U.S.C §1651(a) that, Namecheap, Leaseweb USA, Enom, Spectrum, T-Mobile, and any other service provider cease providing service for Defendants 1701, AUH2O, TALISMARK, Muszynski and Gamache and that, upon Plaintiffs' request, those in privity with Defendants 1701, AUH2O, TALISMARK, Muszynski and Gamache and those with notice of the injunction, including any Internet search engines, Web hosts, domain-name registrars, and domain name registries and/or their administrators that are provided with notice of the injunction, cease facilitating access to any or all domain names and websites through which Defendants engage in the aforementioned infringements; and

(N) grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

DATED: May 5, 2021.

Respectfully submitted,

Joycelyn S. Brown,
Florida Bar No. 0058277
IPS Legal Group, P.A.
1951 NW 7th Ave, Suite 600
Miami, Florida 33136
Tel: 786-539-5098
Fax: 786-627-4146
Email: jbrown@ipslegalgroup.com

20-023DBa

CULPEPPER IP, LLLC

Kerry S. Culpepper, *pro hac vice*
Hawaii Bar No. 9837
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawai'i 96740
Telephone:     (808) 464-4047
kculpepper@culpepperip.com

20-023DBa