**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
CASE NO.: 21-cv-20862-BLOOM/Otazo-Reyes

MILLENNIUM FUNDING, INC. *et. al*,

      Plaintiffs,

v.

1701 MANAGEMENT LLC d/b/a LIQUIDPVN, *et. al*,

      Defendants.

_____/

**QUADRANET, INC.'S AND QUADRANET ENTERPRISES, LLC'S**
**MOTION TO DISMISS THE PLAINTIFFS' FIRST AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT ..................................................................................1

II.  RELEVANT BACKGROUND AND SUMMARY OF QE'S BUSINESS MODEL .........3

III. COUNTS III, IV, AND VI SHOULD BE DISMISSED UNDER RULE 12(b)(6) ..........4

  A. Plaintiffs' Contributory Infringement Claim (Count III) Should Be Dismissed ...............5

    1.  For 20 Years, Quadranet's Services Have Been Used for Substantial Non-Infringing
       Uses ...............................................................................................................5

    2.  Count III Fails to Allege that Quadranet Acted with Culpable Intent .........................7

    3.  The FAC Fails to Allege That Quadranet "Materially Contributed" to the Infringing
       Conduct of Another, and That Quadranet's Alleged Participation was "Substantial"
       .......................................................................................................................5

  B. Plaintiffs' Vicarious Infringement Claim (Count IV) Should Be Dismissed ................... 10

    1.  Quadranet Did Not Profit Directly from the Allegedly Infringing Activity ............... 10

      a.  Plaintiffs Failed to Plead That Quadranet Profited Directly ................................. 10

      b.  There Are No Factual Assertions to Support Quadranet's Alleged Receipt of a
         Direct Financial Benefit .................................................................................. 10

      c.  Plaintiffs Failed to Allege That the Main Draw is Access to the Infringing
         Content .......................................................................................................... 13

      d.  The FAC Fails to Plead That the Allegedly Infringing Content Affected
         Quadranet's Client Base ................................................................................. 14

      e.  The Disputed Number of "Take Down Notices" is Irrelevant to the Viability of
         Plaintiffs' Claim ............................................................................................ 15

    2.  Quadranet Did Not Have the Ability to Supervise, Control, and Stop the Infringing
       Activity ......................................................................................................... 16

  C. Plaintiffs' Application for Injunctive Relief Should be Dismissed ................................. 18

IV. PURSUANT TO FED. R. CIV. P. 8(a) AND 10(b), THE FAC SHOULD BE
    DISMISSED AS AN IMPERMISSIBLE SHOTGUN PLEADING .............................. 18

V.  THE FAC SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION
    PURSUANT TO FED. R. CIV. P. 12(b)(2) ................................................................ 20

  A. Exercising Jurisdiction Here Violates Florida's Long-Arm Statute ................................ 20

    1.  Quadranet is Not Subject to General Jurisdiction ................................................. 21

    2.  Quadranet is Not Subject to Specific Jurisdiction ................................................. 23

  B. Exercising Personal Jurisdiction Would Violate Due Process ........................................ 25

VI. THE FAC SHOULD BE DISMISSED FOR IMPROPER VENUE ............................. 26

  A. The FAC Should be Dismissed Pursuant to Fed. R.  Civ. P. 12(b)(3) ............................. 20

**TABLE OF AUTHORITIES**

**Cases**

*A&M Records v. Napster*, 239 F.3d 1004 (9th Cir. 2001) ...................................................................16

*ALS Scan v. Steadfast*, 819 Fed. App'x 522 (9th Cir. 2020) ............................................................10

*Alpha Tech. v. MLSNA*, 2013 U.S. Dist. LEXIS 167884 (M.D. Fla. Nov. 26, 2013) ............................20

*Apple v. Microsoft*, 821 F. Supp. 616 (N.D. Cal. 1993)......................................................................9

*Arista Records v. Lime Grp.*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011).....................................................5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................................4

*Atl. Recording v. Project Playlist*, 603 F. Supp. 2d 690 (S.D.N.Y. 2009)............................................6

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................5

*Brechbill v. Home Invest*, 2018 U.S. Dist. LEXIS 156896 (N.D. Ill. Sep. 14, 2018) ............................18

*Brown v. Carnival*, 202 F. Supp. 3d 1332 (S.D. Fla. 2016)........................................................21, 24

*BUC Int'lv. Int'l Yacht*, 489 F.3d 1129 (11th Cir. 2007) ..................................................................10

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985)...........................................................................25-26

*Cable/Home Commun. Corp. v. Network Prods.*, 902 F.2d 829 (11th Cir. 1990) .............................24

*Coach, Inc. v. Swap Shop*, 916 F. Supp. 2d 1271 (S.D. Fla. 2012)...........................................11, 18

*Cobbler Nevada v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018).............................................................7

*Demetriades v. Kaufmann*, 690 F. Supp. 289 (S.D.N.Y. 1988) ........................................................9

*Eastridge v. Norfolk*, 2008 U.S. Dist. LEXIS 125126 (N.D. Ala. Feb. 15, 2008) ................................2

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) ...............................................................10, 12

*Equal Employment v. STME, LLC*, 309 F. Supp. 3d 1207 (M.D. Fla. 2018)........................................5

*Exhibit Icons, LLC v. XP Cos., LLC*, 609 F. Supp. 2d 1282 (S.D. Fla. 2009)......................................25

*Fraser v. Smith*, 594 F.3d 842 (11th Cir. 2010) ..............................................................................23

*Gershwin v. Columbia Artists*, 443 F.2d 1159 (2d Cir. 1971) .......................................................5, 9

*Greiser v. Drinkard*, 2018 U.S. Dist. LEXIS 228125 (S.D. Fla. May 21, 2018) ................................19

*Goodyear Dunlop Tires v. Brown*, 564 U.S. 915 (2011) ...........................................................21, 23

*Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353 (2d Cir. 2005)..............................................................27

*HomeBingo v. Chayevsky*, 428 F. Supp. 2d 1232 (S.D. Ala. 2006).................................................20

*Hydentra v. Luchian*, 2016 U.S. Dist. LEXIS 193457 (S.D. Fla. June 2, 2016)..........................1, 5-6, 10

*Ingenuity v. Doe*, 2013 U.S. Dist. LEXIS 16952 (N.D. Cal. Feb. 7, 2013)...........................................8

*Interim Healthcare v. Interim Healthcare of Se. La.*, No. 19-cv-62412-BLOOM/Valle, 2020 U.S. Dist.
LEXIS 101841 (S.D. Fla. June 10, 2020).....................................................................................23, 26

*Io Grp. v. Veoh*, 586 F. Supp. 2d 1132 (N.D. Cal. 2008) ....................................................12-13, 17

*Johnson v. Carnival Corp.*, No. 19-cv-23167-BLOOM, 2020 U.S. Dist. LEXIS 4235 (S.D. Fla. Jan. 9,
2020) ..........................................................................................................................................19, 21

*Kephart v. Data Sys. Int'l, Inc.*, 243 F. Supp. 2d 1205 (D. Kan. 2003) ..............................................3

*Kernel Records v. Mosley*, 2010 U.S. Dist. LEXIS 69424 (S.D. Fla. July 5, 2010) ..........................20, 25-26

*King v. U.S. HUD*, No. 19-80410-BLOOM, 2019 U.S. Dist. LEXIS 54386 (S.D. Fla. 2019) ................12

*Klein & Heuchan v. CoStar Realty*, 707 F. Supp. 2d 1287 (M.D. Fla. 2010)............................10, 12

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936 (9th Cir. 2011) ......................9

*Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068 (9th Cir. 2013) .......................................7, 10, 18

*Mason v. Sony Pictures*, 2021 U.S. Dist. LEXIS 81497 (N.D. Ga. Apr. 28, 2021) ......................22-23, 25

*Merch. One, Inc. v. TLO, Inc.*, No. 19-cv-23719-BLOOM, 2020 U.S. Dist. LEXIS 7462 (S.D. Fla. Jan.
16, 2020) ...........................................................................................................................................18

*Metro-Goldwyn v. Grokster, Ltd.*, 545 U.S. 913 (2005) .................................................................6-7

*Neelu v. Boca*, 18-81445-BLOOM, 2019 U.S. Dist. LEXIS 129454 (S.D. Fla. Aug. 2019) ..........3, 21-23

*Negron v. Selene Fin., LP*, 2017 U.S. Dist. LEXIS 97283 (M.D. Fla. June 23, 2017)...............................18

*Oak Assocs., Ltd. v. Palmer*, 2006 U.S. Dist. LEXIS 4526 (E.D. Pa. Feb. 7, 2006) ...................................2
*Oldfield v. Pueblo De Bahia*, 558 F.3d 1210 (11th Cir. Fla. 2009) ........................................................ 20, 23
*Pegasus v. Northrop*, 2008 U.S. Dist. LEXIS 99985 (M.D. Fla. Nov. 24, 2008) ...................................18
*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F. 3d 1146 (9th Cir. 2007) ................................................7, 16
*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F. 3d 788 (9th Cir. 2007) ...............................................9, 17
*Plan Pros v. Torczon*, 2010 U.S. Dist. LEXIS 148765 (D. Neb. Nov. 17, 2010). ..................................... 8
*Religious Tech. v. Netcom*, 907 F. Supp. 1361 (N.D. Cal. 1995) ...........................................................9
*Response Reward v. Meijer*, 189 F. Supp. 2d 1332 (M.D. Fla. 2002) ...................................................22
*Roblor Mktg. Group, Inc. v. Gps Indus., Inc.*, 645 F. Supp. 2d 1143 (S.D. Fla. 2009) ...........................26
*Sanchez v. Fed. Bureau of Prisons*, 493 F. App'x 14 (11th Cir. 2012) ....................................................5
*Santilli v. Cardone*, 2008 U.S. Dist. LEXIS 111677 (M.D. Fla. July 18, 2008) ........................................24
*Sarvis v. Polyvore*, 2013 U.S. Dist. LEXIS 112539 (D. Mass. Aug. 9, 2013) .......................................11
*Shipping & Transit v. WOV, LLC*, No. 16-cv-80860-BLOOM, 2016 U.S. Dist. LEXIS 130501 (S.D. Fla. Sep. 21, 2016). ......................................................................................................................2, 22
*Smith v. BarnesandNoble.com*, 143 F. Supp. 3d 115 (S.D.N.Y. 2015) .....................................................5
*Sony Corp v. Universal City*, 464 U.S. 417 (1984) ..............................................................................5
*T-12 v. Young Kings*, 36 F. Supp. 3d 1380 (N.D. Ga. 2014) ...................................................................9
*Tarantino v. Gawker Media, LLC*, 2014 WL 2434647 (C.D. Cal. Apr. 22, 2014) .......................................7
*TMJ Practice v. Curran*, 2017 U.S. Dist. LEXIS 114557 (S.D. Fla. July 23, 2017) ..................................26
*UMG Recordings v. Bright House Networks, LLC*, 2020 U.S. Dist. LEXIS 122774 (M.D. Fla. July 8, 2020). ..........................................................................................................................................13
*UMG Recordings v. Grande Communs*, 2018 U.S. Dist. LEXIS 160492 (W.D. Tex. Sep. 20, 2018)...........15
*UMG Recordings v. Grande Communs. Networks*, 2018 U.S. Dist. LEXIS 224827 (W.D. Tex. Oct. 15, 2018) ....................................................................................................................................... 11-12
*UMG Recordings v. Grande Communs*, 2018 U.S. Dist. LEXIS 32275 (W.D. Tex. Feb. 28, 2018)...........15
*UMG Recordings v. Veoh Networks*, 2009 U.S. Dist. LEXIS 14955 (C.D. Cal. Feb. 2, 2009). ........... 12-13
*United Technologies v. Mazer*, 556 F.3d 1210 (11th Cir. 2009) ..........................................................20
*Venus Fashions v. ContextLogic, Inc.*, 2017 U.S. Dist. LEXIS 155748 (M.D. Fla. Jan. 17, 2017) ....... 16-17
*Vibe Micro v. Shabanets*, 878 F.3d 1291 (11th Cir. 2018)..................................................................18
*Waite v. AII Acquisition*, 901 F.3d 1307 (11th Cir. 2018)...................................................................21
*Weiland v. Palm Beach Cty.*, 792 F.3d 1313 (11th Cir. 2015) ..............................................................19
*Williams Elec. v. Honeywell*, 854 F.2d 389 (11th Cir. 1988).............................................................24
*Yparrea v. Twin Cities*, 2010 U.S. Dist. LEXIS 58232 (N.D. Fla. May 17, 2010)................................ 20-21
*Zagorsky v. Rhino Entm't*, 2019 U.S. Dist. LEXIS 153083(D. Ariz. Sep. 9, 2019)....................................14
*Zamora Radio, LLC v. Last.fm Ltd.*, 2011 U.S. Dist. LEXIS 69101 (S.D. Fla. June 28, 2011)...............25

## **Rules**

Fed. R. Civ. P. 10(b) ...........................................................................................................................18
Fed. R. Civ. P. 12(b)(3) ..................................................................................................... 3, 20, 26-27
Fed. R. Civ. P. 12(b)(6).............................................................................................................. 4, 18, 27

Statutes

*Fla. Stat.* § 48.193 (1)(a)(1) ................................................................................................................23
*Fla. Stat.* § 48.193 (1)(a)(2) ................................................................................................................24
*Fla. Stat.* § 48.193 (2)........................................................................................................................21

## I.  <u>PRELIMINARY STATEMENT.</u>

This lawsuit accuses various John Doe defendants – who utilized their own computers, BitTorrent software, and a VPN (virtual private network) service -- of infringing certain rights owned by the Plaintiffs.  The lawsuit was more recently amended to add Quadranet Inc. ("QI") and Quadranet Enterprises, LLC ("QE") (together "Quadranet") for tactical leverage – not because Quadranet directly infringed Plaintiffs' rights, controlled or supervised the alleged infringement, or even hosted the infringing content.  The operative First Amended Complaint [D.E. 24] ("FAC") is entirely baseless as to Quadranet, and through a series of pre-filing emails, Quadranet explained to Plaintiffs that the allegations in the FAC were untrue, lack evidentiary support, and unwarranted by existing law.  Unfortunately, Plaintiffs have ignored Quadranet's cautionary warning and charged ahead by presenting the FAC for an improper purpose and needlessly increase the cost of litigation.  The FAC must be dismissed for two separate reasons.

**First,** as to the claims against Quadranet, the FAC should be dismissed *with prejudice* because this lawsuit should never have been filed against either Quadranet entity.  Aside from the fact that the FAC is an impermissible shotgun pleading and should be dismissed on that basis alone, Count III does not plausibly allege a claim for contributory infringement when Quadranet's services are capable of, and overwhelmingly used for, substantial non-infringing uses, and because Quadranet is *at least* two steps removed from any "involvement" in the purported infringement.  *See Hydentra v. Luchian*, 2016 U.S. Dist. LEXIS 193457 (S.D. Fla. June 2, 2016).  QE solely leased physical computers (which acted as servers) to an encryption service, LiquidVPN, which *may* have then been used by *some* of LiquidVPN's customers (not Quadranet's customers) to access third-party software (the Popcorn Time BitTorrent software) to "torrent" copyrighted material.  Notably, the FAC does not accuse LiquidVPN of any wrongdoing.  Under the law, the act of simply leasing computer servers is not "substantial" enough to be considered a "material contribution" to the infringement, much like credit card companies are not liable when they merely process credit card payments to provide access to infringing websites.  Importantly, at no point was copyrighted material ever stored or hosted on Quadranet's servers, which renders Count III subject to dismissal with prejudice.

Count IV of the FAC for "vicarious liability" similarly fails to state a claim.  The FAC lacks plausible allegations detailing how Quadranet profited **directly** from the alleged infringement – because it did not – which renders any financial benefit from the alleged infringement remote, attenuated, and highly incidental (if at all), and not direct as required by law.  The claim also fails because the FAC fails to plead that Quadranet had the right and ability to supervise, control, and stop

the alleged infringement – it did not, and as a technical matter, cannot: Quadranet does and cannot not view, monitor, control, access, disable, or otherwise supervise any internet traffic that passes through its data centers. This applies to both legal content – such as viewing the news, sports, or entertainment data – as well as any allegedly infringing content.  If Plaintiffs seek a remedy, it is not from Quadranet.

**Second**, Quadranet respectfully urges the Court to dismiss this action *with prejudice*, as the Plaintiffs' lack of deliberation in asserting claims against Quadranet is not only evidenced by the absence of any merit in those claims, but also by the forum in which those claims were filed.  To be sure, and while contributory and vicarious infringement claims should have never been asserted against Quadranet, they most certainly should not have been brought in Florida.  In fact, the case-caption shows that **twenty-eight (28) of the Plaintiffs are located in states having district courts within the Ninth Circuit Court of Appeals** (*e.g.* California, Nevada, and Wyoming) where, unsurprisingly, the majority of copyright infringement cases involving movies, entertainment, and other media are filed.  **None of the Plaintiffs are Florida-based companies**.  The dispute between Plaintiffs and Quadranet has no ties to Florida (and as explained below, allegations of Miami-based servers are a red herring).  As to why Plaintiffs filed suit against Quadranet in a district court within the Eleventh Circuit, it appears that Plaintiffs are engaged in *per se* forum shopping in order to avoid unfavorable law dooming their claims – a tactic "historically disfavored by federal courts…"  *Eastridge v. Norfolk*, 2008 U.S. Dist. LEXIS 125126, at *89 (N.D. Ala. Feb. 15, 2008).[1]  Regardless, because QI (a California corporation) has no business activity, and **zero** contacts with this forum, this Court should find that exercising jurisdiction over QI would be improper and violative of due process. With respect to QE (a Delaware corporation with a principal place of business in California), general jurisdiction cannot be exercised since it is not "at home" in Florida, a principal recognized by this Court's opinion in *Shipping & Transit v. WOV, LLC*, No. 16-cv-80860-BLOOM, 2016 U.S. Dist. LEXIS 130501, at *5 (S.D. Fla. Sep. 21, 2016).  Specific jurisdiction is equally lacking because, notwithstanding QE's data center in Florida, this facility has no connection to the alleged infringement at issue in this case. This Court has recognized that in order for specific jurisdiction to attach, "[t]he business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort."[2]

---

[1] *Oak Assocs., Ltd. v. Palmer*, 2006 U.S. Dist. LEXIS 4526, at *10 (E.D. Pa. Feb. 7, 2006) ("The act of forum shopping is the selection of a court with an eye towards…the avoidance of unfavorable law in an alternate forum.").

[2] *Neelu Aviation v. Boca*, 18-cv-81445-BLOOM, 2019 U.S. Dist. LEXIS 129454 (S.D. Fla. Aug. 2, 2019).

Relatedly, the FAC should be dismissed under Rule 12(b)(3) since Quadranet does not reside in Florida, and because none of the events giving rise to the claims against Quadranet occurred in this district.

For all of these reasons, and based upon the arguments and legal authorities set forth below, the FAC should be dismissed.

## II. RELEVANT BACKGROUND AND SUMMARY OF QE'S BUSINESS MODEL

The allegations in the FAC arise out of internet users' alleged reproduction and dissemination of purported infringing content using a communication protocol for peer-to-peer file sharing known as "BitTorrent."  BitTorrent protocols locate users with files that other users want, at which point small portions of those files are then downloaded simultaneously resulting in faster transmission rates (as opposed to file transfer protocols, which download files sequentially from only one source).  The crux of the allegations in the FAC is that without the Plaintiffs' authorization, permission, or consent, their copyrighted motion pictures were illegally downloaded, copied, and distributed by various "John Does" who masked their internet protocol ("IP") address using a Virtual Private Network ("LiquidVPN") to conceal such movie piracy.

Untethered to any of this nefarious activity is QE, which has, as part of his routine business operations for the past two decades, merely leased dedicated computers which operate as servers. (Ex. 1, ¶16).  These servers are connected to the internet and utilized by Quadranet's corporate customers for a variety of purposes such as web hosting, videogaming, cloud computing, or in this case, providing services for a virtual private network ("VPN"). (Ex. 1, ¶17-18).[3] Due to advances in technology which make unlawful activities (such as identity theft and hacking) more possible and easier to execute, VPN services are frequently used for security and privacy.[4] As a result, many users conduct online activity through a VPN including online banking, paying bills, or accessing other sensitive information such

_____

[3] A VPN creates a private network from a public internet connection such that the user's online actions and IP address are made private and undetectable as they connect a home computer to a website hosted on a distant server. *See Kephart v. Data Sys. Int'l, Inc.*, 243 F. Supp. 2d 1205, 1212 n.11 (D. Kan. 2003) (stating that a VPN is "a set of computers on a public network (such as the internet) that can communicate among themselves with encryption technology, so that their messages are safe from interception by unauthorized users, as if the computers were connected by private lines."). A VPN has been described as creating a "tunnel" between the user's computer and the desired website by encrypting the data sent over a public internet network. Any web activity of the user is associated with the IP address belonging to the VPN server, *not* the user's IP address.  (Ex. 1, ¶17-21).

[4] QE's peers include companies such as AWS (Amazon) cloud services, Hivelocity (https://www.hivelocity.net), Performive (https://performive.com), and THG Hosting (https://thghosting.com).

as healthcare or social security records (Ex. 1, ¶22); even *law firms* are advised to use VPN's in order to more securely protect attorney-client privileged communications, and to ward against data breaches.[5]

QE's many subscribers, and specific to the instant case, LiquidVPN, install and maintain their *own* software on QE's computers.  However, much like a power company is responsible for ensuring that electricity stays on, QE is only responsible for ensuring that the servers stay connected to the internet. (Ex. 1, ¶23). Aside from providing technical support pertaining to hardware issues, power supply, and internet connection to the servers, Quadranet has no involvement with the software that its lessees install on the servers, and similarly has no direct access to the software (Ex. 1, ¶23).  Succinctly stated, Quadranet provides basic internet infrastructure services only.

The FACT does not (and cannot) allege that Quadranet has any connection to BitTorrent (or any other file-sharing websites for that matter), or that Quadranet profits from such protocols.  It similarly fails to allege that Quadranet has the ability and right to control any of the "John Does'" online activity, presumably because the Plaintiffs recognize that the direct infringers **are not even QE's customers**, but rather *LiquidVPN's* customers.  There are no allegations in the FAC that QE receives any money whatsoever from the direct infringers, or that QE profits directly from the purportedly infringing activity.  The FAC does not and cannot allege that QE provides any file-sharing services to subscribers (because QE does not), or that QE directs any internet traffic (much less to BitTorrent or other file sharing protocols).

The liability that Plaintiffs seek to impose on QE is unprecedented.  QE had no more involvement in any of the alleged misconduct than hardware manufacturers (which provided the direct infringers with computers and routers), power utility companies (which provided the direct infringers with electricity), or the Internet Corporation for Assigned Names and Numbers ("ICANN") (which provided LiquidVPN with a web address).  All claims against Quadranet must be dismissed for failure to state a claim.

### III.   COUNTS III, IV, AND VI SHOULD BE DISMISSED UNDER RULE 12(b)(6).

On a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl.*

---

[5] https://www.forbes.com/sites/forbestechcouncil/2019/09/04/protecting-attorney-client-privilege-with-a-vpn/?sh=4b3ce5ba5f1e.

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Sanchez v. Fed. Bureau of Prisons*, 493 F. App'x 14, 15 (11th Cir. 2012) (internal citation omitted).  The Court "should not assume that the plaintiff can prove facts that were not alleged." *Equal Employment v. STME, LLC*, 309 F. Supp. 3d 1207, 1211 (M.D. Fla. 2018) (citation omitted).  Dismissal is appropriate if "there is a dispositive legal issue which precludes relief." *Id.*

### A. Plaintiffs' Contributory Infringement Claim (Count III) Should Be Dismissed.

"The Eleventh Circuit has stated the well-settled test for a contributory infringer as 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'"  *Hydentra HLP Int. Ltd. v. Luchian*, 2016 U.S. Dist. LEXIS 193457, at *33 (S.D. Fla. June 2, 2016) (internal citation omitted); *see also Sony Corp v. Universal City*, 464 U.S. 417, 437 (1984) (recognizing that the Supreme Court has defined a contributory infringer as one who "was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner."). Furthermore, the Eleventh Circuit has explicated that "[t]he standard of knowledge is objective: 'Know, or have reason to know.'" *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987) (*citing Gershwin v. Columbia Artists*, 443 F.2d 1159, 1162 (2d Cir. 1971)). Contributory infringement will not be found if the product in question is capable of "substantial non-infringing uses," which results in wide use "for legitimate, unobjectionable purposes." *Sony*, 464 U.S. at 442.

1. For **_20 Years_**, Quadranet's Services Have Been Used for Substantial Non-Infringing Uses.

The Court should dismiss Count III for the simple reason that Plaintiffs have failed to allege that Quadranet's services have no substantial non-infringing uses. Dismissal with prejudice is warranted on this basis because Plaintiffs cannot credibly do so – without further violating Rule 11 – even if given leave to amend. The law is well-settled that even "a defendant who distributes a product that materially contributes to copyright infringement will not be liable for contributory infringement if the product is also widely used for legitimate, unobjectionable purposes or is merely capable of substantial non-infringing use." *Arista Records v. Lime Grp.*, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011). "The [*Sony*] rule requires a court to determine whether a product or service is *capable* of substantial non-infringing uses, not whether it is currently used in a non-infringing manner." *Smith v. BarnesandNoble.com*, 143 F. Supp. 3d 115, 125 (S.D.N.Y. 2015) (internal citation omitted).

In addressing a similar matter, the court in *Hydentra HLP v. Luchian*, 2016 U.S. Dist. LEXIS 193457 (S.D. Fla. June 2, 2016) acknowledged that *Sony* only considered the sale of products, and that the *Sony* opinion was written while the internet was in its infancy. Thus, the *Hydentra* court looked to

*Metro-Goldwyn v. Grokster, Ltd.*, 545 U.S. 913, 932-33 (2005), where the Supreme Court found that at the time of the lawsuit, Grokster's "products were, and had been for some time, overwhelmingly used to infringe." *Id.* at 948. In fact, the infringement was the "overwhelming source of revenue from the products," and Grokster's products were not even capable of substantial non-infringing uses. *Id.* Based on this analysis, the *Hydentra* court determined that a contributory infringement claim cannot be successful as long as a website or internet service is capable of substantial non-infringing purposes which are legitimate and unobjectionable even if, as was the case in *Hydentra*, infringing content is, at times, hosted on the website. *Hydentra*, 2016 U.S. Dist. LEXIS 193457 at *37-40.

In the instant case, Quadranet does not operate or facilitate the "Popcorn Time" BitTorrent software used by the alleged infringers to distribute copyrighted materials (nor do the Plaintiffs allege to the contrary). Quadranet also does not operate the VPN software that the infringers use to gain access to the BitTorrent software. (Ex. 1, ¶23). Quadranet has no contracts or contacts with the accused Doe defendants. Rather, QE merely operates *data centers* that provide general internet utilities and infrastructure of the type used to keep the world wide web running and interconnected. The Plaintiffs in fact acknowledge this much, as they point to: (1) Quadranet operating a facility in Miami that provides a data center, dedicated servers, and colocation services [FAC, ¶69]; and (2) Quadranet's website (www.quadranet.com) and blog (blog.quadranet.com) [FAC, ¶258, 259].[6]

Even a cursory review of Quadranet's website demonstrates that it is engaged by a multitude of clients as an unobjectionable data center providing a multitude of services that, obviously, have nothing to do with copyright infringement. In fact, Quadranet: (1) provides dedicated servers for companies and individuals to host software (*e.g.* video game servers, healthcare records, etc.); (2) has been named as a top service provider among its peers; (3) regularly attends trade shows and conventions; and (4) publishes a newsletter on its blog to keep its customers and potential customers apprised of its advancement activities. [https://blog.quadranet.com/]. This reality immediately disproves the knowingly false picture painted by the Plaintiffs, which suggest that Quadranet's sole existence is to host the LiquidVPN software. To the contrary, VPN services account for less than 3% of QE's revenue; even more limited, and while somewhat difficult to calculate because the number is

---

[6] Because Quadranet's website is incorporated by reference within the four-corners of the FAC, the Court may and should consider www.quadranet.com for purposes of the instant motion to dismiss. *See, e.g., Atl. Recording v. Project Playlist*, 603 F. Supp. 2d 690, 694 n.3 (S.D.N.Y. 2009) (drawing facts from "Court's own review of the website" on a motion to dismiss because the website was incorporated by reference into the complaint).

so small, revenue from leasing servers to LiquidVPN accounted for less than 0.00001% of QE's revenue during the relevant lease period. (Ex. 1, ¶24-25). The reality is that QE has over 15,000 customers involved in a wide array of services and sectors, and indeed the majority of QE's revenue is derived from colocation and managed services, ***not*** from hosting VPN software (Ex. 1, ¶26-27), much less from providing services to LiquidVPN.

In light of the foregoing, and because Quadranet's services are capable of substantial non-infringing uses, Count III should be dismissed.

2. <u>Count III Fails to Allege that Quadranet Acted with Culpable Intent</u>.

Contributory infringement requires the Plaintiffs to allege that Quadranet acted with "culpable intent." *Metro–Goldwyn v. Grokster, Ltd.*, 545 U.S. 913, 934 (2005); *see also Cobbler Nevada v. Gonzales*, 901 F.3d 1142, 1148 (9th Cir. 2018) ("Nothing in [the] complaint alleges, or even suggests, that [defendant] actively induced or materially contributed to the infringement through purposeful, culpable expression and conduct.") (internal citation omitted). "An allegation that a defendant merely provided the means to accomplish an infringing activity is insufficient to establish [the] claim." *Tarantino v. Gawker Media, LLC*, 2014 WL 2434647, at *3 (C.D. Cal. Apr. 22, 2014). Even where the defendant is "[a] computer system operator," showing the requisite intent requires alleging (and later proving) that the defendant "has *actual* knowledge that *specific* infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F. 3d 1146, 1172 (9th Cir. 2007) (emphases in original; citation omitted).

Nowhere does the FAC allege that Quadranet had actual knowledge of the specific infringing material, and while Plaintiffs will inevitably gripe about the number of "take down notices" purportedly sent by the Plaintiffs to Quadranet, as well as alleged "inaction" by Quadranet, both are irrelevant to establishing this element of the claim. Instead, to "be liable for contributory copyright infringement, the knowledge required is more than a generalized knowledge by the [service provider] of the possibility of infringement." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (finding that contributory liability does not automatically follow merely because a system allows for the exchange of copyrighted material). The Ninth Circuit has emphasized that "actual knowledge of specific acts of infringement is required," and that the number of notices "gives at most a general knowledge that infringement will likely occur again in the future; this does not give notice of any specific acts of infringement that are actually occurring." *Id* (internal citation omitted). Moreover, absent evidence of intent, which Plaintiffs did not even allege, a court is unable to find contributory

infringement liability merely based on a failure to take affirmative steps to prevent infringement." *Plan Pros v. Torczon*, 2010 U.S. Dist. LEXIS 148765, at *13 (D. Neb. Nov. 17, 2010).

Here, since *LiquidVPN* obscures and encrypts the online activities of its subscribers, *even if* QE could view the data passing through the VPN (which it cannot), QE would not be able to discern what content the data includes or where the data is being routed. It is technologically (and therefore literally) impossible for Quadranet to have had actual knowledge that specific infringing material was available using its servers. Moreover, although the FAC contends that the direct infringers used LiquidVPN to obtain copies of the copyrighted material via certain BitTorrent software, due to the fact that the BitTorrent protocol utilizes many different hosts to transmit a small fraction of data at a single moment in time, no "copy" of a copyrighted work was stored on Quadranet's servers.[7]  In other words, the "copy" of the work is only created *on the BitTorrent user's computer* after the user has downloaded all necessary components from various computers in the "swarm."

Quadranet never had the ability to stop any actions of infringement complained of in the FAC. The only "direct" infringers are the "John Does" utilizing the "Popcorn Time" BitTorrent service, and **none of these "John Does" are Quadranet's customers**. Therefore, Quadranet had no obligation, much less the right or capability, to take any action to address the alleged direct infringement.  *See Plan Pros*, 2010 U.S. Dist. LEXIS 148765, at *13 (D. Neb. Nov. 17, 2010) ("In the absence of evidence of intent, a court is unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement.").[8]

3. The FAC Fails to Allege That Quadranet "Materially Contributed" to the Infringing Conduct of Another, and That Quadranet's Alleged Participation was "Substantial."

In Count III, Plaintiffs alleged that the other named defendants contributorily infringed on a theory of "inducement;" as to Quadranet, however, Plaintiffs alleged contributory infringement on a more difficult theory of "material contribution." A third party can only be liable for materially contributing to infringement where its participation in the infringing conduct of the primary infringer is "substantial."  *Religious Tech. v. Netcom*, 907 F. Supp. 1361, 1375 (N.D. Cal. 1995) ("*Netcom*") (citing *Gershwin Publ'g*, 443 F.3d at 1162); *see also Apple v. Microsoft*, 821 F. Supp. 616, 625 (N.D. Cal.

---

[7] "[A] torrent file is only an "encrypted, unusable chunk of zeroes and ones," and not a copy within the legal definition. *Ingenuity v. Doe*, 2013 U.S. Dist. LEXIS 16952 at *7 (N.D. Cal. Feb. 7, 2013).

[8] This is despite the fact that Quadranet maintains an automated system to address abuse tickets, which automatically forwards a notice of infringement to the customer assigned to the IP address to which the abuse pertains. (Ex. 1, ¶29-30). Indeed, Quadranet's records indicate that between 50 and 100 abuse tickets were received, processed, and forwarded to LiquidVPN. (Ex. 1, ¶31).

1993); *Demetriades v. Kaufmann*, 690 F. Supp. 289, 294 (S.D.N.Y. 1988)). As the case law makes clear, not every entity who provides commercial services to a direct infringer is liable for contributory infringement. *See, e.g., Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F. 3d 788 (9th Cir. 2007) (credit card companies did not materially contribute to infringing activities of the plaintiff's copyright material, they merely processed credit card payments to provide access to allegedly infringing websites).

In the context of providing servers and data center services, the opinion from *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936 (9th Cir. 2011) is highly instructive as to what constitutes a "substantial" contribution. In that case, two separate defendants were accused of contributory infringement, Managed Solutions Group, Inc. ("MSG") and Akanoc Solutions, Inc. ("Akanoc"). MSG owned and leased servers to Akanoc. In turn, Akanoc hosted the websites where infringement occurred, routed internet traffic to and from the sites, and had direct control over the "master switch" that kept the websites online and available. The district court set aside a jury verdict against MSG, which the Ninth Circuit upheld on appeal, because MSG did not "operate[ ] the servers that hosted the direct infringers' websites," and similarly had no "reasonable means to withdraw services to the direct infringers." *Id.* at 942.

Here, and even taking all of the assertions in the FAC as true, Quadranet's alleged "contribution" to the infringement is even further removed from that of MSG. In *Louis Vuitton*, the infringing material was actually hosted on the servers owned by MSG. Conversely in the instant case, QE does not host, manage, or control the infringing content, nor does it host the BitTorrent software used to transmit the infringing content. Instead, QE merely provides server space to many third-party subscribers, one being LiquidVPN; a portion of that third-party's customers (*i.e.* **not** Quadranet's customers) then apparently used LiquidVPN to access the BitTorrent software. Quadranet has no access to or control over LiquidVPN's customers, and any allegedly infringing content is fully encrypted by the VPN such that Quadranet has no way to determine *what* the transmitted content contains. Quadranet does not control or review the content (nor does it even have the means to do so), and due to the decentralized nature of the BitTorrent protocol, a complete copy of a copyrighted work is never concurrently in transit through QE's servers. **Put another way, LiquidVPN's users are not placing the accused materials on QE's services.** Rather, the BitTorrent protocol utilizes many different hosts to transmit a small fraction of data at a single moment in time. Thus, with or without QE's provision of services to LiquidVPN, LiquidVPN's end users could still share material using the BitTorrent software. (Ex. 1, ¶28).

The Ninth Circuit's opinion in *ALS Scan v. Steadfast*, 819 Fed. App'x 522 (9th Cir. 2020) is also

instructive.  There, the court held that a computer system operator that leased servers to an allegedly infringing website could not be held liable for contributory infringement when it took the "simple measure" of forwarding notices of claimed infringement to the website, and there was no evidence that the defendant had "other simple measures at its disposal."  *Id.* at 524. Similarly here, Quadranet undertook the "simple measure" of forwarding the notices that it received, and the FAC fails to allege that Quadranet had other measures at its disposal. In sum, because QE merely provides basic internet infrastructure, there can be no liability for contributory infringement.

**B.  Plaintiff's Vicarious Infringement Claim (Count IV) Should Be Dismissed.**

"Vicarious copyright liability is an 'outgrowth' of respondeat superior,"[9] and applies only where the defendant "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.'" *Hydentra v. Luchian*, 2016 U.S. Dist. LEXIS 193457, at *40 (S.D. Fla. June 2, 2016) (internal citation omitted). A plaintiff must plead sufficient ultimate facts showing that the "defendant must have the right and ability to supervise the infringing activity and must have a direct financial interest." *Id.* As detailed below, Count IV should be dismissed because the FAC failed to allege that Quadranet: (1) profited ***directly*** from the infringement; and (2) had the ability to supervise, control, and stop the purported infringing activity.

1. Quadranet Did Not Profit Directly from the Alleged Infringing Activity.

"Liability for vicarious copyright infringement arises 'when the defendant profits ***directly***'" from the alleged infringing activity.  *BUC Int'lv. Int'l Yacht*, 489 F.3d 1129, 1138 n.19 (11th Cir. 2007) (internal citation omitted) (emphasis added). "[N]ot every benefit is a ***direct*** financial benefit," and there must be a "'causal relationship' between the infringing activity and a financial benefit reaped by [the defendant]." *Klein & Heuchan v. CoStar Realty*, 707 F. Supp. 2d 1287, 1299 (M.D. Fla. 2010) (emphasis added). Furthermore, the infringing activity must be the "draw" for customers or subscribers. *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004) ("Financial benefit exists where the availability of infringing material acts as a 'draw' for customers.").

*a.  Plaintiffs Failed to Plead That Quadranet Profited Directly.*

The analysis in determining whether a defendant profited directly or incidentally is rooted in the "swap shop" and "dance hall" cases, "which deal, on the one hand, with the landlord leasing his property at a fixed rental to a tenant who engages in copyright-infringing conduct on the leased premises and, on the other hand, the proprietor or manager of a dance hall or music hall leasing his

---

[9] *Luvdarts, Ltd. Liab. Co. v. AT&T Mobility, Ltd. Liab. Co.*, 710 F.3d 1068, 1071 (9th Cir. 2013)

premises to or hiring a dance band, which brings in customers and profits to the proprietor by performing copyrighted music but without complying with the terms of the Copyright Act." *Shapiro v. H. L. Green*, 316 F.2d 304, 307 (2d Cir. 1963). In the former, where the landlord "charges a fixed rental and receives no other benefit from the infringement, and contributes in no way to it, it has been held that the landlord is not liable for his tenant's wrongdoing." *Id.* Conversely in the "dance hall" cases, the proprietor is often held "liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income." *Id.*

The Southern District of Florida undertook this analysis in *Coach, Inc. v. Swap Shop*, 916 F. Supp. 2d 1271 (S.D. Fla. 2012), where the designer handbag retailer sued multiple defendants, including a flea-market operator and the landlord, for copyright infringement and other related claims pertaining to the sale of knock-off handbags, wallets, and other merchandise. *Id.* at 1282-83. The court determined that the plaintiff had alleged sufficient ultimate facts as to the actual swap shop management company in charge of the premises, because it "obtained a direct financial benefit from the infringing activity." *Id.* Namely, it received rents from vendors, "including those selling fake Coach products, along with parking and concession fees, which are fueled in large part by the draw created by the widespread availability of fake Coach products at the Flea Market." *Id.* However, Coach's vicarious liability claim *against the landlords* was dismissed because the landlords did not receive any direct financial benefit from the allegedly infringing activity, and instead only received rental revenue from leasing the property to the operators of the Flea Market. *Id.*

Just like the landlords received no direct benefit in the *Swap Shop* case from leasing out their physical space, QE received no direct benefit from leasing its server space; instead, QE is paid for the amount and quality of servers, hosting solutions, and data center services that it provides. QE does not know, however, what type of activity takes places on its servers, nor does QE have the power to control or supervise that activity. Furthermore, QE earns the same amount of revenue from its clients irrespective of what activity is transmitted through the use of QE's services. Accordingly, and pursuant to *Swap Shop*, Count IV should be dismissed because Quadranet has no obvious and direct financial benefit connected to any infringement of Plaintiff's copyrighted materials. *See Sarvis v. Polyvore*, 2013 U.S. Dist. LEXIS 112539, at *27 (D. Mass. Aug. 9, 2013) (dismissing claim because the plaintiff failed to allege "'an obvious and direct financial interest in the exploitation of copyrighted materials.'").

    *b.  There Are No Factual Assertions to Support Quadranet's Alleged Receipt of a <u>Direct</u> Financial Benefit.*

While the FAC does include a conclusory assertion that Quadranet "has derived a direct

financial benefit from the infringement of Plaintiffs' copyrights" [D.E. 24, ¶371], this bare allegation is insufficient to state a claim.  This Court has recognized that a well-pled complaint "requires more than bare allegations or conclusions by the plaintiff. The *factual assertions* must be sufficient to allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct." *King v. U.S. HUD*, No. 19-cv-80410-BLOOM, 2019 U.S. Dist. LEXIS 54386, at *2 (S.D. Fla. Mar. 27, 2019) (emphasis added).  In examining the rest of the FAC, Plaintiffs failed to advance any sufficient ultimate facts detailing how Quadranet received a direct financial benefit from the infringing content.

This pleading deficiency alone is fatal to Count IV, because in cases considering "whether defendants received a direct financial benefit because of the 'draw' of infringing content, the defendant allegedly enjoyed a financial benefit that consumers paid to the defendant." *UMG Recordings v. Veoh Networks*, 2009 U.S. Dist. LEXIS 14955, at *15-16 (C.D. Cal. Feb. 2, 2009). For example, in *Napster*, the court "addressed an on-line business that allowed its customers to copy copyrighted songs and provide them to others. The trial court had found that Napster's future revenue was *directly dependent* upon increasing its customer base and that virtually all of Napster's 'draw' of customers resulted from it providing access to infringing material." *Klein & Heuchan*, 707 F. Supp. 2d at 1298 (internal citation omitted) (emphasis added).

The Ninth Circuit subsequently distinguished *Napster* in *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004). There, Ellison's copyrighted works were posted by Robertson to a "Usenet" newsgroup, which was then forwarded and copied throughout the Usenet to servers all over the world, including to those belonging to America Online, Inc. ("AOL").  *Id.* at 1074.  The Ninth Circuit found that unlike "virtually all of Napster's 'draw' of customers [which] resulted from Napster's providing access to infringing material…AOL's USENET group access constituted a relatively insignificant draw when cast against AOL's vast array of products and services," and thus "AOL did not receive a direct financial benefit from the infringing activity."  *Id.* at 1078.

Here, Quadranet was in existence long before the complained-of activities, and QE's revenues have no correlation or dependence whatsoever on providing access to the allegedly infringing material. (Ex. 1, ¶24-27).  Moreover, the FAC does not (and cannot) allege that Quadranet received any fees or subscription payments from those "John Doe" defendants who allegedly misappropriated the infringing works.  In reality, QE is analogous to AOL from the *Ellison* decision, in that QE offers a vast array of services to clients all around the world, and received no direct financial benefit from the allegedly infringing activity. (Ex. 1, ¶16, 18). In sum, and while the FAC wholly fails to outline what exact "benefit" Quadranet purportedly received (if any), whatever benefit Plaintiffs try to muster up

in their response will inevitably be "too far removed from the alleged infringement to be considered a 'direct' financial interest." *Veoh Networks, Inc.*, 2009 U.S. Dist. LEXIS 14955, at *17 (C.D. Cal. Feb. 2, 2009).  On that basis alone, Count IV should be dismissed for failing to meet the first *prima facie* element of the claim.

   *c. Plaintiffs Failed to Allege That the <u>Main</u> Draw is Access to the Infringing Content.*

  As another independent basis to dismiss Count IV, the FAC fails to allege that the <u>main</u> draw for QE subscribers is access to the infringing content. A recent case from the Middle District of Florida sheds light on this issue, as it clarified the limited scope of a vicarious liability claim, and the requirement that the very success of the defendant's venture must depend on the infringing activity. In *Bright House*, the plaintiffs sought to impose liability on "one of the largest ISPs in the country," and claimed "that Bright House receives a direct financial benefit from its users' infringement because 'at least some percentage of [Bright House's] customers are drawn to its service, at least in part, by the ability to infringe.'" *UMG Recordings v. Bright House Networks, LLC*, 2020 U.S. Dist. LEXIS 122774, at *14-15 (M.D. Fla. July 8, 2020).  In support of the "direct financial interest" prong, the plaintiffs alleged that Bright House's "failure to police its infringing subscribers adequately drew subscribers to purchase Bright House's services," and that "Bright House subscribers have illegally downloaded and distributed Plaintiffs' music on a 'massive' scale." *Id.*  The court concluded that the plaintiff had failed to state a viable claim under "binding precedent that, even if liability is to be established under a 'draw' theory, liability must, nonetheless, be based upon a *direct* financial benefit to the alleged vicarious infringer." *Id.* at *16 (emphasis in original).  Furthermore, the court found that:

> [A] plaintiff must be prepared to show and must, therefore, allege that the availability of infringing content provide[s] the *main* customer 'draw' to the [service].' Put differently, 'the very success of the [defendant's] venture [must] depend[ ] on the [infringing] activity.' Absent this limitation, the 'draw' theory 'would provide essentially for the limitless expansion of vicarious liability into spheres' far removed from the factual settings in which vicarious liability arose—employer-employee and independent-contractor relationships. Moreover, requiring that the availability of infringing material be the primary customer draw to the service ensures that a defendant will be held vicariously liable only if it has 'an obvious and direct financial interest in' the infringing conduct.

*Id.* at *16-17 (emphasis in original) (brackets in original) (internal citations omitted).  In dismissing the plaintiff's cause of action, the court held that regardless of the plaintiff's allegation, there was no "reasonable inference…that the *main* draw for Bright House subscribers is access to infringing content generally available on the internet." *Id.* at *19 (emphasis in original).

  The *Bright House* opinion from the Middle District of Florida also cited to *UMG Recordings v.*

*Grande Communs*, 2018 U.S. Dist. LEXIS 32275 (W.D. Tex. Feb. 28, 2018) with approval. In *Grande Communs*, the defendant's motion to dismiss was granted because, with respect to the direct financial interest prong, the plaintiff merely alleged that "the availability of music – and particularly UMG's music – ***acts as a powerful draw*** for users of Grande's service, who use that service to download infringing music files using BitTorrent protocols." *Id.* at *28-29 (emphasis added). The court found that this allegation was "not sufficient to show the 'direct financial interest' necessary to support a vicarious infringement claim." *Id.*

Similarly in the instant case, the Plaintiffs made the exact same conclusory allegation, namely, that "the ability of subscribers such as the LiquidVPN Defendants to use Quadranet's service to host and operate their so-called 'Popcorn Time VPN' to distribute copies of Plaintiffs' Works while concealing their end users' identities ***acts as a powerful draw*** for users of Quadranet's service." [D.E. 24, ¶372].  This bald assertion is insufficient to state a claim, as recognized by the court in *Grande Commmuns*.  Count IV should therefore be dismissed with prejudice because the FAC failed to allege that the very success of Quadranet's business depends on the infringing activity, and that the main draw for Quadranet subscribers is access to the infringing content.

    *d.  The FAC Fails to Plead That the Allegedly Infringing Content Affected Quadranet's Client Base.*

Count IV of the FAC is equally deficient because it fails to plead that the allegedly infringing content affected Quadranet's client base in any way, which in turn reveals that Quadranet did not profit directly from the alleged wrongdoing.  The opinion from *Zagorsky* is instructive on this point, where the plaintiff sued eBay for vicarious copyright infringement because box sets of the plaintiffs' copyrighted works, "including *All Night Long* were available in 2017 on auction websites, such as Defendant eBay's website." *Zagorsky v. Rhino Entm't*, 2019 U.S. Dist. LEXIS 153083, at *7 (D. Ariz. Sep. 9, 2019).  Following eBay's motion to dismiss, the court examined the "direct financial interest" prong, and found that the complaint failed to include any "factual allegations that the listing of the *All-Night Long* track on Defendant eBay's site affected Defendant eBay's user base in any way, and thus, Plaintiff has not alleged facts that Defendant eBay had a direct financial interest in others' alleged direct infringement of her copyright. Consequently, Plaintiff has failed to state a plausible claim for vicarious liability for copyright infringement under § 106(3) against Defendant eBay." *Id.* at *25-26.

In addition to the fact that the allegedly infringing content was not "hosted" or "stored" on QE's servers, revenue from leasing servers to LiquidVPN accounted for less than 0.00001% of QE's revenue during the relevant lease period. (Ex. 1, ¶24-25). Whether or not the "John Does" ever infringed the Plaintiffs' copyrighted works is immaterial to QE's revenues, and does not affect QE's

subscriber base in any way. Therefore, neither Quadranet defendant had any direct financial interest in the end user's alleged infringement, and Count IV should be dismissed.

       *e.*   *The Disputed Number of "Take Down Notices" is Irrelevant to the Viability of Plaintiffs' Claim.*

In an attempt to save Count IV from dismissal with prejudice, Plaintiffs may attempt to claim that Quadranet did not take any action after purportedly receiving hundreds of "take down notices." Even if true – solely for purposes of the instant motion to dismiss – that allegation has no bearing on the viability of a vicarious infringement claim, which the opinion from *Grande Communs* makes clear. In that case, the court originally dismissed the plaintiffs' vicarious liability claim because the plaintiffs failed "to plead that 'the infringing activity constitutes a draw for subscribers, not just an added benefit.'" *Grande Communs*, 2018 U.S. Dist. LEXIS 160492, at *7 (W.D. Tex. Sep. 20, 2018), *report and recommendation adopted by UMG Recordings v. Grande Communs. Networks*, 2018 U.S. Dist. LEXIS 224827, at *3 (W.D. Tex. Oct. 15, 2018).  Following discovery, plaintiffs sought leave to amend their complaint based upon "newly discovered evidence," namely, that "**Grande refused to terminate a single user for copyright infringement from at least 2011 through 2016, while continuing to profit from the fees paid by using infringers**." *Grande Communs*, 2018 U.S. Dist. LEXIS 160492, at *7 (W.D. Tex. Sep. 20, 2018) (emphasis added).  According to the plaintiffs, their proposed amended claim for vicarious liability was viable because "Grande never terminated any user regardless of how many notices of infringement it received," which suggested "that Grande's failure to terminate infringers is a draw."  *Id.*  The court disagreed, and *again* dismissed the proposed vicarious liability claim, stating:

> Plaintiffs still fail to plead facts showing Grande gained or lost customers *because of* its failure to terminate infringers. Instead, the proposed amended complaint states that, "the evidence demonstrates that Plaintiffs' Copyrighted Sound Recordings were a draw to Grande's infringing customers, including customers Grande had identified as repeat infringers." Dkt. No. 85-4 at 16. But as has been noted in prior orders, the means by which Plaintiffs contend the infringing subscribers infringed the Copyrighted Sound Recordings by use of the internet and the BitTorrent protocol, which one can access through *any* ISP. Again, the draw must be something more than this to state a vicarious infringement claim. The allegedly "new" facts are insufficient to overcome the deficiencies of the original Complaint.

*Id.* at *8-9 (emphasis in original).

In the instant case, and even though the number of "take down notices" is disputed (Ex. 1, ¶29-31), that issue is irrelevant for purposes of a motion to dismiss.  The number of notices Quadranet received, and whether it terminated any subscribers (assuming even that it could, since they were LiquidVPN's customers), has no bearing on the Plaintiffs' claim.

    2.  <u>Quadranet Did Not Have the Ability to Supervise, Control, and Stop the Infringing Activity.</u>

Under the second prong of vicarious copyright infringement, a "'plaintiff must establish that the defendant exercises the requisite control over the direct infringer…'" *Venus Fashions v. ContextLogic, Inc.*, 2017 U.S. Dist. LEXIS 155748, at *34 (M.D. Fla. Jan. 17, 2017) (internal citation omitted).  "[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Id.* "The determination of whether a defendant has the capacity to halt infringement is determined by examining the system's 'current architecture.'" *Id.* at *73 (internal citation omitted). For example, in distinguishing the Google search engine from the Napster file-sharing system, the court in *Perfect 10* found that with respect to Napster:

> [T]he infringing conduct was the use of Napster's 'service to download and upload copyrighted music.' Because Napster had a ***closed system*** requiring user registration, and could terminate its users' accounts and block their access to the Napster system, Napster had the right and ability to prevent its users from engaging in the infringing activity of uploading file names and downloading Napster users' music files through the Napster system.  By contrast, Google cannot stop any of the third-party websites from reproducing, displaying, and distributing unauthorized copies of Perfect 10's images because that infringing conduct takes place on the third-party websites. Google cannot terminate those third-party websites or block their ability to 'host and serve infringing full-size images' on the Internet.

*Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1174 (9th Cir. 2007) (*citing to A&M Records v. Napster*, 239 F.3d 1004, 1011 (9th Cir. 2001) (emphasis added).  Similar to an ISP like Verizon, or a search engine like Google, QE is a data center that does not operate within a closed system network. For example, QE cannot stop any of its clients from engaging in certain activity (whether infringing or non-infringing), nor can it access or monitor those clients' activities. And to the extent Plaintiffs respond by claiming that QE could have had *an indirect* effect on the infringing activity by terminating the accounts of any of its subscribers at any time (such as when a subscriber fails to actually pay for QE's services [D.E. 24, ¶270-271]), that argument is a red-herring and irrelevant for multiple reasons.

*First*, complete termination of a subscriber's account due to non-payment, for example, is untethered to whether QE has the *ability* to control, supervise, access, or monitor its clients' activity (infringing or otherwise).  QE does not, and the Plaintiffs cannot plead otherwise.

*Second*, to state a viable claim, the plaintiff must show that the defendant "has the 'practical ability to police the infringing activities of [third parties] as opposed to suggesting measures that are imprecise, overbroad or not workable." *Venus Fashions*, 2017 U.S. Dist. LEXIS 155748, at *34 (M.D. Fla. Jan. 17, 2017) (internal citation omitted) (brackets in original). The notion that QE could and should have simply terminated its clients' accounts – just because the Plaintiffs said so – is an entirely imprecise, overbroad, and unworkable proposition that *Venus Fashions* guards against

16

(particularly when some of QE's clients' customers are engaged in completely lawful activity).

*Third*, this same type of argument was rejected in *Perfect 10, Inc. v. Visa Int'l*, 494 F.3d 788 (9th Cir. 2007), where the plaintiffs brought suit against Visa, Mastercard, and other "**data processing services**" (analogous to the service provided here by QE) for continuing "to process credit card payments to websites that infringe[d] Perfect 10's intellectual property rights after being notified by Perfect 10 of infringement by those websites." *Id.* at 792. The court noted that the plaintiff had "adequately pled that (1) infringement of Perfect 10's copyrights was occurring, (2) Defendants were aware of the infringement, and (3) on this basis, Defendants could have stopped processing credit card payments to the infringing websites." *Id.* at 803. The court held, however, that these allegations were *still* insufficient "to establish vicarious liability because even with all reasonable inferences drawn in Perfect 10's favor, Perfect 10's allegations of fact cannot support a finding that Defendants have the right and ability to control the infringing activity." *Id.* In rejecting each of the plaintiff's arguments attempting to save its vicarious liability claim, the court went on to hold that while the defendants could "take certain steps that may have the indirect effect of reducing infringing activity on the Internet at large," they still did not have "**any ability to directly control that activity, and the mere ability to withdraw a financial 'carrot' does not create the 'stick' of 'right and ability to control' that vicarious infringement requires**." *Id.* at 803 (emphasis added). In affirming the district court's decision, the Ninth Circuit found that the plaintiff's claim deficient because in order for "vicarious liability to attach," the defendants "must have the right and ability to *supervise* and *control* the infringement, not just affect it, and Defendants do not have this right or ability." *Id.*

The opinion from *Perfect 10* applies forcefully here, as the relevant inquiry is not whether QE "has the right and ability to control it[s] *system,* but rather, whether it has the right and ability to control the *infringing activity.* Under the facts and circumstances presented here, the two are not one and the same." *Io Grp. v. Veoh*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008) (emphasis in original). Thus, and even taking as true Plaintiffs' allegation that Quadranet could have terminated its clients' accounts at any time, that allegation has no impact on or relevance to the requirement that Quadranet must have the practical ability to access and control the infringing activity. Quadranet does not, and the Plaintiffs cannot in good faith plead to the contrary.

Count IV should therefore be dismissed because the FAC fails to meet the second prong of a vicarious liability claim. The Plaintiffs cannot allege that Quadranet exercised any supervision and control over the infringing activity, or that Quadranet directly participated in the decisions, processes,

or personnel responsible for the infringing activity.[10]

### C. Plaintiffs' Application for Injunctive Relief Should Be Dismissed.

Plaintiffs' ancillary request for injunctive relief based upon contributory infringement (Count VI), should be dismissed because injunctive relief is a remedy, not a cause of action.  Furthermore, Count VI is subject to dismissal because the underlying causes of action against Quadranet fail to state a claim.  In sum, because the Plaintiffs' claims for contributory infringement (Count III) and vicarious infringement (Count IV) cannot withstand Quadranet's challenge pursuant to Fed. R. Civ. P. 12(b)(6), the Plaintiffs' standalone "application for injunctive relief" (Count VI) should similarly be dismissed. *See Brechbill v. Home Invest*, 2018 U.S. Dist. LEXIS 156896, at *46-47 (N.D. Ill. Sep. 14, 2018) (where after the court dismissed the plaintiff's contributory infringement claim, the court went on to dismiss the plaintiff's related claim seeking injunctive relief).

## IV. PURSUANT TO FED. R. CIV. P. 8(a) AND 10(b), THE FAC SHOULD BE DISMISSED AS AN IMPERMISSIBLE SHOTGUN PLEADING.

"In addition to the requirement that a pleading contain 'a short and plain statement of the claim showing that the pleader is entitled to relief,' a party's claims must be 'limited as far as practicable to a single set of circumstances . . . [and] must be stated in a separate count or defense.'" *Negron v. Selene Fin., LP*, 2017 U.S. Dist. LEXIS 97283, at *6 (M.D. Fla. June 23, 2017) (*citing* Fed. R. Civ. P. 10(b)).  "The Eleventh Circuit has repeatedly and unequivocally condemned shotgun pleadings as a waste of judicial resources."  *Merch. One, Inc. v. TLO, Inc.*, No. 19-cv-23719-BLOOM, 2020 U.S. Dist. LEXIS 7462, at *6 (S.D. Fla. Jan. 16, 2020); *see also Vibe Micro v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) ("Courts in the Eleventh Circuit have little tolerance for shotgun pleadings.").

"The most common type - by a long shot - is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Weiland v. Palm*

---

[10] *See Coach*, 916 F. Supp. 2d at 1282-83 (holding that "even if the Landlord Defendants' financial benefit was direct, rather than indirect, the allegations still do not support a claim for vicarious copyright infringement liability against them because they are not alleged to operate and manage the Flea Market, and therefore there are no factual allegations to support the supervise and control prong of the inquiry as to these Defendants."); *Pegasus v. Northrop*, 2008 U.S. Dist. LEXIS 99985, at *7 (M.D. Fla. Nov. 24, 2008) (where even though the plaintiff checked off the buzz words for a vicarious liability claim, the "Amended Complaint fail[ed] to include sufficient factual allegations of NGC's direct participation in the decisions, processes, or personnel directly responsible for the infringing activity," and also failed to plead how the defendant "authorized or assisted the alleged infringement"); *Luvdarts*, 710 F.3d at 1072 (dismissing claim because the plaintiff's "failure to allege that the Carriers have at least something like a capacity to supervise is fatal to a claim of vicarious liability").

*Beach Cty.*, 792 F.3d 1313, 1321 (11th Cir. 2015).  For example, in *Greiser*, the court noted that "[e]ach count of Plaintiff's 44-page Complaint begins with '[t]he Plaintiff hereby repeats and re-alleges each, and every allegation for the foregoing paragraphs as if fully set forth herein.'" *Greiser v. Drinkard*, 2018 U.S. Dist. LEXIS 228125, at *2-3 (S.D. Fla. May 21, 2018). The court held that the plaintiff's complaint was "precisely the kind of shotgun pleading the Eleventh Circuit has repeatedly condemned, as '[t]he result is that each count is replete with factual allegations [and legal conclusions] that could not possibly be material to that specific count.'" *Id.* Accordingly, the complaint was dismissed.

Here, and similar to the deficient pleading in *Greiser*, the Plaintiff's FAC should be dismissed because it mirrors the quintessential shotgun pleading.  More specifically, Plaintiff failed to delineate which underlying allegations pertain to each specific cause of action, as Counts II through XII "re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs." [*See* D.E. 24 at ¶¶336, 345, 362, 374, 397, 403, 414, 422, 436, and 446].  As a result of this pleading deficiency, Count XII for breach of statutory and common law right of publicity is predicated not only upon *all* of the general allegations in the Amended Complaint [D.E. 24, ¶¶1-320], but also *all* of the allegations in the preceding eleven (11) causes of action [D.E. 24, ¶¶321-445].  This shotgun style pleading is prejudicial because it is impossible for Quadranet to prepare a responsive pleading, in that Quadranet cannot discern which factual allegations support each of the Plaintiff's causes of action.[11] *See T-12 v. Young Kings*, 36 F. Supp. 3d 1380, 1386 (N.D. Ga. 2014) ("The central problem with such pleadings is that it is 'virtually impossible to know which allegations of fact are intended to support which claim(s) for relief,' thus thwarting the opposing party's ability to frame a responsive pleading") (internal citation omitted).  Because the FAC "fails to make the connection between 'the substantive count and the factual predicates,'" this Court should grant Quadranet's motion to dismiss on shotgun pleading grounds.  *Johnson v. Carnival Corp.*, No. 19-cv-23167-BLOOM, 2020 U.S. Dist. LEXIS 4235, at *5-6 (S.D. Fla. Jan. 9, 2020) (internal citation omitted).

The dismissal of the FAC *should be with prejudice, and without leave to amend*.  Plaintiffs' original complaint [D.E. 1] was an impermissible shotgun pleading, and Plaintiffs could have (but failed to) cure this pleading deficiency when they filed their FAC.  [D.E. 24].  Plaintiffs are represented by counsel, and should not be given yet another opportunity to file a pleading that adheres to Eleventh Circuit pleading requirements.

---

[11] Although the FAC is inartfully pled, it appears that only Counts III, IV, and VI are directed at Quadranet.

## V.    THE FAC SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2).

As demonstrated above, the FAC should be dismissed *with prejudice*, as the Plaintiffs should be precluded from re-filing such baseless claims against Quadranet in another forum. In an abundance of caution however, Quadranet is compelled to assert his rights under Fed. R. Civ. P. 12(b)(2) and 12(b)(3) because this lawsuit should never have been filed in Florida. "When a court lacks personal jurisdiction over a defendant, the court is obligated to dismiss the action." *Alpha Tech. v. MLSNA*, 2013 U.S. Dist. LEXIS 167884, at *4 (M.D. Fla. Nov. 26, 2013). "[W]here the Defendant challenges the Court's exercise of jurisdiction over its person, the plaintiff bears the ultimate burden of establishing that personal jurisdiction is present." *Oldfield v. Pueblo De Bahia*, 558 F.3d 1210, 1217 (11th Cir. Fla. 2009). "To prevent dismissal, the plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction.'" *Kernel Records v. Mosley*, 2010 U.S. Dist. LEXIS 69424, at *7 (S.D. Fla. July 5, 2010) (internal citation omitted). "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" *United Technologies v. Mazer*, 556 F.3d 1210, 1274 (11th Cir. 2009) (internal citation omitted).

"When a defendant challenges specific personal jurisdiction in a federal question case, the plaintiff has the twin burdens of establishing that personal jurisdiction over the defendant comports with the forum state's long-arm provision, as well as the strictures of the due-process clause of the Fifth Amendment to the United States Constitution." *HomeBingo v. Chayevsky*, 428 F. Supp. 2d 1232, 1241-42 (S.D. Ala. 2006). "In order to subject foreign defendants to jurisdiction in Florida, a two-prong test must be satisfied: (1) the defendants must have performed one or more of the acts specified in the Florida Long-Arm statute, Fla. Stat. § 48.193, *and* (2) the defendants must otherwise have sufficient 'minimum contacts' with Florida; that is, they must have purposefully availed themselves of the privilege of conducting business in the state (thereby invoking the benefits and protections of its laws), so that hailing them into a Florida court will not offend due process and traditional notions of fair play and substantial justice." *Yparrea v. Twin Cities*, 2010 U.S. Dist. LEXIS 58232, at *7-8 (N.D. Fla. May 17, 2010) (emphasis in original).

### A.  Exercising Jurisdiction Here Violates Florida's Long-Arm Statute.

The first issue is whether the Quadranet entities "have performed one or more of the acts specified in the Florida Long-Arm statute, *Fla. Stat.* § 48.193." *Yparrea*, 2010 U.S. Dist. LEXIS 58232,

at *7 (N.D. Fla. May 17, 2010).  "A defendant may be subject to Florida's long-arm statute through specific jurisdiction and general jurisdiction.  Irrespective of the method, 'Florida's long-arm statute is to be strictly construed.'"  *Brown v. Carnival*, 202 F. Supp. 3d 1332, 1343 (S.D. Fla. 2016).

     1.  <u>Quadranet is Not Subject to General Jurisdiction.</u>

     Plaintiffs concede that they have brought suit against non-resident defendants incorporated in California (QI) and Delaware (QE).  The question then is whether these Quadranet entities' "contacts with Florida fall within the 'exceptional case' provided for in *Daimler* such that this Court should find [that the Quadranet entities are] subject to general jurisdiction in Florida."  *Brown*, 202 F. Supp. 3d 1332, 1344 (S.D. Fla. 2016). "Pursuant to Florida's general jurisdiction, a defendant may be haled into a Florida court if it is 'engaged in substantial and not isolated activity within [the] state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.'"  *Neelu Aviation v. Boca Aircraft*, No. 18-cv-81445-BLOOM, 2019 U.S. Dist. LEXIS 129454, at *27 (S.D. Fla. Aug. 2, 2019) (citing Fla. Stat. § 48.193(2)).  Other courts explain that the affiliations with the state must be "so 'continuous and systematic' as to render them essentially at home in the forum State.'"  *Id.* at *27 (citing *Goodyear Dunlop Tires v. Brown*, 564 U.S. 915, 919 (2011)).

     The Eleventh Circuit in *Waite v. AII Acquisition* expanded on the type of contacts required to render a corporation "at home" in the forum state.  *Waite v. AII Acquisition*, 901 F.3d 1307 (11th Cir. 2018).  "When a defendant's state of incorporation and principal place of business are not in the forum state, the court's task is to decide whether the case is one of the exceptional cases in which general jurisdiction is still proper."  *Neelu Aviation*, 2019 U.S. Dist. LEXIS 129454, at *27 (S.D. Fla. Aug. 2, 2019) (citing *Waite*, 901 F.3d at 1317-18). "To make this decision, [the court] must consider whether 'the corporation's activities in the forum closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business.'"  *Waite*, 901 F.3d at 1318 (internal citation omitted).[12]

     As a preliminary matter, this Court need not delve into a general jurisdiction analysis, given that the Plaintiffs do not allege that either Quadranet entity is "at home" in Florida.  *See Mason v. Sony*

---

[12] In *Waite*, and when considering the asbestos manufacturer's activities in Florida, the Eleventh Circuit noted that the defendant was "registered to do business in Florida, maintained an agent for service of process in Florida, hired a Florida distributor, had customers in Florida, and operated a plant in Brevard County…" *Id.*  Nevertheless, the manufacturer was still not "at home" in Florida, and "outside of a corporation's place of incorporation and principal place of business, only a limited set of affiliations will be substantial enough to make the corporation at home in that State." *Id.*

*Pictures*, 2021 U.S. Dist. LEXIS 81497, at *6 (N.D. Ga. Apr. 28, 2021) ("Here, the Court need not consider whether general jurisdiction exists; Mason does not allege that any of the Defendants can properly be considered 'at home' in Georgia"). Regardless, this Court has held that "***a nonresident corporation will be subject to general jurisdiction only in the 'exceptional case,*'**" and this is most certainly not one of them. *Shipping & Transit v. WOV*, No. 16-cv-80860-BLOOM, 2016 U.S. Dist. LEXIS 130501, at *5 (S.D. Fla. Sep. 21, 2016) (emphasis added). **QI** does not have any assets, nor is it an operating entity. Furthermore, QI does not: **(a)** regularly conduct business in the State of Florida (Ex. 1, ¶7); **(b)** have significant business contacts within the State of Florida (*Id.*); **(c)** maintain any bank accounts, mailing addresses, or telephone numbers in the State of Florida (*Id.* at ¶8); **(d)** maintain any offices, post office boxes, or physical business locations in the State of Florida, nor does it hold any personal or real property in the State of Florida (*Id.* at ¶6, 8); **(e)** pay any employees or taxes in the State of Florida (*Id.* at ¶8); **(f)** hold any Florida license (*Id.*); or **(g)** own or operate any computer servers in the state of Florida (*Id.* at ¶5). On these set of facts, supported by the accompanying declaration, general jurisdiction cannot be exercised over QI. *See Response Reward v. Meijer*, 189 F. Supp. 2d 1332, 1338 (M.D. Fla. 2002) (court lacked jurisdiction where defendant had "no stores, no employees, no offices, and no property in Florida," it did not "solicit or advertise in Florida," and it did not receive profit from residents of Florida).

As to **QE**, its contacts with Florida do not meet the "heavy burden of establishing such an exceptional case" that general jurisdiction should be found. *Waite*, 901 F.3d at 1317. Just like general jurisdiction was improper in *Waite*, notwithstanding the defendant having customers and a physical presence (*i.e.* a plant) in Florida, QE's satellite facility in Miami and any Florida-based customers does not render QE "at home" in this forum. QE is neither registered on the Florida Division of Corporations nor does it have an agent to receive service of process in Florida. (Ex. 1, ¶10). QE's leadership is based in California, and QE directs its operations and business decisions from the state. (Ex. 1, ¶10); *see also Waite*, 901 F.3d at 1317. Any attempt by the Plaintiffs to subject QE to general jurisdiction in Florida is futile since QE is a California limited liability company that was incorporated in Delaware, and because "*Daimler* tells us that even 'substantial, continuous, and systematic' business is insufficient to make a company 'at home' in the state." *Waite*, 901 F.3d 1307, 1318 (11th Cir. 2018) (internal citation omitted); *see also Neelu*, 2019 U.S. Dist. LEXIS 129454, at *27 (granting motion to dismiss and finding that the defendant was not "at home" in Florida "because its principal place of business is in California and state of incorporation is Delaware").

2.  Quadranet is Not Subject to Specific Jurisdiction.

Because neither Quadranet entity is subject to general jurisdiction, "[t]hat leaves specific jurisdiction. This theory hinges 'on an affiliation between the forum and the underlying controversy.'" *Mason v. Sony Pictures*, 2021 U.S. Dist. LEXIS 81497, at *6 (N.D. Ga. Apr. 28, 2021) (*citing Goodyear*, 564 U.S. at 919). With respect to *Fla. Stat.* § 48.193 (1)(a)(1), this Court has held that "***[t]he business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort***." *Neelu*, 2019 U.S. Dist. LEXIS 129454, at *34 (internal citation omitted) (emphasis added). Here, Plaintiffs rest their entire jurisdictional argument on Quadranet's "facility in Miami, Florida for providing a data center, dedicated servers and colocation services." [D.E. 24, ¶69]. This allegation is insufficient to establish personal jurisdiction, however, because "a fundamental element of the specific jurisdiction calculus is that plaintiff's claim must 'arise out of or relate to' at least one of defendant's contacts with the forum." *Oldfield v. Pueblo De Bahia*, 558 F.3d 1210, 1222 (11th Cir. 2009); *see also Interim Healthcare v. Interim Healthcare of Se. La.*, No. 19-cv-62412-BLOOM/Valle, 2020 U.S. Dist. LEXIS 101841, at *36 (S.D. Fla. June 10, 2020) ("Specific jurisdiction 'depends on an affiliatio[n] between the forum and the underlying controversy.'") (internal citation omitted).

*Neelu* is instructive. There, this Court discussed the Eleventh Circuit's "but for" analysis in *Fraser*, where the plaintiff's estate brought suit against the manufacturer of a defective boat. *Fraser v. Smith*, 594 F.3d 842, 844 (11th Cir. 2010). The plaintiff's estate contended that personal jurisdiction was proper because the manufacturer maintained a website accessible in Florida, advertised in the Miami Herald, purchased boats in Florida; and sent its employees to Florida for a training course. *Id.* at 844-45. "The Eleventh Circuit concluded that some of the defendant's Florida contacts, including its advertisements in Florida and its website, were irrelevant because the plaintiffs had not viewed them; thus, those contacts or activities "[could not] reasonably be construed as but-for causes of the accident." *Neelu*, 2019 U.S. Dist. LEXIS 129454, at *36-37.

Similarly here, and because QI does not have any physical presence (including servers) in Florida (Ex. 1, ¶8), the issue is not whether *QE* has servers in Miami, Florida, but rather whether the alleged misconduct by LiquidVPN was *transmitted through* any of QE's servers in Miami (such that QE could allegedly be liable for contributory or vicarious infringement). Put differently, if LiquidVPN did not lease any servers in Florida, then any of QE's Miami-based activities cannot be construed as the "but for" cause of the alleged infringement. As shown in the accompanying declaration, LiquidVPN did not lease any of QE's servers in Miami. (Ex. 1, ¶11-13). More specifically, LiquidVPN leased from QE: **(a)** one server in Los Angeles, California [from July 2014 to August 2014]; **(b)** two servers in Dallas, Texas [from December 2017 to August 2018]; **(c)** one server in New Jersey [from March 2019

23

to April 2019]; and **(d)** one server in New Jersey [from July 2019 to June 2021]. (Ex. 1, ¶13). **Because LiquidVPN did not lease any of QE's servers in Florida, QE's business activities in Miami have no connection with the alleged tort**. In light of Quadranet's supporting declaration, Plaintiffs have not alleged, and could never allege, a nexus between the asserted copyright infringement and QE's Florida-based business activities, which renders the FAC subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(2).  *See Brown*, 202 F. Supp. 3d at 1343 (finding that the defendant was not subject to specific personal jurisdiction because "Plaintiff has failed to allege any nexus between the alleged tort and Windfeather's alleged activities.").

For this same reasoning and analysis, Plaintiffs cannot sufficiently allege that Quadranet is subject to personal jurisdiction under *Fla. Stat.* § 48.193 (1)(a)(2), which requires Quadranet to have committed "a tortious act within the state."  *Id.*  The Eleventh Circuit has expressly held that "for personal jurisdiction to attach under the 'tortious activity' provision of the Florida long-arm statute, the plaintiff must demonstrate that the non-resident defendant **committed a substantial aspect of the alleged tort in Florida by establishing that the activities in Florida were essential to the success of the tort**."  *Cable/Home Commun. Corp. v. Network Prods.*, 902 F.2d 829, 857 (11th Cir. 1990) (internal citation omitted) (emphasis added); *see also Williams Elec. v. Honeywell*, 854 F.2d 389 (11th Cir. 1988) ("For personal jurisdiction to attach under the 'tortious activity' provision of the Florida long-arm statute, the plaintiff must demonstrate that the non-resident defendant 'committed a substantial aspect of the alleged tort in Florida.'") (internal citation omitted).[13]

In sum, LiquidVPN did not lease any server space from QI (which has no servers), and did not lease any server space from QE within the state of Florida. (Ex. 1, ¶13). As a result, Plaintiffs have not alleged (nor could they ever allege in an amended pleading) that: **(a)** Quadranet committed any aspect of the alleged contributory or vicarious copyright infringement in Florida; or **(b)** Quadranet's purported activities in Florida were essential to the completion of the alleged infringement. Because there is an absence of "such a connection, 'specific jurisdiction is lacking regardless of the extent of [QE's] unconnected activities in the State."  *Mason v. Sony Pictures*, 2021 U.S. Dist. LEXIS 81497, at *9 (N.D. Ga. Apr. 28, 2021) (internal citation omitted).  Accordingly, Florida's long-arm statue does not

---

[13] In *Santilli v. Cardone*, 2008 U.S. Dist. LEXIS 111677 (M.D. Fla. July 18, 2008), the defendants moved to dismiss a plaintiff's copyright claim for lack of personal jurisdiction.  In the context of the "tortious act" provision codified in *Fla. Stat.* § 48.193(1)(a)(2), the Court recognized that the "plaintiff must demonstrate that an activity in Florida was essential to the completion of the tort."  *Id.* at *9.  However, because the plaintiff failed to "demonstrate that each defendant committed an essential component of the alleged tort in Florida," the Court lacked *in personam* jurisdiction under the long-arm statute.  *Id.*

reach Quadranet, and the FAC should be dismissed under Rule 12(b)(2).

**B. Exercising Personal Jurisdiction Would Violate Due Process.**

For completeness, exercising jurisdiction would also violate due process since Quadranet does not have "sufficient minimum contacts [ ] to satisfy the Due Process Clause of the Fourteenth Amendment," and because maintenance of the suit would "offend 'traditional notions of fair play and substantial justice.'" *Exhibit Icons, LLC v. XP Cos., LLC*, 609 F. Supp. 2d 1282, 1292 (S.D. Fla. 2009). "Where specific jurisdiction is asserted, the following three conditions must be satisfied in order to find that the exercise of personal jurisdiction over [a defendant] is constitutional: (1) [a defendant] must purposefully avail itself of the privilege of acting in the forum state; (2) the cause of the action must be related to [a defendant's] contacts with the forum or arise from [its] activities here; and (3) the [defendant's] acts or consequences caused by those acts must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction over [the defendant] reasonable." *Kernel Records*, 2010 U.S. Dist. LEXIS 69424, at *31 (S.D. Fla. July 5, 2010).

Here, Plaintiffs' causes of action cannot proceed in Florida since QI has no contacts with this state, and also because the underlying claims are completely unrelated to QE's contacts with Florida, and do not "arise out of" QE's forum-related activities. (Ex. 1, ¶13). *See Zamora Radio, LLC v. Last.fm Ltd.*, 2011 U.S. Dist. LEXIS 69101, at *32 (S.D. Fla. June 28, 2011) ("To assert specific jurisdiction, the claim asserted by Zamora must arise out of AccuRadio's forum-related activities."). Furthermore, the allegations against Quadranet fail to meet the third criteria under the due process analysis, which requires that Quadranet's "acts or consequences caused by those acts must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction over [Quadranet] reasonable." *Kernel Records Oy*, 2010 U.S. Dist. LEXIS 69424, at *31 (S.D. Fla. July 5, 2010). "Minimum requirements of 'fair play and substantial justice' may defeat the reasonableness of asserting personal jurisdiction even if the defendant has purposefully engaged in forum activities." *Id.* at *38. An analysis into each of the *Burger King* factors weighs heavily in favor of dismissing the FAC.[14]

For example, it would be unduly burdensome for the Quadranet entities – a California company and a Delaware company – to litigate in Florida, especially given the limited contacts with

---

[14] Under the "fair play and substantial justice" analysis, the five *Burger King* factors are: (1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive policies. *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985).

this forum. (Ex. 1, ¶9, 15).[15] Next, Florida has zero interest in adjudicating this dispute, **since none of the Plaintiffs are based in this state**.[16] Finally, the Plaintiffs' interest in obtaining convenient and effective relief actually favors any dispute being litigated in California (as opposed to Florida), since **twenty-eight (28) of the Plaintiffs are located in states having district courts within the Ninth Circuit Court of Appeals** (*e.g.* California, Nevada, and Wyoming). Based on the foregoing, the *Burger King* factors favor Quadranet, and because exercising personal jurisdiction over the Quadranet entities would not comport with fair play and substantial justice, this Court should dismiss the FAC.

## VI. THE FAC SHOULD BE DISMISSED FOR IMPROPER VENUE.

### A. The FAC Should be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(3).

"When a defendant objects to venue under Rule 12(b)(3), the plaintiff bears the burden of showing that the venue selected is proper." *Interim Healthcare*, No. 19-cv-62412-BLOOM/Valle, 2020 U.S. Dist. LEXIS 101841, at *20 (S.D. Fla. June 10, 2020). "Pursuant to § 1391(b), venue is proper in: (1) a judicial district in which any defendant resides, if all defendants are residents of the state in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *Id.* (internal citations omitted). "[T]he Eleventh Circuit has stated that 'only the events that directly give rise to a claim are relevant' and that 'of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered.'" *TMJ Practice v. Curran*, 2017 U.S. Dist. LEXIS 114557, at *11 (S.D. Fla. July 23, 2017) (internal citation omitted). The court must focus on the "'relevant activities of the defendant, not the plaintiff' to ensure a defendant is not haled into a remote district having no real relationship to the dispute." *Interim*, No. 19-cv-62412-BLOOM/Valle, 2020 U.S. Dist. LEXIS 101841, at *43 (S.D. Fla. June 10, 2020).

Here, and as demonstrated above, neither Quadranet entity is "at home" in the Southern District of Florida, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims did **not** occur within this judicial district; in fact, as the accompanying declaration makes clear, **none** of the events took place in the Southern District of Florida, since LiquidVPN did not lease any servers

---

[15] *See Roblor Mktg. v. Gps Indus., Inc.*, 645 F. Supp. 2d at 1143, 1156 (S.D. Fla. 2009) ("Considering the very few contacts [defendant] has with Florida, the State of Florida's interest in the issue is limited.").
[16] *See Kernel Records Oy*, 2010 U.S. Dist. LEXIS 69424, at *38 (S.D. Fla. July 5, 2010) ("considering the very few contacts Nelstar has with Florida, the State of Florida's interest in the issue is limited.").

from QE in this state.  In this regard, courts have cautioned that due consideration should be given to the words "substantial part," and for that reason as well, dismissal is appropriate.[17]

WHEREFORE, based upon the foregoing arguments and legal authorities, Quadranet respectfully requests that the Court enter an order dismissing the FAC with prejudice pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 8 and 10, Fed. R. Civ. P. 12(b)(2), and Fed. R. Civ. P. 12(b)(3).

Respectfully submitted,

Dated:  July 30, 2021

Jonathan Woodard
John Cyril Malloy, III
Florida Bar No. 964,220
jcmalloy@malloylaw.com
Peter A. Matos
Florida Bar No. 992,879
pmatos@malloylaw.com
Oliver Alan Ruiz
Florida Bar No. 524,786
oruiz@malloylaw.com
Jonathan R. Woodard
Florida Bar No. 096,553
jwoodard@malloylaw.com
**MALLOY & MALLOY P.L.**
2800 S.W. Third Avenue
Miami, Florida 33129
Telephone (305) 858-8000

---

[17] *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) ("We caution district courts to take seriously the adjective 'substantial'…[which] means for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere.").