# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.:  1:20-cv-20997-BB**

MILLENNIUM FUNDING, INC., a Nevada
corporation, VOLTAGE HOLDINGS, LLC,
a Nevada limited liability company,
BODYGUARD PRODUCTIONS, INC., a
Nevada corporation, HITMAN TWO
PRODUCTIONS, INC., a Nevada
corporation, KILLING LINK
DISTRIBUTION, LLC, a California limited
liability company, LHF PRODUCTIONS,
INC., a Nevada corporation, RAMBO V
PRODUCTIONS, INC., a Nevada
corporation, WONDER ONE, LLC, a
Wyoming limited liability company
DEFINITION DELAWARE, LLC, a
Delaware limited liability company,
MILLENNIUM IP, INC., a Nevada
corporation,  NIKOLA PRODUCTIONS,
INC., a Nevada corporation,  OUTPOST
PRODUCTIONS, INC., a Nevada
corporation,  GLACIER FILMS I, LLC, a
Louisiana limited liability company,
VENICE PI, LLC, a California limited
liability company, I AM WRATH
PRODUCTIONS, INC., a California
corporation,  BADHOUSE STUDIOS, LLC,
a Wyoming limited liability company, YAR
PRODUCTIONS, INC., a New York
corporation,  AMBI DISTRIBUTION
CORP., a Delaware corporation, AFTER
PRODUCTIONS, LLC, a Delaware limited
liability company, AFTER II MOVIE, LLC,
a Nevada limited liability company,
MORGAN CREEK PRODUCTIONS, INC.,
a Delaware corporation, BEDEVILED LLC,
a California limited liability company,
MILLENNIUM MEDIA, INC., a Nevada
corporation, COLOSSAL MOVIE
PRODUCTIONS, LLC, a California limited
liability company,  FSMQ FILM, LLC, a
California limited liability company,  FW
PRODUCTIONS, LLC, a California limited
liability company,  LF2 PRODUCTIONS,
INC., a Nevada corporation, RUPTURE
CAL, INC., a California limited liability
company, MON, LLC, a California limited
liability company, SF FILM, LLC, a New

York limited liability company, SPEED
KILLS PRODUCTIONS, INC., a Wyoming
corporation, HANNIBAL CLASSICS INC.,
a California corporation,  JUSTICE
EVERYWHERE PRODUCTIONS LLC, a
Georgia limited liability company, STATE
OF THE UNION DISTRIBUTION AND
COLLECTIONS, LLC, a California limited
liability company,  PARADOX STUDIOS,
LLC, a Delaware limited liability company,
DALLAS BUYERS CLUB, LLC, a Texas
limited liability company, SCREEN MEDIA
VENTURES, LLC, a Delaware limited
liability company, and 42 VENTURES,
LLC, a Hawaii limited liability company,

Plaintiffs,

vs.

1701 MANAGEMENT LLC d/b/a
LIQUIDVPN, a Puerto Rico limited liability
company, AUH2O LLC, a Nevis limited
liability company, QUADRANET INC., a
California Corporation, QUADRANET
ENTERPRISES LLC, a Delaware limited
liability company, CHARLES MUSZYNSKI
a/k/a FREDERICK DOUGLAS,
individually, VPNETWORKS, LLC d/b/a
TorGuard, a Florida limited liability
company, and DOES 1-100,

Defendants.

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs MILLENNIUM FUNDING, INC., VOLTAGE HOLDINGS, LLC, AMBI

DISTRIBUTION CORP., AFTER PRODUCTIONS, LLC, AFTER II MOVIE, LLC, MORGAN

CREEK PRODUCTIONS, INC., MILLENNIUM FUNDING, INC., BEDEVILED LLC,

MILLENNIUM MEDIA, INC., COLOSSAL MOVIE PRODUCTIONS, LLC, YAR

PRODUCTIONS, INC., FSMQ FILM, LLC, FW PRODUCTIONS, LLC, MILLENNIUM IP,

INC., I AM WRATH PRODUCTION, INC., KILLING LINK DISTRIBUTION, LLC,

BADHOUSE STUDIOS, LLC, LF2 PRODUCTIONS, INC., LHF PRODUCTIONS, INC.,

VENICE PI, LLC, RAMBO V PRODUCTIONS, INC., RUPTURE CAL, INC., MON, LLC, SF

2

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

FILM, LLC, SPEED KILLS PRODUCTIONS, INC., MILLENNIUM IP, INC., NIKOLA

PRODUCTIONS, INC., WONDER ONE, LLC, BODYGUARD PRODUCTIONS, INC.,

OUTPOST PRODUCTIONS, INC., GLACIER FILMS 1, LLC, DEFINITION DELAWARE

LLC, HANNIBAL CLASSICS INC., JUSTICE EVERYWHERE PRODUCTIONS LLC,

STATE OF THE UNION DISTRIBUTION AND COLLECTIONS, LLC, PARADOX

STUDIOS, LLC, DALLAS BUYERS CLUB, LLC, HITMAN TWO PRODUCTIONS, INC., a

Nevada limited liability company, and SCREEN MEDIA VENTURES, LLC ("Copyright

Plaintiffs"), and 42 VENTURES, LLC ("42"), by and through their counsel, bring this Second

Amended Complaint against Defendants 1701 MANAGEMENT LLC d/b/a LIQUIDVPN

("LiquidVPN"), AUH2O LLC, QUADRANET INC., QUADRANET ENTERPRISE LLC,

CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS, VPNETWORKS, LLC d/b/a

TORGUARD ("TorGuard") and DOES 1-100 ("Defendants") and allege as follows:

## I.  INTRODUCTORY STATEMENT

1.      Plaintiffs bring this action to stop the massive piracy of their motion pictures and

registered trademark brought on by the data center QuadraNet and its subscribers such as

LiquidVPN and TorGuard.   LiquidVPN and TorGuard provide a Virtual Private Network

("VPN") service which they blatantly promote for the purpose of committing and concealing

movie piracy.  LiquidVPN's and TorGuard's customers ("end users") use the VPN services

exactly as encouraged – to pirate copyright protected content.  QuadraNet continues to supply

the essential services to these subscribers while willfully ignoring the *hundreds of thousands of*

*notices of infringement* sent to it by copyright owners including the Copyright Plaintiffs.  The

quantity of these notices provides overwhelming evidence to QuadraNet that its subscribers such

as LiquidVPN and TorGuard are using the services for massive piracy, yet QuadraNet steadfastly refuses to take any meaningful action against any of its subscribers.

2.     An individual that pirates copyright protected content in the United States from her home Internet service via peer-to-peer (P2P) networks such as the BitTorrent Protocol puts herself in great legal peril because her Internet Protocol ("IP") address is publicly exposed.  A copyright owner can obtain her subscriber identification from the service provider that provided her with the IP address and seek statutory damages for copyright infringement that can be as high as $150,000.  This risk is known among prolific pirates and feared. QuadraNet's subscribers such as LiquidVPN and TorGuard take advantage of this paradigm by promoting their VPN services as an essential tool to use P2P networks to pirate movies without the risk of getting caught.

## II.     NATURE OF THE ACTION

3.     Copyright Plaintiffs brings this action under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act") and allege that Defendants 1701 MANAGEMENT LLC, AUH2O LLC, VPNETWORKS, LLC, CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS and DOES 1-100 are liable for direct copyright infringements in violation of 17 U.S.C. §§ 106 and 501 and violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202.

4.     Copyright Plaintiffs allege that Defendants 1701 MANAGEMENT LLC, AUH2O LLC, QUADRANET INC., QUADRANET ENTERPRISES LLC, VPNETWORKS, LLC, CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS and DOES 1-100 are secondarily liable (under material contribution, intentional inducement, and vicarious infringement) for direct copyright infringements.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

5.      Copyright Plaintiffs allege that Defendants 1701 MANAGEMENT LLC, AUH2O LLC, CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS are secondarily liable (under material contribution, intentional inducement, and vicarious infringement) for DMCA violations.

6.      Plaintiff 42 brings this action for infringement of a federally registered trademark in violation of Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)) and for unfair competition in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), and alleges that 1701 MANAGEMENT LLC, AUH2O LLC and CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS are liable for trademark infringement and false descriptions.

7.      Plaintiffs MILLENNIUM FUNDING, INC. and VOLTAGE HOLDINGS, LLC allege that Defendants 1701 MANAGEMENT LLC, AUH2O LLC, and CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS are liable for breach of right of David Cox's right of publicity under Fla. Stat. §540.08 (commercial misappropriation) and Florida common law, breach of contract with David Cox and unjust enrichment under Florida common law.

8.      Copyright Plaintiffs allege that Defendants QUADRANET INC. and QUADRANET ENTERPRISES LLC are liable for equitable estoppel, negligent misrepresentations and fraudulent misrepresentations under Florida law.

### III.      JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition) and 28 U.S.C. § 1367 (supplemental jurisdiction).

10.      Defendants solicit, transact, or are doing business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.

11.      As explained more fully below, Defendants QuadraNet, Inc. and QuadraNet Enterprises, LLC operate a data center in Miami, Florida and advertise their operation of the data center on their website.   *See* https://www.quadranet.com/miami-datacenter [last accessed on Aug. 10, 2021].



12.      As of Aug. 11, 2021, the registrant information for the owner of the domain is QuadraNet, Inc.

13.      As explained more fully below, QuadraNet, Inc. further specifically publishes Whois records in the American Registry of Internet Numbers indicating that QuadraNet, Inc. is the owner of numerous IP address blocks located at the Miami data center.

14.      As explained more fully below, QuadraNet, Inc. and QuadraNet Enterprise LLC supply the essential services to subscribers that have directly infringed the copyright in Plaintiffs' Works at said Miami data center as well as other locations, and QuadraNet, Inc. and QuadraNet Enterprise LLC contribute to these direct infringements.

**SRIPLAW**

Cᴀʟɪꜰᴏʀɴɪᴀ ◆ Gᴇᴏʀɢɪᴀ ◆ Fʟᴏʀɪᴅᴀ ◆ Tᴇɴɴᴇssᴇᴇ ◆ Nᴇᴡ Yᴏʀᴋ

15.     By virtue of at least their data center in Miami, QuadraNet, Inc. and QuadraNet Enterprise have continuous and systematic general business contacts with Florida.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; (b) the Defendants reside or resided, and therefore can or could be found, in this District; and/or (c) Defendants are subject to the court's personal jurisdiction with respect to the present action.  Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents resides and/or can be found in this District.

## IV.     PARTIES
### A.   The Plaintiffs

17.     Copyright Plaintiffs are owners of the copyrights for the motion pictures ("Works"), respectively, as shown in Exhibit "1."

18.     Plaintiff MILLENNIUM FUNDING, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

19.     Plaintiff VOLTAGE HOLDINGS, LLC is a Nevada limited liability company with its principal place of business at 116 N. Robertson Blvd, Suite 200, Los Angeles, CA 90048.

20.     Plaintiff BODYGUARD PRODUCTIONS, INC. and HITMAN TWO PRODUCTIONS, INC. are Nevada corporations with their principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

21.     Plaintiff KILLING LINK DISTRIBUTION, LLC is a California limited liability company with its principal place of business at 9190 Olympic Blvd. Suite 400, Beverly Hills, CA 90212.

22.     Plaintiff LHF PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

23.     Plaintiff RAMBO V PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

24.     Plaintiff WONDER ONE, LLC is a Wyoming limited liability company with its principal place of business at 4164 Weslin Ave. Sherman Oaks, CA 91423.

25.     Plaintiff DEFINITION DELAWARE, LLC is a Delaware limited liability company with its principal place of business at 251 Little Falls Drive Wilmington, DE 19808.

26.     Plaintiff MILLENNIUM IP, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

27.     Plaintiff NIKOLA PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

28.     Plaintiff OUTPOST PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

29.     Plaintiff GLACIER FILMS 1, LLC is a Louisiana limited liability company with its principal place of business at 3940 Laurel Canyon Blvd, #493, Studio City, CA 91604.

30.     Plaintiff VENICE PI, LLC is a California limited liability company with its principal place of business at 116 N Robertson Blvd Ste #200, Los Angeles, CA 90048.

31.     Plaintiff I AM WRATH PRODUCTIONS, INC. is a California corporation with its principal place of business at 1901 Ave of the Stars Suite 1050, Los Angeles, CA 90067.

32.     Plaintiff BADHOUSE STUDIOS, LLC is a Wyoming limited liability company with its principal place of business at 8265 Sunset Blvd., Suite 107, West Hollywood, CA 90046.

33.     Plaintiff YAR PRODUCTIONS, INC. is a New York corporation with its principal place of business at 9 Acer Ct. Monsey, New York, 10952.

34.     Plaintiff AMBI DISTRIBUTION CORP. is a Delaware corporation with its principal place of business at 3415 S. Sepulveda Blvd., 11th Fl. Los Angeles, California 90034.

35.     Plaintiff AFTER PRODUCTIONS, LLC is a Delaware limited liability company with its principal place of business at 1209 Orange Street Wilmington, DE 19801.

36.     Plaintiff AFTER II MOVIE, LLC, is a Nevada limited liability company with its principal place of business at 500 N. Rainbow Road, Suite 300 A, Las Vegas, NV, 89107.

37.     Plaintiff MORGAN CREEK PRODUCTIONS, INC. is a Delaware corporation with its principal place of business at 10 E Lee St # 2705, Baltimore, MD 21202.

38.     Plaintiff BEDEVILED LLC is a California limited liability company with its principal place of business at 18823 Belshire Ave Cerritos, CA 90703.

39.     Plaintiff MILLENNIUM MEDIA, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

40.     Plaintiff COLOSSAL MOVIE PRODUCTIONS, LLC is a California limited liability company with its principal place of business at 127 Broadway, Suite 220, Santa Monica, CA 90401.

41.     Plaintiff FSMQ FILM, LLC is a California limited liability company with its principal place of business at 9107 Wilshire Blvd. Ste 600 Beverly Hills, CA 90210.

42.     Plaintiff FW PRODUCTIONS, LLC is a California limited liability company with its principal place of business at 9454 Wilshire Blvd., Suite M-16 Beverly Hills, CA 90212.

43.     Plaintiff LF2 PRODUCTIONS, INC. is a Nevada corporation with its principal place of business at 318 N. Carson Street, Ste 208, Carson City, NV 89701.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

44.     Plaintiff RUPTURE CAL, INC. is a California limited liability company with its principal place of business at 9454 Wilshire Blvd., Suite M-16 Beverly Hills, CA 90212.

45.     Plaintiff MON, LLC is a California limited liability company with its principal place of business at 215 1/2 Arnaz Drive Beverly Hills, CA 90211.

46.     Plaintiff SF FILM, LLC is a New York limited liability company with its principal place of business at 90 State Street Ste 700, Office 40 Albany, New York 12207.

47.     Plaintiff SPEED KILLS PRODUCTIONS, INC. is a Wyoming corporation with its principal place of business at 8265 Sunset Blvd., Suite 107 West Hollywood, CA 90046.

48.     Plaintiff HANNIBAL CLASSICS INC. is a California corporation with its principal place of business at 8033 Sunset Blvd Suite 1066 West Hollywood, CA 90046.

49.     Plaintiff JUSTICE EVERYWHERE PRODUCTIONS LLC is a Georgia limited liability company with its principal place of business at 1901 Ave of the Stars, Suite 1050, Los Angeles, CA, 90067.

50.     Plaintiff STATE OF THE UNION DISTRIBUTION AND COLLECTIONS, LLC is a California limited liability company with its principal place of business at 800 W. 6th Street, Suite 380, Los Angeles, CA 90017.

51.     Plaintiff PARADOX STUDIOS, LLC is a Delaware limited liability company with its principal place of business at 919 North Market Street, Suite 950 Wilmington, DE 19801.

52.     Plaintiff DALLAS BUYERS CLUB, LLC is a Texas limited liability company with its principal place of business at 7 Switchbud Pl, Ste 192, The Woodlands, TX 77380.

53.     Plaintiff SCREEN MEDIA VENTURES, LLC is a Delaware limited liability company with its principal place of business at 800 Third Ave., 3rd Floor, New York, NY 10022.

54.     Copyright Plaintiffs are producers of popular motion pictures currently available for sale online and in brick-and-mortar retail stores. Many of these critically acclaimed motion pictures were released in theaters throughout the world and feature A-list actors such as Matthew McConaughey, Samuel Jackson, Ryan Reynolds, Sylvester Stallone, Nicholas Cage, Angela Basset, Gerard Butler, Gary Oldman, Common, Linda Cardellini, Milla Jovovich, Pierce Brosnan, Dylan McDermott, Woody Harrelson, James Marsden and Rob Reiner, among others.

55.     Copyright Plaintiffs invested significant financial resources, time and effort in making and marketing these motion pictures based upon the expectation that they would have an opportunity to get a return on their investment from rentals and sales. Massive piracy of these motion pictures on the Internet via P2P networks by subscribers of QuadraNet such as LiquidVPN and TorGuard and the willful failure of the QuadraNet to deal with this issue despite clear notice of it have hindered this opportunity.

56.     Plaintiff 42 is a limited liability company organized under the laws of Hawaii and having its principal place of business at 75-5915 Walua Rd, Kailua Kona, Hawaii 96740.

57.     Plaintiff 42 distributes and streams licensed content to the public from a plurality of means including, but not limited to, websites.  For example, 42 streams in depth humorous movie reviews called "Reel Reviews" and debates concerning motion pictures and pop culture called "Nerd Wars" from the website http://popcorntime4u.com/ under the mark "Popcorn Time" through an agreement with Andy Signore, the creator of the popular YouTube channel

Popcorned Planet (since 2009) and former executive producer of the Emmy nominated series Honest Trailers (nominated in 2016 and 2017).

## B.  The Defendants

58.     1701 Management, LLC ("1701") is a limited liability company organized under the laws of Puerto Rico and having a principal place of operations in San Juan, Puerto Rico.

59.     AUH2O LLC ("AUH2O") is a limited liability company organized under the laws of Nevis and having an unknown principal place of operations.  As discussed more fully below, AUH2O is a mere shelf company used by Defendant Muszynski as one of his alter egos.

60.     VPNETWORKS, LLC ("TorGuard") is a is a limited liability company organized under the laws of Florida and, upon information and belief, having a principal place of operations in Orlando, Florida.

61.     QuadraNet, Inc. is a corporation organized under the laws of California and having a principal place of operations in, upon information and belief, Tarzana, California.

62.     QuadraNet Enterprises, LLC is a limited liability company organized under the laws of Delaware and having a principal place of operations in, upon information and belief, Tarzana, California.

63.     QuadraNet, Inc. and QuadraNet Enterprises, LLC are mere alter egos.

64.     QuadraNet, Inc. and QuadraNet Enterprises, LLC have the same address of principal place of operations.  *See* Affidavit of Joshua J. Lee at ¶22.

65.     QuadraNet, Inc. and QuadraNet Enterprises, LLC have the same CEO.  *See Id.* at ¶23.

66.     QuadraNet, Inc. and QuadraNet Enterprises, LLC have some of if not all of the same directors.  *See* Id. at ¶24.

67.     QuadraNet, Inc. and QuadraNet Enterprises, LLC share IP addresses received from ARIN.

68.     There is such a unity of interest between QuadraNet, Inc. and QuadraNet Enterprises, LLC that the individuality, or separateness, of QuadraNet, Inc. and QuadraNet Enterprises, LLC has ceased and the facts are such that an adherence to the fiction of the separate existence of QuadraNet, Inc. and QuadraNet Enterprises, LLC would, under the particular circumstances, sanction a fraud or promote injustice.

69.     QuadraNet, Inc. and QuadraNet Enterprises will be referred to below collectively as "QuadraNet."

70.     QuadraNet operates a facility in Miami, Florida for providing a data center, dedicated servers and/or colocation services.

71.     CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS ("Muszynski") is an adult individual residing in, upon information and belief, Livingston, Texas.  Muszynski has indicated in his Texas driver license that his residential address is in Livingston, Texas since 2019.

72.     Upon information and belief, Muszynski, a Caucasian male of Polish origin, uses the alias of the famous African American abolitionist FREDERICK DOUGLAS [sic] because he considers himself a "slave" for being ordered by a Florida state Court to pay alimony to his ex-wife and having to pay taxes to the United States government despite grossing hundreds of millions of dollars in the United States.

73.     Muszynski resided in Winter Park, Florida (Orange County) until 2019.  Upon information and belief, Muszynski changed his residence to Texas to take advantage of what he considered more favorable laws against excessive alimony.  For example, Muszynski wrote in

the forum of his website Legal Shame under his alias Frederick Douglas, "That "giant sucking sound" you hear is people pulling up stakes and moving to the Republic of Texas - where alimony is capped at 5 years and $5K/month. EVEN AFTER the "agreement" is done in another bolshevik state…" on Nov. 16, 2019.

74.     Upon information and belief, Muszynski spends significant time in Daytona Beach, Florida (Volusia County).  Muszynski uses his credit card to pay for services for his website domains from IP addresses such as 142.196.19.132 that geolocate to Daytona Beach, Florida.

75.     Upon information and belief, Muszynski is the owner and sole member of 1701 and AUH2O.

76.     In the certificate of 1701, the email address of the resident agent is CMUSZYNSKI @TALISMARK.COM.

77.     Defendants Muszynski and 1701 have entered into contractual service agreements with SMR Hosting LLC ("SMR") and David Cox ("Cox") in which they agreed to be subject to jurisdiction in Florida.

78.     Defendants QuadraNet, Muszynski, and 1701 purposefully directed their activities at, and consummated transactions in this District with, for example, each other and non-party ReliableSite.Net LLC, and performed acts by which Defendants QuadraNet, Muszynski and 1701 purposefully availed themselves of the privilege of conducting activities in this District, thereby invoking the benefits and protections of its laws.

79.     Defendants Muszynski and 1701 entered into agreements with ReliableSite.Net LLC and QuadraNet for server and/or network services at data centers located in Miami, Florida and thus in this District.  Upon information and belief, the agreement requires Defendants

Muszynski and 1701 to indemnify ReliableSite.Net LLC and QuadraNet for claims based upon copyright infringement similar to the claims in this complaint.

80.     QuadraNet has purposefully targeted Miami as a place to conduct business and marketed to the public the benefit of its Miami facility.  QuadraNet states on its website that its "…Miami facility is at the center of the leading hub to most Latin American & Caribbean markets."  https://www.quadranet.com/miami-datacenter [last accessed on April 11, 2021].

81.     QuadraNet employs numerous professionals such as electrical engineers to maintain the Miami facility.  QuadraNet states on its website that, "In-house electrical engineers and electricians are on staff to deliver circuits overnight as soon as needed. Controlled access and monitoring with 24/7 manned building security keep your servers safe, so that you never have to worry about unauthorized access to your data."  Id.

82.     QuadraNet, Inc. has the ARIN handle "QUADR-39" and provides an address at 36 NE 2nd St, Suite 520, Miami, FL 33132.

"QUADR-39"

## Entity: QUADR-39

| | |
|---|---|
| **Source Registry** | ARIN |
| **Kind** | Org |
| **Full Name** | QuadraNet, Inc |
| **Handle** | QUADR-39 |
| **Address** | 36 NE 2nd St |
| | Suite 520 |
| | Miami |
| | FL |
| | 33132 |
| | United States |
| **Registration** | Wed, 01 Oct 2014 19:31:34 GMT (Wed Oct 01 2014 local time) |
| **Last Changed** | Mon, 24 Sep 2018 14:18:48 GMT (Mon Sep 24 2018 local time) |
| **Self** | https://rdap.arin.net/registry/entity/QUADR-39 |
| **Alternate** | https://whois.arin.net/rest/org/QUADR-39 |
| **Port 43 Whois** | whois.arin.net |
| **Related Entities** | ▼ 2 Entities |

83.    Under the ARIN name "QUADRANET-MIA," QuadraNet, Inc. has received at least three IP address allotments from ARIN: 96.47.224.0/21; 104.129.48.0 - 104.129.51.255; 2607:FF48::/32; and 173.44.32.0/19.

84.    Upon information and belief, Defendants Muszynski and 1701 sell or have sold VPN service to individuals residing in Florida and this District under the name LiquidVPN (the "LiquidVPN service").

85.    AUH2O sells VPN bandwidth of the LiquidVPN service for digital cryptocurrency on the Orchid distributed VPN network.

86.    In the certificate of 1701, the authorized person is indicated as Carmen Marcano.

87.    Upon information and belief, Carmen Marcano is or was a paralegal at the law firm Ferraiuoli LLC.

88.     Upon information and belief, Muszysnki purposely chose to place Carmen Marcano as the authorized person as an attempt to conceal his involvement with the LiquidVPN Service.

89.     Muszysnki effectively makes all policy decisions for 1701, specifically including any policy regarding copyright infringement. Upon information and belief, Muszynski directed 1701's response to allegations of copyright infringement occurring on the LiquidVPN service, including the decisions not to terminate repeat copyright infringers, to ignore notices of copyright infringement and to promote the LiquidVPN service for the purposes of copyright infringement.

90.     Upon information and belief, Muszynski so dominates 1701 and AUH2O that 1701 and AUH2O have become merely alter egos to Muszynski.

91.     There is such a unity of interest between Muszynski, AUH2O and 1701 that the individuality, or separateness, of Muszynski, AUH2O and 1701 have ceased and the facts are such that an adherence to the fiction of the separate existence of the Muszynski, AUH2O and 1701 would, under the particular circumstances, sanction a fraud or promote injustice.

92.     Muszynski controls, participates in, exercises control over, or benefits from the infringement of Defendants 1701 and AUH2O as discussed below.

93.     Upon information and belief, Muszysnki and his alter egos 1701 and AUH2O have operated the LiquidVPN service under the name LiquidVPN from March of 2019.

94.     From July of 2018 through February of 2019 ("negotiation period"), Muszynski negotiated with Cox and SMR on the terms of purchasing the assets of LiquidVPN.

95.     On October 9, 2018, Muszynski, 1701, Cox and LiquidVPN, Inc. entered into a Letter of Intent ("LOI") for the Acquisition of assets of LiquidVPN.

96.     In an email dated Nov. 30, 2018, Muszynski instructed Cox to come to Orlando, Florida on Dec. 15, 2018 to meet in person and discuss the terms of the asset purchase agreement.

97.     In an email dated Dec. 23, 2018, Muszynski describes each of 1701 and AUH2O as his mere "different shelf company into which the assets are placed."

98.     In February of 2019, Muszynski and his alter ego 1701 entered into an asset purchase agreement with Cox and SMR to purchase the assets of LiquidVPN.  Muszynski, AUH2O and 1701 will be collectively referred to as "LiquidVPN."

99.     Defendant LiquidVPN primarily operates the LiquidVPN service from October 9, 2018 to the present.

100.     Upon information and belief, Defendant TorGuard sells or has sold VPN service to individuals residing in Florida and this District under the name TorGuard.

101.     Defendants LiquidVPN, TorGuard and DOES 1-100 are subscribers of QuadraNet.

102.     LiquidVPN's and TorGuard's VPN services are for transmitting, routing and/or or providing connections for said transmitting and routing, through a network controlled by them and provided to them by QuadraNet ("providing network connections").

103.     A VPN is a type of Internet Service that provides access to the Internet.  A conventional ISP will assign its customer ("end user") an IP address and log the user's activities on the Internet while using the assigned IP address.  In comparison, many VPN providers provide their users "anonymous" usage by, for example, purposefully deleting log records of end user access, assigning the subscriber IP addresses that are simultaneously shared among many users, and/or encrypting traffic.

104.    LiquidVPN advertises its LiquidVPN service as providing "Anonymous IP
Addresses to Protect … Online Privacy," being used to "Hide Your IP address" and further states
that LiquidVPN has "…over two thousand public IP addresses. Imagine getting access to a new
IP anytime you use the VPN for Kodi and BitTorrent."   Affidavit of Joshua J. Lee at ¶8.



**Unblock Blocked Sites**

**Unblock Facebook, Twitter,
Google, Netflix**, and websites
that are only available in specific
regions from wherever you are in
the world.

**Hide Your IP Address**

LiquidVPN has over two thousand
public IP addresses. Imagine
getting access to a new IP anytime
you use the VPN for Kodi and
BitTorrent

**Keep ISP's Guessing**

Everyone should have full access
to the Internet. With a VPN **ISP's
can no longer purposely buffer
streams and rate-limit
downloads.**

105.    LiquidVPN advertises the LiquidVPN service as providing three different types of
VPN connections:  1) dynamically assigned public IP address in which a public IP address is
randomly assigned; 2) a shared VPN tunnel in which encrypted VPN traffic is protected behind a
firewall; and 3) Modulating VPN tunnel in which the subscriber's public IP address from which
traffic exits is changed on new events that create new connections.  *See*
https://www.liquidvpn.com/supported-vpn-tunnel/ [last accessed on Feb. 23, 2021].

106.    LiquidVPN recommends the dynamically assigned public IP address for P2P
downloading.

107.    TorGuard explicitly promotes its VPN service for using BitTorrent.  TorGuard even states that the "tor" in TorGuard relates to "torrents."  https://torguard.net/faq.php [last accessed on Aug. 5, 2021].



108.    TorGuard promotes its VPN service as "Torrent the Way You Want" and "…lets you use P2P activity the way you want to…" and tells its end users to "…plug VPN credentials into your favorite BitTorrent app to secure the app's outgoing traffic by hiding and replacing your IP…"  https://torguard.net/torrentvpnservice.php [last accessed on Aug. 5, 2021].



109.    TorGuard warns its end users that when they use BitTorrent to pirate content that their IP addresses will be visible, and third parties can monitor their activity.  TorGuard explains that its VPN service "tunnel[s] your internet and BitTorrent through another server so that

those…can't be traced back to you.  That way, those 'prying eyes' can't identify you and your ISP will not have any cause to send you a harrowing letter."



110.    Defendants DOES 1-100, TorGuard and LiquidVPN are allocated or reassigned IP addresses from QuadraNet and then assign the IP addresses to their end users.  The end users use these IP address to download and reproduce Plaintiffs' Works from QuadraNet's servers without a license and further share (distribute) copies of Plaintiffs' Works from said IP addresses at QuadraNet's servers to individuals across the world as encouraged and instructed to them by TorGuard and LiquidVPN.

111.    These end users used a piracy website such as Pirate Bay either directly or via a BitTorrent Client such as Popcorn Time to obtain torrent files for downloading and distributing Plaintiffs' Works using IP addresses provided by DOES 1-100, TorGuard and LiquidVPN.

112.    Each of the end users is a member of a group of BitTorrent users or peers whose computers are collectively interconnected for the sharing of a particular unique file, otherwise known as a "swarm."  The particular file a BitTorrent swarm is associated with has a unique "hash" number and a file name.

113.    QuadraNet has the identification records for DOES 1-100.

114.    Although QuadraNet has leased servers to and reassigned or reallocated IP addresses to DOES 1-100, QuadraNet negligently and/or fraudulently publishes ARIN records in violations of its registration agreement with ARIN that identify QuadraNet as the owner of the IP addresses.  Plaintiffs intend to serve discovery on QuadraNet to obtain the identifications of DOES 1-100 and amend this Second Amended Complaint to specifically name DOES 1-100.

### C.  Non-parties

115.    Cox is an adult individual residing in, upon information and belief, Livonia, Michigan (Wayne County).

116.    SMR is a limited liability company organized under the laws of Michigan with its principal place of operations in, upon information and belief, Canton, Michigan (Wayne County).

117.    Upon information and belief, SMR has been in existence since 2013.

118.    LiquidVPN, Inc. is a corporation organized under the laws of Wyoming that was dissolved in 2018.

119.    Cox was the sole shareholder in LiquidVPN, Inc.

120.    The American Registry of Internet Numbers ("ARIN") is a nonprofit, member-based organization that manages and distributes Internet number resources such as IP addresses and Autonomous System Numbers (ASNs).

121.    Choopa LLC ("Choopa") is a provider of data centers, dedicated servers and colocation service at a facility in Miami, Florida, among other places.  Choopa receives IP addresses from ARIN.

122.    ReliableSite.Net LLC ("Reliable") is a provider of data centers and dedicated servers. Reliable obtains at least some services including IP addresses from the facility in Miami, Florida.  Reliable reassigned IP addresses in this facility to LiquidVPN.

123.    Orchid Labs, Inc. is a provider of Orchid Network which is an open source software application suite that facilitates communication between users and providers of bandwidth in a distributed VPN.

## V.    JOINDER

124.    Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs are properly joined because, as set forth in detail above and below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely (i) QuadraNet's subscribers LiquidVPN, TorGuard and DOES 1-100 use the resources such as IP addresses and servers provided to them by QuadraNet for infringing the copyrights in Plaintiffs' Works and infringing 42's trademark, (ii) the contribution to said copyright infringements by QuadraNet, (iii) the promotion of the VPN services by QuadraNet's subscribers for the express purpose of infringing copyright protected Works, and (iv) the failure of LiquidVPN to comply with the obligations of the agreements they made with Cox and SMR concerning the LiquidVPN service; and (b) that there are common questions of law and fact.

125.    Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants was properly joined because, as set forth in more detail below, the Plaintiffs assert that the infringements complained of herein by each of the Defendants (a) arises out of the same transaction, occurrence, or series of transactions or occurrences, and (b) there are common questions of law and fact.  That is, (i) Defendants LiquidVPN, TorGuard and DOES 1-100 promote and use their services for infringing Plaintiffs' copyrights in their Works, and (ii) QuadraNet provided the IP addresses,

servers and/or colocation services used by Defendants LiquidVPN, TorGuard and DOES 1-100 to commit, promote and facilitate widespread infringement.

## VI.    FACTUAL BACKGROUND
### A. The Plaintiffs Own the Copyrights to the Works and a Registered Trademark.

126.    The Copyright Plaintiffs are the owners of the copyright in the Works, respectively.  The Works are the subjects of copyright registrations, and this action is brought pursuant to 17 U.S.C. § 501.  *See* Exhibit "1."

127.    Each of the Works are motion pictures currently offered for sale in commerce.

128.    Defendants had notice of the Copyright Plaintiffs' rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

129.    Defendants also had notice of the Copyright Plaintiffs' rights through general publication and advertising associated with the motion pictures, and packaging and copies, each of which bore a proper copyright notice.

130.    Plaintiff 42 is the owner of a federal trademark registration, Reg. No. 5,963,253, which issued on Jan. 14, 2020 on the principal register of the United States Patent and Trademark Office. This registration for the standard character mark Popcorn Time covers CLASS 9: Downloadable computer software for downloading and streaming multimedia content images, videos and audio. A true copy of this registration is attached as Exhibit "2." The registration is valid and subsisting and has never been cancelled.

131.    Plaintiff 42 is also owner of the trademark registrations for Popcorn Time in Iceland and Russia.

132.    Plaintiff 42 distributes and streams content under the Popcorn Time mark throughout the US on one or more websites.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

133.    Plaintiff 42 has invested substantial time, effort and financial resources promoting its Popcorn Time trademark in connection with the marketing and sale of its software in interstate commerce.

134.    Plaintiff 42's Popcorn Time trademark is inherently distinctive as applied to 42's software and website that bear the mark.

**B. LiquidVPN's, TorGuard's, and DOES 1-100's End Users Used BitTorrent to Infringe the Plaintiffs' Copyrights.**

135.    BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

136.    The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer such as QuadraNet's server connected to numerous computers).

137.    A BitTorrent Client is a software program that implements the BitTorrent protocol.  There are numerous such software programs which can be directly downloaded from the Internet.

138.    Once installed on a computer, the BitTorrent Client serves as the user's interface during the process of uploading and downloading data using the BitTorrent protocol.

139.    LiquidVPN's, TorGuard's and DOES 1-100's End Users installed a BitTorrent Client such as "Popcorn Time" onto their respective computers.

140.    The Popcorn Time promoted by LiquidVPN has been referred to in the news media as "Netflix for pirates." http://fortune.com/2016/02/26/popcorn-time-netflix-pirates/ [accessed on March 1, 2021].

141.    The United States Trade Representative ("USTR") placed the Popcorn Time promoted by LiquidVPN on a list of examples of Notorious Markets engaged in and facilitating substantial piracy. *See* USTR, 2020 Review of Notorious Markets, Jan. 14, 2021, pg. 26, Available at https://ustr.gov/sites/default/files/files/Press/Releases/2020%20Review%20of%20Notorious%20 Markets%20for%20Counterfeiting%20and%20Piracy%20(final).pdf [last accessed on March 5, 2021].

142.    Popcorn Time provides an interface so that users can easily copy and share copies of copyright protected content, including Plaintiffs'.

143.    The home interface of Popcorn Time includes a collection of title art of popular motion pictures and a search bar where a user can enter words associated with a copyright protected motion picture they wish to copy.

144.    Simply entering words associated with a motion picture automatically generates a pull down tab below the search bar with a narrowed selection of motion pictures associated with the words. *See* Affidavit of Stephen M. Bunting at ¶¶23-31.

### 1. The Initial Seed, Torrent, Hash and Tracker

145.    A BitTorrent user that wants to upload a new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using the Client he or she installed onto his or her computer.

146.    The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

147.    The initial seeder often modifies the file title of the Work to include a wording such as "RARBG," "FGT" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her files and attract users to his or her piracy website.

148.    The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

149.    The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Work, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

150.    When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

## 2. Torrent Sites

151.    "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol.  There are numerous torrent websites such as The Pirate Bay, Kickass Torrents and Extratorrents that are promoted by LiquidVPN and TorGuard and the YTS website.

152.    The Pirate Bay torrent site is so notorious that the USTR placed it on a list of examples of Notorious Markets engaged in and facilitating substantial piracy.  *See* USTR, 2018 Out-of-Cycle Review of Notorious Markets, April 2019, pgs. 27-28, Available

at:https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [last accessed on

February 23, 2021].

153.    TorGuard knows and encourages its end users to use its VPN service to access

The Pirate Bay and pirate content.



154.    When TorGuard's end users have trouble accessing Pirate Bay, TorGuard's

official moderators give them advice on how to fix their settings so that the end users can freely

pirate content.





155.     Upon information and belief, LiquidVPN, TorGuard and DOES 1-100's end users went to a torrent site directly or indirectly to upload and download Plaintiffs' copyrighted Works.

156.     Upon information and belief, LiquidVPN, TorGuard and DOES 1-100's end users went to the torrent site Pirate Bay directly or indirectly to download Plaintiffs' copyrighted Works.

157.     Upon information and belief, LiquidVPN, TorGuard and DOES 1-100's end users went to the torrent site YTS to upload and download Plaintiffs' copyrighted Work from IP addresses provided by QuadraNet to its subscribers.  *See* Exhibit "8."

158.     By using a BitTorrent Client such as Popcorn Time, these end users can simply enter words associated with a motion picture to automatically generate a pull down tab below the search bar with a narrowed selection of motion pictures associated with the words and chose one particular motion picture and automatically connect to torrent sites.

### **3. Uploading and Downloading a Work Through a BitTorrent Swarm**

159.     Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Works) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

160.     The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.

161.     Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.

162.     In this way, all of the peers and seeders are working together in what is called a "swarm."

163.     Here, each of the end users participated in the same swarm and directly interacted and communicated with other members of that swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions.

164.     LiquidVPN, TorGuard and DOES 1-100 provide the network connections for their end users and distribute copies of Plaintiffs' Works using servers provided to them by QuadraNet.

165.     As stated by QuadraNet's CEO Ilan Mishan, QuadraNet provides the "tunnel" to its subscribers that their end users use to pirate Plaintiffs' Works.  Decl. of Ilan Mishan [Doc. #83-1] at ¶20.

166.     These "tunnels" serve as channels for distributing Plaintiffs' Works.

167.     In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece or all of the copyrighted Work to each of the peers through channels provided by servers leased by QuadraNet to LiquidVPN, TorGuard and DOES 1-100. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

168.    Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

**4. The Plaintiffs' Computer Investigator Identified LiquidVPN's IP Addresses as Participants in a Swarm That Was Distributing the Plaintiffs' Copyrighted Works**

169.    Choopa reassigned IP address 108.61.128.241 to Reliable.

170.    Reliable reassigned IP address 108.61.128.241 to LiquidVPN.

171.    QuadraNet reassigned IP address blocks including but not limited to 104.223.91.0/24 and 104.129.18.0/24 to LiquidVPN.

172.    The Plaintiffs retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiffs' copyrighted Works.

173.    MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

174.    MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

175.    MEU confirmed that Plaintiffs' Works were distributed from the LiquidVPN servers leased from Reliable and IP addresses assigned from Reliable. For example, the IP addresses, Unique Hash Number, and hit dates contained on Exhibit "3" accurately reflect what is contained in the evidence logs, and show that LiquidVPN's end users have copied and distributed copies of the Plaintiffs' copyrighted Works *Automata*, *Hunter Killer*, *I Feel Pretty* and *Shock and Awe* as identified by the Unique Hash Number from IP address 108.61.128.241.

176.    MEU confirmed that Plaintiffs' Works were distributed from the LiquidVPN servers leased from QuadraNet and IP addresses assigned from QuadraNet. *See* Decl. of Arheidt at ¶11.

177.    LiquidVPN's end users' computers used the identified IP addresses to connect to the investigative server from a LiquidVPN servers leased from QuadraNet and Reliable and transmitted a full copy of a digital media file identified by the Unique Hash Number.

178.    MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Work.

179.    MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

### 5. The Plaintiffs' Computer Investigator Identified TorGuard's IP Addresses as Participants in a Swarm That Were Distributing the Plaintiffs' Copyrighted Works

180.    QuadraNet reassigned and reallocated IP addresses including but not limited to 96.44.142.226, 104.129.28.0 and 173.254.255.106 to TorGuard.

181.    MEU confirmed that TorGuard used these IP addresses at servers leased from QuadraNet to distribute copies of the Works I.T., A Family Man, The Hitman's Bodyguard, Bedeviled, The Mechanic: Resurrection, The Humbling, 211, I Feel Pretty, Hunter Killer, Hellboy, Angel Has Fallen, Rambo V: Last Blood, Boyka: Undisputed IV, Vengeance: A Love Story, Criminal, Once Upon a Time in Venice, I Am Wrath, London Has Fallen, Black Butterfly, Rupture, Day of the Dead, Extremely Wicked, Shockingly Evil and Vile, and Automata.

182.     TorGuard's end users' computers used the IP address to connect to the investigative server from a TorGuard server leased from QuadraNet in order to transmit a full copy, or a portion thereof, of a digital media file identified by a Unique Hash Number.

**6. The Plaintiffs' Computer Investigator Confirmed QuadraNet Subscriber IP Addresses as Participants in a Swarm That Were Distributing the Plaintiffs' Copyrighted Works**

183.     The YTS website operator maintained records of activity of registered user accounts.  See Exhibit "8" at pg. 37 (Certificate of Authenticity).

184.     As shown in Exhibit "8," the records including the email address of the registered user account, the torrent files the registered account downloaded, the IP address from where the registered user accessed the YTS website, and the time.

185.     MEU confirmed that the Works were distributed from many of the same IP addresses from where the end user (in this case a registered YTS account) downloaded the torrent file.

186.     For example, MEU confirmed multiple instances of copies of the Work *Hunter Killer* being distributed from QuadraNet IP address 173.44.48.38 (in Miami, FL) under the file name "Hunter Killer (2018) [BluRay] [720p] [YTS.AM]" shortly after the YTS account user t.forosyotros@gmail.com downloaded the YTS torrent file for pirating a copy of the 720p version of *Hunter Killer*.  See Exhibit "8" at pgs. 1 and 33.

**C. The End Users Knew the Copyright Management Information Included intThe Files They Distributed to Other Peers Had Been Removed or Altered Without the Authority of Plaintiffs.**

187.     A legitimate file copy of the Work includes copyright management information ("CMI") indicating the title.

188.     The initial seeders of the infringing file copies of Plaintiffs' Works added wording to the file titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

189.     The initial seeder of the infringing file copies of the Works *Hunter Killer* and *Shock and Awe* added the wording "FGT" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the RARBG website.

190.     The word FGT is not included in the file title of legitimate copies or streams of the Works *Hunter Killer* and *Shock and Awe*.  The initial seeder of the Work altered the title to falsely include the words "FGT" in the CMI.

191.     The initial seeder of the infringing file copies of the Work *I Feel Pretty* added the wording "YTS" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the YTS website.

192.     The word YTS is not included in the file title of legitimate copies or streams of the Voltage's Work *I Feel Pretty*.  The initial seeder of the Work altered the title to falsely include the words "YTS" in the CMI.

193.     The file copies QuadraNet's subscribers distributed to other peers in the Swarm for their end users included the altered CMI in the file title.

194.     The end users knew that the website or BitTorrent Client from which they obtained their torrent files was distributing illegal copies of the Work.

195.     The end users knew that YTS or FGT was not the author of Plaintiffs' Works.

196.     The end users knew that YTS or FGT was not a licensed distributor of Plaintiffs' Works.  Indeed, the YTS website includes a warning to this effect.

197.     The end users knew that the CMI that included YTS and FGT in the file names was false.

198.     The end users knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Works when they distributed the false CMI, altered CMI or the Work including the false or altered CMI.

199.     Namely, the end users knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Work.

200.     By providing the altered CMI to others, the end users induced, enabled and facilitated further infringements of the Work.

### D.  LiquidVPN and TorGuard Had Knowledge That Their End Users Were Infringing Plaintiffs' Works and Distributing File Copies of the Works with Altered CMI but Continued to Provide Service to Their End Users.

201.     Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512(c)(3) of the DMCA to be sent to service providers of IP addresses where MEU confirmed infringement of copyright protected content.

202.     Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered CMI, the IP address and port number at where infringement was confirmed and the time of infringement down to the second.  *See* Exhibit "4" (excerpt below).

Protocol: BITTORRENT
Infringed Work: I Feel Pretty
Infringing FileName: I Feel Pretty (2018) [BluRay] [1080p] [YTS.AM] Infringing FileSize: 1895499662
Infringer's IP Address: 108.61.128.241 Infringer's Port: 61561 Initial Infringement Timestamp: 2019-05-17 13:43:08

203.     MEU determines the proper abuse contact email address for the service provider assigned the IP addresses at issue from publicly available information from ARIN.

35

204.     Plaintiffs' agent sends the Notice to the abuse contact email address.

205.     Plaintiffs identified the IP addresses used by the LiquidVPN Defendants.

206.     Plaintiffs' agent has sent over 5530 Notices to service providers concerning infringements of Plaintiffs' Works at IP addresses controlled by LiquidVPN.

207.     Plaintiffs' agent has sent 5451 Notices to QuadraNet concerning infringements of Plaintiffs' Works at IP addresses assigned to QuadraNet from ARIN and reassigned to the LiquidVPN by QuadraNet.

208.     Plaintiffs' agent sent at least hundreds of Notices to QuadraNet concerning infringements of Plaintiffs' Works at IP addresses assigned to QuadraNet from ARIN and reassigned to the TorGuard by QuadraNet

209.     QuadraNet failed to update the ARIN records to show that these IP addresses were reassigned to LiquidVPN and TorGuard.

210.     For example, Plaintiffs' agent sent over 980 Notices to QuadraNet concerning infringement of the motion picture *Hitman's Bodyguard* at IP addresses assigned to QuadraNet from ARIN and reassigned by QuadraNet to the LiquidVPN.

211.     Upon information and belief, QuadraNet forwarded these Notices to LiquidVPN.

212.     For example, Plaintiffs' agent sent over 50 Notices to QuadraNet concerning infringement of motion pictures such as *A Family Man*, *Hitman's Bodyguard*, *Bedeviled*, *Hellboy and Angel Has Fallen* at IP address 96.44.142.226 assigned to QuadraNet from ARIN and reassigned by QuadraNet to the TorGuard.

213.     Upon information and belief, QuadraNet forwarded these Notices to TorGuard.

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

214.     Upon information and belief, other rightsholders had similar Notices sent to QuadraNet concerning infringing activity at IP addresses controlled by LiquidVPN and TorGuard that QuadraNet forwarded to LiquidVPN and TorGuard.

215.     Plaintiffs' agent sent Notices to Choopa concerning IP addresses associated with confirmed infringing activity.

216.     Plaintiffs' agent sent over 50 Notices to Choopa concerning IP address 108.61.128.241 between October of 2018 and April of 2019 ("time period").

217.     During this time period, Choopa had allocated IP address 108.61.128.241 to Reliable.

218.     During this time period, Reliable had allocated IP address 108.61.128.241 to LiquidVPN.

219.     During this time period, Choopa forwarded Notices sent by Plaintiffs to its customers, including Reliable.

220.     During this time period, Reliable forwarded Notices it received from Choopa concerning IP address 108.61.128.241 to LiquidVPN.

221.     Upon information and belief, other rightsholders had similar Notices sent to Choopa concerning infringing activity at IP addresses controlled by LiquidVPN that LiquidVPN indeed received.

222.     LiquidVPN continued to provide the LiquidVPN Service to their end users despite knowledge that their end users were using the service to pirate copyright protected Works including Plaintiffs' exactly as promoted, encouraged and instructed by LiquidVPN.

223.    TorGuard continued to provide the VPN service to their end users despite knowledge that their end users were using the service to pirate copyright protected Works including Plaintiffs' exactly as promoted, encouraged and instructed by TorGuard.

### E.  LiquidVPN and TorGuard Intentionally Induce Infringements of Copyright Protected Works, Including Plaintiffs' Works.

224.    LiquidVPN and TorGuard actively promote their VPN services for the purpose of movie piracy, including of infringing Plaintiffs' Works.

225.    LiquidVPN's website includes a statement that their VPN service is the "Best VPN for Torrenting and P2P Filesharing today" over the image of the notorious movie piracy website Pirate Bay. *See*  https://www.liquidvpn.com/best-vpn-for-torrenting/ [last accessed on Feb. 23, 2021] (excerpt below).



Affidavit of Joshua J. Lee at ¶9.

226.     LiquidVPN states that their LiquidVPN Service can be used to "Watch Popcorn Time without being detected by your ISP and P2P tracking software." *See* https://www.liquidvpn.com/popcorn-time-vpn/ [last accessed on Feb. 23, 2021]. (Excerpt below).



Affidavit of Joshua J. Lee at ¶10.

227.     LiquidVPN further states, "Experience everything Popcorn Time has to offer in the United States and the UK. Except the risks," "Stream Content Anonymously. Why bother risking complaints from your ISP, settlement demands, threats and jail time for streaming your favorite TV show." *See* https://www.liquidvpn.com/popcorn-time-vpn/ [last accessed on Feb. 23, 2021]. (Excerpt below).



Affidavit of Joshua J. Lee at ¶11.

228.    LiquidVPN includes a screenshot of Popcorn Time operating on a mobile device that includes the movie art of Millennium's Work *Survivor* among other copyright protected titles.  *See id.*





Magnified Version showing "Survivor"

Affidavit of Joshua J. Lee at ¶12.

229.   LiquidVPN further promotes the VPN service as "Popcorn Time VPN."

https://www.liquidvpn.com/popcorn-time-vpn/ [last accessed on April 21, 2021].



Affidavit of Joshua J. Lee at ¶20.

230.   Plaintiffs' investigator confirmed that Popcorn Time can be used to download, reproduce, and distribute copies of the Works "Automata," "Ava," "The Hitman's Bodyguard," "Criminal," "Disturbing the Peace," "Extremely Wicked, Shockingly Vile and Evil," "Hellboy," "I Feel Pretty," "Kill Chain," "London Has Fallen," "Mechanic: Resurrection," "Rambo V: Last

Blood," "The 2nd," "Hunter Killer," "Homefront," "Survivor" "Stoic fka Acts of Vengeance," "Tesla," and "The Outpost" exactly as promoted and encouraged by the LiquidVPN Defendants. *See* Affidavit of Bunting at ¶¶23-30.

231. LiquidVPN's end users use Popcorn Time exactly as explained and encouraged to them by LiquidVPN – to infringe copyright protected content while logged into LiquidVPN's service so they can conceal their illicit activities.

232. LiquidVPN's end users use LiquidVPN to "…watch Popcorn Time without being detected by [their] ISP and P2P tracking software [such as Plaintiffs]," to "[E]xperience everything Popcorn Time has to offer in the United States … Except the risks," and "Stream Content Anonymously" while not risking…complaints from your ISP, settlement demands, threats and jail time for streaming your favorite TV show" exactly as encouraged to by the LiquidVPN Defendants.

233. LiquidVPN even blatantly promotes their service to be used to stream copyrighted content in violation of criminal laws and encourage their users to do so.



Affidavit of Joshua J. Lee at ¶13.

234.    LiquidVPN promotes its service as a tool to engage in massive copyright infringement to entice end users to purchase their LiquidVPN Service.

235.    Based upon the LiquidVPN's encouragement that the LiquidVPN can be used to "safely" operate piracy apps such as Popcorn Time and visit torrent sites such as Pirate Bay, Kickass Torrents and Extratorrents, end users purchase LiquidVPN, install piracy apps such as Popcorn Time on their devices and/or visit torrent sites to infringe copyright protected content including Plaintiffs' while using the LiquidVPN service.



Affidavit of Joshua J. Lee at ¶14.

236.    In a Frequently Asked Questions section of LiquidVPN's website, in response to the question "Can I use BitTorrent and P2P," LiquidVPN say affirmatively "Yes" and point out they "…will never censor P2P or BitTorrent… ."

> Yes, LiquidVPN fully supports bittorrent and P2P on all of our servers. We will never censor P2P or BitTorrent on any of our servers. In fact, we have pulled out of locations because they did not like our policies on P2P and bit torrent. If you would like to verify LiquidVPN is working by checking your bit torrent IP head over to https://cryptoip.info/check-torrent-ip-address and run a test

Affidavit of Joshua J. Lee at ¶15.

237.    LiquidVPN's end users installed Popcorn Time on their device so they could watch content in violation of copyright laws (i.e., "free movies").

238.    LiquidVPN's end users obtained an IP address via the LiquidVPN Service, and used the IP address to download and share copies of copyright protected content including Plaintiffs by using Popcorn Time as instructed by LiquidVPN while concealing their identity.

239.    LiquidVPN knew or had reason to know that their end users used Popcorn Time exactly as promoted by them would result in direct infringement of the Copyrights of specific material including Plaintiffs'.

240.    TorGuard promotes its VPN service as making "Torrenting Ultra-Secure."

241.    TorGuard states that its VPN service "lets you use P2P activity the way you want to."

242.    TorGuard has even setup a feature so that its service can be incorporated into BitTorrent Client applications so that its end users can do "anonymous" piracy.



243.    TorGuard states that its VPN service can be used with any BitTorrent Client app that uses BitTorrent protocol.  TorGuard emphasizes that its VPN service "is compatible with some of the most popular torrent apps out there like uTorrent, Vuze, qBittorrent, and more." https://torguard.net/torrent-vpn-service-ip.php [last accessed on Aug. 5, 2021].

244.    TorGuard advertises that its VPN service can be used to "Stream your favorite content and download anonymously."



245.    TorGuard advertises its service as allowing its end users to use BitTorrent

anonymously.



246.    TorGuard advertises that for people that are afraid to torrent because of the "repercussions… a torrent VPN like TorGuard for file sharing eliminates those worries. TorGuard shields all of your activities, including torrenting, from absolutely everyone. If no one can see what you're doing, you're free to do whatever you want. Stay safe and secure while torrenting by using TorGuard." https://torguard.net/blog/the-best-bittorrent-clients-for-2019/ [last accessed on Aug. 5, 2021].



247.    TorGuard affiliates even post anonymously in forums that discuss piracy to promote TorGuard for the purposes of piracy.

248.    For example, a TorGuard affiliate posted in the Disqus platform under the name "Travis" to promote TorGuard for the purpose of piracy and included a discount code in the comments for an article discussing the legal risks in the US for using the piracy torrent site YTS. https://torrentfreak.com/yts-lawsuits-offer-clearest-sign-yet-that-pirates-shouldnt-trust-anyone-200201/



**Travis** ➜ sumgai · 3 days ago · edited

Odd, for the past decade I've been paying $25 a year for my VPN and have since been using it with TPB without problems. With Torguard.net and using the discount code 'travis' at checkout, a new subscriber can get 50% off their packages for life. aka ~$25 a year

Silly games for silly people.

3 ⌃ | ⌄ 2 · Reply · Share ›

249.    As of March 13, 2020, the discount code "travis" did indeed provide a 50 percent

discount.



250.    TorGuard pays its affiliates "30% Lifetime Recurring Commissions" for any and

all sales.  https://torguard.net/vpn-reseller-affiliate.php [last accessed on Aug. 5, 2021].

251.    TorGuard's end users use BitTorrent Client apps exactly as explained and

encouraged to them by TorGuard – to infringe copyright protected content while logged into

TorGuard's VPN service so they can conceal their illicit activities.

252.    TorGuard's end users obtained IP addresses via the TorGuard Service, and used the IP addresses to download and share copies of copyright protected content including Plaintiffs by using BitTorrent Client apps as instructed by TorGuard from QuadraNet's servers while concealing their identity.

253.    TorGuard knew or had reason to know that their end users used BitTorrent Client apps exactly as promoted by them would result in direct infringement of the Copyrights of specific material including Plaintiffs'.

### **F.  LiquidVPN and TorGuard Control the Conduct of Their End Users.**

254.    LiquidVPN and TorGuard can terminate their end users' accounts at any time.

255.    Upon information and belief, LiquidVPN and TorGuard promptly terminated end users' accounts when said end users failed to pay for the VPN Service.

256.    LiquidVPN and TorGuard have the capability to log their end users' access to the VPN Service but purposefully choose not to.

257.    LiquidVPN and TorGuard intentionally delete the log data for their end users to conceal their piracy.

## No Logs Means No Records

Here at TorGuard we value your privacy, anonymity, and security. We don't want to jeopardize your data by retaining logs and information about your internet use which makes us a 100% private no log VPN. You can torrent as much you want without exceeding any limits, and since we keep zero records of our torrent VPN servers, you can rest assured your traffic is hidden forever.

**Get TorGuard Now**

258.    Indeed, LiquidVPN Defendants make clear that they will log an end users' activities if they believe these activities are negatively impacting the performance of their network. In such cases, the LiquidVPN Defendants store: Login/logout Timestamps; Remote IP; Username; and Local IP.

**G.  LiquidVPN and TorGuard Profit from the Massive Piracy Conducted by Their End Users.**

259.    LiquidVPN and TorGuard encourage their end users to use their VPN service for piracy.

260.    LiquidVPN and TorGuard even market particular products to assist their end users in engaging in piracy anonymously.

261.    LiquidVPN states that, "If you follow our directions this VPN kill switch will never give your real IP away."  *See* https://www.liquidvpn.com/vpn-kill-switches/ [last accessed on Feb. 26, 2021].

262.    TorGuard provides a special proxy link and instructs their end users exactly how to set up their BitTorrent client to efficiently pirate content.  *See* https://torguard.net/knowledgebase.php?action=displayarticle&id=12 [last accessed on Aug. 4, 2021].



263.    LiquidVPN and TorGuard pay affiliates operating websites evaluating VPN services to give them a positive evaluation and recommend their service for piracy.

264.     For example, on the BESTVPN website https://bestvpn.org/liquidvpn-review/, the author gave the LiquidVPN Service a review of 3.5/5 stars.

265.     In the review, the author stated that "With the Liquid Lock enabled, torrenting is protected from an occasional connection drop."

266.     In the review, the author noted that "P2P is allowed, in case you were wondering" and "provider openly supports P2P."

267.     The author of the article never states that BESTVPN is one among dozens of paid affiliates of Defendants.

268.     LiquidVPN recommends their Public IP VPN Topology for "P2P downloading." *See* https://www.liquidvpn.com/supported-vpn-tunnel/ [last accessed on Feb. 26, 2021].

269.     LiquidVPN states, "Once you buy VPN service from LiquidVPN our network becomes your network. Use it as much as you like. Here are some highlights – We do not limit Bittorrent or P2P."  *See* https://www.liquidvpn.com/buy-vpn-service/ [last accessed on Feb. 26, 2021].

**H.  QuadraNet Had Knowledge Its Subscribers Such as LiquidVPN and TorGuard Were Directly Infringing and Contributing to Infringement of Plaintiffs' Works.**

270.     QuadraNet is a member of ARIN and receives IP addresses from ARIN.

271.     As a member of ARIN, QuadraNet was assigned handles such as "QEL-5" and "QUADR-39."

272.     QuadraNet is required to update the WHOIS records for the IP addresses it reassigns or reallocates per its registration agreement with ARIN.

273.     QuadraNet advertises providing, "high-quality dedicated servers, colocation, and cloud services in…Miami… ."   https://www.quadranet.com/ [last accessed on April 28, 2021].

274.     QuadraNet advertises specific VPN solutions to its subscribers. *See* https://blog.quadranet.com/quadranet-new-vpn-solution-private-network/ [last accessed on April 28, 2021].

275.     QuadraNet advertises its service for providing high-speed access to the Internet.

276.     QuadraNet advertises that, "All Outlet dedicated servers include 100Mbps port speed. Need more speed? Get 10x more network performance - upgrade to a 1Gbps port for + $10/m." https://www.quadranet.com/outlet. [last accessed on April 28, 2021].

277.     QuadraNet's subscribers such as LiquidVPN and TorGuard are motivated to become customers from QuadraNet's advertisements.

278.      QuadraNet's subscribers such as LiquidVPN and TorGuard are motivated to become customers from the knowledge of QuadraNet's practice of ignoring notices of infringements or failing to take any meaningful action.

279.     Plaintiffs' agent sent over 5400 Notices to QuadraNet concerning infringement at IP addresses QuadraNet reassigned to LiquidVPN but continues to hold itself out as the proper abuse contact in ARIN in violation of its registration agreement with ARIN.

280.     Plaintiffs' agent sent over 100 Notices to QuadraNet concerning observed infringements at each of IP addresses 104.223.91.154, 104.223.91.202 and 104.223.91.234 that QuadraNet reassigned to LiquidVPN.

281.     Upon information and belief, other rightsholders had similar Notices sent to QuadraNet concerning infringing activity at IP addresses controlled by the LiquidVPN Defendants.

282.     The LiquidVPN Defendants use IP addresses 23.226.133.19 and 23.226.133.20 provided by QuadraNet as the main server IP addresses for hosting their VPN network and pirating content.

283.     LiquidVPN used the servers it leased from QuadraNet to be a "tunnel" for distributing copies of Plaintiffs' Work for its end users.  Decl. of Ilan Mishan [Doc. #83-1] at ¶20.

284.     LiquidVPN used IP addresses 23.226.133.19 and 23.226.133.20 to distribute copies of Plaintiffs' Work.

285.     QuadraNet failed to terminate the LiquidVPN and TorGuard accounts or the accounts associated with these IP addresses or take any meaningful action in response to these Notices.

286.     QuadraNet has failed to terminate LiquidVPN's account even after being served with the First Amended Complaint detailing LiquidVPN's extensive piracy in this lawsuit.  As of Aug. 4, 2021, LiquidVPN is still hosted by QuadraNet servers at IP addresses 23.226.133.19 and 23.226.133.20.  *See* https://my.liquidvpn.com/index.php?action=serverapi [last accessed on Aug. 10, 2021] (Current server setup for LiquidVPN - partial screenshot below).



287.     QuadraNet continued to provide service to LiquidVPN and TorGuard despite knowledge that they use the service to engage in, facilitate, promote, and encourage use of their

VPN service for massive piracy of copyright protected Works including the Copyright Plaintiffs'.

288.    Upon information and belief, QuadraNet continues to provide service to TorGuard despite receiving a letter from Plaintiffs' counsel detailing how TorGuard intentionally induces piracy and uses the resources it receives from QuadraNet for piracy.  *See* Exhibit "5."

289.    The ability and availability for QuadraNet's VPN subscribers to distribute copyright protected Works including Plaintiffs' from QuadraNet's servers and IP addresses while concealing their identity from the public Whois ARIN records is a draw for subscribers and at least one of their motivations to become customers of QuadraNet.

290.    QuadraNet's VPN subscribers are also motivated to become subscribers because they know that QuadraNet will do nothing in response to notices sent by rightsholders.  *See* Decl. of Cox at ¶4 ("I don't remember QuadraNet ever following up to any of these abuse notices. My impression was that these abuse notices were automatically generated by QuadraNet from an unmonitored email address.")

291.    QuadraNet directly profits from its VPN subscribers' distribution of Plaintiffs' copyright protected Works without authorization.  As QuadraNet's VPN subscribers induce more end users who wish to pirate Plaintiffs' Works, QuadraNet's VPN subscribers purchase more services such as server space and IP addresses from QuadraNet.

### I.  QuadraNet Controls the Conduct of Its Subscribers.

292.    QuadraNet can terminate the account of LiquidVPN, TorGuard or other subscriber accounts at any time.

293.     QuadraNet promptly terminates subscriber accounts when said subscribers failed to pay for the Service.  *See* QuadraNet Terms of Service at ¶8(b), https://www.quadranet.com/terms-of-service [last accessed on April 26, 2021].

294.     QuadraNet has the capability to log its subscribers' access to its service but purposefully chooses not to.  Indeed, QuadraNet offers its subscribers "backup services" and "server management" at an additional price.  Id. at ¶¶3-4.

295.     QuadraNet has the capability to null-route IP addresses it assigns or allocates to its subscribers.

296.     QuadraNet itself states that it provides "[c]ontrolled access and monitoring with 24/7 manned building security keep your servers safe, so that you never have to worry about unauthorized access to your data."  *See* https://www.quadranet.com/miami-datacenter [last accessed on Aug. 10, 2021].

## J.  QuadraNet, TorGuard and LiquidVPN Do Not Have a Safe Harbor from Liability.

297.     As part of the DMCA, Congress created a safe harbor that limits the liability of a service provider for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

298.     QuadraNet has failed to terminate the accounts and/or take any meaningful actions against its subscribers such as LiquidVPN and TorGuard in response to the Notices consistent with a reasonably implemented policy for termination of subscribers and account

holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability ("policy").

299.    QuadraNet has even failed to terminate the accounts of LiquidVPN in response to this lawsuit.

300.    QuadraNet has even failed to terminate the accounts of TorGuard even in response to a letter from Plaintiffs' counsel detailing TorGuard's infringing activities.  *See* Exhibits "5" and "6."

301.    LiquidVPN has failed to terminate any repeat infringers and/or take any meaningful actions against their subscribers in response to these Notices consistent with a policy.

302.    Plaintiffs' agent has sent over 180,000 Notices to QuadraNet concerning infringements at IP addresses QuadraNet publishes as assigned to it.

303.    QuadraNet merely forwards these Notices to its subscribers from an unmonitored email address and fails to take any meaningful action.

304.    QuadraNet even ignores subscribers' follow up questions to Notices QuadraNet automatically forwards to them.  *See* Decl. of Cox at ¶4 ("I sent an email back asking "What is this abuse" [to a garbled unreadable message], but never received a reply.")

305.    QuadraNet's refusal to terminate the accounts of the subscriber assigned IP address 173.44.37.82, or to take any action at all, is illustrative of QuadraNet's lack of any meaningful action consistent with the policy.

306.    Plaintiffs' Agent has sent over 5857 Notices to QuadraNet concerning infringements at this IP address as of March 18, 2020.  Notice numbers sent to other IP addresses controlled by QuadraNet as of March 18, 2020 are show below.

| IP | Notices Sent |
|---|---|
| 173.44.37.82 | 5857 |
| 96.44.144.122 | 5835 |
| 96.44.189.114 | 5736 |
| 173.44.37.98 | 5727 |
| 173.44.37.106 | 5723 |
| 96.44.147.106 | 5722 |
| 173.254.222.162 | 5720 |
| 96.44.147.42 | 5719 |
| 96.44.144.114 | 5716 |
| 173.44.37.114 | 5705 |

Affidavit of Daniel Arheidt at ¶12.

307.    QuadraNet received IP addresses 96.47.224.0-96.47.231.255 ("96 Block") from ARIN, which QuadraNet uses at its facility in Miami.   *See Id.* at ¶15.

308.    Plaintiffs' agents have sent over 2619 Notices to QuadraNet concerning infringements of their Works at just this 96 Block.  Plaintiffs' agent sent over 308 Notices to QuadraNet between June of 2017 to April of 2021 concerning just IP address 96.47.226.34. *See Id.* at ¶16-17.

309.    Plaintiffs' counsel sent first and second letters to QuadraNet on March 18, 2020 and September 1, 2020 concerning massive piracy at IP addresses controlled by QuadraNet that were completely ignored.  *See* Exhibits "5" and "6."

310.    QuadraNet could have taken simple measures to stop its subscribers from continuing to reproduce and/or distribute Plaintiffs' Works, but did not.

311.    For example, QuadraNet could have temporarily "null-routed" the IP addresses to disable the link to the infringing activity and stop further piracy of Plaintiffs' Works.  Indeed, QuadraNet advertises the ability to null route IP addresses.



312.     In the past, QuadraNet has null-routed the IP addresses of its subscribers.  Upon

information and belief, QuadraNet null-routed the IP addresses of its subscriber AlphaRacks.



313.     For example, QuadraNet could have temporarily suspended the subscriber's

account to stop further piracy of Plaintiffs' Works.

314.     For example, QuadraNet could have blocked or mandated that its VPN

subscribers block certain ports such as ports that are used for BitTorrent.

315.     Congress created a safe harbor that limits the liability of a service provider for copyright infringement "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider," if the service provider does not have the requisite knowledge, "responds expeditiously to remove, or disable access to, the material…" and has the appropriate designated agent for receiving notices.  17 U.S.C. § 512(c)(1), (2).

316.     LiquidVPN has set up their network so that at least two of its US servers are of QuadraNet at IP addresses 23.226.133.19 and 23.226.133.20.

317.     LiquidVPN has set up a "tunnel" (decl. of Michan at ¶20) for distributing Plaintiffs' Works from a first member of a swarm through QuadraNet's servers to other members of the swarm.

318.     LiquidVPN displays title art of Plaintiff Millennium Funding, Inc.'s movie *Survivor* on its website hosted on QuadraNet servers without authorization of Millennium Funding, Inc.

319.     Until June 16, 2021, QuadraNet failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2).

320.     QuadraNet's conduct renders it ineligible for safe harbor immunity from copyright liability under the DMCA.

321.     LiquidVPN and TorGuard do not have a policy of terminating repeat infringers.

322.     LiquidVPN even promotes the fact that their LiquidVPN service is a "DMCA Free Zone" as a positive aspect that makes them stand out from competing VPN providers.  *See* https://www.liquidvpn.com/best-vpn-for-torrenting/ [last accessed on Feb. 23, 2021] (screenshot below).



323.    In a Frequently Asked Questions section of LiquidVPN's website, in response to the question "Can I use BitTorrent and P2P?," LiquidVPN says affirmatively "Yes" and points out they "…will never censor P2P or BitTorrent… ."

Yes, LiquidVPN fully supports bittorrent and P2P on all of our servers. We will never censor P2P or BitTorrent on any of our servers. In fact, we have pulled out of locations because they did not like our policies on P2P and bit torrent. If you would like to verify LiquidVPN is working by checking your bit torrent IP head over to https://cryptoip.info/check-torrent-ip-address and run a test

324.    Plaintiffs' counsel sent a letter to 1701 on Oct. 27, 2020 concerning massive piracy at an IP address controlled by LiquidVPN that was completely ignored.  *See* Exhibit "7."

325.    LiquidVPN has failed to designate and register an agent with the Copyright Office as provided by 17 U.S.C. § 512(c)(2).

326.    LiquidVPN and TorGuard interfere with standard technical measures used by copyright holders to identify or protect copyright works by purposefully deleted their end users' logged information. *See* 17 U.S.C. § 512(i)(1)(B).

327.    LiquidVPN's and TorGuard's conduct renders them ineligible for safe harbor immunity from copyright liability under the DMCA.

### K. Quadranet Intentionally Misrepresents Material Information in the Whois Records of RIN.

328.    QuadraNet allocates or reassigns IP addresses in Miami specifically and in the United States to its subscribers such as LiquidVPN and TorGuard.

329.    Despite allocating or reassigning IP addresses to its subscribers, QuadraNet publishes ARIN Whois records falsely indicating QuadraNet as the proper abuse contact at these IP addresses rather than the contact of the subscriber in violation of its registration agreement with ARIN.  *See* Decl. of Eric Smith at ¶¶10-14.

330.    Despite allocating or reassigning these IP addresses to its subscribers, QuadraNet knowingly failed to update the ARIN Whois records to indicate its subscriber as the proper abuse contact at these IP addresses in violation of its registration agreement with ARIN.

331.    For example, QuadraNet states in the ARIN Whois records concerning IP address 104.223.123.98 (and the complete range 104.223.112.0 - 104.223.127.255) in Miami, Florida that abuse should be sent to its "Miami Network Operations" at email address: abuse@quadranet.com at 36 NE 2nd Street, Suite 520, Miami, Florida, 33132.



**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

| | |
|---|---|
| Source Registry | ARIN |
| Kind | Group |
| Full Name | Miami Network Operations |
| Handle | MNO88-ARIN |
| Email | abuse@quadranet.com |
| Telephone | +1-213-614-9371;ext1 |
| Telephone | +1-213-614-9375 |
| Organization | Miami Network Operations |
| Address | 36 NE 2nd St |
| | Suite 520 |
| | Miami |
| | FL |
| | 33132 |
| | United States |
| Roles | Administrative, Technical, Abuse |
| Registration | Mon, 07 Jul 2014 18:19:39 GMT (Mon Jul 07 2014 local time) |
| Last Changed | Wed, 06 Jun 2018 19:21:35 GMT (Wed Jun 06 2018 local time) |
| Comments | http://www.quadranet.com |
| | support@quadranet.com |
| | 24/7 NOC |
| | Mailing address: |

332.    QuadraNet had allocated IP address 104.223.123.98 to its VPN subscriber Noisebridge from September 7, 2011 to January 8, 2019.

333.    On June 6, 2018 when QuadraNet last changed the ARIN record, QuadraNet knowingly and intentionally published its name as the relevant contact rather than Noisebridge.

334.    An end user used Noisebridge's IP address 104.223.123.98 allocated from QuadraNet and servers leased from QuadraNet to conceal his operation of the piracy website YTS.GG.

335.    In contradiction to QuadraNet's statements in the ARIN records that Quadranet's Miami Network Operations is the appropriate party to handle abuse, QuadraNet now disavows any responsibility for abusive activity at IP addresses it allocates to its VPN subscribers.  For

example, QuadraNet's Chief Executive Officer Ilan Mishan now states that "When Quadranet Enterprises, LLC's customers use our servers for a VPN service, Quadranet …has no access to the … internet traffic of the users..."  Decl. of Ilan Mishan [Doc. #83-1] at ¶23.

336.     QuadraNet's Chief Executive Officer Ilan Mishan even denies that QuadraNet, Inc. has "any physical presence in Florida," and further states "Quadranet, Inc. does not have a facility or any data servers in Florida."  Id. at ¶8.

337.     QuadraNet's failure to update the Whois ARIN records and/or publishing false Whois ARIN records for these IP addresses that it reassigned and/or reallocated to its subscribers and no longer has control rights over activity or any legal right or ability to control constitutes misrepresentations of material facts.

338.     Plaintiffs' agent relied on QuadraNet's misrepresented information in the Whois ARIN records to determine the appropriate party to send the notices of infringements ("Notices").

339.     Plaintiffs' agent had a right to rely on the Whois ARIN records to determine the appropriate party to send the Notices.

340.     Relying on the Whois ARIN records is consistent with IT industry practices.  *See* Decl. of Smith at ¶15.

341.     Courts throughout the US have relied on the identification information of the Whois ARIN records when approving warrants and subpoenas.

342.     Rightsholders such as Plaintiffs are third party beneficiaries to QuadraNet's agreement with ARIN to update the Whois ARIN records when QuadraNet allocates or reassigns IP addresses to its subscribers such as TorGuard and LiquidVPN.  Rightsholders rely on the Whois records to stop abuse.

343.    QuadraNet intended for rightsholders such as Plaintiff to rely on the false information QuadraNet publishes in the Whois records of ARIN.

344.    In reliance on QuadraNet's misrepresented information in the ARIN Whois records, Plaintiffs' agent sent notices of infringement to QuadraNet's abuse contact.

345.    QuadraNet failed to inform Plaintiffs' agent that the IP addresses at issue had been allocated and/or reassigned to its subscriber.

346.    Plaintiffs have suffered damages as a result of QuadraNet's misrepresentation.  If QuadraNet had published accurate information in the ARIN Whois records, Plaintiffs' agent would have sent the Notices directly to QuadraNet's subscribers so that the abusive activity could be stopped.

347.    If QuadraNet published accurate information in the ARIN Whois records, Plaintiffs' agent would have sent the Notices directly to QuadraNet's subscribers and taken legal action against the subscriber director earlier.

348.    Upon information and belief, QuadraNet's subscribers such as LiquidVPN and TorGuard are motivated to become subscribers of QuadraNet since they know that QuadraNet will not make them publish their own contact information in the Whois records for the IP addresses allocated to them and QuadraNet benefits by receiving more VPN subscribers.

349.    QuadraNet further benefits by publishing false records in the Whois records by maintaining control over valuable IPv4 addresses.

**L. Defendants 1701 and Muszynski Infringe Plaintiff 42's Registered Trademark.**

350.    Notwithstanding Plaintiff 42's established rights in the trademark Popcorn Time, Defendants 1701 and Muszynski adopt and use the confusingly similar and/or identical mark

Popcorn Time in interstate commerce in connection with the distribution and/or streaming of unlicensed copyright protected content.

351.    Defendants 1701 and Muszynski promote their VPN service under the brand name "Popcorn Time VPN" that includes the Popcorn Time mark as a spurious designation that is identical with, or substantially indistinguishable from Plaintiff 42's registered Popcorn Time trademark.

352.    42's registered trademark is depicted below (see Exhibit "2" for a true copy of the registration):

# Popcorn Time

353.    Defendants 1701 and Muszynski use the Popcorn Time mark as it appears on their website:



Affidavit of Joshua J. Lee at ¶20.

354.     Any prior use of the mark Popcorn Time by Defendants 1701 and Muszynski is ineligible for senior rights because such use was for criminal activities and thus unlawful commerce.

## M.  Muszynski is Individually Liable for 1701's Conduct.

355.     Upon information and belief, Muszynski's infringing conduct included, among other things, formulating and implementing the business policies, procedures, and practices that breach contractual obligations, infringe a registered trademark and the publicity rights of the prior owners, provide repeat infringers with continued internet service through LiquidVPN, without consequence. Because Muszynski directed 1701's policies, Muszynski is personally liable for 1701's failure to comply with its legal responsibilities and for the copyright and trademark infringements that resulted from those failures.

356.     Muszynski has gone through great lengths to conceal his involvement in LiquidVPN because he is aware of his legal liability for copyright infringement.

357.     Muszynski fraudulently uses the alias JAMIE CASTRO on the website to conceal his involvement.

358.     Muszynski uses the same alias when registering with NAMECHEAP for website domains.

359.     Muszynski knowingly and willingly continue to fraudulently hold the dissolved corporation LiquidVPN, Inc. out as the owner and operator of the LiquidVPN Service despite LiquidVPN, Inc. being dissolved in 2018.



Affidavit of Joshua J. Lee at ¶18.

360.     Muszynski knowingly and willingly continues to fraudulently promote Cox as one

of the persons who "run the day to day operations of LiquidVPN" on the website knowing that

Cox ceased all involvement with LiquidVPN in 2019.  https://www.liquidvpn.com/about-

liquidvpn/ [last accessed on April 19, 2021].



## N. LiquidVPN breached a contract with David Cox and SMR.

361.     LiquidVPN entered into a contract with Cox and SMR to purchase LiquidVPN.

362.     The contract called for Cox and SMR to provide "…during the term of the six (6)

months Earn-Out [after the purchase date]…seventy-seven (77) hours of personal assistance as

required by the [LiquidVPN Defendants] to complete and finalize details of the technical aspects related to transferring, operating, and marketing the VPN service."

363.    Cox and SMR provided substantially more than the 77 hours required in the contract and were paid an Earn-Out amount of $65,000 in installments.

364.    After Cox and SMR performed their obligations in the contract, LiquidVPN requested Cox and SMR to perform further infrastructure support services for which they were paid $18,000.

365.    After Cox and SMR fully performed their obligations to the contracts and performed additional infrastructure support work, LiquidVPN proposed that Cox and SMR develop an infrastructure sufficient to permit LiquidVPN to provide services to Orchid VPN, implement new VPN protocols, automate networking task and perform technical support ("post earn-out work") at his hourly rate.  Cox and SMR agreed to this proposal.

366.    LiquidVPN made payments of $5000 and $6365 to SMR via Muszynski's American Express ("Amex") card as a deposit towards costs and services for the post earn-out work.

367.    SMR timely completed the post earn-out work and invoiced the LiquidVPN Defendants $55,790.

368.    Muszynski immediately executed chargebacks on his Amex card to reverse the deposits and any other payments he made to Cox and SMR and ignored their demands for payment.

369.    Cox and the Contract did not give LiquidVPN the right to use Cox's name, likeliness, and or publicity rights to promote LiquidVPN after the purchase date.

370.     Cox and the Contract did not give LiquidVPN the right to use the name of the dissolved corporation LiquidVPN, Inc., likeliness, and or publicity rights to promote LiquidVPN after the purchase date.

371.     Cox and SMR assigned all claims they have against the LiquidVPN to Plaintiffs MILLENNIUM FUNDING, INC. and VOLTAGE HOLDINGS, LLC to resolve claims in an action in the Eastern District of Michigan.

**FIRST CLAIM FOR RELIEF**
**(Direct Copyright Infringement against Defendants 1701, AUH2O, TorGuard, Muszynski and DOES 1-100)**

372.     Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in the unnumbered first paragraph, paragraphs 17-55, 126-129, 135-186, 257 and 326.

373.     Copyright Plaintiffs are the copyright owners of the Works which each contains an original work of authorship.

374.     QuadraNet's subscribers (Defendants 1701, AUH2O and Muszynski ("LiquidVPN'"), TorGuard and Defendants DOES 1-100) actively promote their VPN service for piracy and encourage their customers ("end users") to use their VPN service for piracy.

375.     Defendants LiquidVPN, TorGuard and DOES 1-100 transmit, route, or provide connections for transmitting copies of Plaintiffs' Works through a network under their control including servers provided by QuadraNet.

376.     Defendants LiquidVPN, TorGuard and DOES 1-100 distributed and made copies of copyright protected Works to others on said network when transmitting, routing, or providing connections for transmitting copies of Plaintiffs' Works through said network.

377.     Defendants LiquidVPN, TorGuard and DOES 1-100 encourage their end users to use the network to distribute and reproduce copies of Plaintiffs' Works.

378.     Defendants LiquidVPN, TorGuard and DOES 1-100 distributed and reproduced the constituent elements of Plaintiffs' copyright protected Works via networks under their control without authorization in violation of the Copyright Plaintiffs' exclusive right to reproduce and distribute the Works in copies, in violation of 17 U.S.C. §§ 106(1), 106(3) and 501.

379.     Defendants LiquidVPN, TorGuard and DOES 1-100 interfere with standard technical measures used by copyright holders to identify or protect copyright works by purposefully deleting their end users' log information. *See* 17 U.S.C. § 512(i)(1)(B).

380.     Defendants LiquidVPN, TorGuard and DOES 1-100's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

381.     Copyright Plaintiffs have suffered damages that were proximately caused by the Defendants LiquidVPN, TorGuard and DOES 1-100 's copyright infringement including, but not limited to lost sales, price erosion, and a diminution of the value of its copyright.

382.     1701 and AUH2O are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

## SECOND CLAIM FOR RELIEF
### (Contributory Copyright Infringement by Intentional Inducement against Defendants 1701, AUH2O, Muszynski and TorGuard)

383.     Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in unnumbered first paragraph, paragraphs 17-55, 126-129 and 224-269.

384.     Defendants 1701, AUH2O and Muszynski ("LiquidVPN") and TorGuard intentionally induced the infringement of Copyright Plaintiffs' exclusive rights under the Copyright Act, including infringement of Plaintiffs' exclusive right to reproduce, publicly perform and distribute copies of the Copyrighted Works.

385.     As instructed and encouraged by LiquidVPN, LiquidVPN's end users install and use the piracy application Popcorn Time on their devices while assigned IP addresses by LiquidVPN's so-called "Popcorn Time VPN" to conceal their identities.

386.     LiquidVPN's end users use Popcorn Time to connect to sources that publicly perform and/or distribute copies of Copyright Plaintiffs' Copyrighted Works while they use their so-called "Popcorn Time VPN."

387.     LiquidVPN induces direct infringement of Copyright Plaintiffs' Works by encouraging their end users to use movie piracy applications such as Popcorn Time that facilitate, enable, and create direct links between  their customers and infringing sources, and by actively inducing, encouraging and promoting the LiquidVPN service as "Popcorn Time VPN" and a means to "safely" use movie piracy applications for blatant copyright infringement by assuring customers that their identification information will be concealed by LiquidVPN.

388.     As instructed and encouraged by TorGuard, TorGuard's end users install and use the BitTorrent Client applications on their devices while assigned IP addresses by TorGuard to conceal their identities.

389.     TorGuard's end users use BitTorrent Client apps such as uTorrent to connect to sources that distribute copies of Copyright Plaintiffs' Copyrighted Works while they use TorGuard to conceal their true location and identity.

390.     TorGuard induces direct infringement of Copyright Plaintiffs' Works by encouraging their end users to use BitTorrent Client applications and visit websites such as Pirate Bay that facilitate, enable, and create direct links between  their customers and infringing sources, and by actively inducing, encouraging and promoting TorGuard as a means to use

BitTorrent Client applications for blatant copyright infringement by assuring customers that their identification information will be concealed by TorGuard.

391.     LiquidVPN and TorGuard's intentional inducement of the infringement of Copyright Plaintiffs' rights in their Copyrighted Works constitutes a separate and distinct act of infringement.

392.     1701 and AUH2O are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

### THIRD CLAIM FOR RELIEF
**(Contributory Copyright Infringement based upon Material Contribution against all Defendants)**

393.     Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in unnumbered first paragraph, paragraphs 17-55, 61-69, 201-223 and 258-349.

394.     Through its conduct, Defendants 1701, AUH2O and Muszynski ("LiquidVPN") and TorGuard knowingly and intentionally induced, enticed, persuaded, and caused their end users to infringe Copyright Plaintiffs' Copyrighted Works and continue to do so in violation of Plaintiffs' copyrights.

395.     Through its activities, LiquidVPN and TorGuard knowingly and intentionally takes steps that are substantially certain to result in direct infringement of Plaintiffs' Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiffs' copyrights.

396.     Despite LiquidVPN's and TorGuard's knowledge that their end users are using their services to engage in widescale copyright infringements, LiquidVPN and TorGuard have failed to take reasonable steps to minimize the infringing capabilities of their services.

397.     Not only has LiquidVPN failed to take reasonable steps to minimize the infringing capabilities of its service, LiquidVPN actively promotes the LiquidVPN service as

"Popcorn Time VPN" and a means to safely infringe Copyright protected Works, including Copyright Plaintiffs' and explicitly the Work *Survivor* of Millennium.

398.    Not only has TorGuard failed to take reasonable steps to minimize the infringing capabilities of its service, TorGuard actively promotes its proxy service that can be installed directly in BitTorrent client applications to infringe Copyright protected Works.

399.    LiquidVPN, TorGuard and DOES 1-100 are liable as contributory copyright infringers for the infringing acts of their end users.  LiquidVPN, TorGuard and DOES 1-100 have actual and constructive knowledge of the infringing activity of their end users.  LiquidVPN, TorGuard and DOES 1-100 knowingly caused and otherwise materially contributed to these unauthorized reproductions and distributions of Copyright Plaintiffs' Works.

400.    Through its activities, QuadraNet knowingly and intentionally take steps that are substantially certain to result in direct infringement of Copyright Plaintiffs' Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiffs' copyrights.

401.    Despite QuadraNet's knowledge that its subscribers such as LiquidVPN, TorGuard and DOES 1-100 were using its service to engage in widescale copyright infringements, QuadraNet has failed to take reasonable steps to minimize the infringing capabilities of its service.

402.    QuadraNet is liable as contributory copyright infringers for the infringing acts of its subscribers such as LiquidVPN, TorGuard and DOES 1-100.  QuadraNet has actual and constructive knowledge of the infringing activity of its subscribers.  QuadraNet knowingly caused and otherwise materially contributed to these unauthorized reproductions and distributions of Copyright Plaintiffs' Works.

403.    The Defendants' infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

404.    By engaging in the contributory infringement alleged in this Second Amended Complaint, the Defendants deprived not only the producers of the Work from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.  The Defendants' misconduct therefore offends public policy.

405.    1701 and AUH2O are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

**FOURTH CLAIM FOR RELIEF**
**(Vicarious Infringement against LiquidVPN, TorGuard, DOES 1-100 and QuadraNet)**

406.    Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in unnumbered first paragraph, paragraphs 17-55, 61-69, 201-223 and 258-349.

407.    Defendants 1701, AUH2O and Muszynski ("LiquidVPN"), TorGuard and Quadranet are vicariously liable for the infringing acts of their customers ("end users").

408.    LiquidVPN and TorGuard could take simple measures such as null-routing IP addresses to stop unauthorized distribution of Plaintiffs' Works over servers controlled by them that they lease from QuadraNet but purposefully refuse to do so.

409.    LiquidVPN and TorGuard could take simple measures such as logging their end users' access to servers controlled by them that they lease from QuadraNet to identify end users engaged in unauthorized distribution of Plaintiffs' Works and stop said end users from engaging in infringement but purposefully refuse to do so.

410.    LiquidVPN has the right and ability to supervise and control the infringing activities that occur through the use of their service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

411.    LiquidVPN has refused to take any meaningful action to prevent the widespread infringement by its subscribers. Indeed, the ability of end users to use LiquidVPN's so-called "Popcorn Time VPN" to access Popcorn Time to infringe Copyright Plaintiffs' Works while concealing their activities acts as a powerful draw for users of the LiquidVPN Service, who use that service exactly as encouraged by the LiquidVPN Defendants to download, distribute, and stream copies of Plaintiffs' Works.

412.    LiquidVPN is therefore vicariously liable for the unauthorized reproduction, distribution, and public performance of Plaintiffs' Works.

413.    1701 and AUH2O are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

414.    TorGuard has the right and ability to supervise and control the infringing activities that occur through the use of their service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

415.    TorGuard controls the IP addresses used by its end users.

416.    TorGuard intentionally deletes log records of IP addresses used by its end users.

417.    TorGuard has refused to take any meaningful action to prevent the widespread infringement by its end users. Indeed, the ability of end users to use TorGuard's so-called "Torrent VPN" to access piracy websites such as Pirate Bay and use BitTorrent client applications to infringe Copyright Plaintiffs' Works while concealing their activities acts as a

powerful draw for users of TorGuard, who use that service exactly as encouraged by TorGuard to download, distribute, and stream copies of Plaintiffs' Works.

418.    TorGuard is therefore vicariously liable for the unauthorized reproduction, distribution, and public performance of Plaintiffs' Works.

419.    QuadraNet's subscribers such as LiquidVPN, TorGuard and DOES 1-100 use QuadraNet's service overwhelmingly for the purpose of piracy and explicitly promote their VPN services for the purpose of piracy.

420.    QuadraNet is vicariously liable for the infringing acts of its subscribers' infringements including but not limited to LiquidVPN, TorGuard and DOES 1-100's direct infringements of the Copyright Plaintiffs' exclusive right to distribute and reproduce copies of their Works.

421.    QuadraNet has the right and ability to supervise and control the infringing activities that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

422.    QuadraNet controls the IP addresses used by its subscribers, the Internet access for its subscribers and even the electricity to the servers used by its subscribers.

423.    QuadraNet has refused to take any meaningful action to prevent the widespread infringement by its subscribers including but not limited to LiquidVPN, TorGuard and DOES 1-100 despite having actual knowledge.  Indeed, the ability of subscribers such as LiquidVPN, TorGuard and DOES 1-100 to use QuadraNet's service to host and operate their so-called "Popcorn Time VPN" to distribute copies of Plaintiffs' Works while concealing their end users' identities acts as a powerful draw for users of QuadraNet's service.

424.    QuadraNet's subscribers are also motivated to become subscribers of QuadraNet due to their knowledge that they can pirate Plaintiffs' Works without any consequence because of QuadraNet's policy of failing to take meaningful action in response to notices of infringement.

425.    QuadraNet's subscribers are also motivated to become subscribers of QuadraNet due to their knowledge of QuadraNet's policy of failing to update the ARIN Whois records so that copyright owners could not send notices of infringements to them and thereby pirate Plaintiffs' Works without any consequence.

426.    QuadraNet could take simple measures such as null-routing IP addresses to stop unauthorized distribution of Plaintiffs' Works over servers QuadraNet leases to its subscribers but purposefully refuse to do so.

427.    QuadraNet directly benefits from its subscribers' piracy of Plaintiffs' Works.  As the subscribers attract more end users that wish to use the VPN service to pirate Plaintiffs' Works, QuadraNet's subscribers purchase more server space, IP addresses, and/or colocations services.

428.    QuadraNet is therefore vicariously liable for the unauthorized reproduction, distribution, and public performance of Plaintiffs' Works.

## FIFTH CLAIM FOR RELIEF
**(Secondary Liability for Digital Millennium Copyright Act Violations against LiquidVPN)**

429.    Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in unnumbered first paragraph and paragraphs 187-223.

430.     Defendants 1701, AUH2O and Muszynski ("LiquidVPN")'s end users knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the Plaintiffs' copyright protected Works, distributed copyright management information ("CMI") that falsely included the wording "FGT" in violation of 17 U.S.C. § 1202(a)(2).

431.     The end users knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Work *I Feel Pretty* distributed CMI that falsely included the wording "YTS" or in violation of 17 U.S.C. § 1202(a)(2).

432.     The end users knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Works *Hunter Killer* and *Shock and Awe* distributed CMI that falsely included the wording "FGT" in violation of 17 U.S.C. § 1202(a)(2).

433.     The end users, without the authority of Plaintiffs or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include wording such as "RARBG," "YTS" or "FGT" without the authority of the Plaintiffs and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiffs' Copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

434.     The end users, without the authority of Plaintiffs or the law, distributed Plaintiffs' Copyright protected Works knowing that the CMI had been removed or altered to include wording such as "RARBG," "YTS" or "FGT," and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

435.     Particularly, the end users knew that the CMI in the file names of the pieces of the Work had been altered to include wording such as "RARBG," "YTS" or "FGT."

436.     Particularly, the end users distributed the file names that included CMI that had been altered to include the wording "YTS" or "FGT."

437.     The end users knew that the wording "YTS" or "FGT" originated from notorious movie piracy website.

438.    The end users' acts constitute violations under the Digital Millennium Copyright Act ("DMCA violation"), 17 U.S.C. § 1202.

439.    Through their conduct, LiquidVPN knowingly and intentionally induced, enticed, persuaded, and caused the end users to constitute DMCA violations.

440.    Through its activities, LiquidVPN knowingly and intentionally take or took steps that are substantially certain to result in their end users committing DMCA violations, and that have resulted in DMCA violations.

441.    LiquidVPN encourages its end users to access torrent files for copying copyright protected Works from notorious movie piracy websites such as The Pirate Bay.

442.    Despite LiquidVPN's knowledge that the end users use the LiquidVPN Service to commit DMCA violations, LiquidVPN has failed to take reasonable steps to minimize the capabilities of its service to facilitate DMCA violation.

443.    LiquidVPN is secondarily liable for the DMCA violations of its end users. LiquidVPN has actual and constructive knowledge of its end users' DMCA violations. LiquidVPN knowingly caused and otherwise materially contributed to these DMCA violations.

444.    LiquidVPN is vicariously liable for the DMCA violations of the end users. LiquidVPN has the right and ability to supervise and control the DMCA violations that occur through the use of its service, and at all relevant times has derived a direct financial benefit from the DMCA violations complained of herein. LiquidVPN has refused to take any meaningful action to prevent the widespread DMCA violations by the end users. Indeed, the ability of end users to access torrent websites such as the Pirate Bay that LiquidVPN itself promotes and obtain file copies of the Works with altered CMI and distribute said copies while concealing their activities acts as a powerful draw for users of the LiquidVPN Service who use that service

exactly as encouraged by LiquidVPN to commit DMCA violations. LiquidVPN is therefore vicariously liable for the DMCA violations.

445.   Copyright Plaintiffs are entitled to an injunction to prevent LiquidVPN from engaging in and/or contributing to further violations of 17 U.S.C. § 1202.

446.   Copyright Plaintiffs are entitled to recover from LiquidVPN the actual damages suffered by Plaintiffs and any profits LiquidVPN has obtained as a result of its wrongful acts that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits LiquidVPN has realized by their violations of 17 U.S.C. § 1202.

447.   Copyright Plaintiffs are entitled to elect to recover from LiquidVPN statutory damages for their violations of 17 U.S.C. § 1202.

448.   Copyright Plaintiffs are further entitled to costs and reasonable attorneys' fees.

449.   1701, and AUH2O are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

### SIXTH CLAIM FOR RELIEF
### (Negligence against QuadraNet)

450.   Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in unnumbered first paragraph, paragraphs 17-55, 61-69 and 328-349.

451.   QuadraNet states in the Whois records of ARIN that it is the proper abuse contact for certain IP addresses.

452.   QuadraNet's statement that it is the proper abuse contact for said certain IP addresses is false because QuadraNet has allocated or reassigned said IP addresses to subscribers that have their own end users.

453.     QuadraNet knew that its statement in the Whois records that it is the proper abuse contact for said certain IP addresses was false when it updated the Whois records.

454.     QuadraNet knows that its statement in the Whois records of ARIN that it is the proper abuse contact for said certain IP addresses is false, but it purposefully fails to update the Whois records.

455.     QuadraNet fails to exercise reasonable care or competence in publishing and maintaining the information in the Whois records.  Indeed, QuadraNet is obligated per its registration agreement with ARIN to update the Whois records when it assigns or reallocates IP addresses to its subscribers.

456.     Plaintiffs relied on QuadraNet's misrepresentations when determining the proper abuse contact for sending notices of infringement at the certain IP addresses.

457.     Plaintiffs had a right to rely on QuadraNet's misrepresentations in the Whois records.

458.     QuadraNet knew that rightsowners including Plaintiffs were relying on QuadraNet's misrepresentations when determining the proper abuse contact for sending notices of infringement at the certain IP addresses.

459.     Rights owners such as Plaintiffs are third party beneficiaries of QuadraNet's agreement with ARIN to properly update the Whois records so that they can promptly contact the responsible party to stop abuse.

460.     QuadraNet had a duty to rightsowners including Plaintiffs to publish accurate information in the Whois records.

461.     Plaintiffs have suffered damages based upon QuadraNet's misrepresentations. Plaintiffs' agents have been unable to promptly send notices to the appropriate party that could and would have taken actions to stop further infringements of their Works.

462.     The acts and misrepresentations of QuadraNet constitute negligent misrepresentation. Such conduct was the cause of Plaintiffs' damages, and Plaintiffs have incurred damage as a result of QuadraNet's misrepresentations.

## SEVENTH CLAIM FOR RELIEF
### (Fraud against QuadraNet)

463.     Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in unnumbered first paragraph, paragraphs 17-55 and 328-349 and the sixth claim for relief.

464.     Defendant QuadraNet falsely states in the Whois records that it is the proper abuse contact for said certain IP addresses.  In contradiction to this statement, QuadraNet's Chief Executive Officer Ilan Mishan now states to the effect that there is nothing QuadraNet can do about the activity at these IP addresses. "QuadraNet…has no access to…the internet traffic…" Declaration of Ilan Mishan at ¶23.

465.      Defendant QuadraNet falsely stated in the Whois records on at least June 6, 2018 that QuadraNet, Inc. is the proper abuse contact for certain IP addresses in Miami, Florida where Plaintiffs' Works were pirated.  In contradiction to this statement, QuadraNet's Chief Executive Officer Ilan Mishan now states that "Quadranet, Inc.….does not have any physical presence in Florida.  Furthermore, Quadranet, Inc. does not have…any data servers in Florida."  Id. at ¶8.

466.     Plaintiffs had a right to rely on QuadraNet's misrepresentations in the Whois records.  Indeed, QuadraNet is obligated per its registration agreement with ARIN to update the Whois records.

467.    QuadraNet benefits by its false statements in the Whois records.  For example, VPN subscribers such as LiquidVPN seek to become QuadraNet's subscribers because they know the fact that QuadraNet allocated the IP addresses to them will not be publicly displayed in Whois records.

468.    QuadraNet benefits by its false statements in the Whois records by maintaining control of valuable IPv4 addresses allocated to it from ARIN.

469.    Plaintiffs have suffered damages based upon QuadraNet's misrepresentations. Plaintiffs' agents have been unable to send notices to the appropriate party that could have and would have taken actions to stop further infringements of their Works.

470.    The acts and misrepresentations of QuadraNet constitute fraud and fraudulent misrepresentation. Such conduct was the cause of Plaintiffs' damages, and Plaintiffs have incurred damage as a result of QuadraNet's fraudulent acts and representations.

## EIGHTH CLAIM FOR RELIEF
### (Equitable Estoppel against QuadraNet)

471.    Copyright Plaintiffs re-allege and incorporate by reference the allegations contained in the unnumbered first paragraph, paragraphs 17-55, 63-69 and 328-349.

472.    QuadraNet, Inc. states in the Whois records of ARIN that it is the proper abuse contact for certain IP addresses located in Miami, Florida.

473.    QuadraNet, Inc. now asserts that it does not operate a facility in Miami for providing a data center, dedicated servers and colocation services. This later assertion is contrary to QuadraNet, Inc's earlier assertion in Whois records that certain IP addresses in Miami, Florida belong to it.

474.     QuadraNet, Inc. now asserts that it does not have any physical presence in Miami, Florida.  This later assertion is contrary to QuadraNet, Inc's earlier assertion in Whois records that certain IP addresses in Miami, Florida belong to it.

475.     QuadraNet, Inc. and QuadraNet, Enterprises, LLC state in the Whois records of ARIN that they are the proper abuse contact for certain IP addresses in the United States.

476.     QuadraNet, Inc. and QuadraNet, Enterprises, LLC now assert that they have no access to the internet traffic at these IP addresses.  This later assertion is contrary to their earlier assertion in Whois records that they are the proper contact for stopping abuse at certain IP addresses.

477.     QuadraNet, Inc.'s and QuadraNet, Enterprises, LLC's statements in the Whois records of ARIN are material.

478.     Plaintiffs relied on QuadraNet, Inc.'s and QuadraNet, Enterprises, LLC's representations in the Whois records to their detriment.

479.     Plaintiffs relied on QuadraNet, Inc.'s and QuadraNet, Enterprises, LLC's representations in the Whois records when determining the proper abuse contact for sending notices of infringement at the certain IP addresses.

480.     Plaintiffs relied on QuadraNet, Inc.'s and QuadraNet, Enterprises, LLC's representations in the Whois records when determining whether personal jurisdiction in this district is appropriate.

481.     QuadraNet, Inc. and QuadraNet, Enterprises, LLC knew that rightsowners including Plaintiffs were relying on their representations when determining the proper abuse contact for sending notices of infringement at the certain IP addresses.

482.     Because Plaintiffs have relied on QuadraNet, Inc.'s and QuadraNet, Enterprises, LLC's representations to their detriment, QuadraNet, Inc.'s and QuadraNet, Enterprises should be estopped from contesting personal jurisdiction and venue in the Southern District of Florida.

483.     Because Plaintiffs have relied on QuadraNet, Inc.'s and QuadraNet, Enterprises, LLC's representations to their detriment, QuadraNet, Inc.'s and QuadraNet, Enterprises should be estopped from asserting they did not have control over the activity occurring at IP addresses for which they published themselves as the proper abuse contact in the Whois records.

### NINTH CLAIM FOR RELIEF
### (Trademark Infringement against Defendants 1701, AUH2O and Muszynski)

484.     Plaintiff 42 re-alleges and incorporates by reference the allegations contained in the unnumbered introductory paragraph, paragraphs 56-57, 226-239 and 350-360.

485.     Defendants 1701, AUH2O and Muszynski ("LiquidVPN") have infringed 42's trademark in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

486.     Plaintiff 42 has distributed and streamed licensed content in United States commerce under the Popcorn Time trademark since at least November 29, 2019.  Plaintiff 42 has used the Popcorn Time trademark continuously in United States commerce since that time.

487.     Without Plaintiff 42's consent, LiquidVPN has used and continue to use the infringing Popcorn Time mark in connection with the sale, offering for sale, distribution and advertising of goods and/or services at least in the United States.

488.     LiquidVPN's actions are likely to mislead the public into concluding that their goods and or services originate with or are authorized by Plaintiff 42, which will damage both Plaintiff 42 and the public. Plaintiff 42 has no control over the quality of goods and services sold by LiquidVPN and because of the source confusion caused by LiquidVPN, Plaintiff 42 has lost control over its valuable goodwill.

489.     Upon information and belief, LiquidVPN has advertised and offered their services for sale using the Popcorn Time mark with the intention of misleading, deceiving or confusing consumers as to the origin and of trading on Plaintiff 42's reputation and goodwill. LiquidVPN's use of the Popcorn Time mark constitutes willful, deliberate and intentional trademark infringement.

490.     As a direct and proximate result of LiquidVPN's trademark infringement, Plaintiff 42 has suffered and will continue to suffer irreparable loss of income, profits and goodwill and LiquidVPN has and will continue to unfairly acquire income, profits and goodwill.

491.     LiquidVPN's acts of infringement will cause further irreparable injury to Plaintiff 42 if LiquidVPN is not restrained by this Court from further violation of Plaintiff 42's rights. Plaintiff 42 has no adequate remedy at law.

492.     LiquidVPN's acts of infringement associate 42's trademark Popcorn Time with rampant illegal movie piracy and thus hinder 42's ability to establish legitimate business relationships with other content creators.

493.     Defendants 1701 and AUH2O are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

## TENTH CLAIM FOR RELIEF
### (Federal Unfair Competition against Defendants 1701, AUH2O and Muszynski)

494.     Plaintiff 42 re-alleges and incorporate by reference the allegations contained in each of the unnumbered first paragraph, paragraphs 56-57, 226-239 and 350-360 and in the ninth claim for relief.

495.     LiquidVPN engages in unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

496.    LiquidVPN's unauthorized marketing and sale of its products in interstate commerce using 42's Popcorn Time trademark constitutes a use of a false designation of origin or false representation that wrongfully and falsely designates LiquidVPN's products and/or services as originating from or connected with Plaintiff 42, and constitutes the use of false descriptions or representations in interstate commerce. The actions of LiquidVPN as alleged herein constitute intentional, willful, knowing and deliberate unfair competition.

497.    LiquidVPN's actions constitute federal unfair competition and violate 15 U.S.C. § 1125(a).

498.    As a direct and proximate result of LiquidVPN's unfair competition, Plaintiff 42 has suffered and will continue to suffer irreparable loss of income, profits and goodwill and LiquidVPN have and will continue to unfairly acquire income, profits and goodwill.

499.    LiquidVPN's acts of unfair competition will cause further irreparable injury to Plaintiff 42 if they are not restrained by this Court from further violation of Plaintiff 42's rights. Plaintiff 42 has no adequate remedy at law.

500.    1701 and AUH2O are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

### ELEVENTH CLAIM FOR RELIEF
### (Breach of Contract against 1701, AUH2O and Muszynski)

501.    Plaintiffs MILLENNIUM FUNDING, INC. ("Millennium") and VOLTAGE HOLDINGS, LLC ("Voltage") re-allege and incorporate by reference the allegations contained in paragraphs 361-371.

502.    Defendants 1701, AUH2O, and Muszynski ("LiquidVPN"), Cox and SMR Hosting entered into an agreement for SMR Hosting to perform post earn-out Work for LiquidVPN in exchange for a payment at Cox's hourly rate. *See* Decl. of Cox, Exhibit "B."

503.    The Agreement is a valid, binding and enforceable contract.

504.    Cox and SM relied upon this contract to their detriment.

505.    LiquidVPN breached the Agreement by failing to pay SMR the total of $46,540.00 excluding interest.

506.    LiquidVPN's obligation to make the agreed upon payment was not excused or relieved.

507.    LiquidVPN's breaches of the agreement were substantial failures to perform that are material.

508.    SMR and Cox have been damaged as result of LiquidVPN's breach of contract in an amount to be proven at trial and is entitled to injunctive relief to prevent any further breaches and damages.

509.    SMR and Cox are also entitled to attorneys' fees arising from LiquidVPN's breach of contract.

510.    SMR and Cox's claims against LiquidVPN were assigned to Plaintiffs Millennium and Voltage per the stipulation in the action 4:21-cv-10490 in the Eastern District of Michigan.

511.    1701 and AUH2O are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

## TWELFTH CLAIM FOR RELIEF
### (Unjust enrichment against 1701, AUH2O and Muszynski)

512.    Plaintiffs Millennium and Voltage re-allege and incorporate by reference the allegations contained in paragraphs 361-371and the eleventh claim for relief.

513.    Cox and SMR Hosting conferred a benefit on LiquidVPN.

514.    LiquidVPN requested the benefit.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

515.    LiquidVPN did not pay or otherwise offer compensation to Cox and SMR
Hosting for the benefits Defendant received.

516.    SMR and Cox have been damaged as result of LiquidVPN's unjust enrichment in
an amount to be proven at trial and is entitled to injunctive relief to prevent any further breaches
and damages.

517.    SMR and Cox's claims against LiquidVPN were assigned to Plaintiffs
Millennium and Voltage per the stipulation (Doc. #10) in the action *MILLENNIUM FUNDING,
INC., et al. v. SMR HOSTING LLC, et al.*, 4:21-cv-10490 in the Eastern District of Michigan.

518.    1701 and AUH2O are merely the alter egos for Muszynski, and thus liable for the
acts of Muszynski and each other.

**THIRTEENTH CLAIM FOR RELIEF**
**(Breach of David Cox's Statutory and Common Law Right of Publicity against 1701,**
**AUH2O and Muszynski)**

519.    Plaintiffs Millennium and Voltage re-allege and incorporate by reference the
allegations contained in paragraphs 361-371 and the eleventh claim for relief.

520.    Defendants 1701, AUH2O and Muszynski ("LiquidVPN") publish, print, display
or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the
name and/or other likeness of David Cox on the website liquidvpn.com

521.    Cox did not give LiquidVPN express written or oral consent to use his name on
the website liquidvpn.com.

522.    Cox has suffered damages as a result of said use of his name and/or other likeness
without his permission by LiquidVPN in an amount to be proven at trial and is entitled to
injunctive relief to prevent any further use of his name and/or other likeness without his
permission.

523.     Cox is also entitled to attorneys' fees arising from LiquidVPN's breach of his right of publicity.

524.     Cox's claims against LiquidVPN were assigned to Plaintiffs Millennium and Voltage per the stipulation in the action 4:21-cv-10490 in the Eastern District of Michigan.

525.     1701, and AUH2O are merely the alter egos for Muszynski, and thus liable for the acts of Muszynski and each other.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully requests that this Court:

A.     Permanently enjoin Defendants and each of their agents, representatives, employees, officers, attorneys, successors, assigns, affiliates, and any persons in privity or active concert or participation with any of them from infringing to and/or contributing to infringements of the Copyright Plaintiffs' copyrighted Works;

B.     Permanently enjoin Defendants 1701 and Muszynski from promoting and encouraging their end users to use the LiquidVPN service as a means to conceal use of Popcorn Time and movie piracy websites such as the Pirate Bay for pirating Plaintiffs' Works and promoting its service as "Popcorn Time VPN" in violation of Plaintiff 42's trademark;

C.     Order the Defendants 1701 and Muszynski to immediately remove the title art of Plaintiff Millennium Funding, Inc.'s Work Survivor and any reference to Cox or LiquidVPN, Inc. that falsely portrays him and his dissolved corporation as playing a role in the operations of LiquidVPN from their website;

D.     Order QuadraNet Inc., QuadraNet Enterprises LLC, 1701, AUH2O, Muszynski, TorGuard and all service providers that received notice of this order pursuant to 17 U.S.C. §§ 512(j)(1)(A) and (B) to block subscribers from accessing notorious piracy websites of foreign

origin that are listed in the annual trade report of Notorious Foreign Markets published by the United States Government such as (a) YTS; (b) Piratebay; (c) Rarbg; (d) 1337x; and (e) Popcorntime on networks under their control;

E.     Order QuadraNet Inc., QuadraNet Enterprises LLC, 1701, AUH2O, TorGuard and Muszynski to adopt a policy that provides for (1) the prompt termination of customer accounts for which they receive more than three infringements of copyright protected Works and said customer fail to provide a counter notification; and (2) the immediate updating of ARIN Whois records when IP addresses are allocated to their VPN subscribers;

F.     Award the Copyright Plaintiffs actual damages and Defendants' profits in such amount as may be found; alternatively, at Copyright Plaintiffs' election, for maximum statutory damages of $150,000/Work pursuant to 17 U.S.C. § 504-(a) and (c) against (i) each of Defendant DOES 1-100; (ii) against Defendants 1701, AUH2O, and Muszynski jointly and severally; and (iii) QuadraNet Inc. and QuadraNet Enterprises LLC jointly and severally;

G.     Award the Copyright Plaintiffs their actual damages from the DMCA violations and Defendants' profits in such amount as may be found; or, in the alternative, at Copyright Plaintiff's election, for maximum statutory damages of $25,000 for DMCA violations pursuant to 17 U.S.C. § 1203(c) for contributing to violations of 17 U.S.C. § 1202 against Defendants 1701, AUH2O, and Muszynski jointly and severally:

H.     Award the Copyright Plaintiffs actual, special, general, compensatory, expectation, consequential, treble, exemplary, and/or punitive damages at an amount to be proven at trial for QuadraNet Inc.'s and QuadraNet Enterprises LLC's negligent misrepresentations and/or fraudulent misrepresentations;

I.      Award the Copyright Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 against Defendants;

J.      Order Defendants 1701, AUH2O, and Muszynski jointly and severally, to pay statutory damages of $2,000,000 pursuant to 15 U.S. Code § 1117(c)(2) for willful infringement of Plaintiff 42's Popcorn Time trademark;

K.      Award the Plaintiffs Millennium Funding, Inc. and Voltage Holdings, LLC damages of $46,540.00 plus interest against Defendants 1701, AUH2O, and Muszynski jointly and severally for their breach of contract and/or unjust enrichment;

L.      Award the Plaintiffs Millennium Funding, Inc. and Voltage Holdings, LLC damages against Defendants 1701, AUH2O and Muszynski jointly and severally for their breach of David Cox's publicity rights;

M.      Order pursuant to 28 U.S.C §1651(a) that QuadraNet Inc., QuadraNet Enterprises LLC, Namecheap, Enom, Spectrum and any other service provider cease providing service for Defendants TorGuard, 1701, AUH2O, and Muszynski that, upon Plaintiffs' request, those in privity with Defendants TorGuard,1701, AUH2O, and Muszynski and those with notice of the injunction, including any Internet search engines, Web hosts, domain-name registrars, and domain name registries and/or their administrators that are provided with notice of the injunction, cease facilitating access to any or all servers, domain names and websites through which Defendants engage in the aforementioned infringements; and

N.      Grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

DATED:                          Respectfully submitted,


                                */s/ Joel B. Rothman*
                                JOEL B. ROTHMAN
                                Florida Bar No. 98220
                                joel.rothman@sriplaw.com
                                CRAIG A. WIRTH
                                Florida Bar No. 125322
                                Craig.wirth@sriplaw.com

                                **SRIPLAW**
                                21301 Powerline Road
                                Suite 100
                                Boca Raton, FL 33433
                                561.404.4350 – Telephone
                                561.404.4353 – Facsimile

                                -and-

                                Kerry S. Culpepper
                                *Admitted pro hac vice*
                                kculpepper@culpepperip.com
                                **CULPEPPER IP, LLLC**
                                75-170 Hualalai Road
                                Suite B204
                                Kailua-Kona, HI  96740
                                808.464.4047 – Telephone

                                *Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

        The undersigned does hereby certify that on _____, a true and correct copy of
the foregoing document was sent via electronic mail by the Court's CM/ECF System to all
parties listed below on the Service List.

                                */s/ Joel B. Rothman*
                                JOEL B. ROTHMAN


## SERVICE LIST

JOHN CYRIL MALLOY, III
PETER A. MATOS
OLIVER ALAN RUIZ
JONATHAN R. WOODARD
**MALLOY & MALLOY P.L.**
2800 S.W. Third Avenue
Miami, FL 33129
305.858.8000 – Telephone
jwoodard@malloylaw.com
jcmalloy@malloylaw.com
pmatos@malloylaw.com
oruiz@malloylaw.com

BOBBY A. GHAJAR
**COOLEY LLP**
1333 2nd Street, Suite 400
Santa Monica, CA  90401
301.883.6400 – Telephone
bghajar@cooley.com

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK