# EXHIBIT G

## ORCHID LABS NODE PROVIDER AGREEMENT

This Node Provider Agreement (the "**Agreement**") is entered into as of October 25, 2019 by and between Orchid Labs, Inc., a corporation organized under the laws of the State of Delaware, United States ("**Orchid**"), and ___AUH2O, LLC,___, organized under the laws of ___Nevis___ ("**Provider**"). Orchid and Provider are individually referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

**Whereas**, **Orchid** has developed and continues to develop the **Orchid Network**, as defined herein, an open source software application suite that facilitates communication between users and providers of bandwidth in a distributed virtual private network; and

**Whereas**, **Provider** desires to sell VPN bandwidth on the **Orchid Network**, as defined herein, to users of the **Orchid Network**.

**NOW, THEREFORE**, in consideration of the foregoing Recitals and the mutual covenants and agreements contained herein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **Orchid** and **Provider** intending to be legally bound, agree as follows:

## TERMS

1. **Definitions**

    a. "**Additional Deposits**" has the meaning set forth in Section 3d.

    b. "**Bankruptcy Event**" means any event where Provider: (a) becomes insolvent or unable to pay its debts as they mature; (b) makes an assignment for the benefit of its creditors; or (c) seeks relief, or if proceedings are commenced against Provider or on its behalf, under any bankruptcy, insolvency or debtors relief law and such proceedings have not been vacated or set aside within seven (7) days from the date of commencement thereof.

    c. "**Default List**" means a curated list maintained by Orchid that exists on the Ethereum blockchain, is accessible by default from the Orchid VPN Client, and directs the Orchid VPN Client to utilize Provider Nodes from only a subset of Provider Nodes available on the Provider Directory and Staking Smart Contracts. Any party can create a curated list that can be accessible by the Orchid VPN Client, and Orchid intends for the Orchid VPN Client to support several Default Lists maintained by third parties in addition to the Default List maintained by Orchid.

    d. "**Initial Deposit**" has the meaning set forth in Section 2a.

    e. "**Locked-up**" means the state of OXT being sent to the Orchid Provider Directory and Staking Smart Contracts pursuant to a Stake, as defined in subsection "m" below, such

**Exhibit "G"**

that according to the preprogrammed functionality of the Provider Directory and Staking Smart Contracts, the OXT associated with a particular Stake cannot be withdrawn for a specified period of time following the withdrawal request.

f. "**Network Launch**" means a bona fide public launch of the Orchid Network whereby (i) Orchid's software protocol shall be released as an open source protocol, (ii) the Orchid Network shall be fully functional and allow for the consumption of bandwidth using OXT, and (iii) Orchid's Application Programming Interface ("API") will be available to the general public for download.

g. "**Node Software**" means the software package used by bandwidth providers to sell bandwidth and to receive and route data streams (i.e., Internet traffic) initiated by bandwidth consumers.

h. "**Orchid Network**" means an open source software application suite, originally designed and published by Orchid, that runs on the Ethereum blockchain utilizing smart contracts and facilitates communication between buyers and sellers of bandwidth in a distributed virtual private network.

i. "**OXT**" means the Orchid Token used on the Orchid Network for users to purchase bandwidth from Provider Nodes.

j. "**Provider Directory and Staking Smart Contracts**" means one or more smart contracts residing on the Ethereum blockchain that: (a) provide a directory of all Provider Nodes available on the Orchid Network, (b) facilitate Stakes by Provider Nodes, and (c) are accessible by the Orchid VPN Client.

k. "**Provider Node**" means a computer node operated by a Party with bandwidth capacity on the Internet that is running Node Software, has a Stake, and has elected to sell bandwidth on the Orchid Network.

l. "**Provider Stake**" means a Stake, as defined herein, that Orchid has Locked-up with OXT on Provider's behalf in the Provider Directory and Staking Smart Contracts.

m. "**Stake**" means OXT that has been Locked-up in the Provider Directory and Staking Smart Contracts by a Provider Node, which the Orchid protocol requires for a Provider Node to be able to sell bandwidth. The larger the Stake, the more data streams (i.e., Internet traffic) that will be routed by the Orchid Network to a particular Provider Node.

n. "**Orchid VPN Client**" means the Orchid Network client application that enables users of the Orchid Network to obtain VPN service from Provider Nodes through the Orchid Network.

2. **Provider Stake**

a. Provider shall have the right to receive from Orchid a Provider Stake as defined in Section 1 with 20,000 OXT as the Initial Deposit ("**Initial Deposit**"), and the

4848-1767-2361.2

Provider Stake shall be usable by the Provider for the purpose of selling bandwidth following the Network Launch.

3. **Orchid Rights and Responsibilities**

   a. Provider agrees not to initiate any request to withdraw any of the Initial Deposit from the Provider Stake for **12** months following Network Launch. In addition, Orchid may, but shall not be required to, construct the Provider Stake with the Initial Deposit such that (i) Provider will be unable to withdraw any of the Initial Deposit from the Provider Stake for **12** months following Network Launch, and (ii) the OXT associated with the Initial Deposit or any portion thereof can be withdrawn by Provider only after a period of **3** months from the time that Provider initiates a request to withdraw the OXT.

   b. Provider agrees not to initiate any request to withdraw any of the Additional Deposit (as defined below) from the Provider Stake for **12** months following Network Launch. In addition, Orchid may, but shall not be required to, construct the Provider Stake with the Additional Deposit such that (i) Provider will be unable to withdraw any of the Additional Deposit from the Provider Stake for **12** months following Network Launch, and (ii) the OXT associated with the Additional Deposit or any portion thereof can be withdrawn by Provider only after a period of **3** months from the time that Provider initiates a request to withdraw the OXT ("**Additional Deposit Withdrawal Delay**").

   c. Orchid shall feature Provider in its Default List of Provider Nodes (as defined in Section 1), who each operate, maintain and host a server or set of servers on the Orchid Network, available to users at Network Launch.

   d. Unless or until this Agreement is terminated pursuant to Section 6: (i) Orchid shall transfer to Provider's Provider Stake **20,000** OXT per month as additional deposits ("**Additional Deposits**") for a period of **12** months, provided during such period the Provider maintains Provider Node(s) operational and continues to be on Orchid's Default List; (ii) For the avoidance of doubt these monthly transfers of OXT are in addition to any freely transferable OXT the Provider may earn from providing bandwidth on the Orchid Network peer-to-peer ("P2P") marketplace; (iii) each Additional Deposit added to Provider's Provider Stake or any portion thereof shall be subject to the Additional Deposit Withdrawal Delay; (iv) Orchid shall make these Additional Deposits of OXT monthly to Provider's Provider Stake beginning on the date of Network Launch; and (v) Each monthly transfer of OXT made pursuant to this provision shall be made at the end of the month in which the Node Provider provides the applicable bandwidth on the Orchid Network.

   e. Orchid has the right to remove Provider from its Default List with or without notice pursuant to Section 6e based on the reasonable belief that Provider has participated,

or will participate, in any of the following: logging, monitoring, selling or inspecting of user data; attacks on users of any kind; conduct reasonably anticipated to cause harm to the Network or users of the Network; failure to provide service to the Network in good faith; and any other activity that Orchid considers to be malicious activity.

f.  In the event that Orchid removes Provider from the Default List before the end of the Term, Orchid shall have the right to cease transferring OXT as Additional Deposits to Provider's Provider Stake.

g.  No later than four (4) weeks prior to the Network Launch, Orchid shall provide the Node Software to Provider for the purpose of enabling Provider to become familiar with the Node Software. In the event that Orchid fails to provide the Node Software to Provider pursuant to this Section 3g, Provider's sole remedy shall be to terminate the agreement in accordance with the termination provisions in Section 6.

h.  Until Network Launch, Orchid shall provide such technical support to Provider as Orchid deems reasonably necessary to facilitate Provider's ability to run the Provider Node by Network Launch.

i.  As soon as reasonably practicable upon becoming aware, Orchid shall promptly notify Provider of any government sanctions or other legal measures affecting any other Provider's operation of a node on the Orchid Network or otherwise impacting such Provider's participation in the Orchid Network or ability to comply with their obligations under this Agreement.

j.  Until Network Launch, for the purpose of educating Orchid Network users on how to use the Orchid Network, Orchid shall conduct public education about the Orchid Network and its purpose, principles, policies, and uses.

k.  Until Network Launch, Orchid shall market the Orchid Network to potential users who may purchase bandwidth from the Orchid Network.

l.  With regard to the performance of its obligations under this Agreement, Orchid shall implement such technical and organizational measures as Orchid deems reasonably necessary to ensure a level of security appropriate to any associated risks.

4.  **Provider Rights and Responsibilities**

a.  Upon Network Launch, Provider shall be able to earn OXT in exchange for providing bandwidth to users. In these circumstances, Provider shall receive OXT directly (i.e., P2P) from bandwidth users. Orchid shall not be involved in or have any responsibility for these P2P transactions.

b.  Upon Network Launch, Provider agrees to operate, maintain and host one or more Provider Nodes on the Orchid Network, using the Node Software upon Network Launch, allocating such bandwidth as needed to meet demand with reasonable

4848-1767-2361.2

      performance for at least **24** months following Network Launch. Provider's failure to meet the demand with reasonable performance is considered a material breach subject to (i) Termination, as set forth in Section 6, and (ii) removal of the Provider from the Default List of Node Providers.

c. Upon receiving access to the Node Software from Orchid, Provider may provide feedback to Orchid regarding the Node Software, with the intent of improving the Node Software and removing any bugs.

d. Provider shall have four (4) weeks from the date Orchid has delivered the Node Software to Provider to evaluate the Node Software ("**Evaluation Period**"). If the Node Software is not satisfactory to Provider, Provider shall have no obligation to run the Provider Node at Network Launch and shall be able to terminate the agreement in accordance with the termination provisions in Section 6c.

e. With regard to Provider's operation of the Provider Node, during the Term Provider shall only run Node Software that has been provided by or otherwise approved by Orchid.

f. Provider shall provide input and feedback to Orchid, as reasonably requested and necessary, to assist Orchid in the development and functionality of the Orchid Network and to assist in the testing, evaluation, and improvement of the Orchid Network.

g. As soon as reasonably practicable upon becoming aware, Provider shall promptly notify Orchid of any government or private legal communications relating to Provider's participation in the Orchid Network or ability to comply with Provider's obligations under this Agreement, and shall provide Orchid with a copy of any such communications.

h. As soon as reasonably practicable and no later than 72 hours after becoming aware, Provider shall notify Orchid of any actual or reasonably suspected breach of security leading to the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to, data transmitted, stored or otherwise processed by Provider in connection with the operation of any Provider Node or otherwise affecting Provider's operation of the Provider Node or impacting Provider's participation in the Orchid Network or ability to comply with its obligations under this Agreement.

i. With regard to the performance of its obligations under this Agreement, including, without limitation, its operation, maintenance and hosting of the Provider Node, Provider shall implement appropriate technical and organizational measures to ensure a level of security appropriate to any associated risk and provide sufficient evidence of the same to Orchid upon request.

4848-1767-2361.2

j. Provider shall be responsible for all acts and omissions of its officers, directors, employees, agents, subcontractors and third-party service providers in the course of their duties on behalf of Provider and shall ensure their compliance with this Agreement.

k. Provider shall promptly provide written notice to Orchid in the event of a "**Bankruptcy Event**," as defined in Section 1b.

l. Provider shall not engage in any of the following: logging, monitoring, selling or inspecting of user data; attacks on users of any kind; conduct reasonably anticipated to cause harm to the Network or users of the Network; any other malicious activity.

5. **Reciprocal Orchid and Provider Provisions**

    a. [This Section has been Intentionally Omitted].

    b. The Parties agree that, prior to Network Launch, any actions taken by the Parties are voluntary. For the avoidance of doubt, the Parties acknowledge that they do not view this Agreement as constituting a securities offering or securities transaction. Both Parties represent that they are not expecting any profit based on any expected price appreciation for OXT, and further, that they are not expecting a profit based on the efforts of each other or others.

6. **Term and Termination**

    a. This Agreement commences on the date hereof and shall remain in force until **24** months following Network Launch ("**Term**"), or until terminated by either Party pursuant to this **Section 6 (Term and Termination)**.

    b. Either Party may terminate this Agreement: (i) if the other Party has materially defaulted in the performance of any of its obligations under this Agreement and has not cured such default within fifteen (15) business days of receipt of written notice from the non-defaulting Party of such default; (ii) by giving the other Party thirty (30) calendar days' written notice; or (iii) immediately by written notice to the other Party in the event of any government sanctions or other legal measures that make it unlawful for Provider to operate the Provider Node or participate in the Orchid Network.

    c. The Provider may immediately, and upon written notice to Orchid, terminate the Agreement if it is dissatisfied with the Node Software during the Evaluation Period or Orchid does not provide the Provider with the Node Software timely as set forth in Section 3g above, provided that Provider must provide such notice to Orchid prior to the date of Network Launch.

    d. Upon termination or expiration of this Agreement for any reason: (i) the rights granted to Provider under this Agreement automatically terminate; and (ii) each Party

      shall return or destroy, at the option of the other Party, all confidential information of such other Party.

   e.   Orchid has the right to remove the Provider Node from the Default List in the event of: (i) a Bankruptcy Event; (ii) a termination of this Agreement for any reason; (iii) any occurrence, in Orchid's reasonable judgment, of Provider participating in any of the conduct described in Section 3e or of Provider otherwise not satisfying its obligations under this Agreement; or (iv) an imminent threat to the security, integrity or availability of the Orchid Network.  To the extent a removal or suspension is based on Orchid's reasonable judgment that Provider is not satisfying its obligations under this Section 6e(iii)  or an event that imminently threatens the security, integrity or availability of the Orchid Network under this Section 6e(iv), to the extent practicable, Orchid will offer the Provider a five (5) business day cure period.  In the event Orchid removes Provider from the Default List, within ten (10) days of the removal Orchid shall notify Provider in writing of the removal and the reasons for the removal.  If after removal Provider cures the issues that caused its removal from the Default List, Orchid shall determine in its sole discretion whether to add the Provider Node back to the Default List.

   f.   If (i) Orchid terminates this agreement pursuant to Section 6b(i); (ii) Provider terminates this agreement pursuant to Section 6b(ii); (iii) either Party terminates this agreement pursuant to Section 6b(iii); or (iv) Orchid removes the Provider Node from the Default List pursuant to Section 6e; and such termination occurs prior to six (6) Months following the Network Launch ("Initial Period"), then Provider shall forfeit all of the OXT in the Initial Deposit and the Additional Deposits, all of which shall be returned to Orchid; provided that if such termination occurs after the Initial Period has expired, then Provider shall retain an amount of OXT in the Initial Deposit and in the Additional Deposits determined by multiplying each by a fraction in which the numerator is the number of months that have elapsed since Network Launch and the denominator is twelve (12) (provided, however, that the numerator may not exceed the denominator), and any amounts of OXT not so retained shall be forfeited and returned to Orchid. By way of example, if 50 OXT are in the Initial Deposit, and an additional 50 OXT are in the Additional Deposits (for a total of 100 OXT) and termination pursuant to this Section 6g occurs nice (9) months after Network Launch, then the Provider would retain 75% of the 100 OXT held in the Initial Deposit and Additional Deposits (i.e., 75 OXT) and the remaining 25% of the 100 OXT (i.e., 25 OXT) would be forfeited and returned to Orchid.

7.   **Confidentiality and Publicity**

   a.   Orchid operates in an environment of openness and participation.  By default, except as otherwise set forth in this **Section 7 (Confidentiality and Publicity)**, each Party's disclosures shall not be treated as confidential.

   b.   Where Orchid or Provider desires information to be treated as "confidential," prior to disclosure, the Party seeking confidential treatment shall notify the other Party and

4848-1767-2361.2

  the Parties shall attempt to negotiate mutually agreeable non-disclosure terms. However, no Party is under an obligation to enter into such non-disclosure terms. Notwithstanding the foregoing, the parties have previously entered into a mutual non-disclosure agreement dated September 19th 2019, which is still in full force and effect.

 c. Provider shall coordinate with Orchid in advance concerning any media announcements or publicity regarding the Orchid Network, except for statements solely referencing Provider's participation in the Orchid Network, Provider's operation of the Provider Node and/or services that may utilize the Orchid Network ("Pre-approved Statements"). Except in connection with Pre-approved Statements, Provider shall not use Orchid names, logos, service marks, trade names or trademarks without the prior, written permission of Orchid and then only in accordance with the then-current brand standards issued by Orchid.

 d. Provider grants Orchid permission to publish:

  (i) The Provider's names, logos, service marks, trade names and trademarks on Orchid's web sites and in connection with other public disclosures made by Orchid solely for the purpose of identifying Provider as a Provider on the Orchid Network; provided that this permission does not extend to use of such names, logos, service marks, trade name and trademarks in any disclosure that is not focused solely on the operation of the Orchid Network;

  (ii) Information about the performance and reliability of the Provider Node(s) at the Orchid Network level but not at the Provider Node level; and

  (iii) Anonymous or aggregated data about the overall operation of the Orchid Network.

 e. Orchid agrees to obtain prior written permission from Provider with regard to use of the Provider's names, logos, service marks, trade names and trademarks in any materials not permissioned by the previous subsection 7(d).

**8.**  **Intellectual Property**

 a. Orchid retains all rights to its intellectual property and all contributions, derivatives, enhancements, improvements and modifications thereto and this Agreement shall not be construed as a license to intellectual property rights except where it explicitly so provides. Provider retains all rights to its intellectual property and all contributions, derivatives, enhancements, improvements and modifications thereto and this Agreement shall not be construed as a license to intellectual property rights except where it explicitly so provides.

 b. Except as set forth in the Orchid Open Source Code licensing terms, Provider agrees that it has no right, title or interest in or to the Orchid Infrastructure or Orchid

4848-1767-2361.2

       Protocol (including, without limitation, any of their respective components and all contributions, derivatives, enhancements, improvements and modifications thereto).

c. Provider shall not disclose or contribute any intellectual property under this Agreement without the Parties first entering into an agreement with regard to the introduction and use of such intellectual property.

d. To the extent Orchid desires to introduce intellectual property under this Agreement, it shall do so through use of (or updates to) the Orchid Open Source Code or through other methods agreed upon by the Parties, unless the Parties agree otherwise in writing, in advance.

e. Provider shall abide by any Orchid Open Source Code licensing terms made available by Orchid.

**9. Disclaimer of Warranties**

NEITHER PARTY MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED.  THE PARTIES DISCLAIM ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY OR COMPLETENESS OF DATA.  THE PARTIES HEREBY ACKNOWLEDGE THAT THE ORCHID SMART CONTRACTS, INCLUDING THE PROVIDER DIRECTORY AND STAKING SMART CONTRACTS, WILL BE PROGRAMMED WITHOUT A "KILL SWITCH" AND THEREFORE WILL BE OUTSIDE OF ORCHID'S CONTROL ONCE DEPLOYED.  ACCORDINGLY, THE PARTIES SPECIFICALLY DISCLAIM ANY EXPRESS OR IMPLIED WARRANTIES RELATED TO THE FUNCTIONALITY OF THE ORCHID SMART CONTRACTS, INCLUDING THE PROVIDER DIRECTORY AND STAKING SMART CONTRACTS.

**10. Limitation of Liability**

IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE, SPECIAL, OR OTHER CONSEQUENTIAL DAMAGES UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY LOST PROFITS, BUSINESS INTERRUPTION, LOSS OF PROGRAMS OR DATA, OR OTHERWISE, EVEN IF THE OTHER PARTY IS EXPRESSLY ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES.

EXCEPT IN THE EVENT OF EITHER PARTY'S GROSS NEGLIGENCE, WILFUL MISCONDUCT OR FRAUD, IN NO EVENT SHALL EITHER PARTY'S LIABILITY UNDER THIS AGREEMENT EXCEED $250,000 USD IN THE AGGREGATE.  IN THE EVENT OF EITHER PARTY'S GROSS NEGLIGENCE, SUCH PARTY'S LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED $500,000 USD IN THE AGGREGATE. IN THE EVENT OF EITHER PARTY'S WILFUL MISCONDUCT OR FRAUD, THERE

4848-1767-2361.2

SHALL BE NO DOLLAR CAP ON SUCH PARTY'S LIABILITY UNDER THIS AGREEMENT.

11. **Compliance with Law**

Each Party shall comply with all applicable laws and shall cooperate with the other Party in complying with applicable laws and lawful subpoenas, orders, or investigative demands. Without limiting the generality of the foregoing, each Party agrees to enter into any and all data protection agreements and undertake any and all measures required by applicable law with regard to the processing, protection and/or transfer of personal data, and each Party agrees to undertake all measures required by applicable law to ensure compliance with requirements related to United States national security.

12. **U.S. Treasury Office of Foreign Assets Control**

Without limiting the generality of Section 11, each Party agrees to undertake all measures necessary to comply with requirements of the U.S. Treasury Department Office of Foreign Assets Control ("OFAC"), to include providing to the other Party any and all information required to verify the identities of the Parties, the beneficial owners of the Parties, and the identities of any affiliates or entities owned or controlled by the Parties.

13. **[This Section is Intentionally Omitted]**

14. **Tax**

Provider hereby warrants that it has sole responsibility for any tax liabilities that may accrue to Provider as a result of Provider's receipt of OXT in relation to this Agreement.

15. **Governing Law and Forum**

This Agreement is governed by the law of the State of Delaware, without reference to conflict of laws principles.  All disputes arising out of or in connection with this Agreement shall be finally settled by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce by a single arbitrator appointed in accordance with the said Rules.  Unless the Parties otherwise mutually agree, such arbitration shall be conducted in the English language by electronic exchange of documents and by videoconference.  The arbitrator shall issue a reasoned decision, including findings of fact and conclusions of law.  The arbitrator shall require exchange by the Parties of documents relevant to the issues raised by any claim, defense, or counterclaim or on which the producing Party may rely in support of or in opposition to any claim, defense, or counterclaim, with due regard for eliminating undue burden and expense and the expedited and lower cost nature of arbitration.  At the request of a Party, the arbitrator may at his or her discretion order the deposition of witnesses.  Depositions shall be limited to a maximum of three depositions per Party, each of a maximum of four hours duration, unless the arbitrator otherwise determines.  Demand for arbitration may be initiated by either Party on fifteen (15) days written notice to the other Party's designated representative, together with a written specification of the grounds for the dispute and the relief requested.  By agreeing to binding and non-appealable

4848-1767-2361.2

arbitration, each party understands that they each forever give up and waive any right which each Party may have to resolve any such claim, difference or dispute by court or jury trial. Notwithstanding the foregoing, either Party may bring a proceeding seeking equitable or injunctive relief solely and exclusively in the state and federal courts located in Wilmington, Delaware, to prevent the infringement of intellectual property rights, the disclosure of confidential information or the unlawful processing or transmission of data. Each Party hereto consents to the exclusive jurisdiction of such courts for the adjudication of any such equitable or injunctive relief, as well as for any such matters that are excluded from or fall outside of this arbitration provision.

**16.     Intention Not to Violate Law; Severability**

The Parties hereto expressly agree that it is not the intention of either Party to violate any of the public policies, statutes, or common laws of the United States; that, if any sentence, paragraph, clause or combination of the same is adjudged to be in violation of or unenforceable under any state or federal law of the United States, the Parties agree (without waiving rights of appeal) that the unenforceable provisions(s) shall be (1) reconstituted to approximate as closely as lawfully possible the evident intent of the Parties; or (2) if option (1), above, cannot be implemented, the unenforceable provision(s) shall be excised from the Agreement and the Parties shall negotiate in good faith with respect to the modification of the Agreement. If the Parties cannot agree to a modification, in writing, the Agreement shall be enforced without the unenforceable provision in a fair manner and without undue prejudice to either party. It is the intention of both Parties to make this Agreement binding only to the extent that it may be lawfully done under existing state and federal laws of the United States, whichever may be applicable.

**17.     Miscellaneous**

   a)  <u>Notice</u>. Any notice, payment, demand or communication required or permitted to be delivered or given by the provisions of this Agreement shall be deemed to have been effectively delivered or given and received on the date personally or electronically delivered to the respective Party to whom it is directed, or when deposited by registered or certified mail, with postage and charges prepaid and addressed to the Parties at the addresses set forth below opposite their signatures to this Agreement.

   b)  <u>Severability</u>. If any provision of this Agreement is held invalid, illegal, or unenforceable, the validity, legality, and enforceability of any of the remaining provisions of this Agreement shall not in any way be affected or impaired.

   c)  <u>Relationship of the Parties</u>. This Agreement does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the Parties. Neither Party will represent that it has any authority to assume or create any obligation, express or implied, on behalf of the other Party, nor to represent the other Party as agent, employee, franchisee, or in any other capacity. There are no third-party beneficiaries to this Agreement. Neither Party shall make any proposals,

4848-1767-2361.2

<ol type="a" start="4">
<li></li>
</ol>

promises, warranties, guarantees, or representations on behalf of the other Party or in the other Party's name.

d) <u>Assignment</u>. Neither Party will assign or transfer this Agreement without the other Party's express prior written consent, provided that no such consent is required for an assignment or transfer to a wholly or majority owned subsidiary or to a successor in interest by reason of merger or consolidation or sale of all or substantially all of the assets of such Party relating to the subject matter of this Agreement.

e) <u>Entire Agreement</u>. This Agreement, including all documents incorporated into this Agreement by reference, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes any and all prior agreements and understandings of the Parties, whether written or oral, with respect to such subject matter.

f) <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

g) <u>Survival</u>. Sections 7 – 16 of this Agreement shall survive termination of this Agreement.

**Signatures**

The Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first listed above.

**Orchid Labs, Inc.**

By: _____*Steve Waterhouse*_____    Name: Steve Waterhouse   Title: CEO

**Provider**

By: _____*Charles Muszynski*_____    Name: Charles Muszynski   Title: Manager

4848-1767-2361.2