**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
CASE NO.: 21-cv-20862-BLOOM/Otazo-Reyes

MILLENNIUM FUNDING, INC. *et. al*,

      Plaintiffs,

v.

1701 MANAGEMENT LLC d/b/a LIQUIDPVN, *et. al*,

      Defendants.

_____/

**QUADRANET, INC.'S AND QUADRANET ENTERPRISES, LLC'S**
**MOTION TO DISMISS THE PLAINTIFFS' SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................1

    A.    Plaintiffs' Third Shotgun Pleading Must Be Dismissed With Prejudice. .....................1

    B.    The Second Amended Complaint Must Be Dismissed For Other Reasons................2

II.   RELEVANT BACKGROUND, AND SUMMARY OF QE'S BUSINESS MODEL..........4

III.  ARGUMENT ....................................................................................................7

    A.    Plaintiffs' Third Shotgun Pleading Requires Dismissal...........................................7

    B.    Counts III, IV, VI, and VI-VIII Fail to State a Claim Against Quadranet. .............. 10

        1.    Count III Should Be Dismissed with Prejudice. ............................................ 11

            a.    Quadranet's Services Have Long Been Used for Substantial Non-Infringing Uses................................................................... 11

            b.    Count III Fails to Allege that Quadranet Acted with Culpable Intent. ................................................................................... 13

            c.    Count III Fails to Allege That Quadranet "Materially Contributed" to the Infringing Conduct of Another, and That Its Alleged Participation was "Substantial." ...................................... 15

        2.    Count IV Should Be Dismissed With Prejudice ............................................. 17

            a.    Quadranet Did Not Profit Directly from the Alleged Infringing Activity. ................................................................................... 17

                (1)    Plaintiffs Cannot Plead That Quadranet Profited Directly........................................................................ 17

                (2)    There Are No Factual Assertions to Support Quadranet's Alleged Receipt of a Direct Financial Benefit. ............................................................. 19

                (3)    Plaintiffs Failed to Allege That the Main Draw is Access to the Infringing Content. ................................. 20

                (4)    The SAC Fails to Plead That the Allegedly Infringing Content Affected Quadranet's Client Base.......................... 22

                (5)    The Disputed Number of "Take Down Notices" is Irrelevant. ....................................................... 22

            b.    Quadranet Did Not Have the Ability to Supervise, Control, and Stop the Infringing Activity............................................... 23

        3.    Plaintiffs' Remaining State Law Claims Should be Dismissed Under Ingram...................................................................... 25

        4.    Plaintiffs' Claims for Negligence and Fraud Are Preempted. ........................ 26

        5.    Plaintiffs' Negligence Claim (Count VI) Fails for Additional Reasons......... 27

# TABLE OF CONTENTS
### (continued)

Page

a.  Plaintiffs Fail to Plead a "Legal Duty" Owed by Quadranet to the Plaintiffs. .......................................................................... 28

b.  Plaintiffs Fail to Plead Negligence Based Upon a Third-Party Beneficiary Theory. .............................................................. 28

6.  Plaintiffs' Fraud Claim (Count VII) Fails For Additional Reasons. .............. 29

7.  Count VIII for "Equitable Estoppel" Fails to State a Claim. ....................... 30

C.  The SAC Should Be Dismissed For Lack Of Personal Jurisdiction. .......................... 32

1.  Exercising Jurisdiction Here Violates Florida's Long-Arm Statute............... 32

a.  Quadranet is Not Subject to General Jurisdiction in Florida. .......... 32

b.  Quadranet is Not Subject to Specific Jurisdiction in Florida............ 33

2.  Exercising Personal Jurisdiction Would Violate Due Process. ..................... 35

D.  The SAC Should Be Dismissed for Improper Venue. ................................................. 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abromats v. Abromats,*
No. 16-cv-60653-BLOOM/Valle, 2016 U.S. Dist. LEXIS 125614 (S.D. Fla. Sep.
14, 2016) ................................................................................................................................... 31

*Alpha Tech. v. MLSNA,*
2013 U.S. Dist. LEXIS 167884 (M.D. Fla. Nov. 26, 2013) .................................................. 32

*ALS Scan v. Steadfast,*
819 Fed. App'x 522 (9th Cir. 2020) ...................................................................................... 16

*Arista v. Lime,*
784 F. Supp. 2d 398 (S.D.N.Y. 2011) .................................................................................... 12

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................................ 11

*Atl. Recording v. Project Playlist,*
603 F. Supp. 2d 690 (S.D.N.Y. 2009) .................................................................................... 12

*B&G Opa v. City of Opa,*
2020 U.S. Dist. LEXIS 28209 (S.D. Fla. Feb. 18, 2020) ...................................................... 31

*Barroso v. Respiratory Care,*
518 So. 2d 373 (Fla. 5th DCA 1987) ...................................................................................... 30

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................................ 11

*Brown v. Carnival,*
202 F. Supp. 3d 1332 (S.D. Fla. 2016) ............................................................................ 33, 35

*BUC Int'lv. Int'l Yacht,* 489 F.3d 1129, 1138 n.19 (11th Cir. 2007) ............................................ 17

*by UMG Recordings v. Grande Communs. Networks,*
2018 U.S. Dist. LEXIS 224827 (W.D. Tex. Oct. 15, 2018) .................................................. 23

*Cable/Home Commun. Corp. v. Network Prods.,*
902 F.2d 829 (11th Cir. 1990) ................................................................................................ 35

*Cafaro v. Zois,*
No. 15-CIV-80150-BLOOM/Valle, 2015 U.S. Dist. LEXIS 83302 (S.D. Fla.
June 1, 2015) ..................................................................................................................... 29, 30

## TABLE OF AUTHORITIES

Page(s)

*Casella v. Morris,*
   820 F.2d 362 (11th Cir. 1987) ............................................................................................ 11

*City of Omaha v. CBS Corp.,*
   2010 U.S. Dist. LEXIS 25497 (S.D.N.Y. Mar. 16, 2010) .................................................. 30

*Coach, Inc. v. Swap Shop,*
   916 F. Supp. 2d 1271 (S.D. Fla. 2012) ................................................................. 18, 19, 25

*Cobbler v. Gonzales,*
   901 F.3d 1142 (9th Cir. 2018) ........................................................................................... 13

*Dealer. Dealer Specialities. v. Car Data,*
   2020 U.S. Dist. LEXIS 76292 (M.D. Fla. Apr. 13, 2020) .................................................... 9

*Eastridge v. Norfolk,*
   2008 U.S. Dist. LEXIS 125126 (N.D. Ala. Feb. 15, 2008) .................................................. 4

*Ellison v. Robertson,*
   357 F.3d 1072 (9th Cir. 2004) ..................................................................................... 18, 20

*Embree v. Wyndham,*
   779 F. App'x 658 (11th Cir. 2019) ................................................................................. 2, 10

*Equal Employment v. STME, LLC,*
   309 F. Supp. 3d 1207 (M.D. Fla. 2018) ............................................................................ 11

*Erickson v. Merck,*
   2018 U.S. Dist. LEXIS 186190 (M.D. Fla. May 17, 2018) ................................................ 10

*Exhibit Icons, LLC v. XP Cos., LLC,*
   609 F. Supp. 2d 1282 (S.D. Fla. 2009) ............................................................................. 35

*Flagship v. Interval Int'l,*
   28 So. 3d 915 (Fla. 3rd DCA 2010) .................................................................................. 31

*Fraser v. Smith,*
   594 F.3d 842 (11th Cir. 2010) ........................................................................................... 34

*Garcia v. Kashi,*
   43 F. Supp. 3d 1359 (S.D. Fla. 2014) ................................................................................. 9

*Gershwin v. Columbia Artists,*
   443 F.2d 1159 (2d Cir. 1971) ..................................................................................... 11, 15

## TABLE OF AUTHORITIES

**Page(s)**

*Giddings v. Vision House Prod.*,
    2007 U.S. Dist. LEXIS 58438 (D. Ariz. Aug. 3, 2007) ........................................................27

*GJR Investments, Inc. v. Cty. of Escambia, Fla.*,
    132 F.3d 1359 (11th Cir. 1998), *overruled on other grounds as recognized in Randall v.*
    *Scott*, 610 F.3d 701 (11th Cir. 2010) ................................................................................2, 10

*Goodyear Dunlop Tires v. Brown*,
    564 U.S. 915 (2011)....................................................................................................... 33, 34

*Green v. Young Mi Dreaden*,
    2021 U.S. Dist. LEXIS 54242 (M.D. Ga. Mar. 23, 2021) ...............................................10

*Greiser v. Drinkard*,
    2018 U.S. Dist. LEXIS 228125 (S.D. Fla. May 21, 2018) ..................................................8

*Gulf Ins. Co. v. Glasbrenner*,
    417 F.3d 353 (2d Cir. 2005)..............................................................................................37

*Hydentra v. Luchian*,
    2016 U.S. Dist. LEXIS 193457 (S.D. Fla. June 2, 2016) ...................................2, 11, 12, 17

*Ingenuity v. Doe*,
    2013 U.S. Dist. LEXIS 16952 (N.D. Cal. Feb. 7, 2013) ...................................................14

*Ingram v. Sch. Bd.*,
    167 F. App'x 107 (11th Cir. 2006) ................................................................................3, 26

*Interim Healthcare v. Interim Healthcare of Se. La.*,
    No. 19-cv-62412-BLOOM/Valle, 2020 U.S. Dist. LEXIS 101841 (S.D. Fla. June
    10, 2020) ...............................................................................................................34, 36, 37

*Io Grp. v. Veoh*,
    586 F. Supp. 2d 1132 (N.D. Cal. 2008)............................................................................25

*Johnson v. Bank of N.Y.*,
    2011 U.S. Dist. LEXIS 21359 (N.D. Fla. Feb. 3, 2011) ...................................................28

*Joseph v. Bernstein*,
    612 F. App'x 551 (11th Cir. 2015) ................................................................................2, 10

*Joseph v. Bernstein*,
    No. 13-24355-CIV-ALTONAGA, 2014 U.S. Dist. LEXIS 114997 (S.D. Fla.
    Aug. 19, 2014)....................................................................................................................10

## TABLE OF AUTHORITIES

Page(s)

*Jouria v. CE Res., Inc.*,
  2017 U.S. Dist. LEXIS 111698 (S.D. Fla. July 12, 2017) ....................................................26

*Kassier v. Kipnis*,
  571 So. 2d 54 (Fla. 3rd DCA 1990) .........................................................................................31

*Kephart v. Data Sys. Int'l, Inc.*,
  243 F. Supp. 2d 1205 (D. Kan. 2003) .......................................................................................5

*Kernel Records Oy v. Mosley*,
  2010 U.S. Dist. LEXIS 69424 (S.D. Fla. July 5, 2010)..................................................... 32, 36

*King v. U.S. HUD*,
  No. 19-cv-80410-BLOOM, 2019 U.S. Dist. LEXIS 54386 (S.D. Fla. Mar. 27,
  2019).........................................................................................................................................19

*Klein & Heuchan v. CoStar Realty*,
  707 F. Supp. 2d 1287 (M.D. Fla. 2010)............................................................................. 17, 20

*Kruse v. Mass. Mut.*,
  No. 17-cv-61115-BLOOM, 2017 U.S. Dist. LEXIS 129249 (S.D. Fla. Aug. 14,
  2017).........................................................................................................................................31

*Kubicek v. J. Walter*,
  902 F.2d 33 (6th Cir. 1990).......................................................................................................30

*Louis Vuitton v. Akanoc*,
  658 F.3d 936 (9th Cir. 2011).....................................................................................................15

*Luvdarts, LLC v. AT&T Mobility, LLC*,
  710 F.3d 1068 (9th Cir. 2013) ......................................................................................14, 17, 26

*Malibu Media, LLC v. Doe*,
  2012 U.S. Dist. LEXIS 89286 (C.D. Cal. June 27, 2012) .............................................5, 14

*Mason v. Sony Pictures*,
  2021 U.S. Dist. LEXIS 81497 (N.D. Ga. Apr. 28, 2021).....................................33, 34, 35

*Maxwell Chase Techs., L.L.C. v. KMB Produce, Inc.*,
  79 F. Supp. 2d 1364 (N.D. Ga. 1999) .....................................................................................32

*Merch. One v. TLO*,
  No. 19-23719-BLOOM, 2020 U.S. Dist. LEXIS 7462 (S.D. Fla. Jan. 16, 2020) .....................*passim*

*Metro-Goldwyn v. Grokster, Ltd.*,
  545 U.S. 913 (2005)............................................................................................................ 12, 13

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Meyer v. Meyer,*
   25 So. 3d 39 (Fla. 2nd DCA 2009) ...................................................................... 32

*Michael Grecco Prods. v. RGB Ventures, LLC,*
   2017 U.S. Dist. LEXIS 148820 (M.D. Fla. Sep. 14, 2017) ................................. 14

*Neelu Aviation v. Boca Aircraft,*
   18-cv-81445-BLOOM, 2019 U.S. Dist. LEXIS 129454 (S.D. Fla. Aug. 2, 2019) ............... 4, 33, 34

*Oak Assocs., Ltd. v. Palmer,*
   2006 U.S. Dist. LEXIS 4526 (E.D. Pa. Feb. 7, 2006) .......................................... 4

*Oldfield v. Pueblo,*
   558 F.3d 1210 (11th Cir. Fla. 2009) ............................................................. 32, 34

*Pegasus v. Northrop,*
   2008 U.S. Dist. LEXIS 99985 (M.D. Fla. Nov. 24, 2008) ................................... 25

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   508 F. 3d 1146 (9th Cir. 2007) ............................................................... 13, 24, 25

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*
   494 F. 3d 788 (9th Cir. 2007) ................................................................ 15, 24, 25

*Plan Pros v. Torczon,*
   2010 U.S. Dist. LEXIS 148765 (D. Neb. Nov. 17, 2010) ................................ 14, 15

*Real Estate Mortg. Network, Inc. v. Cadrecha,*
   2011 U.S. Dist. LEXIS 78219 (M.D. Fla. July 19, 2011) ..................................... 9

*Religious Tech. v. Netcom,*
   907 F. Supp. 1361 (N.D. Cal. 1995) ............................................................... 15

*Response Reward v. Meijer,*
   189 F. Supp. 2d 1332 (M.D. Fla. 2002) ........................................................... 33

*Revman Int'l, Inc. v. Sel Mfg. Co.,*
   2019 U.S. Dist. LEXIS 234142 (D.S.C. Mar. 26, 2019) ..................................... 32

*Roblor Mktg. v. Gps Indus., Inc.,*
   645 F. Supp. 2d (S.D. Fla. 2009) .................................................................... 36

*Rouzie v. Alterman,*
   596 So. 2d 747 (Fla. 3rd DCA 1992) .............................................................. 28

## TABLE OF AUTHORITIES

**Page(s)**

*Sanchez v. Fed. Bureau of Prisons,*
    493 F. App'x 14 (11th Cir. 2012) ............................................................................... 11

*Santana v. Miami-Dade,*
    No. 14-CIV-20840-BLOOM/Valle, 2015 U.S. Dist. LEXIS 54597 (S.D. Fla.
    Apr. 27, 2015) ........................................................................................................... 28

*Sarvis v. Polyvore,*
    2013 U.S. Dist. LEXIS 112539 (D. Mass. Aug. 9, 2013) ...................................... 19

*Shapiro v. H. L. Green,*
    316 F.2d 304 (2d Cir. 1963) .................................................................................... 18

*Shipping & Transit v. WOV, LLC,*
    No. 16-cv-80860-BLOOM, 2016 U.S. Dist. LEXIS 130501 (S.D. Fla. Sep. 21,
    2016) ..................................................................................................................... 4, 33

*Smith v. BarnesandNoble.com,*
    143 F. Supp. 3d 115 (S.D.N.Y. 2015) ................................................................... 12

*Sony Corp v. Universal City,*
    464 U.S. 417 (1984) ........................................................................................... 11, 12

*Steadfast v. Corp. Prot.,*
    554 F. Supp. 2d 1335 (S.D. Fla. 2008) ................................................................. 29

*Stone Tech. v. GlobalGeeks,*
    20-23251-BLOOM, 2020 U.S. Dist. LEXIS 201279 (S.D. Fla. 2020) ................... 1

*Tabor v. McNesby,*
    2007 U.S. Dist. LEXIS 110441 (N.D. Fla. June 6, 2007) ..................................... 28

*Tarantino v. Gawker Media,*
    2014 WL 2434647 (C.D. Cal. Apr. 22, 2014) ....................................................... 13

*Thompson v. Bank of N.Y.,*
    862 So. 2d 768 (Fla. 4th DCA 2003) ..................................................................... 29

*Tikiz Franchising, LLC v. Piddington,*
    No. 17-cv-60552 -BLOOM/Valle, 2017 U.S. Dist. LEXIS 221704 (S.D. Fla. July
    31, 2017) ............................................................................................................ *passim*

*TMJ Practice v. Curran,*
    2017 U.S. Dist. LEXIS 114557 (S.D. Fla. July 23, 2017) ..................................... 36

## TABLE OF AUTHORITIES

**Page(s)**

*to A&M Records v. Napster,*
239 F.3d 1004 (9th Cir. 2001) ................................................................. 19, 20, 24

*UMG Recordings v. Bright House,*
2020 U.S. Dist. LEXIS 122774 (M.D. Fla. July 8, 2020) ........................... 20, 21

*UMG Recordings v. Grande Communs,*
2018 U.S. Dist. LEXIS 32275 (W.D. Tex. Feb. 28, 2018) ......................... 21, 23

*UMG Recordings v. Veoh Networks,*
2009 U.S. Dist. LEXIS 14955 (C.D. Cal. Feb. 2, 2009) ............................ 19, 20

*United Mine Workers v. Gibbs,*
383 U.S. 715 (1966) .................................................................................. 26, 28

*United Technologies v. Mazer,*
556 F.3d 1210 (11th Cir. 2009) ....................................................................... 32

*Ure v. Oceania Cruises, Inc.,*
2014 U.S. Dist. LEXIS 154818 (S.D. Fla. Oct. 31, 2014) ................................ 29

*Venus Fashions v. ContextLogic, Inc.,*
2017 U.S. Dist. LEXIS 155748 (M.D. Fla. Jan. 17, 2017) ........................... 23, 24

*Waite v. AII,*
901 F.3d 1307 (11th Cir. 2018) ....................................................................... 34

*Walters v. Ocean,*
925 So. 2d 440 (Fla. 5th DCA 2006) ............................................................... 29

*Weiland v. Palm Beach,*
792 F.3d 1313 (11th Cir. 2015) ......................................................................... 8

*Yeyille v. Miami Dade Cty. Pub. Sch.,*
643 F. App'x 882 (11th Cir. 2016) .................................................................... 8

*Yeyille v. Sch. Bd.,*
No. 14-24624-CIV-ALTONAGA, 2015 U.S. Dist. LEXIS 185057 (S.D. Fla. June
15, 2015) ........................................................................................................... 8

*Yparrea v. Twin Cities,*
2010 U.S. Dist. LEXIS 58232 (N.D. Fla. May 17, 2010) ............................ 32, 33

*Zagorsky v. Rhino Entm't,*
2019 U.S. Dist. LEXIS 153083 (D. Ariz. Sep. 9, 2019) ................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

*Zamora Radio, LLC v. Last.fm, Ltd.* , 2011 U.S. Dist. LEXIS 69101 (S.D. Fla. June 28, 2011).................................................................................................................................35

**Statutes**

17 U.S.C. § 106 ......................................................................................................... 26, 27

Fla. Stat.
  § 48.193................................................................................................................ 32, 33
  § 48.193 (1)(a)(1).........................................................................................................34
  § 48.193 (1)(a)(2).........................................................................................................35
  § 48.193 (2)......................................................................................................... 32, 33

**Other Authorities**

Fed. R. Civ. P.
  8 ....................................................................................................................................37
  10 ..................................................................................................................................37
  11 ..................................................................................................................................22
  12(b)(2) ............................................................................................................. 32, 35, 37
  12(b)(3) .................................................................................................... 4, 32, 36, 37
  12(b)(6) .......................................................................................................... 11, 26, 37
  15(a)(2) ...........................................................................................................................1

## I.      INTRODUCTION

### A.      Plaintiffs' *Third* Shotgun Pleading Must Be Dismissed with Prejudice.

This Court has held that in the context of an impermissible shotgun pleading, and "[e]specially where a party is represented by counsel, it is not the Court's duty to expend precious time and resources in attempting to decipher [that] pleading."[1] But in the instant case, and despite being represented by counsel, Plaintiffs have filed three "back-to-back" shotgun pleadings, all expressly prohibited by 11th Circuit precedent.  Quadranet Inc. ("QI"), Quadranet Enterprises, LLC ("QE"), and this Court should not be forced to expend any more time and resources in dealing with the Plaintiffs' serial deficient pleadings.

The Court should dismiss the latest complaint, the Second Amended Complaint [D.E. 96] ("SAC"), *with prejudice*.  Plaintiffs' original complaint [D.E. 1] was an impermissible shotgun pleading, and Plaintiffs could have (but failed to) cure this pleading deficiency when they filed their First Amended Complaint ("FAC") [D.E. 24].  The undersigned counsel conferred with Plaintiffs' counsel as to this fact (both telephonically and in writing), and even extended a good deed by offering Plaintiffs written consent to amend under Rule 15(a)(2), provided of course that Plaintiffs amended *before* the deadline for QI and QE to respond to the FAC (so as to avoid unnecessary expense in briefing the shotgun issue).[2]  Plaintiffs rejected this offer and, because no good deed goes unpunished, QI and QE were forced to file their motion to dismiss (addressing both the shotgun pleading nature of the FAC, and other bases for dismissal). [D.E. 83]. Plaintiffs reviewed that motion to dismiss, but instead of responding on the August 13, 2021 deadline, they instead filed a motion for leave to file a second amended complaint, engaged in bad faith by intentionally misrepresenting that QI and QE "have consented to Plaintiff filing a second amended complaint" [D.E. 90, p. 6], and assumed that leave to amend would be "freely granted." [D.E. 90].  Two days later, before QI and QE could respond and address Plaintiffs' misrepresentations, prejudicial tactics, repeated failure to cure the shotgun pleading issue, and the futility of the amendment,[3] Plaintiffs' motion was granted. [D.E. 91].

Although Plaintiffs were given leave to amend, the SAC is *still* a shotgun pleading because it does not "separate[e] into a different count each cause of action or claim for relief;" and it "assert[s] multiple claims against multiple defendants [QI and QE] without specifying which of the defendants are responsible for which acts or omissions." *Merch*, 2020 U.S. Dist. LEXIS 7462, at *7-8. Notably,

---

[1] *Merch. One v. TLO*, 2020 U.S. Dist. LEXIS 7462, at *10 (S.D. Fla. Jan. 16, 2020) (Bloom, J.).
[2] **Exhibit 2.**
[3] *Stone Tech. v. GlobalGeeks*, 20-23251-BLOOM, 2020 U.S. Dist. LEXIS 201279, at *3 (S.D. Fla. 2020).

the court in *Joseph* dismissed with prejudice a *pro se* litigant's shotgun pleading after only one "bite at the apple." *Joseph v. Bernstein*, 612 F. App'x 551 (11th Cir. 2015). Here, Plaintiffs are on their **third** "bite at the apple," represented by counsel, and long on notice of these defects. The 11th Circuit instructs that courts should "not construe a pleading drafted by counsel with the same leniency that they otherwise afford to *pro se* litigants who lack 'the benefit of a legal education.'"[4] The SAC must be dismissed.

> **B.    The Second Amended Complaint Must Be Dismissed for Other Reasons.**

This case is about various John Doe defendants, who utilized their own computers, BitTorrent software, internet service, and a VPN (virtual private network) service, allegedly infringing certain rights of Plaintiffs.  Plaintiffs later dragged in QI and QE (collectively "Quadranet") for tactical leverage only – not because Quadranet directly infringed Plaintiffs' rights, controlled or supervised the alleged infringement, or even hosted the infringing content (it did not).[5]  Through a series of pre-filing emails, Quadranet explained to Plaintiffs that the allegations in the FAC/SAC were untrue, lack evidentiary support, and unwarranted under existing law.  The SAC should be dismissed for at least two separate reasons, one on the merits, and the other jurisdictional.

**First,** the SAC should be dismissed *with prejudice* because this lawsuit should never have been filed against either Quadranet entity. Count III does not plausibly allege a claim for contributory infringement under a theory of material contribution when Quadranet's services are capable of, and overwhelmingly used for, substantial non-infringing uses. Despite having a preview of this fatal deficiency in Quadranet's previous motion to dismiss, Plaintiffs failed to make even a basic allegation that Quadranet's services are not capable of such use in the SAC, and could not plausibly do so. Additionally, Quadranet is *at least* two steps removed from any "involvement" in the purported infringement.  *See Hydentra v. Luchian*, 2016 U.S. Dist. LEXIS 193457 (S.D. Fla. June 2, 2016).  QE solely leased physical computers (which acted as servers) to an encryption service, LiquidVPN, which *may* have then been used by *some* of LiquidVPN's customers (not Quadranet's customers) to access third-party software (the Popcorn Time BitTorrent software) to "torrent" copyrighted material. Under

---

[4] *Embree v. Wyndham*, 779 F. App'x 658, 664 (11th Cir. 2019) (*citing GJR Investments, Inc. v. Cty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998), *overruled on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 706 (11th Cir. 2010)).

[5] Although QI and QE are separate companies, Plaintiffs have improperly lumped these defendants together, which results in the SAC being an impermissible shotgun pleading. Nevertheless, because the Plaintiffs have improperly lumped QI and QE together as "Quadranet" in allegations throughout the SAC, QI and QE are forced to respond as "Quadranet" in turn.

the law, the act of simply leasing computer servers is not "substantial" enough to be considered a "material contribution" to the infringement, much like credit card companies are not liable when they merely process credit card payments to provide access to infringing websites. And here, Quadranet's servers did not store or host the subject films.[6] Count III should be dismissed with prejudice.

Count IV of the SAC for "vicarious liability" also fails to state a claim: it lacks plausible allegations detailing how Quadranet profited ***directly*** from the alleged infringement (it did not), which renders any arguable financial benefit from the alleged infringement remote, attenuated, and highly incidental –not ***direct***, as required by law. The SAC also fails to plead that Quadranet had the right and ability to supervise, control, and stop the alleged infringement – it did not, and as a technical matter, cannot: Quadranet does and cannot view, monitor, control, access, disable, or otherwise supervise any internet traffic that passes through its data centers. This applies to both legal content – such as viewing the news, sports, or entertainment data – as well as any allegedly infringing content. If Plaintiffs seek a remedy, it is not from Quadranet.

With no federal causes of action remaining, the newly-added state law claims of negligence (Count VI) and fraud (Count VII) should be dismissed under *Ingram v. Sch. Bd.*, 167 F. App'x 107 (11th Cir. 2006), because "state courts, not federal courts, should be the final arbiters of state law." *Id.* These claims nonetheless fail under the doctrine of preemption, and because they are also fundamentally flawed. As part of a false narrative that Quadranet has either been "negligent" or "fraudulent" in identifying itself as the "abuse contact" for the IP addresses that it reassigned to LiquidVPN in the American Registry for Internet Numbers ("ARIN"), Plaintiffs expend much effort misleading the Court about the procedures for updating records when IP addresses are reassigned. As discussed in detail below, the reporting procedures for updating ARIN records will not permit an organization to serve as an abuse contact for an IP address allocated by ARIN, unless that organization is also an ARIN member, which LiquidVPN is not (much like many "downstream" customers that receive reassigned IP addresses originally allocated to Quadranet and other service providers). Nor does ARIN permit its members to register its downstream customers for such a purpose. Although Plaintiffs invoke labels of "negligence" and "fraud," the reality is that Quadranet was not legally required to provide LiquidVPN's contact information for the "abuse contact" field in the ARIN records. Moreover, Plaintiffs fail to meet the remaining, requisite *prima facie* elements of these claims.

---

[6] After previewing this argument in the previous motion to dismiss, Plaintiffs have inserted a half-hearted, wholly unsupported assertion that "title art" related to the motion pictures had been placed on QE's servers. This allegation is debunked below.

**Second**, although Plaintiffs' claims should have never been asserted against Quadranet, they most certainly should not have been brought in Florida.  In fact, the case-caption shows that **twenty-eight (28) of the Plaintiffs are located in states having district courts within the Ninth Circuit Court of Appeals** (*e.g.* California, Nevada, and Wyoming) where, unsurprisingly, the majority of copyright infringement cases involving movies, entertainment, and other media are filed.  ***None of the Plaintiffs are Florida-based companies***.  The dispute between Plaintiffs and Quadranet has no ties to Florida, and as explained below, allegations of Miami-based servers are a red herring.  As to why Plaintiffs filed suit against Quadranet in a district court within the 11th Circuit, it appears that Plaintiffs are engaged in *per se* forum shopping in order to avoid unfavorable law dooming their claims – a tactic "historically disfavored by federal courts…."  *Eastridge v. Norfolk*, 2008 U.S. Dist. LEXIS 125126, at *89 (N.D. Ala. Feb. 15, 2008); *Oak Assocs., Ltd. v. Palmer*, 2006 U.S. Dist. LEXIS 4526, at *10 (E.D. Pa. Feb. 7, 2006).  Regardless, because QI (a California corporation) has no business activity, and **zero** contacts with this forum, this Court should find that exercising jurisdiction over QI would be improper and violative of due process. With respect to QE (a Delaware corporation with a principal place of business in California), general jurisdiction cannot be exercised since it is not "at home" in Florida, a principal recognized by this Court's opinion in *Shipping & Transit v. WOV, LLC*, No. 16-cv-80860-BLOOM, 2016 U.S. Dist. LEXIS 130501, at *5 (S.D. Fla. Sep. 21, 2016).  Specific jurisdiction is equally lacking because, notwithstanding QE's data center in Florida, this facility has no connection to the alleged infringement at issue in this case. This Court has recognized that in order for specific jurisdiction to attach, "[t]he business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort."  *Neelu Aviation v. Boca Aircraft*, 18-cv-81445-BLOOM, 2019 U.S. Dist. LEXIS 129454 (S.D. Fla. Aug. 2, 2019).  Relatedly, the SAC should be dismissed under Rule 12(b)(3) since Quadranet does not reside in Florida, and because none of the events giving rise to the claims against Quadranet occurred in this district. For these and the additional reasons below, the SAC should be dismissed with prejudice.

## II.    RELEVANT BACKGROUND, AND SUMMARY OF QE'S BUSINESS MODEL

The allegations in the SAC arise out of internet users' alleged reproduction and dissemination of purported infringing content using a communication protocol for peer-to-peer file sharing known as "BitTorrent."  BitTorrent protocols locate users with files that other users want, at which point small portions of those files are then downloaded simultaneously resulting in faster transmission rates (as opposed to file transfer protocols, which download files sequentially from only one source).  *See Malibu Media, LLC v. Doe*, 2012 U.S. Dist. LEXIS 89286, at *1-4 (C.D. Cal. June 27, 2012) (explaining

how files are shared via BitTorrent).  The crux of the allegations in the SAC is that without the Plaintiffs' authorization, permission, or consent, their copyrighted motion pictures were illegally downloaded, copied, and distributed by various "John Does" who masked their internet protocol ("IP") address using a virtual private network ("VPN") provider[7] to conceal their movie piracy.

Untethered to any of this nefarious activity is QE, which has, as part of his routine business operations for the past two decades, merely leased dedicated computers which operate as servers. (Ex. 1, ¶16).  These servers are connected to the internet and utilized by QE's corporate customers for a variety of purposes such as web hosting, videogaming, cloud computing, or providing services for a VPN company. (Ex. 1, ¶17-18). Due to advances in technology which make unlawful activities (such as identity theft and hacking) more possible and easier to execute, VPN services are frequently used for security and privacy.[8] As a result, many users conduct online activity through a VPN including online banking, paying bills, or accessing other sensitive information such as healthcare or social security records (Ex. 1, ¶22); even *law firms* are advised to use VPN's in order to securely protect attorney-client privileged communications, and to ward against data breaches.[9]

QE's many subscribers, and specific to the instant case, LiquidVPN[10], install and maintain their *own* software on QE's computers.  However, much like a power company is responsible for ensuring that electricity stays on, QE is only responsible for ensuring that the servers stay connected to the internet. (Ex. 1, ¶23). Aside from providing technical support pertaining to hardware issues, power supply, and internet connection to the servers, Quadranet has no involvement with the software

---

[7] A VPN creates a private network from a public internet connection such that the user's online actions and IP address are made private and undetectable as they connect a home computer to a website hosted on a distant server. *See Kephart v. Data Sys. Int'l, Inc.*, 243 F. Supp. 2d 1205, 1212 n.11 (D. Kan. 2003) (stating that a VPN is "a set of computers on a public network (such as the internet) that can communicate among themselves with encryption technology, so that their messages are safe from interception by unauthorized users, as if the computers were connected by private lines."). A VPN has been described as creating a "tunnel" between the user's computer and the desired website by encrypting the data sent over a public internet network. Any web activity of the user is associated with the IP address belonging to the VPN server, *not* the user's IP address.  (Ex. 1, ¶17-21).

[8] QE's peers include companies such as AWS (Amazon) cloud services, Hivelocity (https://www.hivelocity.net), Performive (https://performive.com), and THG Hosting (https://thghosting.com).

[9] https://www.forbes.com/sites/forbestechcouncil/2019/09/04/protecting-attorney-client-privilege-with-a-vpn/?sh=4b3ce5ba5f1e.

[10] The SAC newly identifies "TorGuard" as a defendant. Plaintiffs assert that TorGuard is a VPN provider and is also a Quadranet subscriber. For this motion, Quadranet's arguments are generally applicable to any of its VPN subscribers; LiquidVPN is not necessarily distinguished from TorGuard.

that its lessees install on the servers, and similarly has no direct access to the software (Ex. 1, ¶23). Pertinent here, QE provides basic internet infrastructure services only.

The SAC does not (and cannot) allege that Quadranet has any connection to BitTorrent (or any other file-sharing websites for that matter), or that Quadranet profits from such protocols. It similarly fails to allege that Quadranet has the ability and right to control any of the "John Does'" online activity, presumably because the Plaintiffs recognize that the direct infringers **are not even QE's customers**, but rather *LiquidVPN's* customers. There are no allegations in the SAC that QE receives any money whatsoever from the accused infringers, or that QE profits directly from the purportedly infringing activity. The SAC does not and cannot allege that QE provides any file-sharing services to subscribers (because QE does not), or that QE directs any internet traffic (much less to BitTorrent or other file sharing protocols).

Newly-added Counts VI and VII rest on Plaintiffs' fundamental misunderstanding and assertion that the "abuse contact" listed for the WHOIS search tool should have identified LiquidVPN, and not Quadranet. This is wrong. The "abuse contact" is not simply any email address that is desired. Instead, it is a "field" or category of information known as a "Point of Contact" that must be previously listed in ARIN's database.[11] A "Point of Contact" must also be associated with an "Organization ID," which is a unique identifier for organization records in all of the services ARIN provides.[12] Therefore, the "abuse contact" must be associated with an Organization ID. Here, LiquidVPN is not registered as a member of ARIN and therefore has no Organization ID.[13] Nor is Quadranet permitted to create an Organization ID on Liquid VPN's behalf.[14] As a result, when Quadranet reports the reassignment of IP addresses for its customers that are not registered with ARIN, it has no choice but to remain the abuse contact. Thus, Quadranet had no obligation, much less the ability, to identify LiquidVPN as the abuse contact. Further, neither the "Registration Services Agreement,[15]" nor the "Number Resource Policy Manual" relied on by Plaintiffs include any explicit

---

[11] See, https://www.arin.net/resources/guide/account/records/poc/.

[12] See, https://www.arin.net/resources/guide/account/records/org/.

[13] See, https://account.arin.net/public/member-list#group_22.

[14] See, https://www.arin.net/resources/guide/account/records/org/#methods-to-create-org-ids.

[15] The version of the Registration Services Agreement supplied by Plaintiffs is a blank agreement (not executed by Quadranet) found on the Arin website. It is dated as of August 16, 2016. Quadranet was originally formed in 2001 and its involvement with ARIN predates this draft of the agreement by at least a decade, if not more. See, https://www.arin.net/about/corporate/agreements/rsa.pdf

*requirement* that the abuse contact be that of the reassigned or "downstream" customer.[16]  To illustrate this, take an example of the abuse contact for the website of Plaintiffs' counsel, www.ppc-ip.com. When viewing the WHOIS records for Plaintiffs' counsel's website, the IP address of the server where the website is hosted is displayed as 173.201.191.223. When entering that IP address into the ARIN/RDAP WHOIS search tool (the same one used by Plaintiffs' purported "expert" Eric Smith) the only abuse contact listed is that of the website registrar, *Go Daddy*, who is "upstream" from counsel. *See* Declaration of W. John Eagan, attached as **Exhibit 3**.

Lastly, the facts pertaining to the mechanism of infringement that were asserted in the FAC [D.E. 24] are even more distorted and blurred in the SAC.  For example, paragraph 289 alleges that "Quadranet's VPN" subscribers distribute the allegedly infringing works, but this is completely at odds with the basic allegation that the infringement is occurring via BitTorrent. *See, e.g.,* SAC at ¶¶ 135-144. It is not Quadranet's VPN clients who are distributing the allegedly infringing works. A portion of LiquidVPN's subscribers are the ones "distributing" the allegedly infringing works by apparently using LiquidVPN to access the BitTorrent software. Plaintiffs have intentionally sought to blur this line in an attempt to portray Quadranet's involvement as "one step closer" to the alleged infringing activity.

The liability that Plaintiffs seek to impose on Quadranet is unprecedented.  QE had no more involvement in any of the alleged misconduct than hardware manufacturers (which provided the direct infringers with computers and routers), power utility companies (which provided the direct infringers with electricity), or the Internet Corporation for Assigned Names and Numbers ("ICANN") (which provided LiquidVPN with a web address).  All claims against Quadranet must be dismissed.

## III.   ARGUMENT

### A.   Plaintiffs' Third Shotgun Pleading Requires Dismissal.

"The Eleventh Circuit has repeatedly and unequivocally condemned shotgun pleadings as a waste of judicial resources." *Merch. One*, 2020 U.S. Dist. LEXIS 7462, at *6. "The most common type - by a long shot - is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count

---

[16] In fact, Section 4.2.3.7.1 of the Number Resource Policy Manual specifies that the "[r]eassignment registration shall only include point of contact (POC) information if either: (1) requested by the customer; or (2) the reassigned block is intended to be routed and announced outside of the provider's network."            https://www.arin.net/participate/policy/nrpm/#4-2-3-7-1-reassignment-and-reallocation-information

to be a combination of the entire complaint." *Weiland v. Palm Beach*, 792 F.3d 1313, 1321 (11th Cir. 2015). Here, it is evident that Plaintiffs' complaint [D.E. 1] and FAC [D.E. 24] repeated and realleged all of the foregoing paragraphs into each cause of action, such that "each count [was] replete with factual allegations [and legal conclusions] that could not possibly be material to that specific count." *Greiser v. Drinkard*, 2018 U.S. Dist. LEXIS 228125, at *2-3 (S.D. Fla. May 21, 2018). The SAC does not repeat this precise "sin" but makes two others.

The first is that the SAC "commits the sin of not separating into a different count each cause of action or claim for relief." *Merch. One*, 2020 U.S. Dist. LEXIS 7462, at *7. In *Yeyille*, for example, the court dismissed the plaintiff's complaint as a shotgun pleading because, among other things, the complaint "could not reincorporate and reallege preceding counts into subsequent counts, as this is a fatal flaw." *Yeyille v. Sch. Bd.*, No. 14-24624-CIV-ALTONAGA, 2015 U.S. Dist. LEXIS 185057, at *5 (S.D. Fla. June 15, 2015). Notably, the plaintiff's claims were dismissed with prejudice **after only one chance to amend**, as the district judge followed precedent from the 11th Circuit, which has "specifically instructed district courts to dismiss shotgun pleadings as 'fatally defective....'" *Id.* at *12. That dismissal was affirmed on appeal. *See Yeyille v. Miami Dade Cty. Pub. Sch.*, 643 F. App'x 882, 884-85 (11th Cir. 2016). Here, Plaintiffs similarly commit the same "sin" of not separating into a different count each cause of action. For example, in Count VII, Plaintiffs not only repeat and reallege "paragraphs 17-55 and 328-349," but also all of the allegations in the Plaintiffs' "**sixth claim for relief**" (*i.e.* paragraphs 450-462). *See* [D.E. 96, ¶463]. This is inherently confusing, deficient, and impermissible, because in the incorporated allegations from the "sixth claim for relief," Plaintiffs also reincorporate and reallege paragraphs 61-69 [D.E. 96, ¶450], which were **not** otherwise incorporated into Count VII. Similarly, in Count X, Plaintiffs reallege and incorporate by reference "paragraphs 56-57, 226-239," "350-360 **and in the ninth claim for relief**" (*i.e.* paragraphs 484-493). *See* [D.E. 96, ¶494]. Finally, in Count XII, Plaintiffs reallege and incorporate by reference "the allegations contained in paragraphs 361-371 **and the eleventh claim for relief**" (*i.e.* paragraphs 501-511). *See* [D.E. 96, ¶512]. Thus, Plaintiffs have improperly reincorporated by reference a breach of contract claim (Count XI) into an unjust enrichment claim (Count XII).

The SAC also constitutes another type of shotgun pleading, as it commits the "sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible

for which acts or omissions...." *Merch. One*, 2020 U.S. Dist. LEXIS 7462, at *7-8.[17]  Because the SAC continuously references "Quadranet" alone, Plaintiffs have improperly lumped together QI and QE together, without specifying *which* entity is responsible for which act or omission.  *See, e.g.* [D.E. 96, ¶¶400-402, 419-428, 451-462, 464-470].  Plaintiffs are likely to argue in response that QI and QE are mere "alter egos," but the SAC "does not contain enough allegations to support a request to pierce the corporate veil of each of these [Quadranet] entities" under a supposed alter ego theory.  *Id.*  The SAC, however, does not seek to impose alter ego liability between any shareholder and corporation, and contains no allegations that could meet the three-part test set forth in *Dealer.  Dealer Specialties. v. Car Data*, 2020 U.S. Dist. LEXIS 76292, at *16-17 (M.D. Fla. Apr. 13, 2020).

        To the extent Plaintiffs alternatively assert alter ego liability between a parent and a subsidiary,[18] the SAC contains no allegations stating that QI is the "parent" of QE (or vice-versa), nor are there any allegations that meet the three-part test set forth in *Garcia.  Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1395 (S.D. Fla. 2014) (holding "that the SAC must be dismissed as to Kellogg because it simply does not allege a 'mere instrumentality' or 'alter ego' theory of liability.").  Thus, there is no basis to find that the SAC sufficiently pleads an alter ego theory of liability.

        The very best that the Plaintiffs will be able to do in response is to point to the allegation that QI and QE have the same "address of principal place of operations," and "have the same CEO." [D.E. 96, ¶¶64-65].  But that allegation is insufficient to establish alter ego liability.[19]  Plaintiffs may also try to point to their conclusory allegation that there "is such a unity of interest between [QI] and [QE] that the individuality, or separateness, of [QI] and [QE] has ceased and the facts are such that an adherence to the fiction of the separate existence of [QI] and [QE] would, under the particular circumstances, sanction a fraud or promote injustice." [D.E. 96, ¶¶68]. However, paragraph 68 is merely a bald assertion without any sufficient ultimate facts in support, and this Court is not required

---

[17] "Lumping the Defendants together in this manner makes it impossible for the Defendants to be placed on notice as to what allegations specifically apply to their actions or misconduct."  *Real Estate Mortg. Network, Inc. v. Cadrecha*, 2011 U.S. Dist. LEXIS 78219, at *5 (M.D. Fla. July 19, 2011).

[18] In Florida, "a parent corporation will not be held liable for the actions of its subsidiary unless the subsidiary is deemed to be a mere instrumentality of the parent.  For a subsidiary to be considered a mere instrumentality of a parent corporation, there must be: (1) control of the parent over the subsidiary 'to the degree that it is a mere instrumentality;' (2) parent committed fraud or wrongdoing through its subsidiary; (3) unjust loss or injury to a claimant, such as when the subsidiary is insolvent. . . [a] mere instrumentality finding is rare." *Garcia v. Kashi*, 43 F. Supp. 3d 1359, 1394 (S.D. Fla. 2014).

[19] If it were, a plaintiff could similarly claim that Tesla Motors, Inc., Neuralink Corp., and Space Exploration Technologies Corp. (*i.e.* "SpaceX") are all "alter ego" companies, simply because all three "have the same CEO," Elon Musk.  https://www.tesla.com/elon-musk

to accept as true "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts…." *Green v. Young Mi Dreaden*, 2021 U.S. Dist. LEXIS 54242, at *7 (M.D. Ga. Mar. 23, 2021). Finally, Plaintiffs were on notice of a sworn declaration filed in this case, which clearly outlines how QI and QE are distinct companies [D.E. 83-1]; even then though, Plaintiffs still failed to plausibly plead any facts detailing how QI and QE could possibly be "alter egos" of one another (such that they should be lumped together). *Erickson v. Merck*, 2018 U.S. Dist. LEXIS 186190, at *18 (M.D. Fla. May 17, 2018) ("Plaintiff has not plausibly pleaded that Defendants should be lumped together."). Here, Plaintiffs have improperly lumped QI and QE together as "Quadranet," and in doing so, have failed to specify which defendant is responsible for which act or omission – a hallmark of an impermissible shotgun pleading. *Merch. One*, 2020 U.S. Dist. LEXIS 7462, at *7-8.

These repeated errors require dismissal with prejudice. In *Joseph v. Bernstein*, 612 F. App'x 551 (11th Cir. 2015) – where the plaintiff was proceeding *pro se* – his case was dismissed *with prejudice* after he had **only one** opportunity to amend his shotgun pleading. *See also Joseph v. Bernstein*, No. 13-24355-CIV-ALTONAGA, 2014 U.S. Dist. LEXIS 114997 (S.D. Fla. Aug. 19, 2014). Here, Plaintiffs have no credible basis to request yet another chance to amend, as Plaintiffs are represented by two (2) law firms and multiple attorneys. The 11th Circuit has recognized that courts should "not construe a pleading drafted by counsel with the same leniency that they otherwise afford to pro se litigants who lack 'the benefit of a legal education.'" *Embree v. Wyndham*, 779 F. App'x 658, 664 (11th Cir. 2019) (citations omitted).

It is neither Quadranet's nor the Court's job to guide Plaintiffs in drafting a pleading that is compliant with 11th Circuit law. *GJR Invs. v. Cty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998) (while courts show leniency to *pro se* litigants, "this leniency does not give a court license to serve as *de facto* counsel for a party…or to rewrite an otherwise deficient pleading in order to sustain an action…[and because] GJR was represented by counsel, it was not necessary for the court to read GJR's complaint with such indulgence."). Here, at all times represented by counsel, Plaintiffs' Complaint, FAC, and SAC constitute three (3) out of the four (4) types of shotgun pleadings addressed in *Merch. One,* 2020 U.S. Dist. LEXIS 7462, at *7. Three bites at the apple are enough. Respectfully, the Court should not give Plaintiffs permission or guidance on how to file a complaint that adheres to 11th Circuit standards. For this reason, the SAC should be dismissed with prejudice.

**B.      Counts III, IV, VI, and VI-VIII Fail to State a Claim Against Quadranet.**

On a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its SACe.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Sanchez v. Fed. Bureau of Prisons*, 493 F. App'x 14, 15 (11th Cir. 2012) (internal citation omitted). The Court "should not assume that the plaintiff can prove facts that were not alleged." *Equal Employment v. STME, LLC*, 309 F. Supp. 3d 1207, 1211 (M.D. Fla. 2018).

    **1.       Count III Should Be Dismissed with Prejudice.**

"The Eleventh Circuit has stated the well-settled test for a contributory infringer as 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'" *Hydentra*, 2016 U.S. Dist. LEXIS 193457, at \*33 (internal citation omitted); *see also Sony Corp v. Universal City*, 464 U.S. 417, 437 (1984) (recognizing that the Supreme Court has defined a contributory infringer as one who "was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner.").[20] The 11th Circuit has explained that "[t]he standard of knowledge is objective: 'Know, or have reason to know.'" *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987) (citing *Gershwin v. Columbia Artists*, 443 F.2d 1159, 1162 (2d Cir. 1971)). Contributory infringement will not be found if the product in question is capable of "substantial non-infringing uses," which results in wide use "for legitimate, unobjectionable purposes." *Sony*, 464 U.S. at 442.

        **a.       Quadranet's Services Have Long Been Used for Substantial Non-Infringing Uses.**

Plaintiffs have failed – now three times – to allege that Quadranet's services have no substantial non-infringing uses. Quadranet's services – used by businesses of all types – and akin to services offered by many other notable companies (see footnote 8) – are indisputably capable of substantial non-infringing uses. Quadranet previewed this defect in its Motion to Dismiss the FAC, yet the SAC still fails to plead that Quadranet's services have no substantial non-infringing use. The law is well-settled that even "a defendant who distributes a product that materially contributes to copyright infringement will not be liable for contributory infringement if the product is also widely used for legitimate, unobjectionable purposes or is merely capable of substantial non-infringing use." *Arista v. Lime*, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011). "The [*Sony*] rule requires a court to determine whether

---

[20] Notably, Plaintiffs have not attempted to assert liability against Quadranet under theories of inducement or causation, only that Quadranet supposedly "materially contributed."

                                   11

a product or service is *capable* of substantial non-infringing uses, not whether it is currently used in a non-infringing manner." *Smith v. BarnesandNoble.com,* 143 F. Supp. 3d 115, 125 (S.D.N.Y. 2015).

This Court's decision in *Hydentra* illustrates application of this premise to internet service providers. *Hydentra*, 2016 U.S. Dist. LEXIS 193457. Acknowledging that the seminal *Sony* opinion was written while the internet was in its infancy, and related to products, the *Hydentra* court looked to *Metro-Goldwyn v. Grokster, Ltd.*, 545 U.S. 913, 932-33 (2005), where the Supreme Court found that at the time of the lawsuit, Grokster's "products were, and had been for some time, overwhelmingly used to infringe." *Id*. at 948. There, the infringement was the "overwhelming source of revenue from the products," and Grokster's products were not even capable of substantial non-infringing uses. *Id.* The *Hydentra* court held that a contributory infringement claim cannot succeed where a website or internet service is capable of substantial non-infringing purposes that are legitimate and unobjectionable *even if*, as was the case there, infringing content was, at times, hosted on the website. *Hydentra*, 2016 U.S. Dist. LEXIS 193457 at *37-40.

In the instant case, Quadranet does not operate or facilitate the "Popcorn Time" BitTorrent software used by the alleged infringers to distribute copyrighted materials. Quadranet also does not operate the VPN software that the infringers use to gain access to the BitTorrent software. (Ex. 1, ¶23). Quadranet has no contracts or contacts with the accused Doe defendants. Rather, QE merely operates *data centers* that provide general internet utilities and infrastructure of the type used to keep the world wide web running and interconnected. Plaintiffs, in fact, acknowledge this much, as they point to: (1) Quadranet operating a facility in Miami that provides a data center, dedicated servers, and colocation services [SAC, ¶70]; and (2) Quadranet's website (www.quadranet.com) and blog (blog.quadranet.com) [SAC, ¶273, 274].[21]

Even a cursory review of Quadranet's website demonstrates that it is engaged by a multitude of clients as a data center providing various unobjectionable services that, obviously, have nothing to do with copyright infringement. Quadranet: (1) provides dedicated servers for companies and individuals to host software (*e.g.* video game servers, healthcare records, etc.); (2) has been named as a top service provider among its peers; (3) regularly attends trade shows and conventions; and (4)

---

[21] Because Quadranet's website is incorporated by reference within the four-corners of the SAC, the Court may and should consider www.quadranet.com for purposes of the instant motion to dismiss. *See, e.g., Atl. Recording v. Project Playlist*, 603 F. Supp. 2d 690, 694 n.3 (S.D.N.Y. 2009) (drawing facts from "Court's own review of the website" on a motion to dismiss because the website was incorporated by reference into the complaint).

publishes a newsletter on its blog to keep its customers and potential customers apprised of its advancement activities. [https://blog.quadranet.com/]. Contrary to the conclusory insinuations in the SAC (suggesting that Quadranet's sole existence is to host the LiquidVPN software), these VPN services account for less than 3% of QE's revenue.  Even more limited, and while somewhat difficult to calculate because the number is so small, revenue from leasing servers to LiquidVPN accounted for less than 0.00001% of QE's revenue during the relevant lease period. (Ex. 1, ¶24-25).  The Court can take notice that QE has *thousands* (over 15,000) of customers involved in a wide array of services and sectors.  The majority of QE's revenue is derived from colocation and managed services, ***not*** from hosting VPN software (Ex. 1, ¶26-27), much less from providing past services to defendants LiquidVPN or TorGuard.  Count III should be dismissed because Quadranet's accused services are capable of substantial non-infringing uses.

### b.   Count III Fails to Allege that Quadranet Acted with Culpable Intent.

Contributory infringement also requires Plaintiffs to allege that Quadranet acted with "culpable intent."  *Grokster,* 545 U.S. at 934; *see also Cobbler v. Gonzales*, 901 F.3d 1142, 1148 (9th Cir. 2018) ("Nothing in [the] complaint alleges, or even suggests, that [defendant] … materially contributed to the infringement through purposeful, culpable expression and conduct.") (internal citation omitted).  As here, the "allegation that a defendant merely provided the means to accomplish an infringing activity is insufficient to establish [the] claim." *Tarantino v. Gawker Media*, 2014 WL 2434647, at *3 (C.D. Cal. Apr. 22, 2014). Even where the defendant is "[a] computer system operator," showing the requisite intent requires alleging (and later proving) that the defendant "has *actual* knowledge that *specific* infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F. 3d 1146, 1172 (9th Cir. 2007) (emphases in original).

The SAC does not and cannot allege that Quadranet had actual knowledge of the specific infringing material.  Although Plaintiffs will inevitably gripe about the number of alleged "take down notices" purportedly sent by the Plaintiffs to Quadranet, as well as alleged "inaction" by Quadranet, both are irrelevant to establishing this element of the claim.  Instead, to "be liable for contributory copyright infringement, the knowledge required is more than a generalized knowledge by the [service provider] of the possibility of infringement." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (finding that contributory liability does not automatically follow merely because a system allows for the exchange of copyrighted material). The 9th Circuit has emphasized that "actual

knowledge of specific acts of infringement is required," and that the number of notices "gives at most a general knowledge that infringement will likely occur again in the future; this does not give notice of any specific acts of infringement that are actually occurring." *Id* (internal citation omitted).  Moreover, absent evidence of intentional infringement by Quadranet, which has not been alleged, a court cannot find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement." *Plan Pros v. Torczon*, 2010 U.S. Dist. LEXIS 148765, at *13 (D. Neb. Nov. 17, 2010). The SAC does not allege that Quadranet engaged in purposeful, culpable expression necessary to sufficiently state a claim.  The closest it comes, Para. 400, accuses Quadranet of "knowingly and intentionally taking steps which are substantially certain to result in direct infringement…."  This allegation is impermissibly conclusory, but even still, it is relevant only to an "inducement" theory of contributory liability, not a material contribution theory.  *See, Michael Greco Prods. v. RGB Ventures, LLC*, 2017 U.S. Dist. LEXIS 148820, at *23-24 (M.D. Fla. Sep. 14, 2017).  This allegation says nothing more than Quadranet "intentionally" operates a data center, which is legal.

Additionally, LiquidVPN (not QE) obscures and encrypts the online activities of its subscribers.  Thus, *even if* QE could view the data passing through the VPN (which it cannot), QE is unable to discern what content the data includes or where the data is being routed. It is technologically (and therefore literally) impossible for Quadranet to have had actual knowledge that specific infringing material was available using its servers. Although the SAC contends that the direct infringers used LiquidVPN to obtain copies of the copyrighted material via certain BitTorrent software, because the BitTorrent protocol utilizes many different hosts to transmit a small fraction of data at a single moment in time, no "copy" of a copyrighted work was stored on Quadranet's servers.  *Ingenuity v. Doe*, 2013 U.S. Dist. LEXIS 16952 at *7 (N.D. Cal. Feb. 7, 2013) ("[A] torrent file is only an "encrypted, unusable chunk of zeroes and ones," and not a copy within the legal definition.).  In other words, the "copy" of the work is only created *on the BitTorrent user's computer* after the user has downloaded all necessary components from various computers in the "swarm."  *See Malibu Media*, 2012 U.S. Dist. LEXIS 89286, at *1-4.  This is yet another reason why, technically, **Quadranet** cannot be liable here.

To be clear, Quadranet never had the ability to stop any actions of infringement complained of in the SAC.  The only "direct" infringers here are the "John Does" utilizing the "Popcorn Time" BitTorrent service.  **None of these "John Does" are Quadranet's customers**. Quadranet had no obligation, much less the right or capability, to take any action to address the alleged direct infringement.  *See Plan Pros*, 2010 U.S. Dist. LEXIS 148765, at *13 ("In the absence of evidence of intent, a court is unable to find contributory infringement liability merely based on a failure to take

affirmative steps to prevent infringement.").[22] Whether Quadranet had the technical ability to "null-route" an IP address is irrelevant.  *See infra* at pgs. 16-17 (explaining null routing).

> **c.**    **Count III Fails to Allege That Quadranet "Materially Contributed" to the Infringing Conduct of Another, and That Its Alleged Participation was "Substantial."**

Count III is premised on the notion that Quadranet is contributorily liable under a theory of "material contribution."  But a third party can only be liable for materially contributing to infringement where its participation in the infringing conduct of the primary infringer is "substantial." *Religious Tech. v. Netcom*, 907 F. Supp. 1361, 1375 (N.D. Cal. 1995) ("*Netcom*") (citing *Gershwin Publ'g*, 443 F.3d at 1162).  As is clear under the law, not every entity who provides commercial services to a direct infringer is liable for contributory infringement. *See, e.g., Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F. 3d 788 (9th Cir. 2007) (credit card companies did not materially contribute to infringing activities, as they merely processed credit card payments to provide access to allegedly infringing websites).

In the context of providing servers and data center services, the opinion in *Louis Vuitton v. Akanoc*, 658 F.3d 936 (9th Cir. 2011) is highly instructive as to what constitutes a "substantial" contribution.  In that case, two separate defendants were accused of contributory infringement, Managed Solutions Group, Inc. ("MSG") and Akanoc Solutions, Inc. ("Akanoc").  MSG owned and leased servers to Akanoc.  In turn, Akanoc hosted the websites where infringement occurred, routed internet traffic to and from the sites, and had direct control over the "master switch" that kept the websites online and available. The district court set aside a jury verdict against MSG, which the Ninth Circuit upheld on appeal, because MSG did not "operate[] the servers that hosted the direct infringers' websites," and similarly had no "reasonable means to withdraw services to the direct infringers." *Id.*

Taking all of the misguided assertions in the SAC as true, Quadranet's alleged "contribution" to the infringement is even further removed from that of MSG.  In *Louis Vuitton*, the infringing material was actually hosted on the servers owned by MSG.  Conversely here, QE does not host, manage, or control the infringing content, nor does it host the BitTorrent software used to transmit the infringing content.  As explained, QE merely provides server space to many third-party subscribers, one being LiquidVPN.  Some portion of that VPN company's customers (*i.e.* **not** Quadranet's customers) then apparently used LiquidVPN to access the BitTorrent software. Again,

---

[22] This is despite the fact that Quadranet maintains an automated system to address abuse tickets, which automatically forwards a notice of infringement to the customer assigned to the IP address to which the abuse pertains. (Ex. 1, ¶29-30). Indeed, Quadranet's records indicate that between 50 and 100 abuse tickets were received, processed, and forwarded to LiquidVPN. (Ex. 1, ¶31).

Quadranet has no access to or control over LiquidVPN's customers, and any allegedly infringing content is fully encrypted by the VPN such that Quadranet has no way to determine *what* the transmitted content contains.  Quadranet does not control or review the content (nor does it even have the means to do so), and due to the decentralized nature of the BitTorrent protocol, a complete copy of a copyrighted work is never concurrently in transit through QE's servers.  Rather, the BitTorrent protocol utilizes many different hosts to transmit a small fraction of data at a single moment in time.  Thus, with or without QE's provision of services to LiquidVPN, LiquidVPN's end users could still share material using the BitTorrent software. (Ex. 1, ¶28).

Plaintiffs weakly attempt to rebut this reality in paragraph 318 of the SAC, which states "LiquidVPN displays title art of Plaintiff Millennium Funding, Inc.'s movie *Survivor* on its website hosted on Quadranet servers without authorization of Millennium Funding, Inc." This statement is legally deficient, technically false, and irrelevant.  First, Plaintiffs fail to specify what "title art" is being referred to and fail to even allege who owns the copyrights to such "title art."[23] Second, the WHOIS data for liquidvpn.com indicates that the website is hosted on a server having an IP address of 104.21.62.222, which is registered to a company called Cloudflare, Inc., not a Quadranet server. *See,* Decl. of W. John Eagan, ¶¶ 8-9. If anything, the Cloudflare server would have hosted the "title art."

On this issue, the Ninth Circuit's opinion in *ALS Scan v. Steadfast*, 819 Fed. App'x 522 (9th Cir. 2020) is also instructive.  There, the court held that a computer system operator that leased servers to an allegedly infringing website could not be held liable for contributory infringement when it took the "simple measure" of forwarding notices of claimed infringement to the website, and there was no evidence that the defendant had "other simple measures at its disposal." *Id.* at 524. Similarly here, Quadranet undertook the "simple measure" of forwarding the notices that it received.

The SAC suggests that Quadranet had the ability to "null-route" its customers and/or discontinue service to LiquidVPN, but did not do so.  As discussed, LiquidVPN is not a direct infringer. The only alleged direct infringers are some small portion of LiquidVPN's customer base, who apparently utilized LiquidVPN to access BitTorrent software.  Quadranet had no right to interfere in the relationship between LiquidVPN and its customers, effectively pulling the plug on all of LiquidVPN customers.  Some of those VPN customers may comprise the "John Does" in the SAC, but obviously, other customers use VPN software to conduct legitimate surfing and internet activity

---

[23] The "title art" may well be something created by a third-party from public domain assets. Of course, there is no way to verify this allegation because the www.liquidvpn.com website is currently inactive.

online.  Therefore, any allegation regarding Quadranet's ability to "null-route" an IP address, and whether or not it has previously taken this step against a customer, is not irrelevant, but also wildly overbroad and unworkable, as it would cause LiquidVPN to interfere with its customers.[24]

In sum, because QE merely provides basic internet infrastructure, and took the "simple measure" of forwarding notices, there can be no liability for contributory infringement.

### 2.   Count IV Should Be Dismissed with Prejudice

"Vicarious copyright liability is an 'outgrowth' of respondeat superior."  *Luvdarts,* 710 F.3d at 1071 (9th Cir. 2013).  It applies only where the defendant "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.'"  *Hydentra,* 2016 U.S. Dist. LEXIS 193457, at *40 (citation omitted). A plaintiff must plead sufficient facts showing that the "defendant must have the right and ability to supervise the infringing activity and must have a direct financial interest." *Id.* As explained, the Court should dismiss Count IV because the SAC fails to allege that Quadranet: (1) profited ***directly*** from the infringement; and (2) had the ability to supervise, control, and stop the purported infringing activity.

### a.   Quadranet Did Not Profit Directly from the Alleged Infringing Activity.

"Liability for vicarious copyright infringement arises 'when the defendant profits ***directly***'" from the alleged infringing activity.  *BUC Int'lv. Int'l Yacht*, 489 F.3d 1129, 1138 n.19 (11th Cir. 2007) (internal citation omitted) (emphasis added). "[N]ot every benefit is a ***direct*** financial benefit," and there must be a "'causal relationship' between the infringing activity and a financial benefit reaped by [the defendant]." *Klein & Heuchan v. CoStar Realty*, 707 F. Supp. 2d 1287, 1299 (M.D. Fla. 2010) (emphasis added). Furthermore, the infringing activity must be the "draw" for customers or subscribers. *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004) ("Financial benefit exists where the availability of infringing material acts as a 'draw' for customers.").

### (1)   Plaintiffs Cannot Plead That Quadranet Profited Directly.

The analysis in determining whether a defendant profited directly or incidentally is rooted in the "swap shop" and "dance hall" cases, "which deal, on the one hand, with the landlord leasing his

---

[24]  Plaintiffs generally allege that Quadranet "failed" to terminate LiquidVPN.  Although it was not required to do so, in fact, this allegation is untrue.  Quadranet cancelled LiquidVPN's account at least as early as June 13, 2021. Although Plaintiffs do not explain the partial screenshot purportedly showing the "current server setup for LiquidVPN," LiquidVPN has failed to update its server API to reflect the correct IP address for the "getliquid.info" servers.

property at a fixed rental to a tenant who engages in copyright-infringing conduct on the leased premises and, on the other hand, the proprietor or manager of a dance hall or music hall leasing his premises to or hiring a dance band, which brings in customers and profits to the proprietor by performing copyrighted music but without complying with the terms of the Copyright Act." *Shapiro v. H. L. Green*, 316 F.2d 304, 307 (2d Cir. 1963). In the former, where the landlord "charges a fixed rental and receives no other benefit from the infringement, and contributes in no way to it, it has been held that the landlord is not liable for his tenant's wrongdoing." *Id.* Conversely in the "dance hall" cases, the proprietor is often held "liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income." *Id.*

The Southern District of Florida undertook this analysis in *Coach, Inc. v. Swap Shop*, 916 F. Supp. 2d 1271 (S.D. Fla. 2012), where the designer handbag retailer sued multiple defendants, including a flea-market operator and the landlord, for copyright infringement and other related claims pertaining to the sale of knock-off handbags, wallets, and other merchandise. *Id.* at 1282-83. The court determined that the plaintiff had alleged sufficient ultimate facts as to the actual swap shop management company in charge of the premises, because it "obtained a direct financial benefit from the infringing activity." *Id.* Namely, it received rents from vendors, "including those selling fake Coach products, along with parking and concession fees, which are fueled in large part by the draw created by the widespread availability of fake Coach products at the Flea Market." *Id.* However, Coach's vicarious liability claim *against the landlords* was dismissed because the landlords did not receive any direct financial benefit from the allegedly infringing activity, and instead only received rental revenue from leasing the property to the operators of the Flea Market. *Id.*

Just like the landlords received no direct benefit in the *Swap Shop* case from leasing out their physical space, QE received no direct benefit from leasing its server space; instead, QE is paid for the amount and quality of servers, hosting solutions, and data center services that it provides. QE earns the same amount of revenue from its clients irrespective of what activity is transmitted through the use of QE's services. Accordingly, and following *Swap Shop*, Count IV should be dismissed because Quadranet has no obvious and direct financial benefit connected to any alleged infringement (by others) of Plaintiffs' copyrighted materials. *See Sarvis v. Polyvore*, 2013 U.S. Dist. LEXIS 112539, at *27 (D. Mass. Aug. 9, 2013) (dismissing claim because the plaintiff failed to allege "'an obvious and direct financial interest in the exploitation of copyrighted materials.'").

18

        **(2)**      **There Are No Factual Assertions to Support Quadranet's Alleged Receipt of a <u>Direct</u> Financial Benefit.**

Although the SAC includes a conclusory assertion that Quadranet "has derived a direct financial benefit from the infringement of Plaintiffs' copyrights" [D.E. 96, ¶421], this bare allegation is insufficient to state a claim.  This Court has recognized that a well-pled complaint "requires more than bare allegations or conclusions by the plaintiff. The ***factual assertions*** must be sufficient to allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct." *King v. U.S. HUD*, No. 19-cv-80410-BLOOM, 2019 U.S. Dist. LEXIS 54386, at *2 (S.D. Fla. Mar. 27, 2019) (emphasis added).   The SAC later suggests that "Quadranet directly benefits from its subscribers' piracy of Plaintiffs' Works [D.E. 96, ¶421]," but this too is a bare allegation.  Quadranet's customers are **not** the "John Does" pirating the Plaintiffs' Works; Quadranet's clients are VPN companies. *Some fraction* of the VPN company's customers (*i.e.* the alleged "John Does") are the ones who allegedly pirated Plaintiffs' Works, but they have no relationship (contractual or otherwise) with Quadranet.  Whether Quadranet's clients (such as LiquidVPN) "purchase more server space, IP addresses, and/or colocation services" [D.E. 96, ¶427] from Quadranet in order to facilitate their *own* services to their *own* customers – the vast majority of whom are engaged in completely legal activities online, such as those discussed above – hardly constitutes a "direct benefit" in the vicarious infringement context.  Plaintiffs cannot seriously suggest otherwise, especially given that revenue from leasing servers to LiquidVPN, for example, accounted for less than 0.00001% of QE's revenue during the relevant lease period. (Ex. 1, ¶24-25).

Because none of the "John Doe" consumers paid anything to Quadranet, this deficiency alone is fatal to Count IV.  In cases considering "whether defendants received a direct financial benefit because of the 'draw' of infringing content, the defendant allegedly enjoyed a financial benefit that consumers paid to the defendant." *UMG Recordings v. Veoh Networks*, 2009 U.S. Dist. LEXIS 14955, at *15-16 (C.D. Cal. Feb. 2, 2009). For example, in *Napster*, the court "addressed an on-line business that allowed its customers to copy copyrighted songs and provide them to others. The trial court had found that Napster's future revenue was ***directly dependent*** upon increasing its customer base and that virtually all of Napster's 'draw' of customers resulted from it providing access to infringing material." *Klein & Heuchan*, 707 F. Supp. 2d at 1298 (citing *A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) (emphasis added).

The Ninth Circuit subsequently distinguished *Napster* in *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004). There, Ellison's copyrighted works were posted by Robertson to a "Usenet" newsgroup,

which was then forwarded and copied throughout the Usenet to servers all over the world, including to those belonging to America Online, Inc. ("AOL"). *Id.* at 1074. The Ninth Circuit found that unlike "virtually all of Napster's 'draw' of customers [which] resulted from Napster's providing access to infringing material…AOL's USENET group access constituted a relatively insignificant draw when cast against AOL's vast array of products and services," and thus "AOL did not receive a direct financial benefit from the infringing activity." *Id.* at 1078.

Here, Quadranet was in existence long before the complained-of activities, and QE's revenues have no correlation or dependence on providing access to the allegedly infringing material. (Ex. 1, ¶24-27). Moreover, the SAC does not (and cannot) allege that Quadranet received any fees or subscription payments from those "John Doe" defendants who allegedly misappropriated the infringing works. QE is analogous to AOL from the *Ellison* decision, in that QE offers a vast array of services to clients worldwide, and received no direct financial benefit from the allegedly infringing activity. (Ex. 1, ¶16, 18). In sum, and although the SAC wholly fails to outline what exact "benefit" Quadranet purportedly received (if any), whatever benefit Plaintiffs try to muster up in their response will inevitably be "too far removed from the alleged infringement to be considered a 'direct' financial interest." *Veoh*, 2009 U.S. Dist. LEXIS 14955, at *17. This requires dismissal of Count IV.

### (3)   Plaintiffs Failed to Allege That the <u>Main</u> Draw is Access to the Infringing Content.

As another independent basis to dismiss Count IV, the SAC fails to allege that the <u>main</u> draw for QE subscribers is access to the infringing content. A recent case from the Middle District of Florida sheds light on this issue, as it clarified the limited scope of a vicarious liability claim, and the requirement that the very success of the defendant's venture must depend on the infringing activity. In *Bright House*, the plaintiffs sought to impose liability on "one of the largest ISPs in the country," and claimed "that Bright House receives a direct financial benefit from its users' infringement because 'at least some percentage of [Bright House's] customers are drawn to its service, at least in part, by the ability to infringe.'" *UMG Recordings v. Bright House*, 2020 U.S. Dist. LEXIS 122774, at *14-15 (M.D. Fla. July 8, 2020). In support of the "direct financial interest" prong, the plaintiffs alleged that Bright House's "failure to police its infringing subscribers adequately drew subscribers to purchase Bright House's services," and that "Bright House subscribers have illegally downloaded and distributed Plaintiffs' music on a 'massive' scale." *Id.* The court concluded that the plaintiff had failed to state a viable claim under "binding precedent that, even if liability is to be established under a 'draw' theory, liability must, nonetheless, be based upon a *direct* financial benefit to the alleged vicarious infringer."

*Id.* at \*16 (emphasis in original). Furthermore, the court found that:

> [A] plaintiff must be prepared to show and must, therefore, allege that the availability of *infringing* content provide[s] the *main* customer 'draw' to the [service].' Put differently, 'the very success of the [defendant's] venture [must] depend[ ] on the [infringing] activity.' Absent this limitation, the 'draw' theory 'would provide essentially for the limitless expansion of vicarious liability into spheres' far removed from the factual settings in which vicarious liability arose—employer-employee and independent-contractor relationships. Moreover, requiring that the availability of infringing material be the primary customer draw to the service ensures that a defendant will be held vicariously liable only if it has 'an obvious and direct financial interest in' the infringing conduct.

*Id.* at \*16-17 (emphasis in original) (brackets in original) (internal citations omitted). In dismissing the plaintiff's cause of action, the court held that regardless of the plaintiff's allegation, there was no "reasonable inference…that the *main* draw for Bright House subscribers is access to infringing content generally available on the internet." *Id.* at \*19 (emphasis in original).

The *Bright House* opinion from the Middle District of Florida also cited to *UMG Recordings v. Grande Communs*, 2018 U.S. Dist. LEXIS 32275 (W.D. Tex. Feb. 28, 2018) with approval. In *Grande Communs*, the defendant's motion to dismiss was granted because, with respect to the direct financial interest prong, the plaintiff merely alleged that "the availability of music – and particularly UMG's music – ***acts as a powerful draw*** for users of Grande's service, who use that service to download infringing music files using BitTorrent protocols." *Id.* at \*28-29 (emphasis added). The court found that this allegation was "not sufficient to show the 'direct financial interest' necessary to support a vicarious infringement claim." *Id.*

Plaintiffs make the same conclusory allegation here, namely, that "the ability of subscribers such as LiquidVPN [and TorGuard]…to use Quadranet's service to host and operate their so-called 'Popcorn Time VPN' to distribute copies of Plaintiffs' Works while concealing their end users' identities ***acts as a powerful draw*** for users of Quadranet's service." [D.E. 96, ¶423].[25] This bald assertion is insufficient to state a claim, as recognized by the court in *Grande Communs*. Count IV should therefore be dismissed with prejudice because the SAC cannot allege that the success of Quadranet's business depends on the infringing activity of subscribers of Quadranet's VPN clients, and much less that the main draw for Quadranet clients is access to the infringing content.

---

[25] Paragraph 423 misstates that "subscribers such as…Does 1-100" use Quadranet's service. Quadranet assumes the inclusion of the "Does 1-100" was inadvertent; if it was not, this borders a Rule 11 violation, since Plaintiffs know, and there is an affidavit on file showing, that Quadranet's subscribers are the VPN's customers, and ***not*** the "John Does."

        **(4)**     **The SAC Fails to Plead That the Allegedly Infringing Content Affected Quadranet's Client Base.**

Count IV of the SAC is also deficient because it fails to plead that the allegedly infringing content affected Quadranet's client base in any way, which in turn establishes that Quadranet did not profit directly from the alleged wrongdoing. The opinion from *Zagorsky* is instructive on this point, where the plaintiff sued eBay for vicarious copyright infringement because box sets of the plaintiffs' copyrighted works "including *All Night Long* were available in 2017 on auction websites, such as Defendant eBay's website." *Zagorsky v. Rhino Entm't*, 2019 U.S. Dist. LEXIS 153083, at *7 (D. Ariz. Sep. 9, 2019). Following eBay's motion to dismiss, the court examined the "direct financial interest" prong, and found that the complaint failed to include any "factual allegations that the listing of the *All-Night Long* track on Defendant eBay's site affected Defendant eBay's user base in any way, and thus, Plaintiff has not alleged facts that Defendant eBay had a direct financial interest in others' alleged direct infringement of her copyright. Consequently, Plaintiff has failed to state a plausible claim for vicarious liability for copyright infringement under § 106(3) against Defendant eBay." *Id.* at *25-26.

Here, in addition to the fact that the allegedly infringing content was not "hosted" or "stored" on QE's servers, revenue from leasing servers to LiquidVPN accounted for less than 0.00001% of QE's revenue during the relevant lease period. (Ex. 1, ¶24-25). Whether or not the "John Does" ever infringed the Plaintiffs' copyrighted works is immaterial to QE's revenues, and does not affect QE's customer base in any way. Neither Quadranet defendant had any direct financial interest in the end user's alleged infringement. This is an additional reason for dismissal of Count IV.

        **(5)**     **The Disputed Number of "Take Down Notices" is Irrelevant.**

After failing to meet the above elements, Plaintiffs cannot establish vicarious liability by claiming that Quadranet did not take any action after purportedly receiving hundreds of "take down notices." That claim (which is not true, but accepted for the purposes of this motion) has no bearing on the viability of a vicarious infringement claim, as explained by the court in *Grande Communs*. There, the court originally dismissed the plaintiffs' vicarious liability claim because the plaintiffs failed "to plead that 'the infringing activity constitutes a draw for subscribers, not just an added benefit.'" *Grande Communs*, 2018 U.S. Dist. LEXIS 160492, at *7 (W.D. Tex. Sep. 20, 2018), *report and recommendation adopted by UMG Recordings v. Grande Communs. Networks*, 2018 U.S. Dist. LEXIS 224827, at *3 (W.D. Tex. Oct. 15, 2018). Following discovery, plaintiffs sought leave to amend their complaint based upon "newly discovered evidence," namely, that "***Grande refused to terminate a single user for***

*copyright infringement from at least 2011 through 2016, while continuing to profit from the fees paid by using infringers*." *Grande Communs*, 2018 U.S. Dist. LEXIS 160492, at *7 (W.D. Tex. Sep. 20, 2018) (emphasis added).  According to the plaintiffs, their proposed amended claim for vicarious liability was viable because "Grande never terminated any user regardless of how many notices of infringement it received," suggesting "that Grande's failure to terminate infringers is a draw." *Id.*  The court rejected this argument, and *again* dismissed the proposed vicarious liability claim:

> Plaintiffs still fail to plead facts showing Grande gained or lost customers *because of* its failure to terminate infringers. Instead, the proposed amended complaint states that, "the evidence demonstrates that Plaintiffs' Copyrighted Sound Recordings were a draw to Grande's infringing customers, including customers Grande had identified as repeat infringers." Dkt. No. 85-4 at 16. But as has been noted in prior orders, the means by which Plaintiffs contend the infringing subscribers infringed the Copyrighted Sound Recordings by use of the internet and the BitTorrent protocol, which one can access through *any* ISP. Again, the draw must be something more than this to state a vicarious infringement claim. The allegedly "new" facts are insufficient to overcome the deficiencies of the original Complaint.

*Id.* at *8-9 (emphasis in original).  Here, even though the number of "take down notices" is disputed (Ex. 1, ¶¶29-31), that issue is irrelevant for purposes of a motion to dismiss.  The number of notices Quadrant received, and whether it terminated any subscribers (assuming even that it could, since they were *LiquidVPN's* customers), has no bearing on the Plaintiffs' claim.

> **b.    Quadranet Did Not Have the Ability to Supervise, Control, and Stop the Infringing Activity.**

Under the second prong of vicarious copyright infringement, a "'plaintiff must establish that the defendant exercises the requisite control over the direct infringer…'" *Venus Fashions v. ContextLogic, Inc.*, 2017 U.S. Dist. LEXIS 155748, at *34 (M.D. Fla. Jan. 17, 2017) (internal citation omitted).  "[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Id.* "The determination of whether a defendant has the capacity to halt infringement is determined by examining the system's 'current architecture.'" *Id.* at *73 (internal citation omitted). For example, in distinguishing the Google search engine from the Napster file-sharing system, the court in *Perfect 10* found that with respect to Napster:

> [T]he infringing conduct was the use of Napster's 'service to download and upload copyrighted music.' Because Napster had a ***closed system*** requiring user registration, and could terminate its users' accounts and block their access to the Napster system, Napster had the right and ability to prevent its users from engaging in the infringing activity of uploading file names and downloading Napster users' music files through the Napster system.  By contrast, Google cannot stop any of the third-party websites from reproducing, displaying, and distributing unauthorized copies of Perfect 10's

23

> images because that infringing conduct takes place on the third-party websites. Google cannot terminate those third-party websites or block their ability to 'host and serve infringing full-size images' on the Internet.

*Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1174 (9th Cir. 2007) (citing *A&M Records v. Napster*, 239 F.3d 1004, 1011 (9th Cir. 2001) (emphasis added)).  Similar to an ISP like Verizon, or a search engine like Google, QE is a data center that does <u>not</u> operate within a closed system network. For example, QE cannot stop any of its VPN clients from engaging in certain activity (whether infringing or non-infringing), nor can it access or monitor those clients' activities. And contrary to the Plaintiffs' assertion that QE could have had *an indirect* effect on the infringing activity by terminating the accounts of any of its subscribers at any time (such as when a subscriber fails to actually pay for QE's services [D.E. 96, ¶285]), that argument is a red-herring and irrelevant for multiple reasons.

*First*, complete termination of a client's account due to non-payment, for example, is untethered to whether QE has the *ability* to control, supervise, access, or monitor its clients' end-user activity (infringing or otherwise).  QE does not, and the Plaintiffs cannot plead otherwise.

*Second*, to state a viable claim, the plaintiff must show that the defendant "has the 'practical ability to police the infringing activities of [third parties] as opposed to suggesting measures that are imprecise, overbroad or not workable."  *Venus Fashions*, 2017 U.S. Dist. LEXIS 155748, at *34 (M.D. Fla. Jan. 17, 2017) (internal citation omitted) (brackets in original). The notion that QE could and should have simply terminated its clients' accounts – when those clients have their *own* customers who are engaged in completely legal activity online, and would be affected – is an imprecise, overbroad, and unworkable proposition that *Venus Fashions* guards against.

*Third*, this type of argument was rejected in *Perfect 10, Inc. v. Visa Int'l*, 494 F.3d 788 (9th Cir. 2007), where the plaintiffs brought suit against Visa, Mastercard, and other "**data processing services**" (analogous to the service provided here by QE) for continuing "to process credit card payments to websites that infringe[d] Perfect 10's intellectual property rights after being notified by Perfect 10 of infringement by those websites."  *Id.* at 792.  The court noted that the plaintiff had "adequately pled that (1) infringement of Perfect 10's copyrights was occurring, (2) Defendants were aware of the infringement, and (3) on this basis, Defendants could have stopped processing credit card payments to the infringing websites." *Id.* at 803.  The court held, however, that these allegations were *still* insufficient "to establish vicarious liability because even with all reasonable inferences drawn in Perfect 10's favor, Perfect 10's allegations of fact cannot support a finding that Defendants have the right and ability to control the infringing activity." *Id.* In rejecting each of the plaintiff's arguments

attempting to save its vicarious liability claim, the court went on to hold that while the defendants could "take certain steps that may have the indirect effect of reducing infringing activity on the Internet at large," they still did not have "**any ability to directly control that activity, and the mere ability to withdraw a financial 'carrot' does not create the 'stick' of 'right and ability to control' that vicarious infringement requires**." *Id.* at 803 (emphasis added). In affirming the district court's decision, the Ninth Circuit found that the plaintiff's claim deficient because in order for "vicarious liability to attach," the defendants "must have the right and ability to *supervise* and *control* the infringement, not just affect it, and Defendants do not have this right or ability." *Id.*

The opinion from *Perfect 10* applies forcefully here, as the relevant inquiry is not whether QE "has the right and ability to control it[s] *system,* but rather, whether it has the right and ability to control the *infringing activity.* Under the facts and circumstances presented here, the two are not one and the same." *Io Grp. v. Veoh*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008) (emphasis in original). Thus, and even taking as true Plaintiffs' allegation that Quadranet could have terminated its clients' accounts at any time, the law requires that Quadranet had the practical ability to access and control the infringing activity. Quadranet does not, and the Plaintiffs cannot in good faith plead to the contrary.

Count IV should therefore be dismissed because the SAC fails to meet the second prong of a vicarious liability claim. The Plaintiffs cannot allege that Quadranet exercised any supervision and control over the infringing activity, or that Quadranet directly participated in the decisions, processes, or personnel responsible for the infringing activity.[26]

### 3. Plaintiffs' Remaining State Law Claims Should be Dismissed Under *Ingram.*

Under 11th Circuit precedent, "'state courts, not federal courts, should be the final arbiters of state law.'" *Ingram*, 167 F. App'x at 108 (internal citation omitted). "Where, as here, a court has dismissed all federal claims from a case, there is a very strong argument for dismissal" of state law

---

[26] *See Coach*, 916 F. Supp. 2d at 1282-83 (holding that "even if the Landlord Defendants' financial benefit was direct, rather than indirect, the allegations still do not support a claim for vicarious copyright infringement liability against them because they are not alleged to operate and manage the Flea Market, and therefore there are no factual allegations to support the supervise and control prong of the inquiry as to these Defendants."); *Pegasus v. Northrop*, 2008 U.S. Dist. LEXIS 99985, at *7 (M.D. Fla. Nov. 24, 2008) (where even though the plaintiff checked off the buzz words for a vicarious liability claim, the "Amended Complaint fail[ed] to include sufficient factual allegations of NGC's direct participation in the decisions, processes, or personnel directly responsible for the infringing activity," and also failed to plead how the defendant "authorized or assisted the alleged infringement"); *Luvdarts*, 710 F.3d at 1072 (dismissing claim because the plaintiff's "failure to allege that the Carriers have at least something like a capacity to supervise is fatal to a claim of vicarious liability").

claims. *Id.* Quadranet has demonstrated that Plaintiff's federal causes of action (Counts III and IV) should be dismissed under Fed. R. Civ. P. 12(b)(6). Because there are no remaining federal claims to adjudicate, this Court should dismiss Plaintiffs' state law claims (Counts VI through VIII) because "*Gibbs* strongly encourages or even requires dismissal of state claims." *Ingram*, 167 F. App'x at 108-09 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

### 4.  Plaintiffs' Claims for Negligence and Fraud Are Preempted.

Plaintiffs' state law claims for negligence (Count VI) and fraud (Count VII) should be dismissed under the doctrine of preemption. "Federal copyright law preempts state law claims 'that are equivalent to any of the exclusive rights within the general scope of [the Copyright Act].'" *Jouria v. CE Res., Inc.*, 2017 U.S. Dist. LEXIS 111698, at \*5-6 (S.D. Fla. July 12, 2017) (internal citation omitted). "The exclusive rights under the Copyright Act include the right to reproduce the copyrighted work, to prepare derivative works, and to distribute copies to the public. *See* 17 U.S.C. § 106. The Court applies the 'extra element' test to determine 'if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created [cause] of action," and if it does, "then the right does not lie within the general scope of copyright and there is no preemption." *Id.* Attempting to avoid preemption, Plaintiffs may respond that the *prima facie* elements of copyright infringement are different than those of a negligence or fraud claim, and thus preemption does not apply. "'However, the 'extra element test,' is not a rote comparison of the elements of the two claims. The 'extra element' of the state-law-claim **must change the nature of the claim**, so that it is '**qualitatively different from a copyright infringement claim.**'" *Id.* (emphasis added). Plaintiffs may argue that preemption does not apply because copyright infringement is a strict liability offense whereas (1) Plaintiffs' negligence claim is based upon Quadranet's awareness "its statement in the Whois records" was false; and (2) Plaintiffs' fraud claim is based upon Quadranet's intent in publishing allegedly false information in the Whois records. This too is immaterial though, since "awareness and intent are not considered to be qualitatively different elements substantial enough to serve as an 'extra element.'" *Id.*

In *Giddings v. Vision House Prod.*, 2007 U.S. Dist. LEXIS 58438 (D. Ariz. Aug. 3, 2007), the plaintiff asserted a claim for copyright infringement and other state law claims, including fraud. *Id.* at \*2. In response to the defendant's argument that the fraud claim was preempted, the plaintiff "argue[d] that the requirement of misrepresentation in fraud constitutes as an extra element that distinguishes the claim from the copyright infringement cause of action." *Id.* at \*7. The court disagreed, however, noting that "in order to survive preemption, **the misrepresentation must be**

*based on a core of allegations dissimilar from those on which the copyright infringement claim is based*." *Id.* at *8 (emphasis added).  The court then turned to the plaintiff's fraud claim, which was "rooted in Defendants' alleged misrepresentation of the artist's signature and of limited-edition prints. These two allegations are derived from Defendants' unauthorized reproduction and distribution of Plaintiff's artwork and, thus, are not, in actuality, different from the copyright claim. As such, the fraud claim is preempted by the copyright infringement cause of action." *Id.*

Here, Plaintiffs' fraud and negligence claims are not based on a core of allegations dissimilar from those on which Plaintiffs' copyright infringement claim is based.  To the contrary, and as shown below, Plaintiffs' vicarious infringement claim, fraud claim, and negligence claim are all premised upon three core characteristics: **(1)** Quadranet failed to update the Whois records; **(2)** subscribers are motivated to become QuadraNet's subscribers because they know that QuadraNet will not make them publish or display their IP/contact information in the Whois records; and **(3)** copyright owners such as Plaintiffs have been unable to promptly send notices to the appropriate party:

| Vicarious Infringement | Fraud | Negligence |
|---|---|---|
| ¶425.    QuadraNet's subscribers    are    also motivated    to    become subscribers of QuadraNet due to their knowledge of QuadraNet's policy of failing to update the ARIN Whois records so that copyright owners could not   send   notices   of infringements to them and thereby   pirate   Plaintiffs' Works   without   any consequence. | ¶¶466, 467, 469.  By failing to comply with its "agreement with ARIN to update the WHOIS records…QuadraNet benefits by its false statements in the Whois records. For example, VPN subscribers such as LiquidVPN seek to become QuadraNet's subscribers because they know the fact that QuadraNet allocated the IP addresses to them will not be publicly displayed in Whois records," and "Plaintiffs' agents have been unable to send notices to the appropriate party that could have and would have taken actions to stop further infringements of their Works. | ¶¶348, 454, 461.    Quadranet "fails   to   update   the   Whois records,"    "subscribers    are motivated    to    become subscribers of QuadraNet since they know that QuadraNet will not make them publish their own contact information in the Whois records," and "Plaintiffs' agents have been unable to promptly send notices to the appropriate party that could and would have taken actions to stop further infringements of their Works." |

Because Plaintiffs' fraud and negligence claim are both premised upon the same alleged misconduct that is identified in Plaintiffs' vicarious infringement claim, preemption applies.

### 5.    Plaintiffs' Negligence Claim (Count VI) Fails for Additional Reasons.

"The elements of a negligence action in Florida are: (1) a legal duty **owed by the defendant towards the plaintiff** under the circumstances; (2) a breach of that duty by the defendant; (3) the defendant's breach of duty was both the actual and proximate cause of the plaintiff's injuries; and (4) damages as a result of the breach." *Santana v. Miami-Dade*, No. 14-CIV-20840-BLOOM/Valle, 2015 U.S. Dist. LEXIS 54597, at *10 (S.D. Fla. Apr. 27, 2015) (emphasis added). To the extent that Plaintiffs' state law claims are not immediately dismissed pursuant to *Gibbs* and the doctrine of

preemption, two independent bases require the dismissal of Count VI for failure to state a claim.

> **a.** **Plaintiffs Fail to Plead a "Legal Duty" Owed by Quadranet to the Plaintiffs.**

"The principal issue in any negligence action is whether the injury resulted from defendant's violation of a legal duty owed to the plaintiff. Unless a legal duty has been breached, there can be no cause of action for negligence." *Rouzie v. Alterman*, 596 So. 2d 747, 748-49 (Fla. 3rd DCA 1992). "Florida law requires the existence of a legal duty on the part of the defendant[s] towards the plaintiff[s]," and the Plaintiffs in the instant action "have not alleged a legal duty owed to them because as a matter of law they cannot." *Johnson v. Bank of N.Y.*, 2011 U.S. Dist. LEXIS 21359, at *11 (N.D. Fla. Feb. 3, 2011). Aside from injecting the word "duty" into the SAC on only one occasion [D.E. 96, ¶460], Plaintiffs fail to ever mention or describe just how a data center could possibly have some sort of "legal duty" owed to the alleged copyright owner of a film.[27]

> **b.** **Plaintiffs Fail to Plead Negligence Based Upon a Third-Party Beneficiary Theory.**

Plaintiffs understand that there is no such legal duty owed at law, so instead try to manufacture one by invoking some sort of "third party beneficiary" theory.[28] "A party making a third-party beneficiary claim must allege: 1) the existence of a contract in which the claimant is not a party; 2) an intent by the contracting parties that the contract primarily and directly benefit the plaintiff; 3) a breach of that contract by one party; and 4) damages resulting from the breach." *Ure v. Oceania Cruises, Inc.*, 2014 U.S. Dist. LEXIS 154818, at *11 (S.D. Fla. Oct. 31, 2014).

The SAC alleges the existence of a contract to which the Plaintiffs are not a party, but similarly fails to allege an intent by the contracting parties – presumably Quadranet and ARIN – to "primarily and directly benefit the Plaintiffs." *Id.* Plaintiffs did not attach any contract between Quadranet and ARIN, which is problematic (if not fatal) to Plaintiffs' third-party beneficiary claim; indeed, the Court cannot discern whether a contract even exists, as required by *Oceania Cruises. See Walters v. Ocean*, 925 So. 2d 440, 443-44 (Fla. 5th DCA 2006) ("The failure to attach appropriate documents [to the

---

[27] *See* ¶460 of the SAC, where Plaintiffs allege in a conclusory fashion that "Quadranet had a duty to rightsowners including Plaintiffs to publish accurate information in the Whois records." This bald assertion will not do; "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Tabor v. McNesby*, 2007 U.S. Dist. LEXIS 110441, at *10 (N.D. Fla. June 6, 2007).

[28] *See* [D.E. 96] at ¶459, alleging "Rights owners such as Plaintiffs are third party beneficiaries of Quadranet's agreement with ARIN to properly update the Whois records so that they can promptly contact the responsible party to stop abuse."].

complaint] was problematic because '[a] complaint based on a written instrument does not state a cause of action until the instrument or an adequate portion thereof, is attached to or incorporated in the complaint.'") (internal citation omitted). Furthermore, the SAC fails to allege that the Plaintiffs were expressly referenced in the purported Quadranet-ARIN agreement (they obviously were not), or that the allegedly contracting parties clearly intended for Plaintiffs to be a third-party beneficiary. *Steadfast v. Corp. Prot.*, 554 F. Supp. 2d 1335, 1338 (S.D. Fla. 2008) ("If the contract does not expressly provide for the third-party beneficiary, however, the litigant must clearly show that both parties to the contract intended its beneficiary status."). Count VII should must be dismissed, and cannot be predicated upon the bogus status of "third-party beneficiaries."

### 6.    Plaintiffs' Fraud Claim (Count VII) Fails for Additional Reasons.

The SAC alleges no communication (orally or in writing) between Plaintiffs and Quadranet, but still asserts a baseless common law claim for fraudulent misrepresentations. "Because of litigants' proclivity to loosely sling the term 'fraud' into pleadings, the law requires that fraud be described with precision." *Thompson v. Bank of N.Y.*, 862 So. 2d 768, 770 (Fla. 4th DCA 2003). Plaintiffs' newly-added "fraud" claim fails to plead such claim with precision and must be dismissed for several reasons.

*First*, in order to be actionable, a fraud claim requires the defendant to have made a false statement of fact. *Cafaro v. Zois*, No. 15-CIV-80150-BLOOM/Valle, 2015 U.S. Dist. LEXIS 83302, at *37 (S.D. Fla. June 1, 2015). However, and no doubt recognizing that inaccurate statements may be, for example, inadvertent or based upon incomplete information, this Court has required that the false statement be "**known by the defendant to be false** at the time it was made." *Id.* (emphasis added). Count VII fails in this regard, as nowhere does the SAC allege that Quadranet made false misrepresentations in the Whois records, ***knowing them*** to be false at the time. It is non-sensical to suggest that Quadranet would intentionally misrepresent anything in publicly available Whois records. Fundamentally, Plaintiffs also misunderstand the Whois records and ARIN reporting. Those records, cited by Plaintiffs, are accurate within the framework of what is possible when reporting reassignments to ARIN. Even if it had some sort of legal obligation to do so (which it did not), Quadranet could not have listed "LiquidVPN" as an abuse contact with ARIN because that company is not registered with ARIN. *See supra* at p.6. Quadranet could not create a registration for LiquidVPN.

*Second*, a claim for fraud requires plaintiff to allege that the defendant's false statements were made intentionally "***for the purpose of inducing*** the plaintiff" to rely and act on them. *Cafaro v. Zois*, No. 15-CIV-80150-BLOOM/Valle, 2015 U.S. Dist. LEXIS 83302, at *37 (S.D. Fla. June 1, 2015) (emphasis added); *see also Tikiz Franchising, LLC v. Piddington*, No. 17-cv-60552 -BLOOM/Valle, 2017

U.S. Dist. LEXIS 221704, at *12 (S.D. Fla. July 31, 2017) (requiring the plaintiff to allege that the false representation was made "with intent that the representation would induce another to rely and act on it"). Count VII in the SAC fails in this regard, as well. To start, Plaintiffs do not allege that Quadranet made any statements "for the purpose of inducing" the Plaintiffs to do anything. Such allegation would be frivolous. And, as a technical matter, Whois records are publicly available to the world at-large; they hardly constitute some sort of "misrepresentation" made directly to the Plaintiffs, or made in order to "induce" Plaintiffs to take or not take certain actions.

*Third*, Plaintiffs' claim fails as a matter of law as to the "proximate cause," and because Plaintiffs' damages are too remote and speculative. A claim for fraud requires that the plaintiff suffered "injury suffered in justifiable reliance on the representation. Th[is] last element incorporates the requirement of proximate cause for tort claims." *Tikiz*, 2017 U.S. Dist. LEXIS 221704, at *12; *see also Barroso v. Respiratory Care*, 518 So. 2d 373, 376 (Fla. 5th DCA 1987) (requiring "reliance on the representation to the injury of the other party."). "Allegations of fraud may be too speculative even on a motion to dismiss, particularly when premised on distorted inferences and speculations." *City of Omaha v. CBS Corp.*, 2010 U.S. Dist. LEXIS 25497, at *15 (S.D.N.Y. Mar. 16, 2010); *Kubicek v. J. Walter*, 902 F.2d 33 (6th Cir. 1990) (affirming dismissal of fraud claim because the plaintiff's "damages also appear to be remote and speculative"). Here, the only damage Plaintiffs claim is that because Quadranet's Whois information was incorrect, "Plaintiffs' agents have been unable to send notices to the appropriate party that could have and would have taken actions to stop infringements of their Works. [D.E. 96, ¶469]. However, taking the Plaintiffs' allegations as true for purposes of the instant motion, it is undisputed that Quadranet made no misrepresentations *to the Plaintiffs. See Kassier v. Kipnis*, 571 So. 2d 54, 55 (Fla. 3rd DCA 1990) (dismissing claim because "Kipnis, without dispute, made no misrepresentations to the plaintiff to induce the plaintiff"). And there is no proximate cause between Quadranet's purported misrepresentation and Plaintiffs' alleged injury. The notion that Plaintiffs' agents might have been able to send notices to a different party, which may or may not have received those notices, and may or may not have acted to stop infringement, is too remote and speculative to support a fraud claim.[29]

### 7.    Count VIII for "Equitable Estoppel" Fails to State a Claim.

Count VIII should be dismissed because "equitable estoppel is not an independent cause of

---

[29] Even more puzzling is Plaintiffs' suggestion that WHOIS records precluded Plaintiffs from timely addressing the alleged infringement by directly contacting LiquidVPN, even though many of Plaintiffs' allegations highlight LiquidVPN's explicit advertisements that it does not respond to such notices.

action under Florida law." *B&G Opa v. City of Opa*, 2020 U.S. Dist. LEXIS 28209, at *6 (S.D. Fla. Feb. 18, 2020). In *Flagship*, the Third DCA similarly recognized that "equitable estoppel is not a cause of action, but an affirmative defense," and therefore, "as a matter of law, it is not a proper cause of action…" *Flagship v. Interval Int'l*, 28 So. 3d 915, 923 (Fla. 3rd DCA 2010).

*Even if* equitable estoppel was an offensive claim (which it is not), Plaintiffs still failed to satisfy the requisite *prima facie* elements. *Id.* (stating that "even if equitable estoppel were an offensive doctrine, Flagship failed to satisfy the first requisite element for estoppel."). First, the SAC fails to allege that Quadranet made a representation directly to the Plaintiffs regarding some material fact. *See Flagship*, 28 So. 3d at 923 (equitable estoppel requires "a representation by the party estopped **to the party claiming the estoppel** as to some material fact") (emphasis added). Simply publishing information on Whois to the world at large is hardly a "representation to the Plaintiffs." Additionally, this Court has recognized that equitable estoppel requires "**willfulness or negligence with regard to the acts or conduct**…." *Abromats v. Abromats*, No. 16-cv-60653-BLOOM/Valle, 2016 U.S. Dist. LEXIS 125614, at *16 (S.D. Fla. Sep. 14, 2016) (emphasis added). Nowhere in Paragraphs 471-483 of the SAC (or any of the incorporated allegations) do the Plaintiffs ever allege that Quadranet's representations in the Whois records of ARIN were somehow "willful" or "negligent." Finally, it is not enough for the claimant to parrot the "detrimental reliance buzz words," as Plaintiffs have done in the instant case. Rather, this Court has required a plaintiff to allege (and ultimately prove) "by clear and convincing evidence," that there was "a change in position detrimental to the party claiming estoppel based on the representation and reliance thereon." *Kruse v. Mass. Mut.*, No. 17-cv-61115-BLOOM, 2017 U.S. Dist. LEXIS 129249, at *6 (S.D. Fla. Aug. 14, 2017). The SAC fails to allege that Plaintiffs were going to take one course of action, but "changed their position in detrimental reliance" on Quadranet's purported "misrepresentations."

It appears Count VIII was added in "an effort by Plaintiff[s] to manufacture personal jurisdiction" over Quadranet in this case. *Maxwell Chase Techs., L.L.C. v. KMB Produce, Inc.*, 79 F. Supp. 2d 1364, 1372 (N.D. Ga. 1999). "Either personal jurisdiction existed or it did not" at the time when Quadranet was frivolously dragged into this lawsuit, and Plaintiffs cannot gain a favorable personal jurisdiction ruling through a flimsy "equitable estoppel" cause of action. *Revman Int'l, Inc. v. Sel Mfg. Co.*, 2019 U.S. Dist. LEXIS 234142, at *17 n.7 (D.S.C. Mar. 26, 2019). Indeed, "'Florida has long recognized that '[e]quitable estoppel is not designed to aid a litigant in gaining something, but only in preventing a loss.'" *Meyer v. Meyer*, 25 So. 3d 39, 43 (Fla. 2nd DCA 2009).

**C.      The SAC Should Be Dismissed for Lack Of Personal Jurisdiction.**

In an abundance of caution, Quadranet asserts its rights under Fed. R. Civ. P. 12(b)(2) and 12(b)(3) because this lawsuit should never have been filed in Florida.  "When a court lacks personal jurisdiction over a defendant, the court is obligated to dismiss the action."  *Alpha Tech. v. MLSNA*, 2013 U.S. Dist. LEXIS 167884, at *4 (M.D. Fla. Nov. 26, 2013).  When jurisdiction is challenged, "the plaintiff bears the ultimate burden of establishing that personal jurisdiction is present."  *Oldfield v. Pueblo*, 558 F.3d 1210, 1217 (11th Cir. Fla. 2009).  "To prevent dismissal, the plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a *prima Facie* case of jurisdiction.'"  *Kernel Records Oy v. Mosley*, 2010 U.S. Dist. LEXIS 69424, at *7 (S.D. Fla. July 5, 2010) (internal citation omitted).  "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'"  *United Technologies v. Mazer*, 556 F.3d 1210, 1274 (11th Cir. 2009) (internal citation omitted).  "In order to subject foreign defendants to jurisdiction in Florida, a two-prong test must be satisfied: (1) the defendants must have performed one or more of the acts specified in the Florida Long-Arm statute, Fla. Stat. § 48.193, *and* (2) the defendants must otherwise have sufficient 'minimum contacts' with Florida; that is, they must have purposefully availed themselves of the privilege of conducting business in the state (thereby invoking the benefits and protections of its laws), so that hailing them into a Florida court will not offend due process and traditional notions of fair play and substantial justice." *Yparrea v. Twin Cities*, 2010 U.S. Dist. LEXIS 58232, at *7-8 (N.D. Fla. May 17, 2010).

**1.      Exercising Jurisdiction Here Violates Florida's Long-Arm Statute.**

The first issue is whether the Quadranet entities "have performed one or more of the acts specified in the Florida Long-Arm statute, *Fla. Stat.* § 48.193." *Yparrea*, 2010 U.S. Dist. LEXIS 58232, at *7.  "A defendant may be subject to Florida's long-arm statute through specific jurisdiction and general jurisdiction.  Irrespective of the method, 'Florida's long-arm statute is to be strictly construed.'" *Brown v. Carnival*, 202 F. Supp. 3d 1332, 1343 (S.D. Fla. 2016).

**a.      Quadranet is Not Subject to General Jurisdiction in Florida.**

Plaintiffs concede that they have brought suit against non-resident defendants incorporated in California (QI) and Delaware (QE).  The question then is whether these Quadranet entities' "contacts with Florida fall within the 'exceptional case' provided for in *Daimler* such that this Court should find [that the Quadranet entities are] subject to general jurisdiction in Florida." *Brown*, 202 F. Supp. 3d 1332, 1344 (S.D. Fla. 2016). "Pursuant to Florida's general jurisdiction, a defendant may be haled into

a Florida court if it is 'engaged in substantial and not isolated activity within [the] state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.'"  *Neelu*, 2019 U.S. Dist. LEXIS 129454, at *27 (citing Fla. Stat. § 48.193(2)).  Other courts explain that the affiliations with the state must be "so 'continuous and systematic' as to render them essentially at home in the forum State.'"  *Id.* at *27 (citing *Goodyear Dunlop Tires v. Brown*, 564 U.S. 915, 919 (2011)).

As a preliminary matter, this Court need not delve into a general jurisdiction analysis, given that the Plaintiffs do not (and cannot) allege that either Quadranet entity is "at home" in Florida.  *See Mason*, 2021 U.S. Dist. LEXIS 81497, at *6 ("Here, the Court need not consider whether general jurisdiction exists; Mason does not allege that any of the Defendants can properly be considered 'at home' in Georgia").  Regardless, this Court has held that "**a nonresident corporation will be subject to general jurisdiction only in the 'exceptional case,'**" and this is most certainly not one of them. *Shipping & Transit*, 2016 U.S. Dist. LEXIS 130501, at *5 (emphasis added).  **QI** does not have any assets, nor is it an operating entity, and maintains no property or connection in Florida (see Ex. 1 at ¶¶5-8). *See Response Reward v. Meijer*, 189 F. Supp. 2d 1332, 1338 (M.D. Fla. 2002) (court lacked jurisdiction where defendant had "no stores, no employees, no offices, and no property in Florida," it did not "solicit or advertise in Florida," and it did not receive profit from residents of Florida).  **QE**'s contacts with Florida do not meet the "heavy burden of establishing such an exceptional case" that general jurisdiction should be found.  *Waite v. AII*, 901 F.3d 1307, 1317 (11th Cir. 2018). QE's satellite facility in Miami and any Florida-based customers do not render QE "at home" in this forum.  QE is neither registered on the Florida Division of Corporations nor does it have an agent to receive service of process in Florida. (Ex. 1, ¶10). QE's leadership is based in California, it is a California LLC, and QE directs its operations from that state. (Ex. 1, ¶10). *See Waite*, 901 F.3d at 1317; *see also Neelu*, 2019 U.S. Dist. LEXIS 129454, at *27 (finding that the defendant was not "at home" in Florida).

### b. Quadranet is Not Subject to Specific Jurisdiction in Florida.

Specific jurisdiction  hinges 'on an affiliation between the forum and the underlying controversy.'"  *Mason v. Sony Pictures*, 2021 U.S. Dist. LEXIS 81497, at *6 (N.D. Ga. Apr. 28, 2021) (citing *Goodyear*, 564 U.S. at 919).  With respect to *Fla. Stat.* § 48.193 (1)(a)(1), this Court has held that "**[t]he business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort.**"  *Neelu*, 2019 U.S. Dist. LEXIS 129454, at *34 (internal citation omitted) (emphasis added).  Here, Plaintiffs rest their entire jurisdictional argument on Quadranet's "facility in Miami, Florida for providing a data center, dedicated servers and colocation services."

[D.E. 24, ¶69]. This allegation is insufficient to establish personal jurisdiction, however, because "a fundamental element of the specific jurisdiction calculus is that plaintiff's claim must 'arise out of or relate to' at least one of defendant's contacts with the forum." *Oldfield v. Pueblo De Bahia*, 558 F.3d 1210, 1222 (11th Cir. 2009); *see also Interim Healthcare v. Interim Healthcare of Se. La.*, No. 19-cv-62412-BLOOM/Valle, 2020 U.S. Dist. LEXIS 101841, at *36 (S.D. Fla. June 10, 2020) ("Specific jurisdiction 'depends on an affiliatio[n] between the forum and the underlying controversy.'") (citation omitted).

    *Neelu* is instructive. There, this Court discussed the Eleventh Circuit's "but for" analysis in *Fraser*, where the plaintiff's estate brought suit against the manufacturer of a defective boat. *Fraser v. Smith*, 594 F.3d 842, 844 (11th Cir. 2010). Although the manufacturer maintained a website accessible in Florida, advertised in the Miami Herald, purchased boats in Florida; and sent its employees to Florida for a training course (*id.* at 844-45), the court found these "irrelevant because the plaintiffs had not viewed them; thus, those contacts or activities '[could not] reasonably be construed as but-for causes of the accident.'" *Neelu*, 2019 U.S. Dist. LEXIS 129454, at *36-37. Similarly here, and because QI does not have any physical presence (including servers) in Florida (Ex. 1, ¶8), the issue is not whether *QE* has servers in Miami, Florida, but rather whether the alleged misconduct by LiquidVPN was *transmitted through* any of QE's servers in Miami (such that QE could allegedly be liable for contributory or vicarious infringement). Put differently, if LiquidVPN did not lease any servers in Florida, then any of QE's Miami-based activities cannot be construed as the "but for" cause of the alleged infringement. As shown in the accompanying declaration, LiquidVPN did not lease any of QE's servers in Miami. (Ex. 1, ¶11-13) (explaining servers in Los Angeles, Dallas, and New Jersey during relevant period). **Because LiquidVPN did not lease any of QE's servers in Florida, QE's business activities in Miami have no connection with the alleged tort**. In light of Quadranet's supporting declaration, Plaintiffs have not alleged, and could never allege, a nexus between the asserted copyright infringement and QE's Florida-based business activities, which renders the SAC subject to dismissal. *See Brown*, 202 F. Supp. 3d at 1343.

    For similar reasons, Plaintiffs cannot sufficiently allege that Quadranet is subject to personal jurisdiction under *Fla. Stat.* § 48.193 (1)(a)(2), which requires Quadranet to have committed "a tortious act within the state." *Id.* The Eleventh Circuit has expressly held that "for personal jurisdiction to attach under the 'tortious activity' provision of the Florida long-arm statute, the plaintiff must demonstrate that the non-resident defendant **committed a substantial aspect of the alleged tort in Florida by establishing that the activities in Florida were essential to the success of the tort**." *Cable/Home Commun. Corp. v. Network Prods.*, 902 F.2d 829, 857 (11th Cir. 1990) (internal citation

omitted) (emphasis added).

In sum, LiquidVPN did not lease any server space from QI (which has no servers), and did not lease any server space from QE within the state of Florida. (Ex. 1, ¶13). As a result, Plaintiffs have not alleged (nor could they ever allege in an amended pleading) that: **(a)** Quadranet committed any aspect of the alleged contributory or vicarious copyright infringement in Florida; or **(b)** Quadranet's purported activities in Florida were essential to the completion of the alleged infringement. Accordingly, Florida's long-arm statue does not reach Quadranet, and the SAC should be dismissed under Rule 12(b)(2). *See Mason*, 2021 U.S. Dist. LEXIS 81497, at *9.

### 2.     Exercising Personal Jurisdiction Would Violate Due Process.

Exercising jurisdiction would also violate due process since Quadranet does not have "sufficient minimum contacts [ ] to satisfy the Due Process Clause of the Fourteenth Amendment," and because maintenance of the suit would "offend 'traditional notions of fair play and substantial justice.'" *Exhibit Icons, LLC v. XP Cos., LLC*, 609 F. Supp. 2d 1282, 1292 (S.D. Fla. 2009).

QI has no contacts with this state, the underlying claims are completely unrelated to QE's contacts with Florida, and do not "arise out of" QE's forum-related activities. (Ex. 1, ¶13). *See Zamora Radio, LLC v. Last.fm Ltd*, 2011 U.S. Dist. LEXIS 69101, at *32 (S.D. Fla. June 28, 2011). The allegations against Quadranet fail to meet the third criteria under the due process analysis, which requires that Quadranet's "acts or consequences caused by those acts must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction over [Quadranet] reasonable." *Kernel Records*, 2010 U.S. Dist. LEXIS 69424, at *31. "Minimum requirements of 'fair play and substantial justice' may defeat the reasonableness of asserting personal jurisdiction even if the defendant has purposefully engaged in forum activities." *Id.* at *38.

For example, it would be unduly burdensome for the Quadranet entities – a California company and a Delaware company – to litigate in Florida, especially given the limited contacts with this forum. (Ex. 1, ¶9, 15). *See Roblor Mktg. v. Gps Indus., Inc.*, 645 F. Supp. 2d at 1143, 1156 (S.D. Fla. 2009) ("Considering the very few contacts [defendant] has with Florida, the State of Florida's interest in the issue is limited."). Florida has zero interest in adjudicating this dispute, **since none of the Plaintiffs are based in this state**. *See Kernel Records Oy*, 2010 U.S. Dist. LEXIS 69424, at *38 ("considering the very few contacts Nelstar has with Florida, the State of Florida's interest in the issue is limited."). Finally, the Plaintiffs' interest in obtaining convenient and effective relief actually favors any dispute being litigated in California (as opposed to Florida), since **twenty-eight (28) of the Plaintiffs are located in states having district courts within the Ninth Circuit Court of Appeals**

(*e.g.* California, Nevada, and Wyoming).  Because exercising personal jurisdiction over the Quadranet entities would not comport with fair play and substantial justice, this Court should dismiss the SAC.

**D.      The SAC Should Be Dismissed for Improper Venue.**

"When a defendant objects to venue under Rule 12(b)(3), the plaintiff bears the burden of showing that the venue selected is proper." *Interim Healthcare*, U.S. Dist. LEXIS 101841, at *20. "Pursuant to § 1391(b), venue is proper in: (1) a judicial district in which any defendant resides, if all defendants are residents of the state in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *Id.* (internal citations omitted). "[T]he Eleventh Circuit has stated that 'only the events that directly give rise to a claim are relevant' and that 'of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered.'" *TMJ Practice v. Curran*, 2017 U.S. Dist. LEXIS 114557, at *11 (S.D. Fla. July 23, 2017) (internal citation omitted). The court must focus on the "'relevant activities of the defendant, not the plaintiff' to ensure a defendant is not haled into a remote district having no real relationship to the dispute." *Interim*, No. 19-cv-62412-BLOOM/Valle, 2020 U.S. Dist. LEXIS 101841, at *43 (S.D. Fla. June 10, 2020).

Here, and as demonstrated above, neither Quadranet entity is "at home" in the Southern District of Florida, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims did ***not*** occur within this judicial district; in fact, as the accompanying declaration makes clear, ***none*** of the events took place in the Southern District of Florida, since LiquidVPN did not lease any servers from QE in this state.  In this regard, courts have cautioned that due consideration should be given to the words "substantial part," and for that reason as well, dismissal is appropriate.[30]

WHEREFORE, based upon the foregoing arguments and legal authorities, Quadranet respectfully requests that the Court enter an order dismissing the SAC with prejudice pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 8 and 10, Fed. R. Civ. P. 12(b)(2), and Fed. R. Civ. P. 12(b)(3).

---

[30] *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) ("We caution district courts to take seriously the adjective 'substantial'…[which] means for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere.").

Respectfully submitted,

Dated:  August 31, 2021

<u>Jonathan Woodard</u>
John Cyril Malloy, III
Florida Bar No. 964,220
jcmalloy@malloylaw.com
Peter A. Matos
Florida Bar No. 992,879
pmatos@malloylaw.com
Oliver Alan Ruiz
Florida Bar No. 524,786
oruiz@malloylaw.com
Jonathan R. Woodard
Florida Bar No. 096,553
jwoodard@malloylaw.com
**MALLOY & MALLOY P.L.**
2800 S.W. Third Avenue
Miami, Florida 33129
Telephone (305) 858-8000

*Of Counsel:*
Bobby Ghajar (*pro hac vice*)
bghajar@cooley.com
**COOLEY LLP**
1333 2nd Street, Suite 400
Santa Monica, CA 90401
Tel: 310-883-6400