**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
CASE NO.: 21-cv-20862-BLOOM/Otazo-Reyes

MILLENNIUM FUNDING, INC. *et. al*,

     Plaintiffs,

v.

1701 MANAGEMENT LLC d/b/a LIQUIDPVN, *et. al*,

     Defendants.

_____/

**QUADRANET, INC.'S AND QUADRANET ENTERPRISES, LLC'S**
**REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE**
**<u>PLAINTIFFS' SECOND AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................................1

I.  THE SAC IS AN IMPERMISSIBLE SHOTGUN PLEADING, AND MUST BE
    DISMISSED. ..........................................................................................................................2

II. COUNTS III, IV, AND VI-VIII FAIL TO STATE A CLAIM AGAINST
    QUADRANET. ......................................................................................................................3

    A.  Count III Fails to State a Claim Against Quadranet for Contributory
        Infringement. ............................................................................................................3

        1.  Quadranet's Services are Used for Substantial Non-Infringing Uses. ...........4

        2.  There is No Allegation That Quadranet Acted with Culpable Intent. ............5

        3.  Quadranet Did Not Materially Contribute to the Alleged
            Infringement. ................................................................................................7

        4.  The Obligations that Plaintiffs Would Impose on Quadranet Are Not
            Required by Law. ..........................................................................................7

    B.  Plaintiffs' Vicarious Infringement Claim Should Be Dismissed. ...................................9

        1.  Quadranet Did Not Profit *Directly* from the Alleged Infringing
            Activity. .......................................................................................................9

        2.  Quadranet Lacked the Ability to Control and Stop the Infringing
            Activity. .................................................................................................... 10

    C.  Plaintiffs' State Law Claims for Negligence and Fraud Are Preempted. .................... 11

    D.  Plaintiffs' Negligence, Fraud, and Estoppel Claims Fail for Other Reasons. ........... 12

III. DISMISSAL IS WARRANTED FOR LACK OF PERSONAL JURISDICTION
     AND IMPROPER VENUE. ................................................................................................. 14

    A.  Exercising Personal Jurisdiction Violates Florida's Long-Arm Statute. .................... 14

    B.  The SAC Should be Dismissed as Violative of Due Process and for
        Improper Venue. ..................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Records v. Napster, Inc.,*
    239 F.3d 1004 (9th Cir. 2001) ................................................................................................. 10

*ABC, Inc. v. Aereo, Inc.,*
    573 U.S. 431 (2014) .................................................................................................................... 8

*Abromats v. Abromats,*
    No. 16-cv-60653-BLOOM/Valle, 2016 U.S. Dist. LEXIS 125614 (S.D. Fla. Sep. 14, 2016) ....... 14

*ALS Scan v. Steadfast,*
    819 Fed. App'x 522 (9th Cir. 2020) ........................................................................................ 7, 8

*Apex v. United Healthcare,*
    2020 U.S. Dist. LEXIS 120460 (S.D. Fla. July 6, 2020) ........................................................... 3

*B&G Opa v. City of Opa,*
    2020 U.S. Dist. LEXIS 28209 (S.D. Fla. Feb. 18, 2020) ........................................................ 13

*Balthazar v. Beale St.,*
    No. 17-cv-81214-BLOOM/Valle, 2018 U.S. Dist. LEXIS 228665 (S.D. Fla. Oct. 16, 2018) ...... 13

*Bellairs v. Mohrmann,*
    716 So. 2d 320 (Fla. 2nd DCA 1998) .................................................................................. 15, 16

*BMG Rights v. Cox,*
    199 F. Supp. 3d 958 (E.D. Va. 2016) ................................................................................... 4, 6

*Broward Marine v. S/V Zeus,*
    2010 U.S. Dist. LEXIS 8077 (S.D. Fla. Feb. 1, 2010) ............................................................. 15

*Brown v. Carnival,*
    202 F. Supp. 3d 1332 (S.D. Fla. 2016) ................................................................................... 14

*Cafaro v. Zois,*
    No. 15-CIV-80150-BLOOM/Valle, 2015 U.S. Dist. LEXIS 83302 (S.D. Fla. June 1, 2015) ....... 13

*Ellison v. Robertson,*
    357 F.3d 1072 (9th Cir. 2004) ................................................................................................... 9

*Erickson v. Merck,*
    2018 U.S. Dist. LEXIS 186190 (M.D. Fla. May 17, 2018) ........................................................ 3

*Flagship v. Interval Int'l,*
    28 So. 3d 915 (Fla. 3rd DCA 2010) .................................................................................... 13, 14

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Floridians for Solar Choice v. PCI Consultants,*
  2020 U.S. Dist. LEXIS 117964 (S.D. Fla. July 2, 2020) .................................................................15

*Giddings v. Vision,*
  2007 U.S. Dist. LEXIS 58438 (D. Ariz. Aug. 3, 2007) ............................................................. 11, 12

*Green v. First Am.,*
  2018 U.S. Dist. LEXIS 229509 (M.D. Fla. May 10, 2018) ............................................................1, 2

*Hydentra v. Luchian,*
  2016 U.S. Dist. LEXIS 193457 (S.D. Fla. June 2, 2016) ........................................................ 4, 5, 11

*ILC Dover v. Floodbarrier, Inc.,*
  No-20-21350 (S.D. Fla. June 1, 2020) .............................................................................................2

*Ingenuity v. Doe,*
  2013 U.S. Dist. LEXIS 16952 (N.D. Cal. Feb. 7, 2013) ...................................................................7

*Ingram v. Sch. Bd.,*
  167 F. App'x 107 (11th Cir. 2006) ................................................................................................11

*Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc.,* No. 19-cv-62412-BLOOM/Valle, 2020 U.S.
  Dist. LEXIS 101841 (S.D. Fla. June 10, 2020) ...............................................................................15

*Io Grp. v. Veoh,*
  586 F. Supp. 2d 1132 (N.D. Cal. 2008).............................................................................................9

*Klein & Heuchan v. CoStar Realty,*
  707 F. Supp. 2d 1287 (M.D. Fla. 2010) .........................................................................................10

*Louis Vuitton v. Akanoc,*
  658 F.3d 936 (9th Cir. 2011)............................................................................................................8

*Merch. One v. TLO,*
  No. 19-cv-23719-BLOOM, 2020 U.S. Dist. LEXIS 7462 (S.D. Fla. Jan. 16, 2020) ....................2, 3

*Neelu Aviation v. Boca Aircraft, LLC,*
  No. 18-cv-81445-BLOOM, 2019 U.S. Dist. LEXIS 129454 (S.D. Fla. Aug. 2, 2019) ........... 14, 15

*Newton v. Florida,*
  895 F.3d 1270 (11th Cir. 2018) ........................................................................................................3

*Oldfield v. Pueblo De Bahia,*
  558 F.3d 1210 (11th Cir. 2009) ......................................................................................................15

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Paoli*,
    1992 U.S. Dist. LEXIS 18428, 1992 WL 323589 (E.D. Pa. Oct. 21, 1992) .....................................11

*Perfect 10 v. Amazon.com*,
    508 F.3d 1146 (9th Cir. 2007) ..........................................................................................6, 11

*Perfect 10 v. Visa Int'l*,
    494 F.3d 788 (9th Cir. 2007)...........................................................................................9

*Rothis v. M & I Marshall & Isley Bank*,
    2010 U.S. Dist. LEXIS 109074 (M.D. Fla. 2010).................................................................13

*Santana v. Miami-Dade*,
    No. 14-CIV-20840-BLOOM/Valle, 2015 U.S. Dist. LEXIS 54597 (S.D. Fla. Apr. 27, 2015) .....12

*Sompo Japan v. CSX Transp.*,
    2020 U.S. Dist. LEXIS 227025 (M.D. Fla. Dec. 3, 2020) ........................................................3

*Spanski v. Telewizja*,
    883 F.3d 904 (D.C. Cir. 2018) ..........................................................................................8

*Sullivan v. Jones*,
    2015 U.S. Dist. LEXIS 105211 (N.D. Fla. June 15, 2015)......................................................1

*UMG Recordings, Inc. v. RCN Telecom Servs.*,
    2020 U.S. Dist. LEXIS 158269 (D.N.J. Aug. 31, 2020) ......................................................5, 6

*UMG Recordings v. Bright House*,
    2020 U.S. Dist. LEXIS 122774 (M.D. Fla. July 8, 2020) .....................................................10

*UMG Recordings, v. Grande Communs.*,
    384 F. Supp. 3d 743 (W.D. Tex. 2019) ..........................................................................4, 10

*UPPI, LLC v. Jubilant*,
    2020 U.S. Dist. LEXIS 172590 (S.D. Ala. Sep. 18, 2020) ...................................................14

*Venus Fashions v. ContextLogic, Inc.*,
    2017 U.S. Dist. LEXIS 155748 (M.D. Fla. Jan. 17, 2017)..................................................9, 11

*Weinberg v. Advanced Data Processing, Inc.*,
    147 F. Supp. 3d 1359 (S.D. Fla. 2015) ..........................................................................12, 13

*Yeyille v. Sch. Bd.*,
    2015 U.S. Dist. LEXIS 185057 (S.D. Fla. June 15, 2015) ......................................................2

## TABLE OF AUTHORITIES
(continued)

<strong>Page(s)</strong>

*Zagorsky v. Rhino Entm't,*
    2019 U.S. Dist. LEXIS 153083 (D. Ariz. Sep. 9, 2019)..........................................................10

**Statutes**

Copyright Act ..................................................................................................................................11

*Fla. Stat.*
    § 48.193 (1)(a)(1)............................................................................................................14
    § 48.193(1)(a)(2)............................................................................................................15

## <u>PRELIMINARY STATEMENT</u>

In cases across the country, many of the same Plaintiffs, represented by the same counsel, are taking the extraordinary position that VPN companies – which serve an important and legitimate purpose – should be held liable for the conduct of their customers, even though those VPN companies do not control or host any of the allegedly infringing content.   In *this* case, Plaintiffs take an even bigger leap, seeking to hold liable Quadranet – a company one further step removed from the alleged infringement by "John Does," and whose function is to provide hardware and server infrastructure – merely because it provided services to certain VPN companies.  **Quadranet is unaware of any case – and Plaintiffs cite none – in which a company was secondarily liable for copyright infringement when its product or service did not host the infringing material; when it had no direct relationship with the infringer; or when that company could not view that material on its servers.**

Quadranet's motion [D.E. 108] set out the legal framework through which contributory and vicarious copyright infringement must be analyzed, including citation to numerous instructive cases. Plaintiffs' Opposition [D.E. 117] ("Response") fails to refute those legal authorities or the facts demonstrating that Quadranet had no involvement in any of the direct infringement by the "John Doe" defendants, or the alleged vicarious infringement by any VPN companies.  Following the adage, "if you haven't got the law on your side, argue the facts and if the facts are not on your side, argue the law and *if the facts and the law are both against you, just argue,*"[1] that is exactly what Plaintiffs have done here. Stripped of its rhetoric and various irrelevant arguments (including arguments relating to supposed "WHOIS reporting requirements" and "ARIN records" – a new theory, ungrounded in any precedent, which appeared only in the Second Amended Complaint ("SAC") – the Response confirms that the Court should dismiss this case for three reasons.

**First**, Quadranet demonstrated that the complaint [D.E. 1] was an impermissible shotgun pleading, as was the First Amended Complaint [D.E. 24]. Plaintiffs consciously chose not to rectify this deficient pleading issue in the SAC, which constitutes an impermissible shotgun pleading as well. The Response's attempts to avoid this defect are unavailing, and the SAC must be dismissed.

**Second,** as to Counts III and IV, the law holds that a company like Quadranet (which merely leases servers and provides electricity to its equipment) cannot be held liable for "contributory" or "vicarious" infringement, especially as to an individual with whom it has no relationship (*i.e.* one of the VPN companies' users).  New Counts VI-VIII should be dismissed because Plaintiffs have not

---

[1] *Sullivan v. Jones*, 2015 U.S. Dist. LEXIS 105211, at *108 (N.D. Fla. June 15, 2015).

alleged the *prima facie* elements of negligence, fraud, or equitable estoppel. Whatever relief Plaintiffs seek in this case, it cannot come from Quadranet.

**Finally**, even assuming Plaintiffs' claims were viable – which they are not – they should *still* be dismissed because the Court lacks personal jurisdiction over Quadranet, and also because venue in the Southern District of Florida is improper. The Court is urged to stop Plaintiffs' attempt to turn copyright law on its head, setting dangerous precedent, and from harassing companies like Quadranet.

## MEMORANDUM OF LAW

### I.      The SAC is An Impermissible Shotgun Pleading, and Must be Dismissed.

Quadranet's Motion identified how the SAC is the "third type of shotgun pleading" because it "commits the sin of not separating into a different count each cause of action or claim for relief." *Merch. One v. TLO*, 2020 U.S. Dist. LEXIS 7462, at *7 (S.D. Fla. Jan. 16, 2020). Quadranet explained that a complaint cannot "reincorporate and reallege preceding counts into subsequent counts, as this is a fatal flaw." *Yeyille v. Sch. Bd.*, 2015 U.S. Dist. LEXIS 185057, at *5 (S.D. Fla. June 15, 2015). Plaintiffs avoid *Yeyille* and do not dispute that their seventh claim not only "incorporates paragraphs 17-55 and 328-349," but that it also improperly incorporates all of the allegations within the "sixth claim" as well, namely "paragraphs 450-462." [D.E. 117, p. 22].[2] There were more paragraphs incorporated by reference, but ignored by the Response: ¶¶61-69. The shotgun pleading has forced Quadranet to guess which allegations apply to a cause of action, and how (or why) Plaintiffs' claim for fraud could possibly include all of the allegations in Plaintiffs' claim for negligence, as well. *See Green v. First Am.*, 2018 U.S. Dist. LEXIS 229509, at *5 (M.D. Fla. May 10, 2018) ("It is wholly unclear, for example, why Plaintiffs' claim of fraud includes all of the allegations contained in their claim for negligence. The only thing that is clear is that the Complaint is a deficient shotgun pleading.").[3]

Quadranet also explained that the SAC commits the "fourth type" of sin as it relates to shotgun pleadings, because it "assert[s] multiple claims against multiple defendants [Quadranet, Inc. and Quadranet Enterprises, LLC] without specifying which of the defendants are responsible for which

---

[2] Citations to page numbers in docket entries reflect those page numbers at the top of the page.

[3] Quadranet's Motion also pointed out that Counts X through XII of the SAC similarly failed to separate into a different count each cause of action, and improperly reincorporated by reference all of the allegations in preceding counts. [D.E. 108, p. 19]. Plaintiffs' only excuse for this shotgun pleading violation is that Counts X through XII were not asserted against Quadranet. That is irrelevant though, and has no impact on the Court's obligation to *sua sponte* dismiss shotgun pleadings that are expressly condemned by the 11th Circuit. *See ILC Dover v. Floodbarrier, Inc.*, No-20-21350 (S.D. Fla. June 1, 2020) (dismissing the complaint *sua sponte* as an impermissible shotgun pleading) (**Exhibit 1**).

acts or omissions...." *Merch. One*, 2020 U.S. Dist. LEXIS 7462, at *7-8. The Response does not dispute that in nearly every single allegation in the SAC, Plaintiffs repeatedly refer to "Quadranet" alone, without ever identifying *which* entity [QI or QE] is responsible for which act or omission. [D.E. 96, ¶¶400-402, 419-428, 451-462, 464-470]. In their Response, Plaintiffs reach *outside* of the pleadings (e.g. D.E. 117, p. 23 (citing new Exhibits 1 and 2)) to suggest that because a third party website allegedly shows that a "96 block" of an IP address was assigned to "Quadranet-Mia" and that Quadranet asserts that the "96.47 block" is operated by Quadranet Enterprises LLC (QE), this resolves the shotgun pleading issue. *Id.* This confusing explanation hardly rectifies the deficiency. Elsewhere, as anticipated, Plaintiffs' fallback was to argue that QI and QE are somehow "alter egos" of one another. The problem with this theory, however, is that the SAC "does not contain enough allegations to support a request to pierce the corporate veil of each of these [Quadranet] entities" under a supposed alter ego theory. *Apex v. United Healthcare*, 2020 U.S. Dist. LEXIS 120460, at *15 (S.D. Fla. July 6, 2020). The Response's retort is that QI and QE have the same "address of principal place of operations," and "have the same CEO" [D.E. 96, ¶¶64-65], but that is insufficient to establish alter ego liability such that QI and QE should be improperly lumped together.[4] *Erickson v. Merck*, 2018 U.S. Dist. LEXIS 186190, at *18 (M.D. Fla. May 17, 2018).

Especially with Quadranet's pre-filing admonition, Plaintiffs have had ample opportunity – now three "bites" – to draft a pleading that conforms with 11th Circuit authority. [D.E. 108, p. 19]. Any suggestion that Plaintiffs be allowed leave to amend [e.g., D.E. 117, p. 42] should be denied.[5]

## II.   Counts III, IV, and VI-VIII Fail to State a Claim Against Quadranet.

### A.  Count III Fails to State a Claim Against Quadranet for Contributory Infringement.

It is critical not to lose sight of Quadranet's supposed involvement in the purported piracy of Plaintiffs' films by various individuals that are using the BitTorrent software to share movies. Those individuals – whose identities are unknown to Quadranet and have no relationship with it – are using their *own* computers or other servers as hosts, and using their *own* internet connection to access other BitTorrent users' computers. Like millions of other users (including leading law firms), it is alleged

---

[4] *See Sompo Japan v. CSX Transp.*, 2020 U.S. Dist. LEXIS 227025, at *21-22 (M.D. Fla. Dec. 3, 2020) (sharing same place of business, website, and "some overlap of governing officers is insufficient to pierce the corporate veil," and finding that the complaint "include[d] no allegations that SIRS or SSC engaged in improper conduct in the formation or use of their separate corporate entities.").

[5] *Newton v. Florida*, 895 F.3d 1270, 1277 (11th Cir. 2018) ("[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly," and thus a "request made in opposing the motion to dismiss the DCC claim is irrelevant.").

that those individuals used a VPN service.  And here, two VPN companies (which put their *own software* on Quadranet's servers) happened to be customers of Quadranet during certain periods of alleged infringement.  Against this factual backdrop, there is an insufficient nexus between Quadranet and the specific acts of infringement.  And under applicable legal authority, Quadranet cannot, as a matter of law, be contributorily *or* vicariously liable.

### 1.     Quadranet's Services are Used for Substantial Non-Infringing Uses.

A party cannot be contributorily liable if its product is capable of substantial non-infringing uses. [D.E. at 108, at 22].  There is no dispute that Quadranet's services have substantial non-infringing uses, so Plaintiffs ignore *Hydentra* and other authorities in the Motion [*id.* at 23], and rely on a non-11[th] Circuit case with very different facts.  In *BMG v. Cox*, the court held that "providing a product with 'substantial non-infringing uses *can* constitute a material contribution to copyright infringement;" however, "what matters is not simply whether the product has some or even many non-infringing uses, but whether the product is distributed with the *intent* to cause copyright infringement."  *BMG,* 881 F.3d 293, 306 (4th Cir. 2018) (emphasis in original). *BMG* provides no support for Plaintiffs' position: the SAC does not and cannot allege that Quadranet's services (servers and internet access, electricity, cooling, and technical support, which Quadranet has provided to a host of customers long before the alleged infringement) were distributed "with the intent to cause infringement."

Plaintiffs also rely on *Grande Communs.*, which recognized "two categories of contributory liability: 'actively encouraging (or inducing) infringement through specific acts . . . or . . . distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' non-infringing uses."  *UMG Recordings, v. Grande Communs.*, 384 F. Supp. 3d 743, 766 (W.D. Tex. 2019) (citations omitted).  In that case, it was "beyond dispute that the provision of internet services to customers is capable of substantial and commercially significant non-infringing uses," and therefore the court recognized that "[c]ontributory liability against Grande must therefore be predicated on 'actively encouraging (or inducing) infringement through specific acts.'"  *Id.*  In the instant case, however, Count III against Quadranet is ***not*** predicated upon "encouraging or inducing infringement," and therefore must be based upon the notion that Quadranet distributes a product that "is not capable of 'substantial' or 'commercially significant' non infringing uses."  *Id.*  The SAC likewise fails in this regard, as Quadranet's services are indisputably capable of non-infringing uses, and indeed are overwhelmingly used by customers for non-infringing uses. [DE 108-1, ¶24-27].

Plaintiffs' citation to *RCN Telecom* is similarly unavailing because that court recognized that an "ISP's failure to take remedial action against repeat copyright infringers is tantamount to encouraging

infringement." *UMG Recordings, Inc. v. RCN Telecom Servs.*, 2020 U.S. Dist. LEXIS 158269, at \*21-22 (D.N.J. Aug. 31, 2020). There, the defendant-ISP's subscribers (*i.e.* their direct customers) "utilize[d] RCN's service to download infringing music files using BitTorrent protocols," and those subscribers allegedly "download[ed] and distribute[d] Plaintiffs' copyrighted works illegally through RCN's service." *Id.* Here, the SAC fails to allege that Quadranet "encouraged infringement," and critically, **also fails to allege that any of Quadranet's subscribers/clients downloaded any of the Plaintiffs' alleged works.** Again, it is QE's VPN clients' customers (*i.e.* the "Doe" defendants who are ***not*** Quadranet's customers) that are alleged to have directly pirated the Plaintiffs' works. This stark contrast makes any reliance on *RCN Telecom* unavailing.

As explained in the Motion, the Southern District of Florida's analysis in *Hydentra* is instructive. There, the court dismissed contributory infringement claims because the defendants' websites were "capable of substantial non-infringing uses, notwithstanding that copyrighted material is, at times, located on their Websites." *Hydentra v. Luchian*, 2016 U.S. Dist. LEXIS 193457, at \*39-40 (S.D. Fla. June 2, 2016). Plaintiffs try to avoid *Hydentra* by asserting that it is "unpublished" [D.E. 117, p. 27], but ignoring the fact that *Hydrenta* has been cited by other courts on five (5) occasions. They also argue that *Hydentra* is inapplicable because the defendant in that case "claim[ed] that it never received these takedown notices and was unaware of the allegedly infringing files until this lawsuit." [DE 117, p. 27]. This point was immaterial though, as the *Hydentra* court recognized that "this question of fact" was irrelevant to the governing analysis; instead, the court found that "Plaintiff can only succeed on its contributory infringement claim if Plaintiff establishes that the [defendants'] Websites in question are **not** capable of 'substantial non-infringing uses.'" *Hydentra*, 2016 U.S. Dist. LEXIS 193457 at \*37 (emphasis added). As in *Hydentra,* the Court should dismiss Count III for the same reason.

### 2. There is No Allegation That Quadranet Acted with Culpable Intent.

The Response does not dispute that the SAC fails to allege such culpable intent, but instead argues "that intent may be imputed." [D.E. 117, p. 28]. In support, Plaintiffs cite to *Perfect 10*, but in that case, the court stated: "[W]e hold that ***a computer system operator*** [Google] can be held contributorily liable if it 'has *actual* knowledge that *specific* infringing material is available using its system,' and can 'take simple measures to prevent further damage' to copyrighted works, yet continues to provide access to infringing works." *Perfect 10 v. Amazon.com*, 508 F.3d 1146, 1172 (9th Cir. 2007) (emphasis added). *Perfect 10* does not support Plaintiffs because its holding was, by its clear terms, limited to "computer system operators," which QI or QE are not. Try as they might to misplace Quadranet into a position of being "one step closer" to the core infringement, Quadranet is not alleged

to have provided, and did not provide, "access to infringing works" because Quadranet does not operate the "Popcorn Time" BitTorrent software used by the alleged infringers to distribute copyrighted works, nor does it operate the VPN software that the infringers use. [DE 108, ¶23].

The Response turns to other out of circuit cases to argue that – if a party sends "notices" – that is sufficient to "establish[ ] the requisite knowledge and thus intent for contributory infringement." [D.E. 117, p. 29]. Those cases are non-binding and distinguishable. In *BMG*, the court noted that the plaintiff's "claim goes beyond design choice or the mere provision of a service," and that "unlike in *Sony*, [defendant] Cox **maintains an ongoing relationship with users of its service**. An ongoing relationship between a defendant and direct infringers presents a potential for culpability quite beyond distribution or design." *BMG Rights v. Cox*, 199 F. Supp. 3d 958, 976 (E.D. Va. 2016). Unlike the defendant in *BMG*, Quadranet's subscribers are not the direct infringers of Plaintiffs' alleged works, and Quadranet does not have any relationship with any of the "Doe" defendants that are purportedly directly infringing the Plaintiffs' copyrights. QE does not access, manage, control, or direct any of its VPN clients' content, and QE's services and support relevant here are servers, maintaining the power, the cooling of the facility, and allowing access to the internet. [DE 108, ¶23].[6]

Finally, the Response ignores Quadranet's explanation [D.E. 108, at 25] of the nature of VPN services, namely, that the VPN companies obscure and encrypt the online activities of their subscribers, such that Quadranet cannot view the data passing through the VPN and cannot discern what content the data includes or where the data is being routed. As a technical matter, Quadranet has no ability to view any of the accused infringing material (to the extent such material is passing through its servers). And the nature of the BitTorrent protocol makes it such that no "copy" of a copyrighted work would be stored on Quadranet's servers. *Ingenuity v. Doe*, 2013 U.S. Dist. LEXIS 16952 at *7 (N.D. Cal. Feb. 7, 2013). Especially when it (1) did not host the allegedly infringing material; (2) had no contract with the alleged direct infringer; and (3) could not view Plaintiffs' movies allegedly passing through its servers, Quadranet cannot be culpable for the allegations in Count III.

---

[6] As explained above at pgs. 4-5, reliance on *RCN* is unhelpful because that case addressed "an ISP's failure to take remedial action against **repeat** copyright infringers," and found that an ISP could be held liable when it was "purposefully ignoring and turning a blind eye to the flagrant and repeated infringement **by its subscribers**." *RCN Telecom*, 2020 U.S. Dist. LEXIS 158269, at *31 (emphasis added). Here, Quadranet's "subscribers" did not directly infringe any of the Plaintiffs' works. Contrasted with the ability to terminate a single, offending, repeat user, the law does not require that Quadranet terminate its entire relationship with a *VPN company* over the allegation that some of the VPN companies' users may be using BitTorrent to infringe movies.

### 3. Quadranet Did Not Materially Contribute to the Alleged Infringement.

The Response makes the attenuated leap that Quadranet "materially" contributed to the infringement just because it provided servers, "the electricity and 24/7 security for their subscribers." [D.E. 117, p. 30].[7] Plaintiffs try to avoid *ALS Scan v. Steadfast*, 819 Fed. App'x 522 (9th Cir. 2020) by arguing it is different because "the owner took [the infringing images] down," whereas in the instant dispute, certain of the VPN company's customers (*i.e.* the Doe defendants which are not Quadranet's customers) purportedly "continued pirating Plaintiffs' Works." [D.E. 117, p. 30-31]. But *ALS* is on point: the defendant "did not operate, control, or manage any functions of Imagebam.com. It could not supervise, access, locate, or delete Imagebam accounts," and "had no way of knowing…where the infringing works or the Imagebam accounts responsible for illegal uploads were located on Flixya's servers." *ALS Scan*, 819 F. App'x at 524. In the same way, and while Quadranet undertook the "simple measure" of forwarding the notices that it received, QE: **(1)** does not host, manage, or control the infringing content; **(2)** does not host the BitTorrent software used to transmit the infringing content; **(3)** merely provides server equipment to certain third-party company, one being LiquidVPN, and some portion of that VPN company's customers (*i.e.* **not** Quadranet's customers) then apparently used LiquidVPN to access the BitTorrent software; **(4)** has no access to or control over the VPN companies' customers; **(5)** has no way to determine *what* the transmitted content contains (since all content is fully encrypted by the VPN); **(6)** does not control or review the content (nor does it even have the means to do so), and due to the decentralized nature of the BitTorrent protocol, a complete copy of a copyrighted work is never concurrently in transit through QE's servers.

The Response also attempts to distinguish the instructive analysis in *Louis Vuitton v. Akanoc*, 658 F.3d 936 (9th Cir. 2011). There, the defendant "had control over the services and servers provided to the [accused] websites," and "had direct control over the 'master switch' that kept the websites online and available." *Id.* at 943. Here, however, and as explained immediately above, QE does not host, manage, review, or control the infringing content, nor does it host the BitTorrent software used to transmit the infringing content. Nor could it "switch" off a particular VPN company's client.

### 4. The Obligations that Plaintiffs Would Impose on Quadranet Are Not Required by Law.

The Response contends that Quadranet could have taken "measures," albeit exceedingly broad

---

[7] But by that logic, the manufacturer of the servers should have been sued for "materially contributing" to the infringement, since it designed the technical equipment (*i.e.* the servers), and the power utility company that supplies the actual electricity and has a "master switch" to electricity, Florida Power & Light Company could be sued for "material contribution." This overreach is unprecedented.

and unworkable, to stop the alleged infringement [D.E. 117, p. 29-30]. Plaintiffs contend that QE could have "null-routed" its subscribers and/or terminated service to LiquidVPN. But this would not have stopped the allegedly infringing activity, since the "Doe" defendants pirating the Plaintiffs' works were **not** Quadranet's subscribers. Again, Quadranet's VPN clients were not the ones directly pirating the allegedly infringing works.[8]   Rather, it was some of *those VPN clients'* customers who were "distributing" the allegedly infringing works by using a VPN to access the BitTorrent software. Plaintiffs cannot blur this line to suggest Quadranet was "one step closer" to the alleged activity.[9]

As its Motion explained, Quadranet had no right to interfere in the relationship between the VPN companies and their customers, most of whom use VPN software to conduct entirely lawful internet surfing and other online activity.[10] In fact, Plaintiffs' proposed "measures" would not have stopped the Doe defendants from directly infringing; simply terminating LiquidVPN altogether

---

[8] The Response now claims that DOES 1-100 are similarly situated to VPN service providers and therefore are liable for direct infringement because they "transmit, route, or provide connections for transmitting copies of Plaintiffs' Works…" [DE 117, p. 18]. But this language refers to Section 512(a) of the Copyright Act, which provides limitations on secondary liability for internet service providers, and has no bearing on the *prima facie* elements of direct copyright infringement. **Critically,** Plaintiffs do not assert that the VPN clients were engaged in any copying or other "volitional" act in order for direct liability to apply. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121, 131 (2d Cir. 2008) (finding no direct liability because the "volitional conduct that causes the copy to be made" was carried out by end users who "actually presse[d] the button to make the recording, [that] supplies the necessary element of volition"). Only the "Does" were engaged in purported direct infringement, which is why Plaintiffs sued *only* the Doe defendants for *direct* copyright infringement, and *not* the LiquidVPN defendants (which were sued for contributory infringement). [D.E. 1, p. 31-32]. Similarly, Plaintiffs brought the same exact claims in *Millennium Funding, Inc., et. al. v. SMR Hosting, Does 1-100, et. al,* Case No. 21-10490, asserting direct copyright infringement against the "Doe defendants" only, and contributory infringement against the LiquidVPN defendants. **Exhibit 2**, p. 39-40.

[9] That Quadranet is far removed from the allegedly infringing activity is underscored by Plaintiffs' citation to *ABC, Inc. v. Aereo, Inc.,* 573 U.S. 431 (2014) where the defendant sold "a service that allows its subscribers to watch television programs over the Internet," which was executed by the program's data being stored on the defendant's hard drive and then streamed "to the subscriber's screen once several seconds of programming have been saved." *Id.* Quadranet provides no such service, nor does it contract with or sell any services to the Doe defendants who were allegedly pirating Plaintiffs' films over the internet. *Spanski* (cited at DE 117, p. 32-33) is also unavailing; the defendant there unsuccessfully argued that the "automated nature of its video-on-demand system [and] the end user's role in selecting which content to access insulates it from … liability." *Spanski v. Telewizja*, 883 F.3d 904, 911 (D.C. Cir. 2018). Here, Quadranet does not provide any "video-on-demand" system, nor does it contract with, allow, control, or direct what any *VPN* customer does online.

[10] Whether QE "terminated the account of LiquidVPN in June after they were served with the FAC" [D.E. 117, p. 34] is irrelevant. In reality, LiquidVPN's contract was cancelled and not renewed due to non-payment, as QE cannot render services to clients that do not pay for those services.

presumes that Quadranet should have unilaterally terminated completely legitimate and valid LiquidVPN – customer relationships. *See Venus Fashions v. ContextLogic, Inc.*, 2017 U.S. Dist. LEXIS 155748, at \*34 (M.D. Fla. Jan. 17, 2017) (the plaintiff must show that the defendant "has the 'practical ability to police the infringing activities of [third parties] as opposed to suggesting measures that are imprecise, overbroad or not workable.''). Notably, the Response does not distinguish or discuss Quadranet's reliance on *Perfect 10 v. Visa Int'l*, 494 F.3d 788 (9th Cir. 2007), which is instructive here. Ultimately, the analysis is not on whether Quadranet "has the right and ability to control it[s] *system,* but rather, whether it has the right and ability to control the *infringing activity.*"  *Io Grp. v. Veoh*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008) (emphasis in original). It is therefore immaterial whether Quadranet had the ability to control its system and terminate an entire company (e.g. a VPN client)—particularly a company that had completely legitimate business relationships with customers who have no connection to the Plaintiffs' works. Instead, the law requires that Quadranet had the practical ability to *access and control the infringing activity*, which Quadranet did not have, and which the SAC cannot allege.

      **B.**    **Plaintiffs' Vicarious Infringement Claim Should Be Dismissed.**

Quadranet explained at length why it could not be vicariously liable for the conduct of certain third party BitTorrent users. [DE 108 at 28-36]. The Response pays short shrift [DE 117, at 27-29] to these arguments, and ignores key defects in the SAC and governing case law.

      **1.**    **Quadranet Did Not Profit *Directly* from the Alleged Infringing Activity.**

Plaintiffs' vicarious infringement claim is void of any plausible facts indicating that the Quadranet profited directly from the infringement, or that the "infringing activity" was a draw for *Quadranet's* customers. [DE 108 at 17-21]. Count IV fails because the SAC cannot plead facts establishing either prong. *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004). The Response tries to manufacture some direct financial benefit by arguing that as Quadranet's "VPN subscribers induce more end users who wish to pirate Plaintiffs' Works, Defendants' VPN subscribers purchase more services such as server space and IP addresses from Defendants." [D.E. 117, p. 34]. As an initial matter, this speculation is wholly unfounded, and misunderstands why companies use the services of Quadranet or Amazon Web Services, or in turn, why law firms and leading companies use VPN services. Still, following this logic, an electric company would also liable for receiving a "benefit," since QE providing more operational server space to its VPN subscribers would require more electricity to power on and manage those servers (which would in turn increase the profit received by the utility company). This flawed logic is exactly why courts recognize that "not every benefit is a ***direct*** financial benefit," and that there must be a "'causal relationship' between the infringing activity

and a financial benefit reaped by [the defendant]." *Klein & Heuchan v. CoStar Realty*, 707 F. Supp. 2d 1287, 1299 (M.D. Fla. 2010) (emphasis added). Here, there is no such direct financial benefit; for example, QE's revenue from leasing servers to LiquidVPN accounted for less than ***0.00001%*** of QE's revenue during the relevant lease period. [DE 108-1, ¶24-25).[11]

The SAC also cannot and does not allege that the ***main draw*** for customers of QE's services is access to the infringing content. Nor could it. In this respect, *UMG Recordings v. Bright House*, 2020 U.S. Dist. LEXIS 122774 (M.D. Fla. July 8, 2020) – cited in the Motion – is instructive, but ignored by Plaintiffs [D.E. 108, p. 31-32]. Similarly, Plaintiffs avoid the analysis in *Zagorsky v. Rhino Entm't*, 2019 U.S. Dist. LEXIS 153083 (D. Ariz. Sep. 9, 2019), which recognized that because the complaint contained no "factual allegations that the listing of the *All-Night Long* track on Defendant eBay's site ***affected Defendant eBay's user base in any way***…Plaintiff has not alleged facts that Defendant eBay had a direct financial interest in others' alleged direct infringement of her copyright." *Id.* at *25-26. The SAC does not and cannot allege that any infringing activity affected QE's customer base.

Finally, the Response's arguments as to take-down "notices sent by rightsholders" [D.E. 117, p. 34] is irrelevant to the "main draw" requirement. The *Grande Communs* case cited by Quadranet emphasizes this point; there, the court dismissed the plaintiffs' claim even though they alleged that the defendant "refused to terminate a single user for copyright infringement from at least 2011 through 2016, while continuing to profit from the fees paid by using infringers," and because the plaintiffs had failed "to plead facts showing Grande gained or lost customers *because of* its failure to terminate infringers." *Grande Communs*, 2018 U.S. Dist. LEXIS 160492, at *7-9 (emphasis in original). Plaintiffs' failure to address this argument is a concession that they understand that QE's provision of services to some VPN companies that have a handful of bad apple subscribers engaged in alleged copyright infringement is not a "main draw" and did not confer upon QE any "direct benefit."

### 2.   Quadranet Lacked the Ability to Control and Stop the Infringing Activity.

Quadranet's motion explained in detail how courts have addressed this factor. [DE 108 at 34-36 (citing *Perfect 10* and *Venus Fashions*)]. The Response fails to confront this analysis. In *Perfect 10*,

---

[11] This fact sinks Plaintiffs' claim, which is likely why the Response failed to address the *Napster* decision cited by Quadranet [DE 108 at 30-31], which recognized that "Napster's future revenue was ***directly dependent*** upon increasing its customer base and that virtually all of Napster's 'draw' of customers resulted from it providing access to infringing material." *Klein & Heuchan*, 707 F. Supp. 2d at 1298 (citing *A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) (emphasis added). In the instant case, and for good reason in light of that ***0.00001%*** revenue figure, Plaintiffs never once suggest that Quadranet's revenue was "directly dependent" upon increasing its VPN customer base.

the court recognized that "Google cannot stop any of the third-party websites from reproducing, displaying, and distributing unauthorized copies of Perfect 10's images because that infringing conduct takes place on the third-party websites." *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1174 (9th Cir. 2007) (citation omitted).  Similarly here, and as left unrebutted in the Response, there are no allegations demonstrating how Quadranet can possibly exercise any supervision and control over *the actual pirating and infringing activity* (as opposed to the electricity of the servers, for examples), or how Quadranet directly participated in the decisions, processes, or personnel responsible for the infringing activity.[12]

C.     **Plaintiffs' State Law Claims for Negligence and Fraud Are Preempted.**[13]

Quadranet's Motion explained why these state law claims are preempted.  [DE 108 at 37-38]. The Response argues their state law claims are based upon the "false statement concerning a material fact" element, which "emphatically changes the nature of the claim, and is thus not preempted by the Copyright Act." [D.E. 117, p. 36].  Plaintiffs misunderstand Quadranet's position, or the analysis offered in *Giddings v. Vision*, 2007 U.S. Dist. LEXIS 58438 (D. Ariz. Aug. 3, 2007). [D.E. 108, p. 37-38].  The court in *Giddings* rejected the argument that "the requirement of misrepresentation in fraud constitutes as an extra element that distinguishes the claim from the copyright infringement cause of action," and went on to dismiss the fraud claim, recognizing that "in order to survive preemption, the misrepresentation must be ***based on a core of allegations dissimilar from those on which the copyright infringement claim is based.***" *Id.* at *7-8 (emphasis added).  In analogizing *Giddings* (unaddressed by the Response) Quadranet prepared a chart which demonstrated how the Plaintiffs' vicarious infringement, fraud, and negligence claims are all premised upon the same three characteristics. [D.E. 108, p. 38]. Plaintiffs failed to refute this argument, revealing that their fraud and negligence claims are indeed both premised upon the same alleged misconduct that is identified in

---

[12] The Response feebly contends that Quadranet provides "the Internet access for its subscribers and even the electricity to the servers used by its subscribers." [D.E. 117, p. 34].  Quadranet did not provide internet access to the alleged John Doe infringers.  Even so, providing a means of internet access and electricity does not equate to Quadranet being able to "supervise" and "stop" the allegedly infringing activity, as *Hydrenta* and *Venus Fashions* require.  To suggest otherwise would mean that hardware manufacturers (which provided the direct infringers with computers and routers), power utility companies (which provided the direct infringers with electricity), and the Internet Corporation for Assigned Names and Numbers (which provides web addresses) would similarly be liable.

[13] Quadranet's Motion established that because there are no remaining federal claims to adjudicate, this Court should dismiss Plaintiffs' state law claims under *Ingram v. Sch. Bd.*, 167 F. App'x 107 (11th Cir. 2006). [DE 108 at 36-37]. Quadranet's argument remains unrefuted and conceded. *See In re Paoli*, 1992 U.S. Dist. LEXIS 18428, 1992 WL 323589, at *2 (E.D. Pa. Oct. 21, 1992) ("Plaintiffs' response to this motion completely fails to address Defendants' position with respect to [this issue] and is therefore deemed to admit and concede its correctness.").

Plaintiffs' vicarious infringement claim. Counts VI and VII should be dismissed under preemption.

**D.    Plaintiffs' Negligence, Fraud, and Estoppel Claims Fail for Other Reasons.**

Count VI is yet another example where the Plaintiffs' pleading is improperly pled, confusing, and deficient, as Count VI is clearly listed as "Negligence" only (and not "negligent misrepresentation"). *See* **Exhibit 3**. Forced to guess, if Count VI is a claim grounded in negligence, the SAC fails to plead "a legal duty owed by [Quadranet] towards the plaintiff[s]…" *Santana v. Miami-Dade*, No. 14-CIV-20840-BLOOM/Valle, 2015 U.S. Dist. LEXIS 54597, at *10 (S.D. Fla. Apr. 27, 2015). Florida law requires the existence of a legal duty, but Quadranet has not ever contracted with the Plaintiffs, engaged in any sort of business relationship with them, or made any contact that would trigger some sort of "duty" owed by a data center to alleged owners of films. Plaintiffs admit as much, which is why their Response retreats to the weak position that a duty was somehow created by "other judicial precedent," or perhaps a "duty arising from the general facts of the case." [D.E. 117, p. 37]. Neither theory has merit. The "judicial precedent" argument, otherwise "known as the 'undertaker's doctrine'… imposes a duty of care not only on the parties to a contract but also to *any third parties* that perform services under the contract." *Weinberg v. Advanced Data Processing, Inc.*, 147 F. Supp. 3d 1359, 1366 (S.D. Fla. 2015) (emphasis added). Even if applicable here, Plaintiffs do not satisfy this prong because the SAC fails to allege that the Plaintiffs are **(a)** parties to any contract with Quadranet; or **(b)** "parties that perform services" under any contract between Quadranet on the one hand, and a third-party on the other hand. Accordingly, this "judicial precedent" argument does not apply.

In the alternative, Plaintiffs suggest a duty could have arisen "from the general facts of the case." [D.E. 117, p. 37]. Yet under this argument, a "duty arises because of a foreseeable zone of risk arising from the acts of the defendant." *Weinberg*, 147 F. Supp. 3d at 1365. Here, there are no allegations in the SAC detailing what "zone of risk" Quadranet purportedly created through the conduct alleged, or what individuals or entities were purportedly within that "zone of risk." Plaintiffs are unable to establish any duty owed to them by Quadranet. This claim necessarily fails.

Moreover, to the extent Count VI sounds in negligent misrepresentation, this claim must be dismissed according to the Plaintiffs' own admissions in their Response. Specifically, Plaintiffs accurately note that a claim for negligent misrepresentation requires allegations that: "…(3) the representer ***intended to induce another to act*** on the misrepresentation; and (4) injury resulted in a party acting in ***justifiable reliance*** upon the misrepresentation." [D.E. 117, p. 37] (*citing Rothis v. M & I Marshall & Isley Bank*, 2010 U.S. Dist. LEXIS 109074 *5 (M.D. Fla. 2010) (emphasis added). Quadranet invites the Court to review the allegations in Count VI, which reveal that the Plaintiffs

never once allege that Quadranet "***intended to induce*** Plaintiffs to act on the misrepresentation," nor do the Plaintiffs ever allege that they acted in "***justifiable reliance***" on Quadranet's purported misrepresentation.  Therefore, Count VI cannot survive Quadranet's 12(b)(6) motion.

As to Count VII for fraud, nowhere does the SAC allege that Quadranet transmitted any communications whatsoever (orally or in writing) to the Plaintiffs.  That reality did not stop them from asserting another baseless claim for "fraudulent misrepresentations."  This Court should dismiss Count VII by adhering to its *Caforo* and *Balthazar* precedent, which found that a plaintiff must allege that the defendant's false statements were made intentionally "***for the purpose of inducing*** the plaintiff" to act on them.[14]  This pleading omission requires dismissal of Count VII.

Finally, with respect to Count VIII for equitable estoppel, the Response failed to discuss Quadranet's cited authorities demonstrating that "equitable estoppel is not an independent cause of action under Florida law."  *B&G Opa v. City of Opa*, 2020 U.S. Dist. LEXIS 28209, at *6 (S.D. Fla. Feb. 18, 2020); *Flagship v. Interval Int'l*, 28 So. 3d 915, 923 (Fla. 3rd DCA 2010).  Regardless, Quadranet's Motion also emphasized that Quadranet never made a representation ***directly to the Plaintiffs***, as an equitable estoppel claim requires.  *See Flagship*, 28 So. 3d at 923 (equitable estoppel requires "a representation by the party estopped ***to the party claiming the estoppel*** as to some material fact") (emphasis added). The Response did not refute this pleading requirement, or that Quadranet made a representation directly to them (as opposed to the entire world at-large). [15] For those reasons, Count VIII should be dismissed.[16]

---

[14] *Caforo v. Zois*, No. 15-CIV-80150-BLOOM/Valle, 2015 U.S. Dist. LEXIS 83302, at *37 (S.D. Fla. June 1, 2015) (emphasis added); *Balthazar v. Beale St.*, No. 17-cv-81214-BLOOM/Valle, 2018 U.S. Dist. LEXIS 228665, at *9 (S.D. Fla. Oct. 16, 2018).  Plaintiffs' Response makes no attempt to refute this point, side-stepping the issue altogether by instead arguing that Plaintiffs "relied on Quadranet's misrepresentations" and "had a right to rely on Quadranet's misrepresentations." [D.E. 117, p. 40]. But reliance is not the issue here, as reliance is a completely separate element of a fraud claim.

[15] Quadranet's Motion also reiterated that equitable estoppel requires "willfulness or negligence with regard to the acts or conduct…." *Abromats v. Abromats*, No. 16-cv-60653-BLOOM/Valle, 2016 U.S. Dist. LEXIS 125614, at *16 (S.D. Fla. Sep. 14, 2016).  But nowhere in paragraphs 471-483 of the SAC (or any of the incorporated allegations) do the Plaintiffs ever allege that Quadranet's representations in the Whois records of ARIN were somehow "willful" or "negligent."

[16] Plaintiffs try to make their fraud, negligence, and estoppel claims appear less frivolous by pointing to updated ARIN WHOIS records. However, those arguments are red herrings, as ARIN (a non-profit organization) exists primarily to manage/administer IP addresses, and not to facilitate copyright owners' take-down requests. Per the ARIN guidelines located at https://www.arin.net/resources/registry/reassignments/#options, Quadranet may either use "Referral WHOIS (RWHOIS)" or the Shared WHOIS Project (SWIP);" here, Quadranet accurately updated the relevant registration records using the RWHOIS service, and IP addresses were reassigned

## III.   <u>Dismissal is Warranted for Lack of Personal Jurisdiction and Improper Venue.</u>

### A. Exercising Personal Jurisdiction Violates Florida's Long-Arm Statute.

It is the Plaintiffs' burden, which they have failed to carry, to establish personal jurisdiction. *Oldfield v. Pueblo*, 558 F.3d 1210, 1217 (11th Cir. 2009). What is more, the Response wholly ignores the elementary starting point for a personal jurisdiction analysis: whether a "defendant may be subject to Florida's long-arm statute through specific jurisdiction and [/or] general jurisdiction." *Brown v. Carnival*, 202 F. Supp. 3d 1332, 1343 (S.D. Fla. 2016). In fact, the phrases "specific jurisdiction" and "general jurisdiction," or any combination of those legal principles, are not found anywhere in the Response. Regardless, and as explained in Quadranet's Motion, general jurisdiction does not apply because QI and QE are non-resident defendants, and therefore are not "at home" in Florida pursuant to *Neelu v. Boca Aircraft, LLC*, No. 18-cv-81445-BLOOM, 2019 U.S. Dist. LEXIS 129454 (S.D. Fla. Aug. 2, 2019) and other authorities cited in the Motion. [DE 108 at 43-44.] Plaintiffs effectively concede that QI and/or QE cannot somehow be deemed "at home" in Florida.

Although the Response never actually argues that "specific jurisdiction" should be exercised, Quadranet is again forced to speculate that Plaintiffs are attempting to establish specific jurisdiction by claiming that QE "operat[es]" a facility in Miami which "satisfies the requirement that the defendant have 'an office or agency in this state,'" and in turn, "[t]his contact is imputed to its alter ego Quadranet, Inc." [D.E 117, p. 19]. However, Plaintiffs failed to discuss or distinguish Quadranet's reliance on this Court's opinion from *Neelu*, which recognized that under *Fla. Stat.* § 48.193 (1)(a)(1), "***[t]he business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort*.**" *Neelu*, 2019 U.S. Dist. LEXIS 129454, at *34 (internal citation omitted) (emphasis added). Quadranet's declaration is left undisputed that QI has no office or agency in Florida, nor does it conduct any business activity in Florida. [D.E. 108, ¶5-8]. As to QE, and while it admittedly has a satellite facility in Florida, the SAC fails to meet the requirement that the Plaintiffs' "claim must 'arise out of or relate to' at least one of defendant's contacts with the forum." *Oldfield v. Pueblo De Bahia*, 558 F.3d 1210, 1222 (11th Cir. 2009). This is significant to a specific jurisdictional

---

to the relevant parties. And regardless of the "abuse contact" field that Plaintiffs complain of, this field can still only be occupied by an organization registered with ARIN; LiquidVPN is not registered, and therefore cannot be supplied in the "abuse contact" field. On the law, Plaintiffs' position is equally baseless, as the Response fails to cite a single case supporting Plaintiffs' interpretation of ARIN, or that not listing a VPN client for an IP address in ARIN is a basis for fraud or negligence. As addressed, Plaintiffs' claims based on ARIN reporting still fail because the SAC does not and cannot allege that Quadranet supplied information to ARIN with the intent to deceive, and "for the purpose of inducing" the Plaintiffs to act. *Cafaro*, 2015 U.S. Dist. LEXIS 83302, at *37 (S.D. Fla. June 1, 2015).

analysis under *Fla. Stat.* § 48.193(1)(a)(2) as well, because neither QE nor QI committed a "tortious act" within Florida. QE has no contracts or business relationships with any of the "Doe" defendants that were directly infringing the Plaintiffs' works, and QE's subscriber (LiquidVPN) did not lease any servers in Florida [D.E. 108, ¶11-13]; therefore, none of QE's Miami-based activities cannot be construed as the "but for" cause of the alleged infringement.[17] For the same reason, the SAC fails to allege that: **(1)** QI committed a "tortious act" in Florida (particularly because it has no offices, employees, or business in Florida); and **(2)** QE committed a "tortious act" in Florida, since it is undisputed that QE does not contract with or engage in any business with the "Doe" defendants, and also because LiquidVPN did not lease any of QE's servers in Florida.[18]

**B. The SAC Should be Dismissed as Violative of Due Process and for Improper Venue.**

The Response does not refute, for example, that Florida has zero interest in adjudicating this dispute, ***since none of the Plaintiffs are based in this state***. Nor does the Response refute that QI has no facilities, servers, customers, or business activity in Florida, or that QE's contacts in Florida have a substantial enough connection with this forum to make the exercise of personal jurisdiction over QE reasonable. For these reasons, the SAC should be dismissed as violative of due process, and for improper venue as well. Plaintiffs rest their entire venue argument on the "substantial part of the events" prong, but the SAC fails to focus on the "'relevant activities of the defendant...to ensure a defendant is not haled into a remote district having no real relationship to the dispute." *Interim*, No. 19-cv-62412-BLOOM/Valle, 2020 U.S. Dist. LEXIS 101841, at *43 (S.D. Fla. June 10, 2020). Venue is improper as no "substantial events" occurred within this forum.

WHEREFORE, Quadranet respectfully requests that the Court dismiss the SAC *with prejudice*.

---

[17] While the Response contends that Plaintiffs' allegations "are not limited to … LiquidVPN," the SAC does not allege that QE contracted with or leased any servers to Torguard *in Florida*.

[18] To the extent Plaintiffs are now trying to use an "alter ego" theory to establish personal jurisdiction, they fail to cite any case where an "alter ego" theory of personal jurisdiction was successfully asserted over two non-resident corporations. Also, a "plaintiff must first allege a jurisdictional basis in his pleading," which the SAC failed to do. *Broward Marine v. S/V Zeus*, 2010 U.S. Dist. LEXIS 8077, at *17 (S.D. Fla. Feb. 1, 2010). Next, "[u]nder the alter ego theory of long-arm jurisdiction, a nonresident shareholder of a ***resident corporation*** may be subject to long-arm jurisdiction where the alter ego test can be met. *Bellairs v. Mohrmann*, 716 So. 2d 320, 322 (Fla. 2nd DCA 1998) (emphasis added). But here, neither QI nor QE are ***resident*** corporations in Florida. Finally, the SAC failed to "allege facts sufficient to pierce the corporate veil…" *Id.* Assertions that QI and QE have a common CEO and common directors, "use the same office," and "have their principal place of operations" in California [D.E. 117, p. 18] are insufficient, particularly since "the corporate veil will be pierced only in 'exceptional circumstances, such as for fraud or where the corporation is formed for some illegal purpose." *Floridians v. PCI*, 2020 U.S. Dist. LEXIS 117964, at *31-32 (S.D. Fla. July 2, 2020).

Respectfully submitted,

Dated:  September 17, 2021

<u>Oliver Alan Ruiz</u>
John Cyril Malloy, III
Florida Bar No. 964,220
jcmalloy@malloylaw.com
Peter A. Matos
Florida Bar No. 992,879
pmatos@malloylaw.com
Oliver Alan Ruiz
Florida Bar No. 524,786
oruiz@malloylaw.com
Jonathan R. Woodard
Florida Bar No. 096,553
jwoodard@malloylaw.com
**MALLOY & MALLOY P.L.**
2800 S.W. Third Avenue
Miami, Florida 33129
Telephone (305) 858-8000

*Of Counsel:*
Bobby Ghajar (*pro hac vice*)
bghajar@cooley.com
**COOLEY LLP**
1333 2nd Street, Suite 400
Santa Monica, CA 90401
Tel: 310-883-6400
*Attorneys for Quadranet, Inc. and Quadranet
Enterprises, LLC*