UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:  1:21-cv-20862-BB

MILLENNIUM FUNDING, INC., et al.,

      Plaintiffs,

v.

1701 MANAGEMENT, LLC DBA
LIQUIDVPN, et al.,

      Defendants.

_____

**PLAINTIFFS' OPPOSITION TO DEFENDANT VPNETWORKS, LLC D/B/A
TORGUARD'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT**

JOEL B. ROTHMAN
Florida Bar No. 98220
joel.rothman@sriplaw.com
CRAIG A. WIRTH
Florida Bar Number:  125322
craig.wirth@sriplaw.com
**SRIPLAW**
21301 Powerline Road, Suite 100
Boca Raton, FL 33433
561.404.4350 – Telephone
561.404.4353 – Facsimile

and

Kerry S. Culpepper
*Admitted pro hac vice*
**CULPEPPER IP, LLLC**
75-170 Hualalai Road, Suite B204
Kailua-Kona, HI  96740
808.464.4047 – Telephone
kculpepper@culpepperip.com
*Attorney for Plaintiffs*

Plaintiffs MILLENNIUM FUNDING, INC.; VOLTAGE HOLDINGS, LLC; AMBI DISTRIBUTION CORP.; AFTER II MOVIE, LLC; MORGAN CREEK PRODUCTIONS, INC.; MILLENNIUM FUNDING, INC.; BEDEVILED LLC; MILLENNIUM MEDIA, INC.; COLOSSAL MOVIE PRODUCTIONS, LLC; YAR PRODUCTIONS, INC.; FSMQ FILM, LLC; FW PRODUCTIONS, LLC; MILLENNIUM IP, INC.; I AM WRATH PRODUCTION, INC.; KILLING LINK DISTRIBUTION, LLC; BADHOUSE STUDIOS, LLC; LF2 PRODUCTIONS, INC.; LHF PRODUCTIONS, INC.; VENICE PI, LLC; RAMBO V PRODUCTIONS, INC.; RUPTURE CAL, INC.; MON, LLC; SPEED KILLS PRODUCTIONS, INC.; MILLENNIUM IP, INC.; NIKOLA PRODUCTIONS, INC.; WONDER ONE, LLC; BODYGUARD PRODUCTIONS, INC; OUTPOST PRODUCTIONS, INC.; GLACIER FILMS 1, LLC; DEFINITION DELAWARE LLC; HANNIBAL CLASSICS INC.; JUSTICE EVERYWHERE PRODUCTIONS LLC; PARADOX STUDIOS, LLC; DALLAS BUYERS CLUB, LLC and SCREEN MEDIA VENTURES, LLC ("Plaintiffs"), by and through their counsel, file this opposition to the Motion to Dismiss [Doc. #14] the Second Amended Complaint ("SAC") of Defendant VPNetworks, LLC d/b/a TorGuard ("Defendant").  For the reasons discussed below, Defendant's Motion should be denied.

## I.      INTRODUCTION

Although sometimes couched in terms of privacy, Defendant promotes its Virtual Private Network ("VPN") service for piracy, instructs its customers to use its VPN service for piracy, and heavily advertises that it destroys all evidence of its customer's piracy[1].  Defendant's customers use its VPN service for piracy and Defendant destroys all evidence of its customer's piracy just as promised.[2]  And Defendant profits from its customer's piracy[3] without even bothering to conceal its piracy business plan – it even chose as its company name "TorGuard", and states that the name refers to "…guarding one's privacy when using [*sic*] bitorrent" – a protocol so overwhelmingly

---

[1] "If you don't have protective measures in place to secure your connection to the torrent cloud…The worst case scenario is…receive a subpoena from an attorney requesting your identity for a potential lawsuit….TorGuard offers…VPN service…protecting you from these risks.  Our private VPN…can keep you completely safe when you use a BitTorrent client...[W]e don't keep any logs…so there's no trail leading back to you…."  Exhibit "8"
[2] Defendant's affiliate, end user and avid defender "Travis" promotes Defendant's service as an alternative to paying for streaming service from Disney and states he uses the website YTS frequently.  *See* Decl. of Culpepper at ¶¶55-56.
[3] Defendant boasted that its Canadian sales went up 100 percent after Canada implemented a rule requiring mandatory piracy notifications.  *See* Decl. of Culpepper at ¶¶60-61.

used for piracy that a study showed that 96.28% of BitTorrent users sought infringing content. Defendant's advertisements are so over the top that legitimate companies such as PayPal and even other BitTorrent Client application providers want no part of doing business with it.[4]

Defendant attempts to portray its TorGuard as innocuous by comparing itself to the VPN definition in *VirnetX Inc. v. Mitel Networks Corp.*, No. 6:11-CV-18, 2012 U.S. Dist. LEXIS 107280 (E.D. Tex. Aug. 1, 2012) and inaccurately quoting the SAC[5].  However, encrypting customer communication as defined in *VirnetX* is starkly different from actively deleting customer log records to keep the end user's identity from being determined by "IP monitoring firms", "lawsuit happy lawyers" and the "ISP from sending [the end user] a harrowing letter" and promoting the service for breaking the geographic restrictions of legal platforms such as Hulu as done by Defendant.

In addition to destroying its end user log records, Defendant chooses host providers such as Digital Ocean and QuadraNet that do not publish reassigned Internet Protocol ("IP") addresses so it can conceal the IP addresses it uses and rightsholders cannot directly send it Notices of infringement.

But even if a rightsholder somehow identifies Defendant as the relevant party for an IP address where infringement has occurred, Defendant makes clear that it has specifically set up its network so that there is nothing it can do.[6]

Defendant's defense amounts to this –we know our end users pirate and that we are helping them do it but we cannot do anything about it and you cannot hold us liable because we have purposely set up our network to conceal and destroy the evidence.

## II.    BRIEF FACTUAL ALLEGATIONS

Plaintiffs own the copyrights for motion pictures ("Works") listed in Exhibit "1" to the SAC. *See* Exhibit "1" [Doc. #104-1] (errata).   These Works are currently available for sale online and in brick-and-mortar retail stores.  *See* SAC [Doc. #96] at ¶54.

---

4 PayPal stopped accepting payments from Defendant in 2019. BitTorrent, Inc. refused to allow Defendant to advertise in its client app unless Defendant changed its name and stopped promoting its service for piracy.  *See* Decl. of Culpepper at ¶¶80-82.
5 Defendant inaccurately cites paragraphs 102-103 of the SAC for support for its assertion that "**Most** VPN providers…provided "anonymous" usage by…not logging subscriber access…".  The relevant portion says "…**many** VPN providers…"
6 "Due to our no-log policy and shared IP network, we are unable to forward any [DMCA takedown notice] requests to a single user…" Decl. of Culpepper at ¶63.

To deal with massive piracy of their Works, Plaintiffs engaged Maverickeye UG (haftungsbeschränkt) ("MEU") to monitor P2P/BitTorrent networks, capture evidence of acts of distribution of Plaintiffs' Works, and generate infringement notices ("Notices") to be sent to the service provider assigned the IP addresses where infringements of the Works was confirmed. *See* Id. at ¶¶201. Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered copyright management information, the IP address and port number at where infringement was confirmed and the time of infringement down to the second. *See* Id. at ¶202.

MEU determines the proper abuse contact email address for the service provider assigned the IP addresses at issue from WHOis records of the American Registry for Internet Numbers Ltd ("ARIN"). QuadraNet failed to update the ARIN records to identity Defendant having been reassigned IP addresses. *See* Id. at ¶¶203 and 209. In comparison, other host providers such as CenturyLink require their subscribers to submit the proper documentation so that it can update the ARIN WHOis records to reflect proper identification. *See* Decl. of Culpepper at ¶8; www.centurylinkservices.net/faq.php [Doc. #117-7 at pg. 3].

Plaintiffs' agent sent hundreds of Notices to QuadraNet concerning infringements of Plaintiffs' Works at IP addresses QuadraNet reassigned to Defendant. For example, Plaintiffs' agent sent over 50 Notices to QuadraNet concerning infringement of motion pictures such as *A Family Man*, *Hitman's Bodyguard*, *Bedeviled*, *Hellboy* and *Angel Has Fallen* at IP address 96.44.142.226 reassigned by QuadraNet to Defendant. SAC at ¶¶208, 212.

QuadraNet's CEO Ilan Mishan stated in his declaration that "Quadranet Enterprises, LLC's system is semi-automated and forwards the abuse notification to the relevant customer." Decl. of Mishan [Doc. #108-1] at ¶30; SAC at ¶464.

David Cox, the former owner of LiquidVPN, stated in his declaration that he received abuse notices from rightsholders that were forwarded to him by QuadraNet. *See* Decl. of Cox [Doc. #96-9] at ¶¶3-4; SAC at ¶290.

Upon information and belief, QuadraNet forwarded Plaintiffs' Notices to TorGuard and other rightsholders had similar Notices sent to QuadraNet concerning infringing activity at IP addresses controlled by TorGuard that QuadraNet forwarded to TorGuard. *See* Id. at ¶¶208-209 and 212-214.

Defendant continued to provide the VPN service to its end users despite knowledge that its end users were using the service to pirate copyright protected Works including Plaintiffs' exactly as promoted, encouraged and instructed by Defendant. SAC at ¶223.

Defendant promotes its VPN service for piracy.  Defendant operates its VPN service under the name "TorGuard" and advertises the service to "Torrent the Way You Want" and "…lets you use P2P activity the way you want to…" and tells its end users to "…plug VPN credentials into your favorite BitTorrent app to secure the app's outgoing traffic by hiding and replacing your IP…"  SAC at ¶108.

BitTorrent is overwhelmingly used for piracy.  *See* David Price, "NetNames Piracy Analysis: Sizing the Piracy Universe", September 2013, pg. 18, http://creativefuture.org/wp-content/uploads/2016/01/netnames-sizing_piracy_universe-FULLreport-sept2013.pdf         [last accessed on Oct. 1, 2021] ("Of all unique visitors to bittorrent portals in January 2013, it is estimated that 96.28% sought infringing content during the month…")

Defendant warns its end users that when they use BitTorrent to pirate content that their IP addresses will be visible, and third parties can monitor their activity.  Defendant tells its users that if they use its VPN service, their traffic will be tunneled through another server "so your ISP will not have any cause to send you a harrowing letter."  SAC at ¶109.

Defendant recognizes that its end users are afraid to use BitTorrent to pirate Works due to the legal risks, but tells them that, "TorGuard shields all of your activities, including torrenting, from absolutely everyone. If no one can see what you're doing, you're free to do whatever you want. Stay safe and secure while torrenting by using TorGuard."  Id. at ¶246.

Defendant knows and encourages its end users to use its VPN service to access notorious piracy torrent sites such as the "The Pirate Bay" to pirate content and provides technical help when its end users encounter difficulty pirating from torrent sites.  *See* Id. at ¶¶152-154.

Defendant emphasizes that its VPN service is compatible with popular BitTorrent client apps so end users can "Stream your favorite content and download anonymously."  Id. at ¶¶243-245.

Defendant instructs its end users how to setup their BitTorrent client with a special proxy link it provides to efficiently pirate content.  *See* Id. at ¶262.

Defendant pays affiliates commissions for referring new customers and to promote its VPN service.  *See* Id. at ¶¶247-250, 263.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

Some of Defendant's affiliates promote TorGuard as "The Best VPN for Popcorn Time". Exhibit "3" and "4"[7].

Defendant's end users install BitTorrent Client such as "Popcorn Time" onto their respective computer. *See* SAC at ¶139; *see also* Decl. of Culpepper at ¶64 (Defendant advising end user to help setup a script to "kill" Popcorn Time when the VPN goes down); *see* Id. at ¶54 (Defendant's affiliate Travis suggest Popcorn Time should be released with a built in VPN).

Defendant interferes with standard technical measures used by copyright holders to identify or protect copyright works by destroying the log data for their end users to conceal their piracy. *See* SAC at ¶¶257, 326. Defendant advertises its service as permitting its end users to "torrent as much as you want" because "No Logs Means No Records". *See* Id. at ¶257.

Defendant is motivated to become a subscriber of QuadraNet since it knows that QuadraNet will not make Defendant publish its own contact information in the Whois records for the IP addresses allocated to it. *See* Id. at ¶348.

MEU confirmed that Defendant used certain IP addresses reassigned to it from QuadraNet to distribute copies of the Works *I.T.*, *A Family Man*, *The Hitman's Bodyguard*, *Bedeviled*, *The Mechanic: Resurrection*, *The Humbling*, *211*, *I Feel Pretty*, *Hunter Killer*, *Hellboy*, *Angel Has Fallen*, *Rambo V: Last Blood*, *Boyka: Undisputed IV*, *Vengeance: A Love Story*, *Criminal*, *Once Upon a Time in Venice*, *I Am Wrath*, *London Has Fallen*, *Black Butterfly*, *Rupture*, *Day of the Dead*, *Extremely Wicked, Shockingly Evil and Vile*, and *Automata*. *See* Id. at ¶181.

## III.    BRIEF PROCEDURAL HISTORY

On Aug. 17, 2021, Plaintiffs filed the SAC [Doc. #96] seeking damages and injunctive relief against Defendant, among others, based upon claims for Direct Copyright Infringement (FIRST CLAIM), Contributory Copyright Infringement by Intentional Inducement (SECOND CLAIM), Contributory Copyright by Material Contribution Infringement (THIRD CLAIM) and vicarious infringement (FOURTH CLAIM).

On Sept. 24, 2021, Plaintiffs served a First Request for Production of Documents ("RPOD") on QuadraNet requesting identification information of the 245,706 IP addresses where

---

7 This Court can take judicial notice of this website and the other websites cited in this Motion as well as the screenshots in the declaration of Culpepper because they are publicly available documents. "The Court may take judicial notice of any fact that is not subject to reasonable dispute because it 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1258 (11th Cir. 2019) (quoting Fed. R. Evid. 201(b)(2)).

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

their Works were pirated. QuadraNet has objected and refused to disclose the identification information. *See* Decl. of Culpepper at ¶¶14-15.

On Oct. 8, 2021, Plaintiffs served a subpoena on non-party Digital Ocean requesting, *inter alia*, the IP addresses that Digital Ocean reassigned to Defendant. *See* Exhibit "1" [Doc. #143-1] to Defendant's Notice of Hearing [Doc. #143].

On Oct. 18, 2021, Plaintiffs cross-noticed a hearing based upon Defendant's refusal to preserve end user customer records and to provide initial disclosures. *See* Cross-Notice of Hearing [Doc. #146].

On Oct. 18, 2021, Defendant filed the present Motion.

## IV.    APPLICABLE LEGAL STANDARD

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting *Twombly*, 550 U.S. at 570). A complaint should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. *See Twombly*, 550 U.S. at 555. Accordingly, a well pleaded complaint will survive a motion to dismiss "even if it appears that a recovery is very remote and unlikely." *Id.* at 556

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). Pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. A Court considering a Rule 12(b)(6) motion is generally limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).

## V.    ARGUMENT - VENUE

**A. Defendant has waived any arguments against venue in this District.**

Defendant has waived arguments of improper venue by simultaneously making a motion to dismiss the SAC with prejudice unconditionally.  *See Boulger v. Woods*, 306 F. Supp. 3d 985, 996 (S.D. Ohio 2018) (a Defendant that made motions to dismiss for lack of personal jurisdiction and service of process and then made a motion for judgment on the pleadings waived jurisdictional arguments because "by asking the Court to pass on the merits, [the defendant] voluntarily submitted to the jurisdiction of the Court").  Defendant first requests that this Court consider its Motion to dismiss the SAC as a "shotgun pleading", then as a second alternative requests that the Court dismiss the SAC for failing to plead a claim for failure to claim, and then, as a third alternative requests a more definite statement, and finally as a fourth alternative (after the first three alternatives are considered) requests dismissal or transfer for improper venue.  Thus, Defendant requests this Court fully consider the allegations of the SAC, and then consider venue only if this Court concludes that the SAC should fails.  Defendant did not condition its first three request on whether this Court considered venue proper.

Moreover, Defendant has constructively consented to personal jurisdiction and thus venue in this Court by its extensive participation in these proceedings without any condition.  "[T]he voluntary use of certain [district] court procedures" serve as "constructive consent to the personal jurisdiction of the [district] court."  *Ins. Corp. of Ireland, LTD v. Compagnie des Bauxite de Guinea*, 456 U.S. 694, 704 (1982).  Besides filing the Motion to dismiss the SAC on its merits, Defendant has gone further in its case participation by agreeing to a mediation schedule (*see* Doc. #114) and filing a Motion to Quash [Doc. #141] a subpoena Plaintiff made to a third party without any condition on its appearance in any of these filings.  Defendant's actions demonstrate that it has sought to have this Court use its power to reach a decision on the merits, and requires the court to expend significant efforts in doing so. Accordingly, Defendant has participated in these proceedings to the extent that it has waived any arguments against venue.

**B.  Venue is appropriate because this Court has personal jurisdiction over Defendant.**

28 U.S.C. §1400(a) provides that civil action relating to copyrights "may be instituted in the district in which the defendant or his agent resides or may be found."  §1391(b) provides that venue is appropriate in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located". § 1391(c)(2) provides that "an entity…shall

be deemed to reside…in any judicial district in which such defendant is subject to the court's personal jurisdiction…".

Accordingly, based upon the definition of "reside" provided in § 1391(c)(2), under either §1391(b) or §1400(a) venue is appropriate where Defendant is subject to the court's personal jurisdiction.  Defendant is a Florida limited liability company, and thus subject to personal jurisdiction in Florida.  By the plain language of either venue statute, venue is appropriate in this District despite Defendant having its principal address in Orlando since this District is in Florida. Defendant cites *David Byrne & Index Music v. Crist*, No. 8:10-cv-1187-T-26MAP, 2010 U.S. Dist. LEXIS 162786, at *6 (M.D. Fla. Aug. 4, 2010) for the proposition that venue is only appropriate in the specific district where it could be served.  However, *Byrne* and the Eleventh Circuit decision of *Palmer v. Braun*, 376 F.3d 1254, 1259 (11th Cir. 2004) on which *Byrne* relies both concerned the residence of *natural persons* such as Charlie Crist and Eldon Braun.  Neither of these cases dealt with the explicit definition of "reside" for entities provided in § 1391(c)(2) in comparison to the definition of residence of a natural person in §1391(c)(1) which is limited to his/her domicile.

Nonetheless, venue is also appropriate in this District because Plaintiffs have pled that Defendant conducts business and has committed the tortious act of copyright infringement in this district. *See* SAC at ¶10. Defendant's CEO attempts to rebut this allegation by stating in his declaration that "TorGuard does not operate or conduct business in… Miami-Dade… (the "Southern District of Florida")".  Decl. of Van Pelt [Doc. #145-3].  Mr. Van Pelt's declaration is contradicted by Defendant's multiple advertisements on its website that it maintains servers in Miami-Dade county (Miami) and has a location in Miami. *See* Decl. of Culpepper at ¶¶43-48. Because Plaintiffs have set forth evidence conclusively contradicting Mr. Van Pelt's declaration, the Court should credit Plaintiffs' evidence and construe all reasonable inferences in favor of Plaintiffs. *See Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

The Plaintiffs cannot determine the extent of the piracy of their Works at Defendant's servers in Miami because Defendant conceals from public records the IP addresses that are assigned to it.  Indeed, concealing the IP addresses Defendant uses is a portion of its business strategy to prevent legal content streaming services such as Hulu and Netflix from blacklisting its IP addresses. *See* Decl. of Culpepper at ¶¶29-36, 40-42.  The Defendant has even filed a motion to quash a subpoena Plaintiffs issued to one of its host providers requesting the IP addresses assigned to it by arguing that disclosure of the requested information may divulge its trade secrets.

*See* Notice [Doc. ##143, 147]. Nonetheless, Plaintiffs have alleged that Defendant solicits, transacts, or is doing business within this jurisdiction, and has committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that its acts would cause injury in this jurisdiction. *See* SAC at ¶10. Thus, personal jurisdiction in this District is appropriate per Fla. Stat. § 48.193(1)(a)(1) and (2), and thus venue in this District is proper.  Should this Court not be persuaded by Plaintiffs' allegations, Plaintiffs respectfully request the Court permit it to continue with discovery to ascertain Defendant's contacts with this District such as the IP addresses it uses in Miami and identification information of its end users.

## VI.    ARGUMENT – THE CLAIMS AGAINST DEFENDANT IN THE SAC ARE ADEQUATELY PLED

### A. The SAC is not an impermissible "Shotgun Pleading".

Defendant criticizes the SAC for being "almost 100 pages in length with more than 200 pages of exhibits…", "vague and immaterial facts" and "a ramshackle compilation".  Mot. at pg. 3.  However, in actuality what displeases Defendant is the inclusion of screenshots from its website showing exactly how it advertises its service for piracy and deletes end user's logs so they won't get caught.  *See* e.g., SAC at ¶257.   But despite Defendant's criticisms about the length, it turns around and argues that this Circuit's pleading standards require Plaintiffs to include even *more*.  For example, Defendant argues that Plaintiffs need to allege "which specific Defendant infringed which specific Work" or "which Plaintiff holds rights to the allegedly infringed Work."  Mot. at pg. 4.  However, Plaintiffs already allege in, for example, Count 1, that they "are the copyright owners of the Works which each contains an original work of authorship" and that Defendant "distributed and reproduced…Plaintiffs' copyright protected Works via networks under their control without authorization in violation… 17 U.S.C. §§ 106(1), 106(3) and 501" in paragraphs 373 and 378.  Moreover, Exhibit "1" [Doc. #104-1] to the SAC sets forth specifically the entity that owns the Works and the relevant copyright registration number.  In a case such as this where Plaintiffs' Works have been pirated on *hundreds of thousands* of IP addresses, it would require *volumes* to lay out the specific IP addresses and times where the Works were pirated.  This is made even more difficult by Defendant's practice of concealing from the public which IP addresses have been reassigned to it from QuadraNet and other host providers.  But this Court need not delve into this issue because this is not the level of pleading that is required.  Rather, Rule 8 merely requires

"a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Defendant also argues that a separate count should be set forth for each Defendant by each Plaintiff even when Plaintiffs are asserting the same basis for relief against the Defendants. Mot. at pg. 4. Defendant's ridiculous demand for a 144 count complaint (36 Plaintiffs x 4 Counts) is not required by Rule 8. Rule 8 merely requires that Plaintiffs provide Defendants fair notice of the claims against them. *See Exist, Inc. v. E.S.Y., Inc.*, No. 14-62429-CIV-BLOOM/VALLE, 2015 U.S. Dist. LEXIS 181144, at 12 (S.D. Fla. May 20, 2015) (finding that allegations that Defendant, an officer of the Defendant corporations, along with the Doe Defendants, contributed to a single category of unauthorized use of Plaintiff's copyright and trademark provided Defendants with fair notice of the claims against them). Defendant has fair notice that Plaintiffs allege that it infringes their exclusive rights.

**B. The SAC adequately pleads a claim for direct copyright infringement against Defendant.**

Plaintiffs assert that they "are the copyright owners of the Works which each contains an original work of authorship", that Defendant "distributed and reproduced…Plaintiffs' copyright protected Works via networks under their control without authorization in violation of 17 U.S.C. §§ 106(1), 106(3) and 501, "encourage[s] end users to use the network to distribute and reproduce copies of Plaintiffs' Works" and "interfere[s] with standard technical measures used by copyright holders to identify or protect copyright works by purposefully deleting…end users' log information." SAC at ¶¶373, 376-379

Defendant does not contest Plaintiffs' allegation that it transmits, routes or provides connection for transmitting copies of Plaintiffs' Works. Further, Defendant does not appear to dispute Plaintiffs' allegation that it violates their exclusive right of distribution. Rather, Defendant incorrectly argues that Plaintiffs have failed to allege that "TorGuard **copied** original elements of the Works". Mot. at pg. 6. However, Plaintiffs explicitly allege, for example, that Defendant "TorGuard…made *copies* of copyright protected Works to others on said network…" SAC at ¶376 (emphasis added).

Defendant further argues that "there is no volitional conduct by TorGuard related to the alleged infringement of the Works." Mot. at pg. 6. However, Plaintiffs' plausible allegations of Defendant's involvement with its end users' piracy amount to significantly greater than "merely

passively providing the means to transmit, route or provide connections for the piracy."[8]  Mot. at pg. 7.  First, Plaintiffs allege that Defendant deletes its end users' log information so that they cannot be tied to the piracy in violation of the prohibition against interference with standard technical measures provided by 17 U.S.C. § 512(i)(1)(B).  Second, Plaintiffs allege that Defendant provides a special proxy link and instructs its end users how to set up their BitTorrent client to include the special proxy link to efficiently pirate content.  *See* SAC at ¶262.  Third, Plaintiffs allege that Defendant helps its end users access pirated content from notorious piracy sources such as The Pirate Bay.  Id. at ¶154.

In the context of the public performance right, the Supreme Court's decision in *ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431, 134 S. Ct. 2498 (2014) is instructive of the very limited amount of "volition or causation" necessary for direct infringement.  The Defendant in *Aereo* sold a service that allowed its subscribers to watch television programs over the Internet at about the same time as the programs were broadcast over the air.  *See Id.* at 431.  The Supreme Court concluded that "when Aereo merely supplies equipment that allows others [to transmit copyright works,] the Act is unmistakable: An entity that engages in activities like Aereo's performs."  *Id*. at 438-439.  In grappling with a similar issue, the DC Circuit similarly concluded that *Aereo* "forecloses [Defendant's] argument that the automated nature of its video-on-demand system or the end users' role in selecting which content to access insulates it from Copyright Act liability."  *Spanski Enterprises v. Telewizja Polska*, 883 F.3d 904, 911 (D.C. Cir. 2018).

The facts alleged against Defendant in the SAC are even worse than in *Aereo* and *Spanski* because Defendant: (1) deletes log records so its end users can pirate without fear (*see* SAC at ¶¶257, 326); (2) instructs their end users exactly how to set up their BitTorrent client to efficiently pirate content using a specially provided proxy link (*see Id.* at ¶262); and (3) helps their customers access notorious torrent websites such as The Pirate Bay to pirate content [*see Id.* at ¶¶153-154 (Defendant's administrator advises end user trying to access piracy website that is blocked by a Court order to try using TorGuard's alternative DNS)].  Defendant tries to brush its atrocious behavior aside by stating "it is not in the business of online censorship" and arguing that "the asker did not state their purpose for accessing [The Pirate Bay] or identify the specific materials they sought

---

8 Defendant's assertion that Plaintiffs are trying to claim that TorGuard copies the Works…to Does 1-100 is nonsensical.  DOES 1-100 are alleged to be subscribers of QuadraNet and likely other service providers rather than end users of TorGuard.  *See* SAC at ¶101.

access". Mot. at pgs. 16 and 21. However, Defendant does not even bother concealing that their motive for deleting end users' logs is to defeat standard measures used by rightsholders to track infringements. *See* Id. at ¶¶109, 226, 244, 246, 257; Decl. of Culpepper at ¶¶68-69 (Defendant states, "If no one can see what you're doing, you're free to do whatever you want" and promotes it service for preventing receiving "a subpoena from an attorney requesting your identify for a potential lawsuit").

Simply put, Defendant tells its end users how to pirate with its service, assists them in pirating, and destroys the evidence. Solely Defendant's action of destroying the end user's log records so that its end users cannot be tied to the piracy is sufficient volitional conduct. Defendant cannot now argue that there is no evidence of its volitional conduct because it destroyed the evidence.

Defendant incorrectly argues Plaintiff is alleging that the same conduct is evidence of both direct and secondary liability and – without citation to any legal precedent – state that "it is axiomatic that what is contributory or vicarious infringement cannot also be direct infringement." Mot. at pg. 6. 17 U.S.C. § 106 grants Plaintiffs exclusive rights besides reproduction such as the distribution and public performance. Defendant is secondarily liable for its end users' violations of Plaintiffs' exclusive right to publicly perform (stream) or distribute Plaintiffs' works because, for example, it provides its end users IP addresses at servers outside of their geographic region and explicitly encourages them to use them to access Netflix, Amazon Prime and Hulu for streaming or downloading Plaintiffs' Works in violation of the geographical restrictions. Defendant is secondarily liable for its end users' violation of Plaintiffs' exclusive right of distribution by, for example, connecting its end users to sources (such as the BitTorrent swarm) to obtain an infringing copy of their Works and deletes log records. Defendant directly infringes Plaintiffs' exclusive rights of distribution and reproduction when, for example, it distributes copies of their Works (to the BitTorrent swarm) after the copy is obtained and deletes log records.

**C. The SAC adequately pleads a claim for contributory infringement based upon intentional inducement against Defendant.**

As stated by the Supreme Court, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936-37, 125 S. Ct. 2764, 2780 (2005). The intentional inducement

standard of *Grokster* has been extended from products to services.  *See Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1037; *Disney Enters. v. Hotfile Corp.*, No. 11-20427-CIV-WILLIAMS, 2013 U.S. Dist. LEXIS 172339, at *113 (S.D. Fla. Aug. 28, 2013) ("a defendant will be liable for actually expressing an intention to foster infringement…").

Defendant argues that it cannot be held liable for inducement because Plaintiffs did not send the Notices to its registered DMCA agent.  Mot. at pg. 9.  However, specific knowledge is not an element of intentional inducement.  As explained by the Ninth Circuit in *Fung*, "…if one provides a service that could be used to infringe copyrights, with the manifest intent that the service actually be used in that manner, that person is liable for the infringement that occurs through the use of the service." *Id.* at 1037.  The Ninth Circuit went on to point out the potential devastating consequences to those liable for inducement.

> We are mindful, however, of the potential severity of a loose causation theory for inducement liability. Under this theory of liability, the only causation requirement is that the product or service at issue was used to infringe the plaintiff's copyrights. The possible reach of liability is enormous, particularly in the digital age.

*Id.*

To deal with this "potential severity", *Fung* discussed how an entity could "rehabilitate" itself so as not to "infinitely expand its liability in either temporal direction" by methods such as "actions actively discouraging the infringing use of their product…" *Id.* at 1038.

Plaintiffs have sufficiently alleged Defendant's culpable expression and conduct by providing screenshots of Defendant's advertisement of its service as "lets you use P2P activity the way you want", "stream content and download anonymously", "your ISP will not have any cause to send you a harrowing letter," and pointing out how its affiliates promote TorGuard for piracy. SAC at ¶¶107-109, 247-250; *see also* Exhibits "3" and "4" (affiliates promoting TorGuard for using PopcornTime).  Defendant's argument that "there is no evidence that TorGuard…endorsed or approved the statements…" on pg. 12 is unavailing because Plaintiffs allege that Defendant pays the affiliates for referrals.  Defendant cannot disavow the promotions of its service for piracy by the affiliates that it considers as "the backbone of [it's] marketing team" and pays a bounty of "30% recurring lifetime commission for any and all sales".  Exhibit "7".  Defendant's assertion that "it explicitly directs its affiliates not to promote piracy and has a strict termination policy for affiliates who violate its requirements" on pg. 18 is also unavailing because Defendant has failed

to provide *any* evidentiary support (not even a declaration) let alone publicly available documents in support of this assertion.  Defendant's assertion is also contradicted by its affiliates' promotion of TorGuard as the Best VPN for Popcorn Time and Defendant's statement that "TorGuard cannot remove or censor our affiliate's YouTube videos or blogs under any circumstance."  Decl. of Culpepper at ¶37; *see* Exhibits "3" and "4".   Because the SAC includes sufficient supported allegations of culpable expression and conduct that are "plausible on its face", Plaintiffs should be permitted to proceed to discovery to obtain further evidence of Defendant's culpable expression and conduct and agency relationship between Defendant and its affiliates.

Assuming *arguendo* that intentional inducement requires specific knowledge, Defendant's argument still fails.  First, this assertion relies on the declaration of Mr. Losey that he did not receive the notices, and thus non-public information outside of the pleadings that should not be considered.  Moreover, if Defendant agreed to receive the notices from QuadraNet at a different contact from that of Losey PLLC, it cannot now turn around and argue that it does not have knowledge if the Notices were sent by QuadraNet to the very email address Defendant explicitly agreed to receive them.  For example, §8(h) of QuadraNet's publicly available terms of service states that "It is client's responsibility to promptly notify…of any change in email address or contact person(s)" and the data breach policy states that it "…commits to a notification via email to…the primary business contact registered upon contract signing."  Decl. of Culpepper at ¶¶25-27; https://www.quadranet.com/terms-of-service [last accessed on 10/26/2021].

Further, the declaration of Mr. Losey states that Losey PLLC has been TorGuard's DMCA agent "since at least 2018" and that Defendant has had a DMCA policy since sometime in "2018".  Decl. of Losey [Doc. #145-1] at ¶¶8-9.  However, the DMCA records show that Defendant *did not even have a registered DMCA agent* prior to Nov. 23, 2018.  *See* Decl. of Culpepper at ¶¶23-24; Exhibit "1".  The effective date of the SAC is March 3, 2018.  *See* Fed. R. Civ. Pro 15(c).  Plaintiffs should be able proceed to discovery to obtain evidence on the important issue of whether Defendant had a policy prior to Nov. 23, 2018 because, according to QuadraNet, Defendant "has been Quadranet's client since June 28, 2012".  *See* Exhibit "3".  It should be noted that the discovery rule permits Plaintiffs to proceed against Defendant for infringements prior to the three year statute of limitations of 17 U.S.C. § 507(b). *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 n.4, 134 S. Ct. 1962, 188 L. Ed. 2d 979 (2014); *see also Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1022-24 (9th Cir. 2019).

**SRIPLAW**
California ◆ Georgia ◆ Florida ◆ Tennessee ◆ New York

Second, Plaintiffs allege that they cannot send the Notices directly to Defendant because QuadraNet does not update the ARIN WHOis records to identify Defendant for the IP addresses QuadraNet reassigned to Defendant.  QuadraNet's CEO has stated in a declaration that QuadraNet forwards the Notices to its subscribers.  Plaintiffs were only able to link certain IP addresses of QuadraNet to Defendant because QuadraNet provided that information in response to a subpoena. *See* Decl. of Culpepper at ¶¶ 11-12, 20; Exhibits "3" and "9".

Third, Defendant arguments concerning Notices pertain to whether it has a safe harbor from financial liability, not whether it is liable.  Particularly, 17 U.S.C. §512(c)(3)(B)(i) states that "a notification from a copyright owner…that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph *(1)(A)*."  However, §512(c)(1)(A) provides:

> A…provider shall not be liable for monetary relief, or, *except as provided in subsection (j)*…for infringement of copyright by reason of the storage at the direction of a user of material that resides on a…network controlled…by the service provider, if the service provider (i) does not have actual knowledge that the material …on the…network is infringing…

Even if Defendant established a safe harbor based upon defective notices, it can still be liable for the injunctive relief provided in §512(j)(1)(B)(ii) and ordered to block access to notorious foreign piracy websites such as The Pirate Bay that Defendant steadfastly refuses to do.  Moreover, because Defendant asserts that it is a registered *transitory* digital network communications service provider, §512(c) is not applicable.  Mot. at pg. 2 ("TorGuard is also a registered transitory digital network communications service provider…").

Fourth, Plaintiffs also allege that Defendant distributes and contributes to distribution and public performance of unauthorized copies of Plaintiffs' Works.  *See* SAC at ¶¶384, 418. However, the provision of §512(c)(3)(B)(i) pertain to "storage of material", not distribution and public performance.

Fifth, Defendant is incorrect in its assertion that Notices would need to be sent to its DMCA agent for it to need to terminate "subscribers and account holders of the service provider's system or network who are repeat infringers" as called for §512(i)(1)(A).  Defendant conflates the requirements for the §512(c)(3)(B)(i) notice scheme with the §512(i) requirements for eligibility of any of the safe harbors.  Moreover, Defendant fails to address the fact that it interferes with standard technical measures in violation of §512(i)(1)(B) by destroying its customer's log records.

**D.      The SAC adequately pleads a claim for contributory infringement based upon material contribution against Defendant.**

Contributory copyright infringement occurs where a party with knowledge of infringing activity materially contributes to the infringing conduct of another. *See Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990); *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987); *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).

Defendant materially contributes to infringement of Plaintiffs' Works by providing the VPN service its end users use to infringe Plaintiffs' exclusive rights of their Works despite having actual knowledge of their end users' piracy from the notices forwarded to it from QuadraNet and its other host providers. *See* SAC at ¶¶213, 396.   "[A]ctual knowledge is not required. All that must be shown [for contributory infringement] is that [defendant] had reason to know" of the infringing activity. *See Cable/Home*, 902 F.2d at 846 (citing *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987)).

Defendant asserts that Plaintiffs' claim based upon material contribution must fail because its service is capable of a substantial non-infringing use.  Mot. at pg. 13.  However, BitTorrent, from which Defendant's service TorGuard gets its name, is overwhelmingly (by some measures 96.28% percent of its traffic) used for piracy.  *See* David Price, "NetNames Piracy Analysis: Sizing the Piracy Universe", September 2013, pg. 18.  Moreover, Defendant's assertion (without any citation) that it's VPN service "is also predominantly used and marketed for such noninfringing use…" improperly relies on non-public documents outside of the pleadings.  Mot. at pg. 14.  In the contrary, Defendant publicly states that its service can be used to avoid lawsuits, letters from an ISP and to break geographic restrictions of Hulu, Netflix and Amazon Prime.  *See* Decl. of Culpepper at ¶¶29-34 and 41-42; Exhibits "5"-"6"

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) does not absolve Defendant from liability because Defendant has knowledge that its end users are using TorGuard to pirate copyright protected content via BitTorrent and, even now, steadfastly fails to take even the simplest measures to stop further piracy.  In *Sony*, the Defendant sold a *product* (the VCR) to customers without specific notice that its customer was going to use the *product* to pirate content. Sony could not take any simple measures to stop piracy once the customer had purchased the product.  In comparison, Defendant sells an ongoing *service* to its end users and has *specific notice*

that these end users are using the services to distribute copies of Plaintiffs' Works without authorization yet purposely chooses to do absolutely nothing while continuing to provide the service. Even worse, Defendant continues to delete the log records which provide evidence of the piracy even after being served with this lawsuit. In instances such as here where Defendant has knowledge of the specific infringing activity yet fails to take simple measures stop it, traditional common law principles permit a court to impute intent so that defendant may be liable, by operation of law just as if it had actually intended to infringe. *See Disney Enters. v. Hotfile Corp.*, No. 11-20427-CIV-WILLIAMS, 2013 U.S. Dist. LEXIS 172339, at 113 (S.D. Fla. Aug. 28, 2013).

Defendant's proposition that a service provider with knowledge of ongoing infringement by its subscribers can escape liability by merely asserting that its service has substantial non-infringing uses has been repeatedly rejected. The Fourth Circuit called this argument "meritless" when pointing out that the Supreme Court clarified in *Grokster* that "*Sony* barred secondary liability based on *presuming or imputing intent* to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement…the fact that a product is "capable of substantial lawful use" does not mean the "producer can never be held contributorily liable." *BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*, 881 F.3d 293, 306 (4th Cir. 2018); *Umg Recordings, Inc. v. Grande Communs. Networks, LLC*, 384 F. Supp. 3d 743, 767 (W.D. Tex. 2019) ("liability may be imposed for intentionally encouraging infringement through specific acts…The specific act in question here is the continued provision of internet services to customers. Thus, this is not a case of mere refusal to act. Grande acted affirmatively by continuing to sell internet services and continuing to provide internet access to infringing customers."); *UMG Recordings, Inc. v. RCN Telecom Servs.*, LLC, Civil Action No. 19-17272 (MAS) (ZNQ), 2020 U.S. Dist. LEXIS 158269, at *31 (D.N.J. Aug. 31, 2020) (rejecting RCN's argument that material contribution to infringement is precluded by the *Sony* Rule because its internet service has substantial non-infringing uses). Courts have sustained pleadings of contributory infringement against residential service providers such as Cox, RCN and Charter that merely provide the Internet connection and a modem liable for contributory copyright infringement for their subscriber's piracy. *Supra*. While these residential providers had lax policies for terminating subscribers, Defendant goes further and deletes log records of its customer access. *See* SAC at ¶¶257, 326. Because Defendant deletes the log records, it is impossible for it to reasonably implement a policy for terminating its end users who use the service

for piracy as required.   A defendant who disables itself from doing anything to prevent infringement does not reasonably implement a repeat infringer policy.  *See In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) ("Far from doing anything to discourage repeat infringers of the plaintiffs' copyrights, Aimster invited them to do so, showed them how they could do so with ease using its system, and by teaching its users how to encrypt their unlawful distribution of copyrighted materials disabled itself from doing anything to prevent infringement").

Defendant's reliance on the unpublished decision of *Hydentra v. Luchian* to support its widely rejected proposition is misplaced because the Defendant in this case argued it never actually received the notices.  *See Hydentra HLP Int. Ltd. v. Luchian*, No. 1:15-cv-22134-UU, 2016 U.S. Dist. LEXIS 193457, at *53 (S.D. Fla. June 2, 2016) ("SSM claims that it never received these takedown notices and was unaware of the allegedly infringing files until this lawsuit").  Here, Plaintiffs allege that QuadraNet and other host providers forwarded notices to Defendant.  *See* SAC at ¶¶213, 396.  Recognizing the weakness in its argument, Defendant attempts to improperly introduce evidence outside the pleadings that its DMCA agent never received the notices.[9]  *See* Mot. at pgs. 2.  However, as discussed above, this argument fails.  Moreover, as argued above, Plaintiffs should be permitted to proceed to discovery to determine if Defendant actually received the Notices.

**E.  The SAC Sufficiently Pleads a Claim for Vicarious Copyright Liability.**

"One…infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it."  *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. at 930.  In order to state a claim for vicarious copyright infringement, a plaintiff must allege (1) "the right and ability to supervise," and (2) "a direct financial interest" in the profits of the infringing activity. *See Affordable Aerial Photography, Inc. v. Modern Living Real Estate, LLC*, No. 19-cv-80488-BLOOM/Reinhart, 2019 U.S. Dist. LEXIS 132023, at *7-8 (S.D. Fla. Aug. 6, 2019) (citing *Klein & Heuchan, Inc. v. Costar Realty Info., Inc.*, 707 F. Supp. 2d 1287, 1297 (M.D. Fla. 2010)

Defendant contends that they do not have the right and ability to supervise the infringing activity or the obligation to terminate their user accounts "without specific knowledge and notice of infringement".  Mot. at pg. 16.  Here, again Defendant does not argue that it did not receive

---

9 Plaintiffs reserve their right to move to disqualify Losey PLLC as counsel since according to the declaration of Mr. Losey, his firm is Defendant's registered DMCA agent and receives notices of infringement on behalf of Defendant.  Thus, Losey PLLC and Mr. Losey will be important witnesses in this action.

notices form QuadraNet, only that merely because QuadraNet did not forward the notices to its DMCA agent rather than to it, it does not have the requisite knowledge. As discussed above, this argument improperly relies on documents outside of the pleadings and is based on a conflation of the necessary elements of establishing a safe harbor defense from liability for infringing material residing on servers from actions of third parties. Defendant does not dispute Plaintiffs' allegation that it can control its users' alleged infringements by simple measures such as null-routing end users, logging their end users' access and blocking access to notorious piracy websites such as The Pirate Bay, it merely states that it does not want to do it. Mot. at pg. 16 ("…TorGuard is not in the business of online censorship…").

Plaintiffs also allege that Defendant at all relevant times have derived a direct financial benefit from the infringement of Plaintiffs' copyrights. Id at. ¶414. Defendant directly profit from its end users' reproduction, distribution and public performance of Plaintiffs' copyright protected Works without authorization because end users are motivated to become customers of Defendant so that they can use TorGuard to pirate without getting caught. Defendant argues that it "does not promote or endorse piracy". Mot. at pg. 17. However, Defendant clearly states its objective when it warns potential customers that they should use its service to keep their log information for illegal downloads from being released by the ISP in piracy lawsuits to lawsuit happy lawyers. *See* Exhibits "5" and "6". Moreover, Defendant explicitly promotes its service to end users that wish to break the geographic restrictions of legal platforms such as Netflix, Amazon Prime and Hulu to consume content from unauthorized regions. *See* Decl. of Culpepper at ¶¶29-34 and 41-42. Piracy is clearly the main draw of TorGuard.

**F. Defendant's request for a more definite statement should be denied**

The SAC clearly states that Defendant infringes and contributes to infringements in Plaintiffs' exclusive rights to their Works. Accordingly, no "more definite" statement is needed. Plaintiffs can provide Defendant with the "when" after obtaining from QuadraNet and Defendant's other host providers or from Defendant through discovery the IP addresses that were reassigned to it. *See Valentin v. J & T Management Inc*., No. 14-cv-62087, 2014 U.S. Dist. LEXIS 163059, 2014 WL 6610941, at *2 (S.D. Fla. Nov. 20, 2014) (quoting *Hernandez v. Two Brothers Farm, LLC*, 579 F. Supp. 2d 1379, 1382 (S.D. Fla. 2008) ("Defendants may not use a motion for more definite statement as a means of discovery regarding those claims.")). It should be noted that Defendant is actively hindering Plaintiff from obtaining this information.

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

## VII.   CONCLUSION

Defendant's Motion should be denied because the SAC asserts ample facts supporting Plaintiffs' claims and venue in this district is proper.  If the Defendant's 12(b)(6) Motion is granted, Plaintiff respectfully requests leave to amend the SAC.  Further, should the Court be inclined to grant Defendant's 12(b)(2)(3) Motion, Plaintiffs respectfully request limited discovery to ascertain Defendant's contacts with the Southern District of Florida.

Dated:  October 27, 2021                            Respectfully submitted,


*/s/ Joel B. Rothman*
JOEL B. ROTHMAN
Florida Bar No. 98220
joel.rothman@sriplaw.com
CRAIG A. WIRTH
Florida Bar Number:  125322
craig.wirth@sriplaw.com
**SRIPLAW**
21301 Powerline Road, Suite 100
Boca Raton, FL 33433
561.404.4350 – Telephone
561.404.4353 – Facsimile

and

Kerry S. Culpepper
*Admitted pro hac vice*
**CULPEPPER IP, LLLC**
75-170 Hualalai Road, Suite B204
Kailua-Kona, HI  96740
808.464.4047 – Telephone
kculpepper@culpepperip.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2021, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served on this day on all those identified on the Service List, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those parties who are not authorized to receive Notices of Electronic Filing.

*s/ Joel B. Rothman*
JOEL B. ROTHMAN
Florida Bar Number: 98220
joel.rothman@sriplaw.com

## SERVICE LIST

Mr. Johnathan R. Woodard
Mr. John Cyril Malloy III
Mr. Oliver Alan Ruiz
Malloy & Malloy, PL
2800 SW 3rd Ave
Miami, FL 33129-2317
info@malloylaw.com
jwoodard@malloylaw.com
jcmalloy@malloylaw.com
oruiz@malloylaw.com
Attorneys for QuadraNet, Inc. and QuadraNet
Enterprises, LLC

Mr. Bobby A. Ghajar
Cooley LLP
1333 Second Street
Suite 400
Santa Monica, CA 90401
bghajar@cooley.com
Attorneys for QuadraNet, Inc. and QuadraNet
Enterprises, LLC

Mr. Adam Losey
Losey PLLC
1420 Edgewater Drive
Orlando, FL 32804
alosey@losey.law
Attorney for VPNetworks, LLC dba
TorGuard

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK