UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 21-cv-20862-BLOOM/Otazo-Reyes

MILLENNIUM FUNDING, INC. *et. al*,

    Plaintiffs,

v.

1701 MANAGEMENT LLC d/b/a LIQUIDPVN, *et. al*,

    Defendants.

_____/

**QUADRANET, INC.'S AND QUADRANET ENTERPRISES, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION [D.E. 180]**

Quadranet, Inc. and Quadranet Enterprises, LLC (collectively "Quadranet"), by and through their undersigned counsel, hereby submit their response in opposition to the Plaintiffs' Motion for Reconsideration of Order granting Quadranet's Motion to Dismiss, or in the alternative Plaintiffs' Motion for Clarification of Order [D.E. 180] (the "Motion"). In support, Quadranet states as follows.

## PRELIMINARY STATEMENT

In a forty (40) page ruling, this Court considered and flatly rejected Plaintiffs' arguments that Quadranet – a company that did not host Plaintiffs' alleged material – should somehow be liable for secondary copyright infringement. Dissatisfied with that ruling, Plaintiffs now multiply the burden on the Court and Quadranet by asking this Court to "rule twice," spinning the same arguments this Court previously rejected. This do-over is an improper use of a reconsideration motion.[1] As this Court has emphasized, a party seeking reconsideration "must set forth facts or law **of a strongly convincing nature** to induce the court to reverse its prior decision."[2]

Plaintiffs' Motion fails to meet the extraordinarily high standards governing Rule 60(b) motions. It does not identify any errors of law, material omission of facts, or mistakes in the Court's Dismissal Order "of a strongly convincing nature." It does not identify any intervening change in controlling law or point to "new evidence" that it did not have and could not have obtained before. Throughout their Motion, Plaintiffs refer to a "need to correct clear error" but this is nothing more than their displeasure with the Court's ruling, as opposed to some sort of "manifest injustice." The Motion "merely parrots back arguments made in its initial briefing."[3] The Motion fails to demonstrate any need to correct clear error or to prevent manifest injustice. The claims in the Second Amended Complaint ("SAC") were carefully analyzed and correctly dismissed as to Quadranet. Plaintiffs' attempts to disturb that ruling under Rule 60 must be denied.

---

[1] *See Williams v. Mosley*, No. 21-cv-23242-BLOOM/Otazo-Reyes, 2022 WL 168541 at *3 ("Far too often, litigants operate under the flawed assumption that any adverse ruling on a dispositive motion confers upon them license to move for reconsideration ... as a matter of course, and to utilize that motion as a platform to criticize the judge's reasoning, to relitigate issues that have already been decided, to champion new arguments that could have been made before, and otherwise to attempt a 'do-over' to erase a disappointing outcome. This is improper.") (citations omitted).

[2] *Fernandez v. United States*, No. 19-cv-24073-BLOOM/Louis, 2021 U.S. Dist. LEXIS 10159, at *4 (S.D. Fla. Jan. 20, 2021) (citation omitted) (emphasis added).

[3] *Commerzbank v. United States Bank*, 2021 U.S. Dist. LEXIS 28567, at *5 (S.D.N.Y. Feb. 16, 2021).

1.

### I. RELEVANT PROCEDURAL HISTORY.

#### A. Plaintiffs' Claims against Quadranet and its Motion to Dismiss.

As the Court is aware, this lawsuit centers around accusations against various John Doe defendants – who utilized their own computers, BitTorrent software, and a VPN (virtual private network) service – and those "Does'" alleged infringement of certain rights owned by the Plaintiffs. The initial complaint constituted an impermissible shotgun pleading. [D.E. 1]. Plaintiffs amended that pleading to wrongfully adding Quadranet– not because Quadranet directly infringed Plaintiffs' rights, controlled or supervised the alleged infringement, or even hosted the infringing content – but for tactical leverage only. [D.E. 24]. Quadranet was untethered to any accused activity alleged against the "Doe" defendants. Procedurally, and through a series of meet-and-confer exchanges with Plaintiffs' counsel, Quandranet alerted opposing counsel to the fact that the First Amended Complaint [D.E. 24] suffered from the same deficiencies, to wit, that it constituted a shotgun pleading in violation of 11th Circuit authority. Through a detailed and comprehensive "safe harbor" letter, Quadranet also explained to Plaintiffs that the allegations in the First Amended Complaint were untrue, lacked evidentiary support, and were unwarranted by existing law. Indeed, the liability that the Plaintiffs sought to impose on Quadranet *was unprecedented*.

Plaintiffs refused to redirect their attack and continued to focus on Quadranet. They sought leave to file a Second Amended Complaint ("SAC") (which constituted *another* shotgun pleading), and "doubled down" by tacking on additional and baseless claims against Quadranet. On August 31, 2021, Quadranet filed its case-dispositive Motion to Dismiss *with prejudice* [D.E 108], making clear that this lawsuit should never have been filed against either Quadranet entity. Quadranet's motion papers explained, in detail, how the SAC remained procedurally defective as a shotgun pleading. *Id..* (citing *Merch. One v. TLO*, 2020 U.S. Dist. LEXIS 7462, at *6 (S.D. Fla. Jan. 16, 2020) (Bloom, J.)). Quadranet also demonstrated that the secondary liability claims against it were deficient under a Fed. R. Civ. P. 12(b)(6) analysis for numerous reasons, including, *inter alia*: **(a)** Quadranet's services are capable of, and overwhelmingly used for, substantial non-infringing uses; **(b)** Quadranet was *at least* two steps removed from any "involvement" in the purported infringement; **(c)** Quadranet's servers did not store or host the subject films; **(d)** Plaintiffs' claims failed to plausibly allege how Quadranet profited **directly** from the alleged infringement (because Quadranet did not); and **(e)** the SAC failed to plead that Quadranet had the right and ability to supervise, control, and stop the alleged infringement (and Quadranet did not, since it cannot view, monitor, control, access, disable, or otherwise supervise any internet traffic that passes through its data centers). *See generally* [D.E. 108].

B. **The Court Grants Quadranet's Motion to Dismiss**.

On December 13, 2021, the Court entered an order granting Quadranet's Motion to Dismiss [D.E. 173] (the "Dismissal Order" or "Order"). As to Quadranet's shotgun pleading argument – namely that the SAC failed to conform with 11th Circuit pleading standards –the Court found that "[g]iven the Eleventh Circuit's holding that district courts are to dismiss shotgun pleadings as 'fatally defective,' *B.L.E.*, 335 F. App'x at 963, Plaintiffs' failure is dispositive." [D.E. 173 at p. 20]. Although Eleventh Circuit precedent would have supported dismissal of the SAC on this basis alone (*see Joseph v. Bernstein*, 612 F. App'x 551 (11th Cir. 2015) and *Yeyille v. Miami Dade Cty. Pub. Sch.*, 643 F. App'x 882 (11th Cir. 2016)), the Court addressed Quadranet's Rule 12(b)(6) arguments in the interests of efficiency and judicial economy.

Among other bases for dismissal, the Court correctly decided that "Quadranet was unaware of any specific infringing activity," and that "Plaintiffs notably fail[ed] to address Quadranet's argument that the encryption prevents Quadranet from knowing specific infringing activity." [D.E. 173, p. 26]. In light of the fact that Quadranet "never had access to a complete copy of Plaintiffs' copyrighted works to become aware of any specific infringing activity," and the Plaintiffs' failure to "address Quadranet's argument regarding the BitTorrent protocol…" the Court found that "Plaintiffs fail to sufficiently allege that Quadranet had specific knowledge of infringing activities required to impute culpable intent." *Id.* at p. 27. As an additional basis for dismissal of Plaintiffs' secondary liability claims, the Court "agreed" that Quadranet "did not derive a direct benefit from the infringing activity," as the law requires. *Id.* at 29. "As such, Plaintiffs fail to sufficiently allege that Quadranet profited directly from the infringing activity." *Id.* at p. 30.

Analyzing the "supervision and control" aspects of the secondary liability claims, including arguments by Plaintiffs that Quadranet could have taken measures such as "null routing" IP addresses, the Court found that the SAC failed "to allege that Quadranet has the practical ability to police infringers with measures that are not imprecise or overbroad…[and that] if Quadranet were to terminate the accounts of VPN companies, Quadranet would be interfering with the relationship between the VPN companies and their customers, many of whom may be engaged in lawful uses of VPN." *Id.* at 31. The Court concluded that, for this additional reason, Plaintiffs failed to state a claim because Quadranet did not have "the right and ability to supervise the infringing activity." *Id.* Finally, the Court concluded that Plaintiffs' state law claims were deficient, as well.

3.

C. **Plaintiffs' Motion for Reconsideration and "Request for Clarification."**

Plaintiffs' baseless claims, amendments, and discovery fishing expeditions caused Quadranet to suffer inordinate expense and harm to its business. Quadranet expected that the Court's well-reasoned Dismissal Order would put a stop to Plaintiffs' crusade against Quadranet. Not so. Plaintiffs then filed a "Motion for Reconsideration" of the Order. [D.E. 180]. As explained below, however, Plaintiffs' Motion is largely a rehash of the same arguments and facts considered by the Court in its prior Order and fails to satisfy the requirements of Rule 60. *See In re Horizon Organic Milk*, 2014 U.S. Dist. LEXIS 82342, at *18 (S.D. Fla. June 17, 2014) ("Parties who ignore arguments made by their opponents do so at their own peril and should not rely on the restrictive standard of a motion for reconsideration to provide them with a second bite at the apple.").[4]

## MEMORANDUM OF LAW

II. **Legal Standard Governing Motions for Reconsideration.**

"As the Eleventh Circuit has explained, relief under Rule 60(b)(6) 'is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances." *Fernandez v. United States*, No. 19-cv-24073-BLOOM/Louis, 2021 U.S. Dist. LEXIS 10159, at *4 (S.D. Fla. Jan. 20, 2021) (*citing Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th Cir. 1984). "A party seeking relief under Rule 60(b)(6) 'has the burden of showing that absent such relief, an 'extreme' and 'unexpected' hardship will result.'" *Id*. "Moreover, a motion for reconsideration is 'an extraordinary remedy to be employed sparingly,'" and the "burden is upon the movant to establish the extraordinary circumstances supporting reconsideration." *Fernandez*, No. 19-cv-24073-BLOOM/Louis, 2021 U.S. Dist. LEXIS 10159, at *4-5 (S.D. Fla. Jan. 20, 2021) (internal citations omitted).

Citing with approval to *Cover v. Wal-Mart Stores, Inc.*, 148 F.R.D. 294 (M.D. Fla. 1993), this Court recognized:

> A motion for reconsideration must do two things. First, it must demonstrate some reason why the court should reconsider its prior decision. Second, it must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision. Courts have distilled three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice.

*Fernandez*, 2021 U.S. Dist. LEXIS 10159, at *5 (*citing Cover*, 148 F.R.D. at 295 (M.D. Fla. 1993)).

---

[4] As discussed towards the end of this memorandum, Quadranet does not object to the aspect of the Plaintiffs' Motion *seeking clarification* that the Order does in fact constitute a "Final Judgment" in favor of Quadranet.

4.

Plaintiffs' Motion does not come close to meeting these standards.

### III. Plaintiffs' Motion Fails to Present an Intervening Change in Controlling Law, the Availability of New Evidence, or the Need to Correct Clear Error or Manifest Injustice.

#### A. Plaintiffs Identify No Proper Basis for the Court to Reconsider its Order Granting Quadranet's Motion to Dismiss.

Plaintiffs fail to identify any proper basis for reconsideration of the Order under Rule 60, including any legal authority or facts that the Court erroneously considered (or failed to consider). Plaintiffs are thus forced to retreat to a multi-page discussion of "null routing," encryption, IP address blocking, and other highly technical red-herrings. Despite this irrelevant misdirection, the Motion fails to address the heart of the matter: **Quadranet was several steps removed from the alleged infringement, did not have knowledge or materially contribute to it, and had no legal right to supervise, control, or stop the infringing activity.** That is a reality that the Plaintiffs never could (or wanted to) come to terms with during this lawsuit; and even after the Dismissal Order, Plaintiffs are *still* vexatiously litigating the case in an unreasonable manner, needlessly increasing costs, and causing further prejudice to Quadranet. Such prejudice has now forced Quadranet to incur more fees by disputing each of the Plaintiffs' red-herrings, in turn.

1. The Court Correctly Determined that "Null Routing" and Quadranet's Ability to "Blackhole Filter" its Customers is an Impermissibly Broad Measure that Does Not Constitute a Practical Ability to Police Infringing Activities of Third Parties.

Plaintiffs repeat their argument that Quadranet should have interfered in the relationship between Quadranet's VPN clients (such as LiquidVPN or TorGuard) and those VPN clients' customers. Quadranet already addressed this argument [D.E. 108, p. 27-28; D.E. 123, p. 14-15], and so too did the Court. [D.E. 173, p. 31]. Plaintiffs' "null routing" theory is an improper attempt to relitigate matters previously considered and rejected by this Court. *See Barsoum v. United States*, No. 8:15-cv-2322, 2017 U.S. Dist. LEXIS 229370, at *5-6 (M.D. Fla. Jan. 12, 2017) ("Motions to reconsider are not platforms to relitigate arguments previously considered and rejected.").

Plaintiffs' arguments are technically false and unsupported by any case law, "new evidence," or "strongly convincing" argument that might warrant reconsideration of the Court's Order. Quadranet did not have specific knowledge of infringing activities and could not have had such knowledge given *Plaintiffs'* own theory of the case: that infringement was occurring via John Does using the BitTorrent protocol, with such traffic consisting of an "unusable chunk of zeroes and ones" which is indecipherable until the work is reconstituted on the end user's computer. *See Ingenuity 13,*

5.

*LLC v. Doe*, 2013 WL 765102, at *3 (C.D. Cal. Feb. 7, 2013); *see also* ECF No. [96] ⁋168.[5] In plain terms, the existence of "simple measures" to prevent piracy are only potentially relevant if a defendant had specific knowledge of the infringing activities. Because Quadranet did not (and could not) have such specific knowledge, Plaintiffs' "simple measures" argument is and was irrelevant.

Plaintiffs' Motion repeats the argument that Quadranet could have "null routed" an IP address used by the VPN companies (in turn used by many of the VPN companies' customers). The reality is that this overbroad method is akin to "killing an ant with a sledgehammer," which has significant and widespread ramifications, including the denial of service to scores of legitimate users. Although this argument is an improper basis of reconsideration under Rule 60, Quadranet offers further explanation to debunk it. Quadranet, like other companies in its field, reassigns a small block of IP Addresses to its clients (including VPN clients) so that third party customers of the VPN clients can then, in turn, use those IP addresses to browse the internet through the VPN.[6] Stated differently, when a user of a VPN service browses the internet, the outward facing IP Address of the user is that of the VPN server, and not that of the user's own device (such as a personal computer) from which the user accesses the internet through the VPN. VPN companies may use a single IP Address to relay *hundreds of thousands* of VPN requests through a process known as Network Address Translation. As explained by Quadranet in its Motion to Dismiss [D.E. 108, p. 27], "null routing" a single IP Address can improperly deny service to many users, not just the ones using the BitTorrent software. Plaintiffs had no answer to this point before, and its attempt to re-argue it now fails the same.

Further, IP addresses are "dynamic" in that they are periodically reassigned. By example, one user may be assigned a particular IP address for a certain period of time (*e.g.*, two weeks), or IP addresses may be reassigned every time a user begins a new session. For this additional reason, Plaintiffs' null-routing argument makes no sense, because *even if* the drastic step of null routing one particular IP address was taken (due to an instance of alleged piracy on that IP address): **(a)** the IP address would be useless to the next user after the alleged infringer has turned it over; and **(b)** the

---

[5] Plaintiffs' specious argument that some of the works "may" have been reconstituted on Quadranet's servers before being sent to the end user was already debunked in Quadranet's Motion to Dismiss, and is again proven false throughout this memorandum.

[6] Again, the use of a VPN is perfectly legitimate and lawful, and Court systems even employ the use of VPN technology. *See* the "Information Technology Policy" for the U.S. District Court for the District of Maryland, stating that "[r]emote access to Court systems is provided using a **VPN connection** through JPort and then a connection to the employee's work computer. (https://www.mdd.uscourts.gov/sites/mdd/files/EmployeeITPolicy.pdf).

alleged infringer would be able to carry on pirating content as soon as it received a new IP address. Plaintiffs attempt to side-step this fact by claiming (improperly for the first time in its Motion) that TorGuard offers "static" IP addresses – to support the notion that null routing is feasible – but this is the exception that proves the rule. Moreover, this new allegation is unsupported by "new evidence" much less evidence as to how many users opt for this special service compared to how many use a dynamic IP address. Even so, the "dynamic" versus "static" comparison is a distinction without a difference, as a user with a static IP address that finds itself null routed can simply request a new static IP address and carry on with the alleged activity.

As the Court already considered, an across-the-board termination (*i.e.* null-routing IP addresses) would cause several disruptions and interference between Quadranet and its business relationships with its VPN clients (and would have a downstream effect on those VPN clients' numerous customers). To suggest that Quadranet should take such drastic steps – based solely on unsupported DMCA notices from third parties – is plainly absurd, and would otherwise put Quadranet in the untenable position of facing potential claims of wrongdoing by the Plaintiffs, or facing potential claims of tortious interference from VPN clients and those clients' customers.[7] There was no error in the Court's Order dismissing Quadranet from the lawsuit because the SAC failed to sufficiently allege that Quadranet could have taken simple measures to prevent further infringement, and because Quadranet did not have the ability to supervise, control, or stop the infringing activity. Any attempt to relitigate this issue fails under Rule 60.

2. Plaintiffs' Alleged Settlement with a Non-Party "Sharktech, Inc." [D.E. 180, p. 7] is Irrelevant and Does Not Constitute New Evidence.

As noted throughout this opposition, Plaintiffs' Motion does not cite any legal authority or "intervening change in the law" that might justify reconsideration of the Dismissal Order. The Motion also fails to point to any "clear and obvious" error in the Dismissal Order that was not at "least arguable." *Barsoum v. United States*, 2017 U.S. Dist. LEXIS 229370, at *5 (M.D. Fla. Jan. 12, 2017) ("An error is not 'clear and obvious' if the legal issues are 'at least arguable.'").

Plaintiffs are left pointing to supposed "new evidence" in the form of a stipulated dismissal in another case. That dismissal is irrelevant to the merits of Plaintiffs' Motion and should not be

---

[7] This is why, as Plaintiffs note on page 5 of their Motion for Reconsideration, Quadranet *gives its VPN clients* the ability to take actions relative to *their own* customers. So when Quadranet allegedly received the notices from Plaintiffs, no one had accused Quadranet's clients of wrongdoing or violations of Quadranet's Terms of Service; rather, it was the downstream users that were accused of alleged copyright infringement via the notices.

considered under Rule 60. If anything, this self-serving document speaks to Plaintiffs' campaign of harassment against other companies.

Moreover, a "Stipulation of Dismissal of Sharktech, Inc." [D.E. 180-2] is not "new evidence" supporting Plaintiffs' case against Quadranet, nor does that stipulated dismissal affect the propriety of the Court's Order. *See, e.g., Rai v. Dynagear, Inc.*, 2000 U.S. Dist. LEXIS 11448, at *36-37 (N.D. Ill. June 23, 2000) ("Plaintiff's desperate assertion that his 'statistical proof proves [his] prima facie case,' is just another poignant reminder that just because Plaintiff says something does not make it so.").

*First*, the evidence is nothing that Plaintiffs suddenly "discovered." According to the docket, Plaintiffs had also ensnared Sharktech, Inc. in a lawsuit since **May of 2021** alleging secondary liability claims. *See* **Exhibit 1**. And, like Quadranet did in the instant case, Sharktech, Inc. also sought to dismiss such claims pursuant to Fed. R. Civ. P. 12(b)(6). *See* **Exhibit 2**. Shortly thereafter, the defendant Sharktech apparently entered into a "confidential settlement agreement" with the Plaintiffs.[8] **Exhibit 3**. The conclusion of a months-long litigation against Sharktech hardly constitutes "new evidence," much less evidence that has any bearing on this Court's ruling. *See Torah Soft Ltd. v. Drosnin*, 2001 U.S. Dist. LEXIS 19217, at *15 (S.D.N.Y. Nov. 27, 2001) ("a party that knowingly gambles on an unreasonable legal theory in order to achieve a secondary gain -- in this case, the leveraging of a settlement -- is indeed improperly motivated.").

*Second*, other than Plaintiffs' belated and improper "say so," there is no evidence that Quadranet and Sharktech operate in the same manner, employ the same procedures, and have the same technological capabilities and practices. Whatever Sharktech may or may not do (or whatever "efforts" it may try to do relative to blocking certain websites) cannot be imputed to Quadranet and are improperly considered in *this* case.

*Third*, the Stipulation of Dismissal (**Exhibit 3**) reveals that as part of the confidential settlement agreement, Sharktech made a commitment *to try* to block certain pirating sites. *Id.* at p. 2 (stating that Sharktech would "*use commercially reasonable efforts to block*" alleged piracy websites). The dismissal does **not** state that Sharktech has the capacity, ability, and control to permanently and forever block access to the listed websites.[9] As stated in the Stipulation for Dismissal, Sharktech agreed to

---

[8] That confidential settlement agreement is not before this Court, and is irrelevant in any event.

[9] Furthermore, whatever Sharktech's "efforts" might be, the same problem will occur from the issues highlighted above, namely, that blocking a particular IP address is only workable until the website or the user obtains a new IP address. At that point, traffic can proceed to and from the new IP address unimpeded.

use *unspecified* "efforts" to block the "known" and "current" IP addresses associated with those websites. Logically then, once these websites obtain new IP addresses and point their domain name servers to the new IP address, BitTorrenters pointing their traffic through Sharktech's servers will be able to visit these sites once again.

In the final analysis, Plaintiffs' attempt to inject the Stipulated Dismissal of Sharktech into *this* case, and argue that it is somehow relevant to the Court's Order, is frivolous. It is yet another red-herring, plainly irrelevant to the propriety of the Order and the Court's legal analysis, and fails to constitute "new evidence" sufficient to merit reconsideration of the Dismissal Order.

3. Plaintiffs' Attempt to Relitigate the Encryption Issue Should Be Rejected.

The Dismissal Order recognized that "Quadranet was unaware of any specific infringing activity," and that "Plaintiffs notably fail to address Quadranet's argument that the encryption prevents Quadranet from knowing specific infringing activity." [D.E. 173, p. 26]. Faced with this ruling, Plaintiffs would like a belated do-over. They now try to argue that not all transmissions by a VPN company were encrypted, pointing to a secondary service (a so-called "proxy" service) offered by one of the VPN companies, TorGuard.[10] First, this argument is untimely and improperly raised in a reconsideration motion. Second, it is misleading and unsupported: it appears that this so-called "proxy service" is *separate* from TorGuard's VPN service. Plaintiffs now theorize that some users *may* have been using the "proxy service" instead of the VPN service, and that traffic sent via the proxy service *may* not have been encrypted. One struggles to understand how this argument somehow changes the propriety of the Court's Order.

Even assuming that this argument was properly raised, and assuming *arguendo* that Plaintiffs' broad assertions were true (*i.e.* that traffic sent via a proxy service was not encrypted such that it can be "seen" in transit), Plaintiffs present no evidence and point to no allegation in the SAC that: **(a)** TorGuard's proxy server was a Quadranet server or that Quadranet could even "view" the traffic; or **(b)** how many of TorGuard's users opted for this service instead of the VPN service. More importantly, even if one could "see" the proxy service traffic in transit, the Court's Dismissal Order no doubt recognized that the BitTorrent traffic is merely an "unusable chunk of ones and zeros" until

---

[10] As evidence that this separate proxy service did not encrypt its user's traffic, a screenshot of a portion of a discussion on a TorGuard support forum is presented in the declaration of Kerry Culpepper. Notably though, the declaration presents only a small excerpt of the discussion and intentionally cuts out the remaining discussion which provides the important context and calls into question the accuracy of the portion relied on by Plaintiffs.

9.

it is recombined on the end user's computer into a complete media file. In short, even if the traffic was not encrypted (of which there is no evidence), there still would be no way to determine whether such unencrypted "chunks" pertain to a copyrighted work until they are recombined.

Plaintiffs also resort to false aspersions that they know are untrue. They argue that "Quadranet's subscribers are ones who used Quadranet's servers to store pirated copies of Plaintiffs' Works…." [D.E. 180, p.8]. This accusation is recklessly false, unsupported by evidence, and is contrary to Plaintiffs' own theory of infringement occurring via BitTorrent, where the only traffic that passes between peers on the BitTorrent network are "unusable chunks of ones and zeroes" that are only combined into a media file on the end user's computer. As discussed now at length, *even if* Quadranet was able to see the traffic routed through TorGuard's proxy server, it would only see those "unusable chunks of ones and zeros" and would have no way to determine that whether those chunks of data pertained to a copyrighted work. *Id.*

Turning to the argument that VPN services may not encrypt traffic, once again Plaintiffs' alleged "evidence" is the exception that proves the rule. The article that Plaintiffs cite to [D.E. 180, p. 8] is from December of **2018**, and therefore is not "new evidence." The article was *not* part of the Plaintiffs' prior opposition, and therefore should not be considered now. Nevertheless, this new article – cited for the proposition that not all VPN providers encrypt traffic [D.E. 180, p. 8] – discusses that the **lack of encryption** was surprising to the industry, against the norm, and conducted against the expectations of that company's customers. It is expected that a VPN provider will encrypt traffic, and to quote from the article, "**[t]his behavior is very different from that of a normal VPN solution where all internet traffic is routed through an encrypted VPN tunnel**…" *Id.* (emphasis added). Plaintiffs have advanced no "new evidence" to suggest that Quadranet's VPN subscribers deviated from the industry norm in this manner, and therefore, Plaintiffs' argument that the Dismissal Order was based on an incorrect assumption that all traffic flowing through Quadranet's servers was encrypted is baseless, irrelevant, and insufficient to disturb the Order.

4. <u>The Court's Order Correctly Dismissed Plaintiffs' Causes of Action, as no Copies of the Pirated Works were Stored on Quadranet's Servers</u>.

Plaintiffs' new arguments (improperly raised in a motion for reconsideration) regarding TorGuard's "special proxy link" are another red-herring. According to Plaintiffs, TorGuard provides its users with specific proxy server settings for their BitTorrent software, which points the user's BitTorrent client at TorGuard's proxy servers. These settings "tunnel all your torrent traffic through a secure server." [D.E. 180, p. 9]. With no citation to any legal authority or "new evidence," Plaintiffs

10.

then make an incredible leap to assume that the "unusable chunks" of BitTorrent traffic are somehow reconstituted on Quadranet's server (which again Plaintiffs know is untrue). The key words quoted by the Plaintiffs are "tunnel" and "through," because these settings do not differ from the basic functionality of a VPN server, in that it is merely a conduit for internet traffic and, in the case of BitTorrent, a conduit for the "unusable chunks of zeroes and ones" that are only combined into a usable media file on the end user's computer. Plaintiffs present no "new evidence" that the works are recombined or stored on Quadranet's servers (which they are not). As such, this argument provides no basis for reconsideration of the Court's Order.

5. Notwithstanding Plaintiffs' Shifting Allegations, DOES 1-100 are End Users, and Plaintiffs' Assertion that DOES 1-100 are Quadranet's Subscribers is not Credible and Contradicts Plaintiffs' Theory of Infringement.

Plaintiffs repeat another baseless argument that only demonstrates their vexatious and willfully blind behavior towards Quadranet. Ostensibly in an attempt to make Quadranet appear more closely connected to the alleged wrongdoing, Plaintiffs claim that Quadranet's own subscribers are guilty of direct infringement and that they constitute the "DOES 1-100" who are committing infringement (as Quadranet is only alleged to be liable on a secondary basis). This assertion is neither credible, nor does it comport with Plaintiffs' theory of infringement.

In a BitTorrent network, each user hosts a copy of the work which is available from his or her own computer and when a new user wishes to download a copy of the work from the network, each host provides a portion of the work, which is transmitted as "unusable chunks of zeroes and ones" that are only combined into a complete copy of the work on the new user's computer. *See Malibu Media, LLC v. Doe*, 2012 U.S. Dist. LEXIS 89286, at *1-4 (C.D. Cal. June 27, 2012) (explaining how files are shared via BitTorrent). Quadranet's subscribers such as LiquidVPN are a conduit through which the "unusable chunks" are transmitted and do not engage in any "volitional" act of copying necessary for direct liability to apply to them. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) (finding no direct liability because the "volitional conduct that causes the copy to be made" was carried out by end users who "actually presse[d] the button to make the recording, [that] supplies the necessary element of volition").

Knowing full well that *Quadranet's* subscribers could not be sued for direct infringement, Plaintiffs initially pleaded the claims in this fashion: only the "Does 1-100" were sued for direct infringement, and the LiquidVPN defendants were sued for contributory infringement. [D.E. 1, p. 31-32]. Plaintiffs then "shifted" the definition of "DOES 1-100" in later amended pleadings to include

the LiquidVPN defendants as part of a last-ditch effort to bring Quadranet one step closer to the infringing conduct. The Court should give no credence to this tactic, and there is no "new evidence" supporting this allegation, much less a demonstration of error that would compel reconsideration of the Order.

### B. The Court's Order Correctly Dismissed the Plaintiffs' State Law Claims.

On page twelve (12) of their Motion for Reconsideration, and as it relates to the dismissal of their state law claims, Plaintiffs split hairs about whether discovery in the case has been "extensive." Again, the Court's findings are "at least arguable," and Plaintiffs' argument does not establish any basis to reconsider the Order. *Barsoum v. United States*, 2017 U.S. Dist. LEXIS 229370, at *5 (M.D. Fla. Jan. 12, 2017) ("An error is not 'clear and obvious' if the legal issues are 'at least arguable.'"). It is undisputed that Plaintiffs and Quadranet attended the required Rule 16 conference, and submitted joint scheduling reports to the Court. Quadranet was forced to file a motion to dismiss the Plaintiffs' First Amended Complaint, and an entirely new motion to dismiss the SAC. During the lawsuit, Plaintiffs propounded expansive and sweeping discovery requests on Quadranet, which effectively required Quadranet to sift through nearly **250,000 entries** on an excel spreadsheet (with each entry containing several columns, including columns for IP addresses as well as a particular date and time). As a result, Quadranet incurred needless expense by preparing objections to such burdensome discovery. Quadranet asked that, at a minimum, Plaintiffs agree to a stay of discovery until the pending Motion to Dismiss was resolved. [D.E. 103]. Plaintiffs refused and – pushing the envelope even further – set a discovery hearing with the Magistrate Judge (*i.e.* the equivalent of a motion to compel under the Magistrate's discovery procedures). [D.E. 157]. Prior to that hearing, Quadranet re-allocated its company resources and several individuals versed in information technology ("IT") to work *exclusively* on the Plaintiffs' discovery requests, rather than to support the business operations of Quadranet. With lost resources and person-hours dedicated to the Plaintiffs' discovery requests, Quadranet incurred extraordinary expense in sifting through those hundreds of thousands of entries. This bad faith discovery tactic caused Quadranet to take on significant expense in Plaintiffs' losing cause. Thus, it was not "clear error" for the Court to conclude that extensive discovery of Quadranet took place.

Even if Plaintiffs continue to bicker on this point, the Eleventh Circuit has recognized that the "district court is in the best position to weigh the competing interests . . . in deciding whether it is appropriate to exercise supplemental jurisdiction." *Bravo v. Loor-Tuarez*, 727 F. App'x 572, 576 (11th Cir. 2018) (citation omitted). "A district court therefore has the discretion to continue

to exercise jurisdiction over state law claims in a case even after dismissing the federal claim that created the original jurisdiction." *Id.* Here, and regardless of whether discovery was extensive or not, the Court exercised its discretion and jurisdiction relative to the Plaintiffs' state law claims, and dismissed them pursuant to Fed. R. Civ. P. 12(b)(6). There is no basis to disturb the Court's discretion on this point, and the Motion for Reconsideration should be denied.

> **C. The Dismissal Order was Correctly Decided as to 42 Ventures LLC Since the SAC was Inartfully Pled, and Also Because 42 Ventures, LLC Waived This Argument by Failing to Raise it in the First Instance.**

Plaintiffs make several arguments that do not concern or pertain to the Court's analysis of Quadranet's secondary liability. Quadranet addresses these arguments in turn.

Plaintiffs first argue the Order "erroneously refers to Plaintiff 42 Ventures, LLC even though [42 Ventures] never made claims against Quadranet." [ECF No. 180, p. 3]. Plaintiffs seek a ruling that effectively removes 42 Ventures, LLC from the underlying Dismissal Order. However, this argument can (and should) be easily disposed of for several reasons.

> 1. The SAC was Poorly Pled to the Detriment of the Plaintiffs, Because Although the Causes of Action Specified Which Defendant(s) were Being Sued, Each Cause of Action Failed to Specify *Which Plaintiff(s)* were Asserting the Claim.

In the SAC, and although Plaintiffs identified which defendant(s) were being sued for each cause of action, the SAC failed to specify *which particular plaintiff(s)* were bringing the underlying claim. For the Court's ease of reference, this indisputable fact is shown in each box below, which is taken directly from the relevant portions of the FAC:

**[Remainder of Page Left Intentionally Blank]**

| |
|---|
| **FIRST CLAIM FOR RELIEF**<br>(Direct Copyright Infringement against Defendants 1701, AUH2O, TorGuard, Muszynski and DOES 1-100) |
| **SECOND CLAIM FOR RELIEF**<br>(Contributory Copyright Infringement by Intentional Inducement against Defendants 1701, AUH2O, Muszynski and TorGuard) |
| **THIRD CLAIM FOR RELIEF**<br>(Contributory Copyright Infringement based upon Material Contribution against all Defendants) |
| **FOURTH CLAIM FOR RELIEF**<br>(Vicarious Infringement against LiquidVPN, TorGuard, DOES 1-100 and QuadraNet) |
| **FIFTH CLAIM FOR RELIEF**<br>(Secondary Liability for Digital Millennium Copyright Act Violations against LiquidVPN) |
| **SIXTH CLAIM FOR RELIEF**<br>(Negligence against QuadraNet) |
| **SEVENTH CLAIM FOR RELIEF**<br>(Fraud against QuadraNet) |
| **EIGHTH CLAIM FOR RELIEF**<br>(Equitable Estoppel against QuadraNet) |
| **NINTH CLAIM FOR RELIEF**<br>(Trademark Infringement against Defendants 1701, AUH2O and Muszynski) |
| **TENTH CLAIM FOR RELIEF**<br>(Federal Unfair Competition against Defendants 1701, AUH2O and Muszynski) |
| **ELEVENTH CLAIM FOR RELIEF**<br>(Breach of Contract against 1701, AUH2O and Muszynski) |
| **TWELFTH CLAIM FOR RELIEF**<br>(Unjust enrichment against 1701, AUH2O and Muszynski) |
| **THIRTEENTH CLAIM FOR RELIEF**<br>(Breach of David Cox's Statutory and Common Law Right of Publicity against 1701, AUH2O and Muszynski) |

As shown immediately above, and although each cause of action detailed which *defendant(s)* were being sued for each claim, the heading failed to specify *which "Plaintiffs"* were actually asserting the claim. All of the Plaintiffs were the master of their own complaint, and the Court should not

14.

second guess Plaintiffs' decision not to plead each claim in a clear manner. *See Gomez v. City of N.Y.*, 2016 U.S. Dist. LEXIS 128338, at *24-25 (S.D.N.Y. Sep. 14, 2016) ("Plaintiff is the master of [ ] his complaint; the court will not second guess the decision not to plead the claim"). Based upon this pleading deficiency alone, Plaintiffs' Motion for Reconsideration should be denied.

2. The SAC Improperly "Lumped" All of the Plaintiffs Together in the Allegations Asserted Against Quadranet.

Running in tandem to the point made immediately above, many of the underlying allegations in the SAC also failed to separate out, or otherwise distinguish, which of the "Plaintiffs" were making the accusation. For example, in Count IV against Quadranet, the allegation was made that "QuadraNet could take simple measures such as null-routing IP addresses to stop unauthorized distribution of **Plaintiffs' Works** over servers QuadraNet leases to its subscribers but purposefully refuse to do so." [D.E. 96 at ¶426]. In Count VI against Quadranet, the allegation was made that the "**Plaintiffs** relied on QuadraNet's misrepresentations when determining the proper abuse contact for sending notices of infringement at the certain IP addresses," and that the "**Plaintiffs** had a right to rely on QuadraNet's misrepresentations in the Whois records." *Id.* at ¶456-457. Repeatedly lumping all of the "Plaintiffs" together, the SAC alleged that:

> 458. QuadraNet knew that rightsowners including **Plaintiffs** were relying on QuadraNet's misrepresentations when determining the proper abuse contact for sending notices of infringement at the certain IP addresses.
>
> 459. Rights owners such as **Plaintiffs** are third party beneficiaries of QuadraNet's agreement with ARIN to properly update the Whois records so that they can promptly contact the responsible party to stop abuse.
>
> 460. QuadraNet had a duty to rightsowners including **Plaintiffs** to publish accurate information in the Whois records.
>
> 461. **Plaintiffs** have suffered damages based upon QuadraNet's misrepresentations. **Plaintiffs'** agents have been unable to promptly send notices to the appropriate party that could and would have taken actions to stop further infringements of their Works.
>
> 462. The acts and misrepresentations of QuadraNet constitute negligent misrepresentation. Such conduct was the cause of **Plaintiffs'** damages, and **Plaintiffs** have incurred damage as a result of QuadraNet's misrepresentations.

*Id.* at ¶458-462 (emphasis added). This pleading deficiency poured into the fraud claim (Count VII) as well, which asserted that the "**Plaintiffs** have suffered damages based upon QuadraNet's

15.

misrepresentations. **Plaintiffs'** agents have been unable to send notices to the appropriate party that could have and would have taken actions to stop further infringements of their Works." *Id.* at ¶469 (emphasis added). In the equitable estoppel claim (Count VIII), and once again failing to distinguish whether 42 Ventures, LLC was included or not, the allegation was made that the "**Plaintiffs** relied on" various purported representations by Quadranet. *Id.* at ¶478-483 (emphasis added). For this reason as well, the Court's Order of Dismissal was correct as to all Plaintiffs (including 42 Ventures).

      3. <u>All Plaintiffs (including 42 Ventures, LLC) Sought Affirmative Relief Against Quadranet</u>.

Contrary to the assertion made in their Motion, all Plaintiffs (including 42 Ventures, LLC) sought affirmative relief against Quadranet. One such example occurred where the term "Plaintiffs" was defined to include 42 Ventures, LLC [ECF no. 125, p .2], and where those "Plaintiffs" (including 42 Ventures, LLC) specifically sought a permanent injunction against Quadranet:

> **Plaintiffs further seek an order pursuant to 28 U.S.C §1651(a) that QuadraNet Inc., QuadraNet Enterprises LLC**, Namecheap, Enom, Spectrum and any other service provider cease providing service for the LiquidVPN Defendants that, upon Plaintiffs' request, those in privity with the LiquidVPN Defendants and those with notice of the injunction, including any Internet search engines, Web hosts, domain-name registrars, and domain name registries and/or their administrators that are provided with notice of the injunction, cease facilitating access to any or all servers, domain names and websites through which the LiquidVPN Defendants engage in the aforementioned infringements.

[ECF no. 125, p. 21]. Although Plaintiffs (including 42 Ventures, LLC) ultimately retracted their request for permanent injunctive relief again Quadranet, the fact remains that **all** Plaintiffs sought affirmative and permanent relief *against* Quadranet. Accordingly, the Court's Order of Dismissal was both correct and just.

      4. <u>Plaintiffs Failed to Raise This Issue Before, and Therefore Waived this Argument by Raising it for the First Time in a Motion for Reconsideration</u>.

Given the deficient and poorly pled SAC, Quadranet sought dismissal of *all* claims by *all* of the Plaintiffs. *See* [D.E. 108, p. 12, requesting that the "Court dismiss the latest complaint, the Second Amended Complaint [D.E. 96] ("SAC"), *with prejudice*."] (emphasis in original). Yet in their opposition to Quadranet's motion to dismiss, Plaintiffs never once argued that: **(a)** 42 Ventures, LLC had not asserted any allegations against Quadranet; **(b)** 42 Ventures, LLC was not part of the "Plaintiffs" that were lumped together in the SAC [as Quadranet demonstrated above in Section III(C)(2)]; or **(c)** 42 Ventures, LLC should otherwise be left out of the equation in terms of a potential order of dismissal order. [*See generally* ECF No. 117].

16.

As a result of this omission, Plaintiffs' "argument raised for the first time in a motion for reconsideration is waived." *Brown v. Anselme (In re Polo Builders, Inc.)*, 374 B.R. 638, 642 (Bankr. N.D. Ill. 2007); *see also Laserage Techn. Corp. v. Laserage Labs., Inc.*, 972 F.2d 799, 804 (7th Cir. 1992) (stating that an argument not raised until a motion for reconsideration is "too little, too late"); *Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 553 (6th Cir. 2008) (explaining that issues raised for the first time in motions for reconsideration are considered waived). Plaintiffs' argument as to 42 Ventures, LLC is "too little, too late," and should receive no consideration.

D. **The Dismissal Order was Correctly Decided as to Plaintiffs After Productions, LLC, SF Film, LLC and State of the Union Distribution and Collections LLC.**

1. Notwithstanding Their Notice of Dismissal [D.E. 105], Plaintiffs After Productions, LLC, SF Film, LLC and State of the Union Distribution and Collections LLC *Sought Permanent Injunctive Relief* Against Quadranet.

Plaintiffs After Productions, LLC, SF Film, LLC and State of the Union Distribution and Collections LLC assert that the Order of Dismissal against them was incorrect, since they filed a notice of voluntary dismissal before Quadranet's Motion to Dismiss the SAC. [D.E. 105]. Even if true, that does not negate the fact that these *same plaintiffs* sought affirmative relief against Quadranet through a request for a permanent injunction:

> Plaintiffs MILLENNIUM FUNDING, INC., VOLTAGE HOLDINGS, LLC, AMBI DISTRIBUTION CORP., AFTER PRODUCTIONS, LLC, AFTER II MOVIE, LLC, MORGAN CREEK PRODUCTIONS, INC., MILLENNIUM FUNDING, INC., BEDEVILED LLC, MILLENNIUM MEDIA, INC., COLOSSAL MOVIE PRODUCTIONS, LLC, YAR PRODUCTIONS, INC., FSMQ FILM, LLC, FW PRODUCTIONS, LLC, MILLENNIUM IP, INC., I AM WRATH PRODUCTION, INC., KILLING LINK DISTRIBUTION, LLC, BADHOUSE STUDIOS, LLC, LF2 PRODUCTIONS, INC., LHF PRODUCTIONS, INC., VENICE PI, LLC, RAMBO V PRODUCTIONS, INC., RUPTURE CAL, INC., MON, LLC, SF FILM, LLC, SPEED KILLS PRODUCTIONS, INC, MILLENNIUM IP, INC., NIKOLA PRODUCTIONS, INC., WONDER ONE, LLC, BODYGUARD PRODUCTIONS, INC., OUTPOST PRODUCTIONS, INC., GLACIER FILMS 1, LLC, DEFINITION DELAWARE LLC, HANNIBAL CLASSICS INC., JUSTICE EVERYWHERE PRODUCTIONS LLC, STATE OF THE UNION DISTRIBUTION AND COLLECTIONS, LLC, PARADOX STUDIOS, LLC, DALLAS BUYERS CLUB, LLC, HITMAN TWO PRODUCTIONS, INC., and SCREEN MEDIA VENTURES, LLC ("Copyright Plaintiffs") and 42 VENTURES, LLC ("42") (all collectively "Plaintiffs"), move this honorable Court for Entry of Final Default Judgment against

17.

[D.E. 125]. As shown above, and after defining all of these entities as the "Plaintiffs," those entities then sought permanent injunctive relief against Quadranet:

> Plaintiffs further seek an order pursuant to 28 U.S.C §1651(a) that QuadraNet Inc., QuadraNet Enterprises LLC, Namecheap, Enom, Spectrum and any other service provider cease providing service for the LiquidVPN Defendants that, upon Plaintiffs' request, those in privity with the LiquidVPN Defendants and those with notice of the injunction, including any Internet search engines, Web hosts, domain-name registrars, and domain name registries and/or their administrators that are provided with notice of the injunction, cease facilitating access to any or all servers, domain names and websites through which the LiquidVPN Defendants engage in the aforementioned infringements

[D.E. 125]. Plaintiffs – and specifically After Productions, LLC, SF Film, LLC and State of the Union Distribution and Collections LLC – cannot have it both ways by "withdrawing" their claims for affirmative relief on the one hand, and then later specifically seeking *permanent* injunctive relief against Quadranet on the other. The Dismissal Order was correctly decided in this regard as well.

**E. Quadranet Does Not Object to This Court Clarifying Two (2) Issues, to the Extent Necessary.**

**1. Quadranet Does Not Object to the Court Clarifying That the Dismissal Order Does Not Apply to Hunter Killer Productions, Inc., 211 Productions, Inc., and Millennium SPVH, Inc.**

The Motion requests that Hunter Killer Productions, Inc., 211 Productions, Inc., and Millennium SPVH, Inc. be removed from the Order. More specifically, although "these entities were Plaintiffs in the Original Complaint and FAC, they were not Plaintiffs in the SAC." [D.E. 180, p. 4]. To the extent necessary, Quadranet does not object to the Court's clarification in this regard. For efficiency purposes, and in addition to clarifying that the Order constitutes a final judgment (discussed immediately below), a subsequent order could make clear that it does not apply to Hunter Killer Productions, Inc., 211 Productions, Inc., and Millennium SPVH, Inc.

**2. Quadranet Does Not Object to the Court Clarifying That the Dismissal Order Constitutes a Final Judgment in Favor of Quadranet.**

On pages 13-14 of their Motion, Plaintiffs request "clarification" as to whether the Dismissal Order constitutes a final judgment. Pursuant to Fed. R. Civ. P. 58, every judgment must be set forth

18.

on a separate document, in order to ensure that the time for appeal does not linger indefinitely. *See* Fed. R. Civ. P. 58, Advisory Committee Notes for the 2002 Amendments. Accordingly, Quadranet does not object to this Court clarifying, to the extent necessary, that the Dismissal Order does in fact constitute a final judgment in favor of Quadranet in all respects.

## V.   CONCLUSION

WHEREFORE, based upon the foregoing arguments and legal authorities, Quadranet respectfully requests that the Court enter an order (1) denying the Plaintiffs' Motion; (2) clarifying, to the extent necessary, those two issues addressed immediately above in Section III(E); and (3) granting Quadranet such other and further relief that the Court deems just and proper.

Respectfully submitted,

Dated:  February 15, 2022

Jonathan Woodard
John Cyril Malloy, III
Florida Bar No. 964,220
jcmalloy@malloylaw.com
Peter A. Matos
Florida Bar No. 992,879
pmatos@malloylaw.com
Oliver Alan Ruiz
Florida Bar No. 524,786
oruiz@malloylaw.com
Jonathan R. Woodard
Florida Bar No. 096,553
jwoodard@malloylaw.com
W. John Eagan
Florida Bar No. 105,101
Johneagan@malloylaw.com
**MALLOY & MALLOY P.L.**
2800 S.W. Third Avenue
Miami, Florida 33129
Telephone (305) 858-8000

*Of Counsel:*
Bobby Ghajar (*pro hac vice*)
bghajar@cooley.com
**COOLEY LLP**
1333 2nd Street, Suite 400
Santa Monica, CA 90401
Tel: 310-883-6400
*Attorneys for Quadranet, Inc. and Quadranet Enterprises, LLC*

19.