**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 21-cv-20862-BLOOM/Otazo-Reyes

MILLENNIUM FUNDING, INC. et al,

     Plaintiffs,

     vs.

1701 MANAGEMENT LLC et al,

     Defendants.

_____

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR
RECONSIDERATION OF ORDER [DOC. #173]**

20-023DBa

Plaintiffs established that the Order includes numerous clear errors of fact such as: misapprehending null-routing an IP address with terminating an entire VPN subscriber account; stating that all the data transmissions on Quadranet's servers of VPN subscribers were encrypted; including Plaintiffs that had dismissed or even never asserted claims against Quadranet; and stating that the parties engaged in extensive discovery.   With the benefit of just weeks of cooperative discovery with TorGuard, Plaintiffs have established that at least nearly 40 percent of the notices sent to the abuse contact Quadranet published in ARIN WHOIS concerned <u>unencrypted</u> traffic, and thus Quadranet's arguments that the data was unviewable because it was encrypted is completely inaccurate.   Accordingly, reconsideration is appropriate because "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Williams v. Mosley,* No. 21-cv-23242-BLOOM/Otazo-Reyes*, 2022 WL 168541.* At the very least, the Order should be amended to dismiss Plaintiffs claims against Quadranet <u>without prejudice</u>.

## I.    ARGUMENT

**A.    Plaintiffs have pointed out clear errors in the Order.**

**1.    Quadranet continues to conflate null-routing a single IP address with all IP addresses.**

Quadranet does not dispute that the Court was incorrect when characterizing Plaintiffs' asserted anti-piracy measure as null-routing *all* the IP addresses of the subscriber rather than null-routing the IP addresses of ongoing infringement.   Quadranet first attempts to recast and disparage Plaintiffs' argument as interfering in the relationship of its customer, but Plaintiffs presented undisputed evidence that shows null-routing IP addresses is Quadranet's exact business practice. *See* Aff. of Cox [Doc. #96-9] at ¶3 ("Repeated unresolved or high priority issues may result in *a filter being applied to your uplink*.")   Quadranet does not refute this point or Plaintiffs' allegation that it null-routed IP addresses of its subscriber Alpharacks. *See* SAC at ¶312. Quadranet's subscriber TorGuard points out that it would have adopted a firewall to filter out BitTorrent traffic sooner if Quadranet had done like the "common practice in the industry…even if the subscriber is a VPN provider" and null-routed its IP address where the piracy was reported in the notices. *See* Joint Statement of Undisputed Facts ("Facts") [Doc. #200-1] at ¶16.   Quadranet's reliance on the unpublished decision of *Barsoum v. United States*, No. 8:15-cv-2322, 2017 U.S. Dist. LEXIS 229370, (M.D. Fla. Jan. 12, 2017) is misplaced because *Barsoum* was attempting to relitigate a

rejected motion to vacate (*see Id.* at *6) while Plaintiffs are pointing out this Court's clear error in misapprehending null-routing an IP address with null-routing or terminating an entire account.

Quadranet incorrectly states "As explained by Quadranet in its Motion to Dismiss [D.E. 108, p. 27], "null routing" a single IP Address can improperly deny service to many users, not just the ones using the BitTorrent software." Response in Opposition ("Opp.") [Doc. #189] at 6. Rather, Quadraent argued in its Motion [Doc. #108] that "The SAC suggests that Quadranet had the ability to "null-route" its **customers and/or discontinue service** to LiquidVPN, but did not do so." Accordingly, Quadranet did not address null-routing a *single* IP address in its motion to dismiss. Now, it argues that null-routing even a single IP address is an overly broad measure[1] without any verified evidence in support such as how its subscribers use the IP addresses assigned to them or even how long a dynamic assignment lasts. In comparison, Plaintiffs provided evidence that Quadranet's subscriber TorGuard offers static IP addresses such as a screenshot of TorGuard's website where it says it offers dedicated IP addresses. TorGuard concedes that its dedicated IP addresses are static and that if Quadranet had null-routed one of the dedicated IP addresses it would not have interfered with service by other end users. *See* Facts at ¶18. Quadranet, despite being a data center having "company resources and several individuals versed in information technology" (opp. at p. 12) provides not verified evidence for its argument that this is the exception rather than the rule. However, Plaintiffs do not concede that null-routing even a dynamic IP address for a limited time period is imprecise or overly broad.

Quadranet incorrectly argues that null routing is "irrelevant" because Quadranet did not have specific knowledge. Opp. at p. 6. Vicarious liability does not require that the defendant have knowledge of the infringement. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 931 n.9 (2015). With regards to material contribution, Plaintiffs discuss later that the Court made an error in concluding that encryption of transmissions prevented Quadranet from having specific knowledge of piracy because at least 40 percent of the noticed piracy was not encrypted. Moreover, the Supreme Court emphasized in *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, No. 20-915, 2022 U.S. LEXIS 1226, at *5 (Feb. 24, 2022) that "willful blindness also supports actual knowledge"[2]. Accordingly, in view of *Unicolors*, the Court should also

---

1 TorGuard notes that it is common practice in the industry for a host provider to null route an IP address of a subscriber even if the subscriber is a VPN provider. *See* Facts [Doc. #198-1] at ¶16. Mr. Cox notes that LiquidVPN was "kicked off" servers of other host providers multiple times because of excessive notices while he owned it. *See* Second Aff. of Cox at ¶2.

2 Even the dissent noted that "A "knowledge" requirement...often encompasses actual and

reconsider its conclusion that specific knowledge of infringing activities is required to impute culpable intent. *See* Order at 6. Quadranet clearly had constructive knowledge of the ongoing piracy from the hundreds of thousands of notices that were sent to it or willfully blinded itself to obtaining actual knowledge by refusing to investigate the transmissions from the IP addresses in the notices.

**2.      Quadranet does not dispute that the date of the new evidence is after briefing.**

Quadranet does not dispute that the date of the document in which Sharktech agreed to use commercially reasonable efforts to block foreign piracy websites is after completion of briefing but argues that because the litigation against Sharktech had started earlier it is not new evidence and denigrates it as "self-serving". Opp. at 8. The document is not "self-serving" because it was signed by counsel for Sharktech. Further, it is clearly dated after briefing of the motion to dismiss had been closed. Quadranet's reliance on *Torah Soft Ltd. v. Drosnin*, 2001 U.S. Dist. LEXIS 19217, at *15 (S.D.N.Y. Nov. 27, 2001) is unavailing because *Drosnin* has absolutely nothing to do with evidence obtained from different litigation after briefing has closed. Second, Quadranet argues that there is no evidence that Quadranet and Sharktech operate similarly even though Plaintiffs included a screenshot of a website that showed Sharktech is one among "Quadranet Competitors and Similar". Decl. of Culpepper [Doc. #180-1] at ¶2. Plaintiffs should be permitted to proceed to discovery to obtain evidence that Quadranet has the capacity to implement the practical and common anti-piracy measure of blocking foreign piracy websites that is routinely adopted by ISPs in numerous English-speaking countries (*see* Decl. of Culpepper at ¶6) and specifically provided for in 17 U.S.C. §512(j)(1)(B)(ii). Third, Quadranet argues that the document does not show that Sharktech has the ability to "permanently and forever" block access. However, a measure does not have to be perfect and permanent; rather, as stated by this Court, the measures must be "not imprecise or overbroad". Order at 31. Moreover, a website can also be blocked by URL so it would remain blocked even after the IP address of the website changed. *See* Decl. of Culpepper at ¶7.

**3.      Quadranet does not dispute that not all its subscribers encrypt data transmissions.**

Quadranet does not dispute that its subscriber TorGuard offers a proxy server where transmissions are not encrypted. Instead, Quadranet incorrectly argues that this is Plaintiffs' first time bringing up TorGuard's proxy server. Plaintiffs pleaded in the SAC that TorGuard offers a

---

constructive knowledge…[besides §411(b)(1)(A)] the other knowledge requirements in the Copyright Act are satisfied by either kind of knowledge." *Id.* at 25 (Thomas dissenting)

proxy server and even included a screenshot where TorGuard described its SOCKS5 proxy as a "lightweight solution".  *See* SAC at ¶¶108, 262, 398.  Further, "…a technical error or a slight mistake by [a party's] attorney should not deprive [the party] of an opportunity to present the true merits of his claims." *Blois v. Friday*, 612 F.2d 938, 940 (5th Cir. 1980).  Until recently, TorGuard vigorously resisted Plaintiffs' discovery requests (*see* Decl. of Culpepper at ¶8), but now explicitly confirms that its SOCKS5 proxy servers do not encrypt transmissions. *See* Facts at ¶4.

Quadranet argues that Plaintiffs present no evidence that TorGuard's proxy servers were Quadranet's servers or how many users opted for this service. *See* Opp. at 9.  TorGuard confirms that not only were the proxy servers Quadranet's servers, but 39.7 percent of the notices at issue were sent to Quadranet concerning unencrypted traffic at these proxy servers and that nearly 60 percent of all the notices concerned TorGuard.  *See* Id. ¶8; Decl. of Culpepper at ¶¶3-5, 8. Quadranet was in possession of Plaintiffs' first RPOD since Sept. 24, 2021 that included these IP addresses. *See* Docs. ##157, 169.  Accordingly, Quadranet *knew* that at least the plurality of these notices concerned piracy at servers leased to TorGuard yet it made this misleading argument. Further, since the traffic was unencrypted, Quadranet could "view" the traffic, just as it advertises that it monitors all the traffic on its network for DDOS attacks.  *See* Facts at ¶¶6-7; Second Aff. of Cox at ¶¶19-23; Second Aff. of Arheidt at ¶¶4-9 and 15-16[3].  Plaintiffs should be permitted to proceed to discovery to disprove many of Quadranet's other misleading arguments and determine what portion of the remaining 40 percent of the Notices were also unencrypted traffic.  Quadranet accuses Plaintiffs of making a "misleading" argument because "it appears that this so-called "proxy service" is separate from TorGuard's VPN service."  Opp. at 9.  However, TorGuard concedes that it used Quadranet's servers for their proxy servers, that it was offered to end users, and that the Works were pirated on the proxy servers. *See* Facts at ¶¶2-5.

Quadranet next incorrectly asserts that even if the traffic was unencrypted there would be no way for it to determine whether such unencrypted "chunks" pertain to a copyrighted work until they are recombined. Opp. at p. 10.  However, the nature of P2P is advertising to the world that you have something to share.  As described in the SAC, Plaintiffs' agent MEU monitored publicly available trackers and DHTs to determine the IP addresses broadcasted as pirating Plaintiffs" Works and captured instances of infringement from these so-called "chunks".  *See* Aff. of Arheidt

---

3 Mr. Cox and Mr. Arheidt point out in their affidavits that based upon their experience Quadranet knew about even the encrypted BitTorrent traffic.

[Doc. #96-20] at ¶¶3-5.  Not only could Quadranet have looked at the same trackers and saw the IP addresses at its servers were pirating the Works just as MEU did, but it did not even have to do that because the notices informed it of the exact IP address where the piracy was occurring. Quadranet could have done an exchange with the infringing IP address to confirm the piracy just like MEU did. *See* Second Aff. of Arheidt at ¶¶4,6-9; Decl. of Culpepper at ¶23 (screenshots publicly available website showing piracy at Quadranet IP addresses).  Or alternatively Quadranet could have done a deep packet inspection of the "unusable chunk" of the unencrypted data transmissions and saw the data that confirmed the same movies were being pirated as asserted in the notices (under penalty of perjury).  *See* Facts at ¶¶6-7; Second Aff. of Arheidt at ¶¶11-16 (Mr. Arheidt pulled two random packets from a BitTorrent stream from a Quadranet IP address and determined that one of the random packets contained a portion of *The Hitman's Wife's Bodyguard*); Second Aff. of Cox at ¶22; Decl. of Culpepper at ¶19.  Even in *Malibu Media, LLC v. Doe* cited by Quadranet (*see* Opp. at 11), the Court noted that Plaintiff's agent IPP was able to determine the IP addresses and dates of alleged infringement by logging onto the BitTorrent swarm.  *See Malibu Media, LLC v. Doe*, No. 2:12-cv-3623-ODW(PJWx), 2012 U.S. Dist. LEXIS 89286, at *4 (C.D. Cal. June 27, 2012).  But the key undisputed point is that Quadranet did not even try do anything besides auto-forwarding notices to its subscriber.  *See, e.g.,* Decl. of Mishan [Doc. #83-1] at ¶30.

Quadranet also argues that Plaintiffs' allegation that its subscribers are direct infringers is "reckless".  Opp. at 10.  However, Quadranet does not dispute that Plaintiffs alleged in the SAC that DOES 1-100, TorGuard and LiquidVPN are Quadranet's subscribers and directly infringe their Works.  Accordingly, the Court's assertion in the Order such as in FN17 (at pg. 29) that Plaintiffs are not alleging that DOES 1-100 are Quadranet's subscribers was clear error. DOES 1-100 could include VPN seedbox operators or other VPN provider that delete logs.  *See* Decl. of Culpepper at ¶16 (explaining seedbox). Even QuadraNet's CEO says that its customers include people who host online video games and store records.  *See* Decl. of Mishan at ¶18.  Plaintiffs should not be punished because the identification of DOES 1-100 is uniquely in the possession of Quadranet and hidden from ARIN records.  Nonetheless, it is not disputed that even when an end user pirates a work using TorGuard's VPN service, copies of the movie are distributed from QuadraNet's servers leased to TorGuard.  Quadranet may dispute whether its VPN subscriber has sufficient volitional conduct, but it cannot dispute that the copies go through these servers by "tunneling".  Accordingly, this

accusation is not reckless, but supported by evidence of MEU's detection of piracy from IP addresses at servers owned by QuadraNet – not at the end user's computer.  Further, even TorGuard now concedes that copies of Plaintiffs' Works were distributed unencrypted from the proxy servers.  *See* Facts at ¶¶ 8-11.

Quadranet does not dispute that there is at least one VPN provider that does not encrypt transmissions but argues that the article Plaintiffs presented should not be considered on a motion for reconsideration.  Opp. at 10.  Plaintiffs have already provided evidence that TorGuard provided unencrypted proxy servers.  Other commonly used VPN providers such as Private Internet Access, IP Vanish VPN, Cyberghost VPN, NordVPN and PIA advertise unencrypted proxy servers. *See* Decl. of Culpepper at ¶11; Second Aff. of Cox at ¶¶13-14, 16-18. Because this case was dismissed on the pleadings, Plaintiffs were not even able to determine identifications of other subscribers and their network configurations and ascertain whether these VPN companies are also subscribers.

**4.    Quadranet does not dispute that Plaintiffs have provided evidence that copies of the Works may be on the unencrypted proxy server of its subscribers.**

Quadranet attempts to characterize Plaintiffs' assertion that copies of the works would be stored on the proxy server as an "incredible leap".  If the leap is so incredible it is surprising that Quadranet provides no evidence refuting this point such as a declaration from one of its "several individuals versed in information technology." Opp. at 12.  On the other hand, the screenshot shows that the bittorrent client is set to tunnel through the proxy server.  Accordingly, it was not an "incredible leap" to assert that the file is recombined at the proxy server.  *See* Second Aff. of Cox at ¶26 ("it is technically possible").  At the very least, the pieces would be copied when they passed through the proxy server in violation of Plaintiffs' exclusive rights of reproduction and distribution.  *See Id.* at ¶24; Second Aff. of Arheidt at ¶20; Facts at ¶¶10-11.  Moreover, if the subscriber is using the server to operate a seedbox, the file would be recombined on Quadranet's server.  *See* Second Aff. of Cox at ¶27. Without discovery to determine the network configuration of the server, Plaintiffs cannot ascertain how long these pieces and the recombined copy persist on the Quadranet's server.  It is unclear how Quadranet can assert what "Plaintiffs know is untrue" when only Quadranet knows who its subscribers are.

**5.    Quadranet does not dispute that Plaintiffs alleged that Quadranet's subscribers are direct infringers.**

Quadranet concedes that its subscribers are distributing at least pieces of the works but argues that there is lack of volitional conduct and that the pieces distributed are "unusable".  However, volitional conduct was not the issue in the Order.  Rather, the Court said that the direct infringers were the end users, although Plaintiffs alleged in the SAC that Quadranets' subscribers are direct infringers because they distribute copies of the Work and delete the log records.  Quadranet did not argue lack of volitional conduct in its motion to dismiss opening brief.  Even in its opposition Quadranet cites no 11th Circuit opinions requiring volitional conduct for direct infringement[4].  Even one district court case in this circuit that adopted the volitional conduct for automated processes still recognized that sufficient volitional conduct to hold a party liable for direct infringement can be shown if the party created the automated environment where copyright infringement can multiply and spread through its own promotional material and by contract with a third party for its benefit such as done by TorGuard and LiquidVPN.  *See Venus Fashions, Inc. v. ContextLogic, Inc.,* No. 3:16-cv-907-J-39MCR, 2017 U.S. Dist. LEXIS 155748, at *65-66 (M.D. Fla. Jan. 17, 2017).  A court in a different circuit considered it "crucial" whether the ISP encouraged infringement such as also done by TorGuard and LiquidVPN.  *See Playboy Enters. v. Russ Hardenburgh, Inc.,* 982 F. Supp. 503, 513 (N.D. Ohio 1997).  Moreover, in a published decision, another court of this circuit concluded that volitional conduct is not even required for direct infringement of public performances.  *See Atl. Recording Corp. v. Spinrilla, LLC*, 506 F. Supp. 3d 1294, 1315 (N.D. Ga. 2020) ("…the Supreme Court in *Aereo* rejected the application of the copy shop analogy in the context of a cases such as this involving infringement of the right of performance by an online streaming service").

Quadranet incorrectly cites the case of *Malibu Media, LLC v. Doe*, 2012 U.S. Dist. LEXIS 89286, at (C.D. Cal. June 27, 2012) for the proposition that pieces distributed by its subscribers are unusable chunks of zeros and ones.  *See* Opp. at p. 11.  *Malibu* declined to state whether transmitting pieces constituted copyright infringement.  *Malibu Media, LLC*, 2012 U.S. Dist. LEXIS 89286 at *7 ("…the Court declines to opine whether transmitting pieces of a copyrighted

---

4 Quadranet cites the Second Circuit Opinion of *Cartoon Network LP, LLLP v. CSC Holdings*, Inc., 536 F.3d 121 (2d Cir. 2008). However, Cartoon Networks was decided after intensive discovery determined that the data remained in a buffer memory for only 1.2 seconds. Moreover, even *Cartoon Networks* recognized instances such as *Princeton University Press* where even automated conduct would be direct infringement. *See Id.* at 130-133.

work using BitTorrent, without transmitting all of the pieces, constitutes copyright infringement"). Moreover, Plaintiffs' allegation in the SAC that Quadranet's subscribers transmit not a piece but "copies of Plaintiffs' Works" and "distributed and made copies of copyright protected Works" (SAC at ¶¶375-376) is agreed with by TorGuard. *See* Facts at ¶¶10-11.

Quadranet tries to characterize the fact that Plaintiffs alleged that the end users are direct infringers in the original complaint but that its subscribers are direct infringers in the SAC as an impermissible "shift". Opp. at 11. As Plaintiffs have pointed out in earlier pleadings, the original complaint was filed the same day as another complaint against the previous owner of LiquidVPN in the Eastern District of Michigan ("MI lawsuit"). *See* SAC at ¶517.  In the MI lawsuit, the previous owner provided essential non-public information such as LiquidVPN leased servers from Quadranet, Quadranet merely auto-forwarded notices without taking any disciplinary measures, and log evidence that shows the vast number of users of the service (including one of the operators of LiquidVPN) for piracy. *See* Aff. of Cox [Doc. #96-9]; Decl. of Culpepper at ¶12.  Plaintiffs focused their allegations in the SAC on Quadranet and Quadranet's subscribers because attempting to sue thousands of end users located throughout the United States and in foreign countries in this district would not be practical. *See* Id.  Accordingly, Plaintiffs' approach is consistent with the rationale for secondary liability in that when a party distributes infringement-enabling services that facilitate direct infringement on a massive scale, "the only practical alternative is to go against the distributor of the copying device for secondary liability." *Grokster*, 545 U.S. at 930 (citing *In re Aimster Copyright Litig.*, 334 F.3d 643, 645-646 (7th Cir. 2003))

**B.     The Court exercised supplemental jurisdiction based upon a clear error.**

Quadranet does not dispute that discovery was limited to a single RPOD but characterizes it as extensive because it included 250,000 entries.  However, Plaintiffs have already confirmed that nearly 60 percent of these entries were just for Quadranet's subscriber TorGuard including nearly 40 percent just for only 15 TorGuard IP addresses. *See* Facts at ¶8; Decl. of Culpepper at ¶4-5.  Accordingly, Quadranet's unverified description of lost resources, person-hours and extraordinary expenses to respond is a gross exaggeration.  It is not plausible that "individuals versed in information technology" (opp. at p. 12) would not know how to run excel scripts or even use control F for an excel spreadsheet. *See* Decl. of Culpepper at ¶¶9-10.  Moreover, as Quadranet concedes earlier, it "reassigns a small block of IP Addresses to its clients (including VPN clients)." Opp. at p. 7. Accordingly, Quadranet could easily determine which IP addresses belonged to which

subscriber by looking at its block assignment of IP addresses. Quadranet falsely asserts that it asked Plaintiffs for a stay of discovery[5] when in fact Quadranet asserted a *unilateral* right not to respond to the RPOD while their motion was outstanding. *See* [Doc. #157-4]. As soon as the parties conferred, they quickly came to an agreement in which Quadranet would disclose a portion of the subscribers. *See* Notice [Doc. #169]. Quadranet cannot dispute that no other discovery between the parties took place and that it did not even respond to the RPOD prior to dismissal.

Quadranet cites the unpublished case of *Bravo v. Loor-Tuarez*, 727 F. App'x 572 (11th Cir. 2018) and argues that the Court still has discretion to exercise supplemental jurisdiction despite this clear error. In *Bravo* the 11th Circuit instructed the court to consider whether judicial economy, convenience, and fairness to the parties counseled in favor of supplemental jurisdiction. *See Id.* at 577. However, Quadranet does not deny arguing against exercising supplemental jurisdiction and that Plaintiffs did not argue for the court to exercise supplemental jurisdiction if the federal claims were dismissed. Further, Quadranet concedes that discovery between the parties was limited to a single RPOD for which it did not even serve the response. Accordingly, judicial economy, convenience, and fairness do not weigh in favor of the Court exercising supplemental jurisdiction.

## C.    The Court made a clear error in including 42 Ventures LLC, After Productions LLC, SF Film LLC and State of the Union Distribution and Collections LLC in the order.

Quadranet incorrectly argues that the SAC failed to distinguish between Plaintiffs. The SAC defined the movie studio Plaintiffs as "Copyright Plaintiffs" and 42 Ventures as "42"in the introductory paragraph. Counts 1-8 refer to "Copyright Plaintiffs", while counts 9-10 refer to '42'. The reference to "plaintiffs" a few times in counts 4 and 6-7 cannot implicate 42 because the SAC never asserts that 42 owns copyright protected Works.[6] Quadranet argues, without any legal support, that 42, After Productions LLC, SF Film LLC and State of the Union Distribution and Collections LLC joining other Plaintiffs in the motion for default judgment to request an injunction ordering Quadranet to merely stop providing service to LiquidVPN somehow created a claim against Quadranet. However, this argument is contradicted by Quadranet's special opposition [Doc. #134] failing to mention supposed claims against it by 42 and focusing on the risk of inconsistent judgments concerning the *copyright* claims. Quadranet's reliance on the unpublished

---

5 Quadranet cites a summons to Defendant TorGuard [Doc. #103] in support of its false assertion that it asked Plaintiffs to agree to a stay of discovery. Opp. at 12.

6 Quadranet's motion to dismiss [Doc. #108] does not even include the word "trademark".

decision of *Gomez v. City of N.Y.*, 2016 U.S. Dist. LEXIS 128338 (S.D.N.Y. Sep. 14, 2016) is unavailing because in *Gomez* the Court rejected an attempt to claim a previously expressly disclaimed claim in a subsequent pleading.  *See Gomez v. City of N.Y.*, 2016 U.S. Dist. LEXIS 128338, at *24. The opposite is occurring here.  42 never asserted claims against Quadranet in the SAC and the other Plaintiffs dismissed their claims prior to the motion to dismiss, yet Quadranet is arguing that claims should still be "read in" the SAC.[7]

**D.      The Request for Clarification**

Plaintiffs note that Quadranet previously argued that it would be improper for this Court to grant Plaintiffs' motion for default judgment against LiquidVPN until after all claims were resolved against Defendants to avoid inconsistent judgments (*see* Docs. #134, 171) but now encouraged the Court to clarify that the Order is a final judgment before TorGuard's dismissal.  If the Court determines that the Order is a final judgment, Plaintiffs' request for default judgment against LiquidVPN should be granted.

**III. CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court reconsider its order and deny Quadranet's motion to dismiss so that Plaintiffs can ascertain Quadranet's subscribers or amend the order to dismiss the claims <u>without</u> prejudice and eliminate Plaintiffs who dismissed or never made claims against Quadranet.

DATED: March 4, 2022                    Respectfully submitted,


                                        */s/ Joel B. Rothman*
                                        JOEL B. ROTHMAN
                                        Florida Bar No. 98220

---

[7] Quadranet's reliance on *Brown v. Anselme (In re Polo Builders, Inc.)* 374 B.R. 638 (Bankr. N.D. Ill. 2007) is also unavailing because *Brown* did not even oppose the motion until his motion for reconsideration.  *See Id.* 641-642. Quadranet's reliance on *Laserage Techn. Corp. v. Laserage Labs., Inc.,* 972 F.2d 799 (7th Cir. 1992) is also unavailing because in *Laserage* the movant attempted to request an oral hearing when it did not request one in the original brief.  42 was not even put on notice that Quadranet was asserting dismissal of phantom claims and nor could it be put on notice when the word "trademark" was not even used in Quadranet's briefs. The same applies to *Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 553 (6th Cir. 2008) (failing to object to subject matter jurisdiction).

joel.rothman@sriplaw.com
CRAIG A. WIRTH
Florida Bar Number:  125322
craig.wirth@sriplaw.com
**SRIPLAW**
21301 Powerline Road, Suite 100
Boca Raton, FL 33433
561.404.4350 – Telephone
561.404.4353 – Facsimile

And

Kerry S. Culpepper
*Admitted pro hac vice*
**CULPEPPER IP, LLLC**
75-170 Hualalai Road
Suite B204
Kailua-Kona, HI  96740
808.464.4047 – Telephone
kculpepper@culpepperip.com

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that on March 4, 2022, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served on this day on all those identified on the Service List, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those parties who are not authorized to receive Notices of Electronic Filing.

*s/ Joel B. Rothman*
JOEL B. ROTHMAN
Florida Bar Number: 98220
joel.rothman@sriplaw.com

## SERVICE LIST

Mr. Johnathan R. Woodard                    Mr. Bobby A. Ghajar

Mr. John Cyril Malloy III
Mr. Oliver Alan Ruiz
Malloy & Malloy, PL
2800 SW 3rd Ave
Miami, FL 33129-2317
info@malloylaw.com
jwoodard@malloylaw.com
jcmalloy@malloylaw.com
oruiz@malloylaw.com
Attorneys for QuadraNet, Inc. and QuadraNet
Enterprises, LLC

Mr. Adam Losey
Losey PLLC
1420 Edgewater Drive
Orlando, FL 32804
alosey@losey.law
Attorney for VPNetworks, LLC dba
TorGuard

Cooley LLP
1333 Second Street
Suite 400
Santa Monica, CA 90401
bghajar@cooley.com
Attorneys for QuadraNet, Inc. and QuadraNet
Enterprises, LLC